## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ANAHEIM GARDENS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 93-655C |
| | ) | (Judge Tapp) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST WAVE PLAINTIFFS' MOTION FOR RECONSIDERATION OF POST-TRIAL OPINION AND ORDER

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT ................................................................................................................... 2

I.   BGLP, CHC, AND RCTLP ALL ESTABLISHED REASONABLE INVESTMENT-
     BACKED EXPECTATIONS TO PREPAY THEIR HUD-INSURED MORTGAGES
     AFTER 20 YEARS........................................................................................................ 2

     A.  The Court applied the wrong legal standard when it concluded that BGLP, CHC,
         and RCTLP failed to show that the right to prepay after 20 years was the "primary
         reason" they invested in their properties................................................................. 3

     B.  BGLP met its burden of proving that it relied on the right to prepay when it
         invested in its property............................................................................................ 6

     C.  RCTLP met its burden of proving that it relied on the right to prepay when it
         invested in Rock Creek. .......................................................................................... 9

     D.  CHC met its burden of proving that it relied on the right to prepay when it
         invested in Chauncy House...................................................................................... 13

         1.  The Court cannot rely on evidence of the 121A Agreement. ........................ 14

         2.  CHC's 121A Agreement with the BRA does not undermine CHC's proof
             that it had reasonable investment-backed expectations to prepay its mortgage. ........ 17

         3.  The PPM is not probative of the investors' reasonable expectations at the
             time of the original investment. .................................................................... 22

II.  FWPS PROVED THAT THEY SUFFERED SEVERE ECONOMIC LOSSES.................... 23

     A.  Drs. Wade and Trout provided credible opinions to support FWPs' economic
         losses. .................................................................................................................... 24

         1.  FWPs' economic loss calculations were previously reviewed by the
             Federal Circuit and reasonably explained by Wade and Trout..................... 24

         2.  Wade and Trout both reasonably explained why Wade subtracted TPE
             from the denominator when calculating economic severity. ........................ 26

         3.  Wade subtracted principal but not interest for most of the FWPs (except
             RCTLP) in his economic loss calculation to match the treatment of debt for
             FWPs' actual results under LIHPRHA, which reduced FWPs' economic losses. ..... 27

         4.  Wade's use of both ex ante and ex post data was appropriate........................ 28

         5.  Wade reasonably applied two different discount rates because, as Wade and
             Trout testified, there were significant changes in economic conditions during
             the course of the 20 years of FWPs' economic losses. ................................. 31

6.  Wade properly compared what FWPs received under LIHPRHA to what FWPs would have received but for LIHPRHA. ............................................................................... 32

7.  The "missing column" of discount factors in "Chart SL.9B" did not impact FWPs' economic losses, and those numbers are easily calculated based on numbers in that table. ..................................................................................................................... 33

B.  Contrary to the Post-Trial Opinion, the Court *did* prohibit FWPs from using many charts and tables as demonstratives in the Rule 63 hearing, to the unfair prejudice of FWPs. ... 34

III. THE COURT INCORRECTLY BALANCED THE THREE *PENN CENTRAL* FACTORS. ........................................................................................... 37

CONCLUSION .................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.B. Joint Venture v. United States*,
    77 Fed. Cl. 702 (2007) ................................................................................................1

*Anaheim Gardens, L.P. v. United States*,
    953 F.3d 1344 (Fed. Cir. 2020)...............................................................25, 26, 29

*Anaheim Gardens v. United States*,
    109 Fed. Cl. 33 (2013) .........................................................................................2, 3

*Ark. Game & Fish. Comm'n v. United States*,
    568 U.S. 23 (2012).....................................................................................................5

*Armstrong v. United States*,
    364 U.S. 40 (1960)...................................................................................................37

*Biery v. United States*,
    818 F.3d 704 (Fed. Cir. 2016)..................................................................................2

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946).................................................................................................30

*Bronstein v. Prudential Ins. Co.*,
    459 N.E.2d 772 (Mass. 1984) ...........................................................................19, 21

*CCA Assocs. v. United States*,
    91 Fed. Cl. 580 (2010), *rev'd on other grounds*, 667 F.3d 1239 (Fed. Cir.
    2011) ................................................................................................................4, 5, 32

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021).................................................................................................38

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003)........................................................................4, 5, 6

*Cienega Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007).................................................................................4

*Horne v. Dep't of Agric.*,
    576 U.S. 351 (2015).................................................................................................38

*Lone Star Indus., Inc. v. United States*,
    111 Fed. Cl. 257 (2013).............................................................................................2

*Love Terminal Partners, L.P. v. United States*,
    889 F.3d 1331 (Fed. Cir. 2018)..........................................................5

*Maehr v. United States*,
    767 F. App'x 914 (Fed. Cir. 2019) ...................................................2

*Magnum Opus Techs, Inc. v. United States*,
    94 Fed. Cl. 553 (2010) ......................................................................1

*Penn Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978)........................................................................10

*Prudential Ins. Co. v. Boston*,
    340 N.E.2d 858 (Mass. 1976) ........................................................21

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015)..........................................................................5

**Statutes**

Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242,
    § 202, 101 Stat. 1877 (1988)...........................................................6

Low-Income Housing Preservation and Resident Homeownership Act of 1990,
    Pub. L. No. 101-625, 104 Stat. 4249 (1990)................................. *passim*

Mass. Gen. Laws ch. 121A ...............................................14, 18, 20, 21

Mass. Gen. Laws ch. 121A, § 2 ....................................................21

Mass. Gen. Laws ch. 121A, § 6A ..................................................18

Mass. Gen. Laws ch. 121A, § 13 ...................................................20

Mass. Gen. Laws ch. 121A, § 18C .......................................18, 19, 20

Mass. Gen. Laws ch. 121A, § 18C(e) ............................................19

Pub. L. No. 100-242, § 202(a)(1)....................................................6

**Other Authorities**

Rules of the Court of Federal Claims Rule 30(b)(6).....................9, 10, 12, 13

Rules of the Court of Federal Claims Rule 59 ...............................................1

Rules of the Court of Federal Claims Rule 63 ...............................34, 35, 36

## INTRODUCTION

Pursuant to the provisions of Rule 59 of Rules of the Court of Federal Claims, First Wave Plaintiffs ("FWPs")[1] respectfully move the Court to reconsider its Post-Trial Opinion and Order. ECF No. 809.  FWPs do so mindful that the provisions of Rule 59 are not to be invoked lightly, and that the Court must exercise care in deciding such a motion.  *A.A.B. Joint Venture v. United States*, 77 Fed. Cl. 702, 704 (2007).  Yet, FWPs are also cognizant of the fact that "A motion for relief under Rule 59 enables a trial court to address oversights, and the court appreciates the opportunity to do so."  *Magnum Opus Techs, Inc. v. United States*, 94 Fed. Cl. 553, 554-555 (2010) (cleaned up).  "In exercising this discretion, the Court must balance 'the need to bring litigation to an end and the need to render just decisions on the basis of all the facts.'"  *Id.* at 555 (quoting *Minton v. NASD, Inc.*, 336 F. 3d 1373, 1379 (Fed. Cir. 2003)).

The Court was presented with a monumental task when it was assigned to this case in the fall of 2023.  At that time, the case was 30 years old, with a record that was beyond extensive.  Furthermore, the January 2023 trial of FWPs' claims lasted nearly a month and included, in addition to extensive live testimony, numerous depositions designated by the parties, a lengthy stipulation of facts, and hundreds of trial exhibits.  Under the circumstances, it is not surprising that the Post-Trial Opinion and Order contains errors of fact and law that have a material impact on the Court's application of the investment-backed expectations and economic impact factors of the *Penn Central* test.  If those errors are not corrected, it will result in manifest injustice to FWPs. Thus, FWPs are compelled to file this motion.

---

[1]      FWPs included Buckman Gardens Limited Partnership ("BGLP"), Cedar Gardens Associates ("CGA"), Chauncy House Company ("CHC"), Rock Creek Terrace Limited Partnership ("RCTLP"), and 3740 Silverlake Village, L.P. ("SVLP").

**LEGAL STANDARD**

A motion for reconsideration under RCFC 59 should be granted when a moving party shows: "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Maehr v. United States*, 767 F. App'x 914, 916 (Fed. Cir. 2019) (quotation omitted). In other words, the Court "may grant a motion for reconsideration when there is … a need to correct clear factual or legal error or prevent manifest injustice." *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (quotation omitted). A "manifest injustice" is an "injustice that is apparent to the point of almost being indisputable." *Lone Star Indus., Inc. v. United States*, 111 Fed. Cl. 257, 259 (2013); *see also Anaheim Gardens v. United States*, 109 Fed. Cl. 33, 35 (2013) (explaining that a "manifest error of law or mistake of fact" warrants reconsideration).

**ARGUMENT**

**I.    BGLP, CHC, AND RCTLP ALL ESTABLISHED REASONABLE INVESTMENT-BACKED EXPECTATIONS TO PREPAY THEIR HUD-INSURED MORTGAGES AFTER 20 YEARS.**

As explained in more detail below, BGLP, RCTLP, and CHC met their burden of proving that their investment-backed expectations to prepay and exit the 221(d)(3) and 236 programs was reasonable and aligned with industry expectations. *See* Sections I.B.-D, *infra*. Express provisions in all of FWPs' mortgage notes included an express right to prepay, and FWPs' reliance on that right is established by the undisputed trial evidence for each FWP. As the Court correctly found, "[t]he prepayment option was a particularly attractive enticement" and "permitted far greater economic returns on initial investments," which is why "numerous

2

investors relied on the government's promises."[2]  ECF No. 809 at 7.  In other words, the Court found that owners who participated in the Section 221(d)(3) and Section 236 programs—the industry as a whole—had a reasonable, objective investment-backed expectation that they could prepay their mortgages.  Individual FWPs had the burden of proving each had a reasonable, subjective investment-backed expectation that they could prepay and exit the program.  FWPs had to meet was a preponderance of the evidence standard of proof.  Given the scope of the trial record, it is not surprising that the Court missed voluminous evidence offered by Chauncy House, Rock Creek, and Buckman by which each clearly met that burden.  That uncontradicted evidence is set forth below.

The Court found that BGLP, CHC, and RCTLP did not meet their burden of proving that prepayment was their "primary reason" for investing, a finding that is based upon clear factual and legal errors.  There is, however, no basis, either in existing law or basic investment principles to apply, as the Court did, a rule that FWPs had to demonstrate that the right to prepay was the "primary" or only reason they invested in their properties.  Therefore, FWPs are entitled to reconsideration.  At most, FWPs only had to demonstrate a "but for" expectation regarding the right to prepay, and evidence presented by all FWPs, including BGLP, CHC, and RCTLP, certainly satisfied that standard.  *Cf. Anaheim Gardens*, 109 Fed. Cl. at 36 (granting motion for reconsideration based on a mistake in evaluating plaintiffs' evidence).

A.    **The Court applied the wrong legal standard when it concluded that BGLP, CHC, and RCTLP failed to show that the right to prepay after 20 years was the "primary reason" they invested in their properties.**

The Court acknowledges, correctly, that the "law governing regulatory takings" is "a muddle."  ECF No. 809 at 22.  But that problem is only exacerbated by the Court's application of

---

[2]    Admissions by the United States establish that the vast majority of owners intended to prepay after 20 years and exit the program.  *See, e.g.*, PX 236 at 2; PX 509 at 21.

the investment-backed expectations factor.  The Court holds that the FWPs were required to show that their "primary reason" for investing in their properties was to prepay after 20 years. ECF No. 809 at 25.  The Court "ultimately" concluded "that Chauncy House, Buckman, and Rock Creek … did not establish that the expectation to prepay was the *primary reason* for their investment."  *Id*. (emphasis added).  The "primary reason" test applied by the Court, however, lacks a sound basis in controlling law, and it is inconsistent with basic investment principles, especially for properties held for long-term investment, like those owned by FWPs.  The Court of Federal Claims has previously, and correctly, explained that "creation of a primary-expectation rule would seem to run counter to the Supreme Court's statements about the *Penn Central* test because the Supreme Court has been notably reluctant to establish special rules for regulatory takings cases, and a 'primary' expectation rule would impose heightened evidentiary burdens on a plaintiff."  *CCA Assocs. v. United States*, 91 Fed. Cl. 580, 610 (2010), *rev'd on other grounds*, 667 F.3d 1239 (Fed. Cir. 2011).

In fact, neither the Supreme Court nor the Federal Circuit has ever held that a "primary reason" rule applies in regulatory takings cases.  To the contrary, in *Cienega X*, the Court expressly refused to decide "whether the reason for the investment must be the 'primary' expectation or simply that reasonable owners would not have invested 'but for' the expectation…."  *Cienega Gardens v. United States*, 503 F.3d 1266, 1290 (Fed. Cir. 2007). Similarly, the Federal Circuit in *CCA* did not determine whether a particular "primary reason" or "but for" standard applies.  *See CCA Assocs.*, 667 F.3d at 1247.  And, in *Cienega VIII*, the Federal Circuit held that a "but for" expectation was sufficient.  *Cienega Gardens v. United States*, 331 F.3d 1319, 1347 (Fed. Cir. 2003) (although not expressly requiring proof of a "but

for" expectation to satisfy investment-backed expectation prong).  Thus, at most, the Court should apply a "but for" standard.

Additionally, in *CCA*, the Federal Circuit held that "multiple objectively reasonable investment strategies" may exist. *CCA Assocs.*, 667 F.3d at 1247.  That clear holding establishes that there can be multiple objectively reasonable investment strategies over the course of time, the mere existence of which does not defeat a regulatory taking claim.  Trial evidence about fundamental investment principles support that conclusion.  *See, e.g.*, Trial Tr. Vol. 4 at 713:11-716:18, 717:6-718:24, 722:17-724:15.  In other words, the mere expectation or receipt of some short-term benefits from participating in the 221(d)(3) or 236 programs during the first 20 years of ownership does not preclude the existence of a reasonable investment-backed expectation to prepay after 20 years and terminate regulatory restrictions, including those on the amount of rent that could be charged and hence on the amount of income that could be earned.  *Cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015) (explaining that "*multiple* factors … go into investments decisions about where to construct or renovate housing units") (emphasis added).

Furthermore, the heightened evidentiary burden imposed by the Court's "primary reason" rule is inconsistent with the purpose of the investment-backed expectations factor.  "The purpose … is to limit recoveries to property owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Cienega Gardens VIII*, 331 F.3d at 1345-46; *accord Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018); *cf. Ark. Game & Fish. Comm'n v. United States*, 568 U.S. 23, 522 (2012) ("The determination whether a taking has occurred includes consideration of the property owner's distinct investment-backed expectations, a matter often informed by the law in

force in the State in which the property is located.").  FWPs certainly relied on the right to prepay.

FWPs' mortgage notes and regulatory agreements, partnership agreements, and HUD's contemporaneous regulations, not to mention the language of the Preservation Statutes[3] and implementing regulations, indicate that FWPs and other owners bought their properties "in reliance on a different regulatory regime."  *Cienega VIII*, 331 F.3d at 1347; *see also, e.g.*, ELIHPA, Pub. L. No. 100-242, § 202(a)(1); PX 236 at 2; PX 509 at 21.  As explained in more detail below, undisputed trial evidence shows that each FWP had an express right to prepay, and they relied on that right.  That evidence is certainly sufficient to prove a "but for" expectation.

### B.    BGLP met its burden of proving that it relied on the right to prepay when it invested in its property.

The deposition testimony of Murray Haber *established* that the investment-backed expectation for BGLP was to prepay and exit the HUD program after 20 years, and the testimony of Barry Gosnell and John Wall was consistent with Haber's testimony.  As the Court recognized, "Mr. Haber was an experienced real estate investor, including in Section 221(d)(3) and 236 projects."  ECF No. 809 at 27.  In fact, Haber began investing in 221(d)(3) and 236 projects as early as 1968.  JX 186 at 13:2-21.  As a syndicator, he worked on 70 to 75 deals and specialized in obtaining investors for real estate projects.  *Id.* at 13:22-16:19, 16:23-17:6.  He invested in and syndicated properties like Buckman Gardens, expecting they would increase in value over time.  *Id.* at 70:25-71:9.  He understood that his expectation of an increase in value of Buckman Gardens over time could only be realized by prepaying.  *See id.* at 71:16-20.

---

[3]    Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) ("ELIHPA"), and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) ("LIHPRHA") (collectively, the "Preservation Statutes").

The Court suggested Haber did not identify the right to prepay when deciding whether to "syndicate" a property. ECF No. 809 at 27. To the contrary, the undisputed evidence is that the right to prepay was identified by Haber in documentation that he provided to investors in BGLP when they were considering whether to invest. *See* JX 186 at 36:5-22, 37:5-9. Haber also testified that he could not have attracted investors without the right to prepay:

> Q: In your opinion would you have been able to attract investors to invest in one of these partnerships if there had been no right to prepaying after 20 years?
> A: I don't think so.
> Q: Why is that?
> A: *Because there's got to be something at the end of the rainbow. We are going to say put your money in and that's it, you are gone? No, there has to be something at the end. And the end was to prepay the mortgage and have a conventional project.*
> Q: What would the investor receive upon prepayment and conversion of the project to a conventional project?...
> A: He would receive the benefits of a project, that now instead of renting for $200.00 a month was renting for $1,000.00 a month. And he would share in the distribution of the cash flow.

*See* JX 186 at 42:22-43:16 (emphasis added).

Documentary evidence supports Haber's testimony. Haber documented that original expectation in communications to other investor limited partners in BGLP when he wrote:

> It has been almost 20 years since you made your financial commitment to the subject partnership. Since that time you have received yearly losses and some cash flow. *There was also the anticipation that at the end of 20 years we would have the opportunity to pay off the mortgage and have the ownership of a project free and clear of government regulations.* Unfortunately, the government reneged on that promise.

JX 45 at IRH 0039729 (emphasis added); *see also* JX 186 at 73:2-74:14, 21-75:7 (explaining that the letter expressed his frustration that LIHPRHA took the right to prepay that the partners relied on when they invested). Haber's testimony is undisputed and uncontradicted.

The Court found that Barry Gosnell and John Wall "had limited direct knowledge of the property" and based its holding on that finding ignoring the Haber testimony cited above. ECF

No. 809 at 25.  Yet, the undisputed trial evidence proves that Gosnell and Wall had sufficient knowledge to understand that the partners relied on the right to prepay when they invested.

The Court found that Gosnell had limited personal knowledge that is not based upon what the Court has held to be hearsay, over FWPs' arguments to the contrary.  Yet, Gosnell knew that his father and uncle invested in Buckman Gardens for long-term value and appreciation.  *See* JX 202 at 48:9-49:2.  They did not develop Buckman Gardens for short-term tax advantages, which they considered to be available for any other type of real estate development.  *See id.* at 51:4-14.

More importantly, Wall provided undisputed trial testimony that he knew the original general partners and developers of Buckman Gardens—the Gosnell brothers, Clarence and John—"well."  Trial Tr. Vol. 4 at 725:14-726:9.  Wall knew them as "Buddy and Jack," and he had many interactions with them.  *Id.* at 726:5-11.  While working with the Gosnells, Wall learned that they chose the location of the project because "[i]t was a significant growth area and opportunity for investment," with the area improving at the time of investment.  *Id.* at 728:6-17.  Wall also knew Haber, whom he met in the 1970s, and he knew Haber "had the access to investor partners that were contemplating coming in as … limited partners in [BGLP]."  *Id.* at 732:13-16, 732:25-733:5.  Additionally, Wall knew that the partnership understood that regulatory restrictions, including rent restrictions, would terminate upon prepayment of the mortgage note.  *See id.* at 742:8-13.  Wall also knew that the right to prepay was important to the partnership and that it originally intended to exercise that right after 20 years.  *See id.* at 755:12-17, 772:14-22, 774:2-8.  And Wall's testimony is supported by the plain text of Buckman's partnership agreement, which reflected the partnership's understanding of and expectation

regarding the right to prepay and refinance after 20 years.[4]  *See id.* at 734:17-735:13; JX 38 at DOJ0030011.

Wall's individual testimony is also supported by the Rule 30(b)(6) deposition testimony of BGLP, which was admitted but which the Court does not even acknowledge.  That testimony confirms that BGLP expected to prepay after 20 years.  *See* JX 191 at 22:8-23:12, 25:9-19, 36:17-37:14, 71:16-72:6.

Thus, the testimony of BGLP, Wall, and Gosnell is consistent with, and supports, Haber's testimony.  Even if the Court considers the *undisputed* testimony of Wall and Gosnell "insufficient" in isolation, *id.* at 26, when all the testimony is viewed together, with other documentary evidence, the trial evidence satisfies the preponderance of the evidence standard and therefore compels a conclusion that BGLP relied on the right to prepay when it invested in its property.  There is simply no evidence that prepayment was not the same "particularly attractive enticement" to BGLP and the other FWPs that it was for other participating owners.  ECF No. 807 at 7.  The Court should therefore reconsider its holding to the contrary.

> ### C.    RCTLP met its burden of proving that it relied on the right to prepay when it invested in Rock Creek.

In holding that RCTLP did not establish investment-backed expectations regarding the right to prepay, the Court relied on Rule 30(b)(6) deposition testimony from Nicolas Billings on

---

[4]    The Court characterizes Wall's testimony as "attenuated" by quoting a small portion of his testimony from January 13, 2023, which was near the end of nearly two days of direct testimony by Wall.  ECF No. 809 at 26 (citing Trial Tr. Vol. 5 at 944:16-19).  The small portion of Wall's testimony quoted by the Court was lay "opinion" testimony about the *objective reasonableness* of FWPs' reliance on the right to prepay, based on Wall's decades of experience working in the industry.  *Id.*  It was not offered by FWPs or Wall as testimony about the *subjective* expectations of Buckman, as the Court suggests.  *See id.* & n.22.  As explained in the preceding paragraph of this motion, Wall testified about the subjective expectations of Buckman the day before, on January 12, 2024.

behalf of the National Corporation of Housing Partnerships ("NCHP") and the National Housing Partnership ("NHP"). That was clear error as a matter of fact and law.

Mid-City Financial Corporation ("Mid-City") and NCHP formed RCTLP in September 1970 to develop Rock Creek. JX 198 at 19:10-20:20; 21:8-20 & PX 297; *see also* JX 82; Trial Tr. Vol. 4 at 821:20-823:825:23. Mid-City had a 5% partnership interest as general partner and a 45% partnership interest as a limited partner, and NCHP had a 1% partnership interest as general partner and a 49% partnership interest as a limited partner. JX 78 at IRH 0014933. NHP did not acquire a limited partnership interest in RCTLP from NCHP until later, in 1971. *See* JX 198 at 8:1-9; JX 89 at IRH 0224865-69.

The investment expectations of NCHP and NHP became immaterial in 1984, however, because they no longer owned *any* partnership interests in RCTLP after December 31, 1984. That was years before the Preservation Statutes were enacted, not to mention implemented. Undisputed trial evidence clearly showed that Eugene F. Ford, Sr., the President of Mid-City and the mentor of John Wall, was the Managing General Partner of RCTLP, and the limited partners consisted of Viers Mill Limited Partnership (which was controlled by Mid-City as the General Partner), Clark Enterprises, Inc., and Homer S. Gudelsky. *See* JX 81; Trial Tr. 4 at 701:4-702:3.

Contrary to the Court's Post-Trial Opinion, the investment expectations of NCHP and NHP have no bearing on whether RCTLP suffered a regulatory taking multiple years after NCHP and NHP exited the partnership. The relevant investment-backed expectations are those of "the claimant" who is adversely affected by the regulations at issue. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Because NCHP and NHP were no longer partners in RCTLP after 1984, and thus had no ownership interest in Rock Creek thereafter, the Rule

30(b)(6) testimony of Nicholas Billings on behalf of NCHP and NHP cannot be relied on by the Court to conclude that RCTLP lacked investment-backed expectations regarding prepayment.

There is, however, other undisputed evidence that *does* prove the investment-backed expectations of RCTLP.  Viers Mill Limited Partnership ("Viers Mill") acquired, for consideration, *all* the RCTLP partnership interests owned by NCHP and NHP in 1984, including a 1% percent interest as a general partner and a 24% interest as a limited partner.  JX 198 at 93:8, 94:6, 94:18-95:3; PX 302.  To pay for its acquisition, Viers Mill executed two purchase money notes.  *See, e.g.*, PX 306 (Security Agreement for acquisition).  And undisputed trial evidence established that Viers Mill acquired its 25% ownership interest in RCTLP because the partners expected that RCTLP would prepay the HUD-insured mortgage when eligible in 1992, which was necessary to generate sufficient cash flow to pay off the purchase money note.  *See, e.g.*, Trial Tr. Vol. 4 at 842:25-843:16, 846:5-847:5; JX 198 at 93:8-94:6.  Indeed, Wall stated the original intent succinctly:

> The original intent was to pay the [purchase money] note off pursuant to the right of prepayment of the mortgage and to then convert the property to market-rate housing or to realize the full value … of Rock Creek Terrace with which pass-through payments to Viers Mill could satisfy the requirements of the initial [purchase money] note.

Trial Tr. Vol. 4 at 879:4-10.  When prepayment was barred by the Preservation Statutes, undisputed trial evidence establishes that Mid-City had to renegotiate the purchase money notes on behalf of Viers Mill to avoid defaults because expected proceeds from refinancing Rock Creek after prepayment were not available to repay the notes.  *See* PX 332 at IRH 0015200, IRH 0015202; Trial Tr. Vol. 4 at 847:25-850:5; JX 92 at IRH 0015981-82; JX 93; Trial Tr. Vol. 4 at 851:3-852:20, 853:1-858:25; JX 105; Trial Tr. Vol. 4 at 864:7-865:10; JX 106; Trial Tr. Vol. 4 at

11

867:9-868:4, 869:5, 16-25; PX 353; Trial Tr. Vol. 4 at 873:13-875:6, 875:15-878:8, 878:25-879:10; JX 114; Trial Tr. Vol. 4 at 890:23-891:14; JX 105; Trial Tr. Vol. 4 at 864:7-865:17.

Furthermore, extensive and undisputed Rule 30(b)(6) testimony by Mid-City and individual testimony from John Wall, supported by other documentary evidence, establishes that Mid-City and RCTLP relied on the right to prepay when they originally invested in Rock Creek. *See, e.g.*, JX 195 at 27:9-28:7, 30:11-33:3, 46:18-21; JX 198 at 27:5-28:1, 32:13-33:8; Trial Tr. Vol. 4 at 820:5-25, 834:13-836:13, 838:1-839:5, 13-840:3; PX 318; JX 80 at IRH 0014966; JX 78 at IRH 0014953-55. To put it bluntly, when asked by the United States whether Mid-City would "have invested in the property if the mortgage could not have been prepaid," Wall's answer was, "No." JX 195 at 32:15-18.

The Court gives little to no weight to the undisputed Rule 30(b)(6) testimony and Wall's individual testimony because he "was not directly involved in Rock Creek investors' decision-making process." ECF No. 809 at 30. Yet, that rationale is incompatible with the Court's reliance on testimony by Billings, who certainly was "not directly involved in Rock Creek investor's decision-making process" and whose understanding was based on what he reviewed in documents. *See, e.g.*, JX 196 at 4:15-25, 8:25-2, 12:21-2. That is why, as the Court pointed out, Billings did not know whether NHP would have invested in 1971 had it known that RCTLP would not have been able to prepay after 20 years. *See* ECF No. 809 at 30 (quoting JX 197 at 25:25-26:3).[5]

Moreover, in contrast to Billings, Wall had years of experience working for Mid-City, beginning in 1971, and he was directly involved in Mid-City's financing and development

---

[5]    Even so, Billings understood that "the ability to prepay or refinance was contemplated by the parties to [RCTLP]." JX 197 at 25:8-10.

activities for about 30-35 Section 236 projects.  *See* Trial Tr. Vol. 4 at 699:18-700:24, 702:11-703:1.  His mentor was Eugene F. Ford, Sr., who taught him the business and *was directly involved* in the investment decisions for RCTLP.  *See id.* at 701:4-702:3.  As a result, Wall knew the "business model" used by Mid-City for projects, including Rock Creek, and he understood why Mid-City established RCTLP and invested in Rock Creek, relying on the right to prepay. JX 198 at 27:2-28:1.  Indeed, Mr. Wall's extensive knowledge about RCTLP is precisely why he (not Billings[6]) was designated by RCTLP to testify on behalf of the partnership in Rule 30(b)(6) depositions that are part of the trial evidence.  *See id.* at 12:9-18, 13:1-20; JX 195 at 9:13-10:11. FWPs' burden was to prove the existence of the investment-backed expectation by a preponderance of the evidence.  RCTLP certainly did that; indeed, the government offered no material evidence to the contrary.

### D. CHC met its burden of proving that it relied on the right to prepay when it invested in Chauncy House.

The Court held that CHC "did not meet its burden to demonstrate that its investors had objectively reasonable expectations *at the time of the original investment* of being able to prepay and convert to market-rate housing after twenty years."  ECF No. 809 at 27 (emphasis added). To reach that conclusion, the Court primarily relied on (1) language from a Private Placement Memorandum ("PPM") issued by CHC to prospective investors, after the original investment decision was made, and (2) the existence of a so-called "121A Agreement" between CHC and the City of Boston.  ECF No. 809 at 27-29.  With respect to the Court's reliance on language in the PPM, the Court misunderstood the timing of the *original investment* and the issuance of the PPM and ignored other important language in the PPM and related testimony.  With respect to

---

[6]    Billings recognized that "Mid-City is the best source to determine the intent and the actions of the partnership during the relevant time period."  JX 196 at 24:17-19.

the Court's reliance on the 121A Agreement, that agreement and related evidence should not be considered because the United States failed to comply with the provisions of Appendix A, Part VI, 13(c)(3) which required the United States to disclose at the pretrial meeting of counsel its contentions regarding the 121A Agreement, which it did not do.  Regardless, the 121A Agreement has no bearing on the original investment expectations of the partnership.  Nor did that agreement preclude prepayment or conversion to market rentals.

### 1.    The Court cannot rely on evidence of the 121A Agreement.

Appendix A to the Rules of the Court of Federal Claims requires a meeting of counsel before trial.  Appendix A, Part VI.  It also requires that counsel "disclose to opposing counsel all contentions as to applicable facts and law unless previously disclosed." Appendix A, Part IV, 13(c)(3).  An Appendix A meeting of counsel in this case took place on January 26, 2018.  *See* ECF No. 424.  At no point prior to, or during the meeting, did counsel for the United States disclose its contentions, factual or legal, with respect to the 121A Agreement to which Chauncy House was a party.  Significantly, the United States also did not disclose any contentions of fact or law about the 121A Agreement in its pretrial brief.  *See* ECF No. 538.  As a result of the United States's violation of its obligation, the Court cannot rely upon the Chapter 121A "evidence," such as it is, in supporting its holding.

Prior to trial, the 121A Agreement was touched upon briefly on two occasions, once in the 30(b)(6) deposition of CHC taken on July 13, 2007, and once in the 30(b)(6) deposition of CHC taken on November 6, 2014.  Designated transcripts from those depositions were admitted as trial evidence.

At the 2007 deposition, James Reagan, Chauncy House's designated witness, was asked about a sentence in a letter from the General Partners to limited partners dated April 7, 1989.  After specifically discussing the "completion of their restricted use term, at which time such

14

projects could be eligible for conversion to market rate developments" the letter went on to say, "in addition, any change in the use of the property after October of 1995 and before April 2015 would require approval of the Boston Redevelopment Authority [or 'BRA']."  JX 64 at IRH 0048550-8551.  On behalf of CHC, Reagan was asked, "To what does that sentence refer?" JX 193 at 59:18.  Reagan's answered, "That refers to the 121A tax agreement for the property, which means that we had to use the property for *apartments* and we could not convert it to non-residential use, and I don't think we could convert it to condominium use without the BRA's approval."  *Id.* at 59:21-60:4 (emphasis added).  The United States did not ask any further questions about the 121A Agreement at that deposition.

In the deposition taken on November 6, 2014, Reagan, who was again the designated witness for CHC, was asked if he was familiar with the BRA.  JX 194 at 22:5-13.  After he answered in the affirmative, he was asked how Chauncy House's tax rate was determined under the agreement, a process he described in his answer.  *Id.* at 23:16-22.  Then he was asked if the agreement was "contingent on the property remaining as affordable housing," to which he answered "No, it was not.  There was no right to change the residential use of the project without authorization from the [BRA]."  *Id.* at 24:5-11.  He also testified that if the property was to be sold during the term of the 121A Agreement, it would be necessary to get the BRA's permission, but the property would not have to remain affordable housing, it would simply have to remain residential housing.  *Id.* at 24:19-24.  The questions about the 121A Agreement took up about 2 pages of the transcript.

Tellingly, the United States then marked the 121A Agreement as deposition exhibit 3.  *See* JX 194 at 26:18-27:4.  Counsel for FWPs objected, pointing out that the document had never been produced and did not have a Bates number on it.  In response, the two lawyers representing

the United States gave contradictory answers, one saying, "That's correct. We obtained a copy yesterday so it's not been Bates stamped," and the other saying, "It would have been in the documents that we had sent in the document production in 2013." JX 194 at 25:1-26:17. The fact of the matter is that the document was never properly produced by the United States, either before or after the deposition, as evidenced by the fact that DX 85, the 121A Agreement, upon which the Court's treatment of Chauncy House hinges, is not Bates stamped. And after marking it as a deposition exhibit, the United States did not ask Mr. Reagan any substantive questions about the Agreement, which might have constituted some sort of notice of the factual and legal contentions the United States believed flowed from the Agreement. *See* PX 194 at 26:18-27:14.

At trial, for the first time, the United States alluded to its factual and legal contentions with respect to the 121A Agreement through the testimony of a HUD employee, Maurice Barry.[7] The plaintiffs objected to the testimony and the admission of the document on several grounds, all of which the trial court overruled. Trial Tr. Vol. 9 at 1726:20-1727:19. The factual and legal contentions of the United States with respect to the 121A Agreement were revealed for the first time in its Post-Trial brief.

FWPs' Post-Trial brief, which was filed 45 days before the brief of the United States was filed, did not discuss the 121A Agreement for two principal reasons. First, the United States had never articulated its factual and legal contentions about the Agreement, so FWPs would have had to guess what the United States's factual and legal contentions were and respond based upon those guesses. Second, the Court imposed strict page limitations on the parties' post-trial filings,

---

[7]     Barry's speculative and hearsay testimony, admitted over objection, was about what the BRA would do with the 121A Agreement, particularly with respect to prepayment of the HUD-insured mortgage loan. Barry acknowledged that his testimony was merely "[b]ased on" his "nonlawyer," or lay, "reading of the law." Trial Tr. Vol. 9 at 1727:17, 19. His testimony also contradicted his prior testimony on behalf of the United States. *See id.* at 1730:14-1731:13.

16

and FWPs reasonably decided not to use space on factual and/or legal contentions that had never been clearly stated. FWPs did subsequently move for leave from the Court to permit them, as the party with the burden of proof, to file a Reply. ECF No. 765. The motion was denied. Paperless Order (Aug. 6, 2024). Had it been granted, FWPs could have addressed the United States's violation of the provisions of Appendix A, not to mention the substantive reasons why the mere existence of the 121A Agreement did not negate FWPs' direct evidence about CHC's investment-backed expectation that it would prepay the mortgage after 20 years and operate the property as a market rate, *residential*, property. *See* Section II.D.2, *infra*.

### 2. CHC's 121A Agreement with the BRA does not undermine CHC's proof that it had reasonable investment-backed expectations to prepay its mortgage.

Moreover, the 121A Agreement does not impair CHC's original investment expectations, nor did it preclude prepayment and conversion to market rentals. When CHC originally invested, CHC understood that it could, and expected it would, prepay the HUD-insured mortgage on Chauncy House after 20 years and could then refinance and convert the property to market-rate rentals. *See* Trial Tr. Vol. 3 at 634:24-635:14, 635:21-637:2; *see also id.* at 495:17-499:4; 517:2-518:9; JX 194 at 145:3-11; Trial Tr. Vol. 2 at 428:1-9; Trial Tr. Vol. 3 at 506:12-514:11, 514:16-518:9; 519:12-24; JX 194 at 145:3-11; JX 184 at 69:18-70:11. In fact, before the 121A Agreement was executed, CHC had already (i) been in existence for nearly a year, (ii) chosen the location for Chauncy House, (iii) invested money in the partnership and property, and (iv) initiated construction. *See* Trial Tr. Vol. 3 at 636:9-21; Trial Tr. Vol. 2 at 428: 14-429:1; JSOF ¶ 66; *see generally* PX 208; PX 59; *see also* DX 85 at 1 (showing that the 121 Agreement was "entered into" on January 2, 1974).

The Court found "no contemporary evidence" of investment-expectations, but the location of Chauncy House was chosen well before the 121A Agreement was entered into, with

an expectation of later market appeal of the project after prepayment, as evidenced by contemporaneous documents, including correspondence from HUD in 1972, which acknowledged that a proposed urban renewal plan around Chauncy House would insure the future market appeal of the project.[8] *See* PX 141; PX 4; PX 6; PX 26; PX 28; PX 7; PX 5; *see also* Trial Tr. Vol. 2 at 439:15-445:1; 446:1-448:20; 454:7-455:15, 456:2-458:3, 458:17-459:5; 478:7-480:7, 481:21-484:21, 485:18-486:2, 488:14-489:1.  Accordingly, the investment-backed expectation to prepay the HUD-insured mortgage and be free of regulatory restrictions was established in 1972, long before CHC entered into the 121A Agreement in 1974.

Additionally, the 121A Agreement did not preclude CHC's expectations from being objectively reasonable.  The 121A Agreement did not preclude prepayment of the HUD-insured mortgage.  *See* Trial Tr. Vol. 3 at 637:19-22.  Indeed, the mortgage note for Chauncy House expressly permitted prepayment after 20 years from the date of final endorsement by HUD.

Furthermore, the term of 121A Agreement would not have affected CHC's plans.  The 121A Agreement was subject to "the provisions of Chapter 121A, Section 18C."  DX 85 at 1.  121A agreements "may provide that, without mutual consent, any subsequent amendment of any such provisions [of Chapter 121A], rules, regulations and standards shall not affect the project," Mass. Gen. Laws ch. 121A, § 6A, but the 121A Agreement entered into by CHC does not include such a provision.  Although the benefits and obligations were originally for 40 years, the term was reduced to 15 years in 1975, as clearly stated in Mass. Gen. Laws ch. 121A, § 18C:

> If the persons or organizations described in this section have carried out their
> obligations and performed their duties as imposed by this chapter for a period of
> fifteen years from the date of approval of the project and for such further time any
> period of extension granted pursuant to section ten, shall be in effect … they shall
> thereafter no longer be subject to the obligations of this chapter except as to any

---

[8]    The Government did not challenge any of that evidence.  Nor could it.  Yet, the Court inexplicably ignored that undisputed evidence in the Post-Trial Opinion.

liability theretofore incurred nor shall they enjoy the rights and privileges hereby granted.

*See also* Amendment Notes, The 1975 amendment, Mass. Gen. Laws ch. 121A, § 18C ("The 1975 amendment … rewrote the sixth paragraph to decrease the limitation period from 40 to 15 years…."). That statutory change applies retroactively to Chauncy House. *See Bronstein v. Prudential Ins. Co.*, 459 N.E.2d 772, 776 (Mass. 1984).

To the extent the 121A Agreement imposed a restriction on the owner's dividends, that restriction would have evaporated upon prepayment of the HUD-insured mortgage loan. Even if the 121 Agreement stayed in place, in contravention of the 1975 amendment, the limitation on the dividend changed in 1975, from six to eight percent, and the limitation on the dividend would have been eliminated *entirely* but for the Preservation Statutes, because those restrictions were coterminous with the HUD restrictions. If CHC could have prepaid its HUD-insured mortgage loan after October 14, 1995, as CHC intended, all HUD regulatory restrictions on Chauncy House, including the restriction on CHC's annual return to six percent of its initial equity investment in the project. *See* JSOF ¶ 4; JX 67 at IRH 0052162 ("6. Owners shall not without the prior written approval of the Commissioner:… (e) Make, or receive and retain, any distribution of assets or any income of any kind of the project, except from surplus cash and except on the following conditions: (1) All distributions shall be made only as of or after the end of the semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six percent on the initial equity investment, as determined by the Commissioner….").

Upon prepayment of the HUD-insured mortgage and termination of the regulatory agreement with HUD, the 121A Agreement's limitation on the dividend, or net income, would have similarly terminated in accordance with Mass. Gen. Laws ch. 121A, § 18C(e), which states,

in part: "Regarding residential housing projects, the preceding limitations on dividends shall not apply whenever … HUD … allows a change in the allowable distribution or other measure to increase the rate of return on investment…." *See also* Amendment Notes, The 1989 amendment, Mass. Gen. Laws ch. 121A, § 18C ("The 1989 amendment, in clause (e) of the first paragraph inserted the provision at the end providing exceptions to the application of limitations on repayments and dividends.").

The Court concluded that the ill-defined approval powers of the BRA somehow undercut the owners' prepayment expectations. *See* ECF No. 809 at 29. As noted above, whatever the owners wrote about BRA approval in 1992, after the enactment of the Preservation Statutes, sheds no light on their prepayment expectations when they identified the location of the project in 1972 and made their investment in 1973. But, the BRA rules did not bar prepayment and conversion to market rentals. Rather, regulations expressly permitted termination of the 121A Agreement with the approval of the Department of Housing and Community Development. *See* Mass. Gen. Laws ch. 121A, § 13 (providing for "leave to change the type and character of the buildings on a project"). There are multiple reasons to conclude that such approval would have been granted.

First, approval would have been consistent with the project from its inception. As the 121A Agreement states, the application under Chapter 121A was "filed to undertake and carry out a project on Chauncy Street in Boston to rehabilitate a multi-story building as a housing project containing approximately 87 apartment units and retail commercial space to be financed under the provisions of Section 236 of the National Housing Act…." DX 85 at 1. As the Court has already found, the right to prepay the HUD-insured mortgage and termination of regulatory

restrictions after 20 years was a fundamental feature of the 236 program that "investors relied on" and was background law to the 121A Agreement.  ECF No. 809 at 7.

Second, prepayment of the HUD-insured mortgage after 20 years and making further investment in Chauncy House to convert the project to market rentals was consistent with the purpose of Mass. Gen. Laws ch. 121A.  As stated in Mass. Gen. Laws ch. 121A, § 2, the purpose of ch. 121A is (and was) to stimulate investment of private capital in blighted, open, substandard or decadent areas.  *See Prudential Ins. Co. v. Boston*, 340 N.E.2d 858, 860 (Mass. 1976).  In part, "the Legislature attempted to alleviate the shortage of rental housing in urban areas…." *Bronstein v. Prudential Ins. Co.*, 459 N.E.2d 772, 776 (Mass. 1984).  That purpose is consistent with CHC's plan to prepay the HUD-insured mortgage and make additional investments in Chauncy House to convert it to market rentals.

Third, as Reagan testified, the restrictions in the 121A Agreement were intended to maintain the property for *residential* use, which prepayment and conversion to market rentals would not have affected.  *See* Section II.D.1, *supra*.

In sum, the 121A Agreement is a red herring.  It sheds no light on the owners' original expectations, which were formed years before the 121A Agreement was executed; its term was limited; and to the extent that there were lingering rights of approval by the BRA, *which only persisted because the Preservation Statutes prevented the owners from prepaying*, those approval rights would not have interfered with the owners' plans to prepay their mortgage.  The 121A Agreement did not defeat CHC's prepayment expectations and would not have precluded prepayment and conversion to market rentals in the absence of the Preservation Statutes.

3.      **The PPM is not probative of the investors' reasonable expectations at the time of the original investment.**

In holding that Chauncy House did not meet its burden of proving that "its investors had objectively reasonable expectations *at the time of the original investment* of being able to prepay and convert to market rate housing after twenty years," the Court relied upon the PPM that was issued in February of 1974.  ECF No. 809 at 27.  In doing so, the Court completely misperceived when the relevant *original investment* was made.

The location of Chauncy House was identified by partners in 1972, CHC was formed on January 29, 1973, and the project was developed in 1973.  *See* JSOF ¶¶ 66-67.  The original General Partners were Walter Winchester and John Gallagher.  *Id.* at ¶ 66.  The original Limited Partners were John King, Gerald Blakely, John O'Donnell and Stephen Casey. *Id.*; *see also* Trial Tr. Vol. 2 at 428: 14-429:1.  The parties also stipulated that CHC obtained the mortgage for the project on November 21, 1973.  JSOF ¶ 70.  Thus, the original investment decision was made by the original partners, who were the partners primarily impacted by the Preservation Statutes, well before the PPM was issued.  Their investment-backed expectations should therefore be controlling.  And, as other trial evidence established, CHC's intent at the time of the original investment was to prepay and exit the 236 program after 20 years.  *See* Section II.D, *supra*.

The PPM's plain language confirms that the investment decision was made well before the PPM.  It identifies the General Partners of the project as Winchester and Gallagher and the Limited Partners as King, Blakely, O'Donnell, and Casey.  JX 65 at 3.  The PPM describes all of them as the Principals of the project.  *Id.* at 24-25.  In the "Introduction," the PPM explains that the project construction began in 1973, and the partnership already had a commitment in place for a mortgage.  It further says that construction, which was underway, was to be complete in 1974. *Id.* at 7.  The PPM also discusses rental units that are to be subsidized under Section 236

22

and discloses that the partnership had already entered into a Regulatory Agreement with the FHA. *Id.* at 20, 22. In addition, the PPM specifically mentions that the mortgage may be prepaid after 20 years. *Id.* at 20. In other words, the uncontradicted evidence establishes that the decision to invest in this project was made by the Chauncy House partnership well before it sought the so-called Investor Limited Partners.

Moreover, the group to which the PPM is directed, the so-called Investor Limited Partners, are just that, investors who are entitled to specific returns, but have no rights to direct the operation of the project, which began before they were invited to invest. And, tellingly, the financial projections included in the PPM for the Investor Limited Partners only show results through 1995, *twenty years after the final endorsement date of the mortgage*. *See* JX 65 at IRH 0048546-47; JSOF ¶ 70. Furthermore, those Investor Limited Partners left the partnership early, before the prepayment eligibility date, and their ownership interests were acquired by Reagan and original partners. *See* Trial Tr. Vol. 3 at 523:13-525:11. Accordingly, FWPs are baffled by the Court's suggestion that the PPM "conflicts with" Reagan's testimony about why prepayment was essential to solve the problem of phantom income. ECF No. 809 at 28.

The Court's conclusion that the language of the PPM is "insufficient to establish investment expectations for the investors of Chauncy House" misses the point: other undisputed facts establish when the project began, who made the original investment decisions, and the expectations for the partnership's investment. Those decisions were made, as the undisputed evidence makes plain, by the partners well before the PPM was prepared in 1974.

## II.    FWPS PROVED THAT THEY SUFFERED SEVERE ECONOMIC LOSSES.

In concluding that FWPs did not prove sufficient economic impact, the Court concluded that "Dr. Trout's explanations of Dr. Wade's methodology and conclusions [were] not credible." ECF No. 809 at 35. As FWPs understand it, that conclusion was based on the following: (1)

Trout's explanation of Dr. Wade's formulas, replicated at ECF No. 809 at 14, did not provide "clear insight into the calculations made by Dr. Wade to arrive at his economic loss calculations," particularly "which formula was primarily utilized to calculate economic impact, id. at 37; (2) "Dr. Trout was not able to explain why Dr. Wade's formula subtracted TPE [("Transfer Preservation Equity")] in the denominator of his economic loss equation," *id.* at 38; (3) "Dr. Wade subtracted only some debt payments from the overall property value," *id.*; (4) "Dr. Wade inconsistently utilized *ex post* and *ex ante* data in the same equation"; (5) the Court was "dissatisfied with Dr. Trout's explanation of how Dr. Wade arrived at the discount rates used throughout his economic loss analysis," *id.* at 40 (cleaned up); (6) the Court was unsure whether Wade incorporated "offsetting benefits" "during the years that FWPs continued to own the properties after the enactment of the Preservation Statutes but before their respective sales or agreement with HUD," *id.* at 40-41; and (7) "Chart SL.9B … was missing a column of numbers called the interest factor or how the Court could verify the total numbers presented," *id.* at 41. Yet, as described in more detail below, these criticisms miss the forest for small trees: they overstate the significance of limited testimony while ignoring other testimony by Wade and Trout, and they do not materially impact the resulting economic losses calculated by Wade.

**A.    Drs. Wade and Trout provided credible opinions to support FWPs' economic losses.**

**1.    FWPs' economic loss calculations were previously reviewed by the Federal Circuit and reasonably explained by Wade and Trout.**

Wade and Trout opined that the appropriate formula to calculate the economic losses suffered by FWPs is Economic loss = ((PV (market conversion) less TPE) minus (PV(actual outcome) less TPE)). *See* Trial Tr. Vol. 6 at 1159:9-1164:7; Trial Tr. Vol. 14 at 2761:21-2764:7; PDM DD at 4. The formula used by Wade to calculate FWPs' economic losses is the *same formula* that the Federal Circuit concluded that Wade used and held was consistent with *Cienega*

*X*. *See Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1352, 1354 (Fed. Cir. 2020);

Trial Tr. Vol. 14 at 2764:3-7; Trial Tr. Vol. 6 at 1164:2-1166:20; PDM DD at 4.

Wade and Trout adequately and credibly explained the components of that formula.  "PV (market conversion)" is the money FWPs lost because they were barred from prepaying their mortgages and converting to market rentals.  That is the present value of the stream of income each FWP would have received for 20 years after prepaying the mortgage.  The future stream of income was discounted back to the prepayment eligibility date.  Trial Tr. Vol. 6 at 1160:12-1161:16.  In the formula, TPE is a term from the LIHPRHA appraisals, referring to the estimate of the owners' equity as of the appraisal dates for FWPs' properties.  Trial Tr. Vol. 6 at 1162:9-1163:3.  In the formula, "PV (actual outcome)" is the present value of the money the respective FWPs received under LIHPRHA.  Trial Tr. Vol. 6 at 1161:5-8.

The Court opined that a portion of Dr. Trout's cross-examination testimony was confusing.  *See* ECF No. 809 at 37.  Yet, the Court does not explain how that one colloquy, when viewed in conjunction with other testimony of Wade and Trout, undermines Wade's opinion, or calculation, of FWPs' economic losses.  As Trout said, both equations shown as "1 and 1A" by counsel for the United States resulted in the same "estimate of economic damages" for FWPs, even though one shows the losses in present value terms while the other shows the losses in net present value ("NPV") terms.  Trial Tr. Vol. 7 at 1336:6.  Using Buckman Gardens as an example at trial, Trout described the methodology, inputs, and calculations Wade used to opine about FWPs' economic losses.[9]  *See* Trial Tr. Vol. 6 at 1171:20-1188:2, 1188:15-1201:7.

---

[9]      The Court appears to conflate the economic loss equations with the calculation of "economic impact," *i.e.*, the *severity* of the economic losses, expressed as percentages.  ECF No. 809 at 37.  Not surprisingly, Wade's equation for calculating the severity of FWPs' losses was not the same as the equation for calculating the economic losses.  Trout clearly stated, without any "struggle[d]," *id.*, that the equation to measure severity—*i.e.*, the percentage reduction in

2.     **Wade and Trout both reasonably explained why Wade subtracted TPE from the denominator when calculating economic severity.**

As Wade explained, "[s]tandard financial analysis" in finance and economics typically "compares [financial] returns to equity investment" in the project or business opportunity being evaluated. JX 201 at 34:20-25:4. Unlike real estate appraisers, economists and financial analysts do not typically perform "asset-level valuations" to determine the impact of an event, such as impact of the Preservation Statutes, on income-generating businesses or properties, like FWPs' properties. *Id.* at 25:20-26:21.

As Wade explained, the subtraction of TPE values from the denominator was for the purpose of determining the *severity* of the economic losses suffered by FWPs. *See* JX 201 at 59:8-60:7, 61:2-20, 62:16-22, 63:8-20, 65:13-66:4, 66:19-67:6; *see* PDM DD at 7. The results show the severity of the economic losses caused by the Preservation Statutes because FWPs did not recoup their equity plus reasonable returns. *See id.* at 97:8-11 ("The issue is what's at stake here in this case and what represents the owner[s'] 100 percent stake in the property, and that's [their] equity."); *accord id.* at 100:18-101:10. In other words, the amounts recovered by FWPs through LIHPRHA processing were a small percentage of what FWPs would have received, had they been allowed to prepay their mortgages as intended. *See* JX 201 at 97:5-11.

Moreover, the subtraction of TPE values from the denominator of Wade's *severity* calculation, shown as percentages, has no bearing on the economic *losses* of FWPs, which are dollar values. Even if the Court believes Wade's calculation of severity—the percentage reduction in NPV—is problematic, that is not fatal to FWPs' takings claims. *See Anaheim Gardens, L.P.*, 953 F.3d at 1356 ("Finally, even if the Claims Court were to conclude that Dr. Wade's decision to

---

NPV—"is the NPV market conversion less the NPV actual outcome, divided by the NPV market conversion." Trial Tr. Vol. 7 at 1336:21-23.

subtract equity was problematic … we note that Dr. Wade's expert report is likely still probative of economic impact. To illustrate, Dr. Wade presented an economic loss equation and used net present values as inputs to that equation. The economic loss equation itself appears to be unchallenged…."). Severity could be calculated, with present values in the record for the FWPs, without subtracting TPE values. Additionally, FWPs' economic losses themselves are substantial and should be sufficient on their face to establish a taking when properly balancing all three *Penn Central* factors. *See* Section III, *infra*.

> **3.** **Wade subtracted principal but not interest for most of the FWPs (except RCTLP) in his economic loss calculation to match the treatment of debt for FWPs' actual results under LIHPRHA, which *reduced* FWPs' economic losses.**

As Wade testified, he made an adjustment to net operating income ("NOI")— subtracting mortgage loan principal from what the NOI that FWPs would have received had they been able to prepay—for a *particular reason*, based on the *particular facts* in this case. He did so to focus on the losses of FWPs, *not debtholders*, and to determine if the losses suffered by FWPs were significant based on what they invested. *See* JX 201 at 24:16-18, 24:20-25:4, 25:20-26:21. Wade explained that he did so to match the treatment of principal and interest in the actual outcomes for FWPs who sold their properties pursuant to LIHPRHA. *See* JX 201 at 178:16-181:1, 181:14-182:12. There is no dispute that the facts of this case are unusual due to the coerced LIHPRHA outcomes for FWPs, particularly LIHPRHA sales for most of the FWPs, requiring some adjustments when calculating NOI to fit the unique facts of this case.

Trout's trial testimony supports that conclusion. He explained that what Wade did may have been somewhat unusual, but the facts of this case are unusual, and Wade's purpose in making the adjustments he did was to be able to effectively compare restricted and unrestricted

results for FWPs' properties that were sold pursuant to LIHPRHA.  *See* Trial Tr. Vol. 7 at
1407:2-1408:3.

The Court also ignores the fact that Wade subtracted debt *and* interest when calculating
economic losses for RCTLP to match how the accounting records for Rock Creek treated interest
under RCTLP's new use agreement pursuant to LIHPRHA.  *See* JX 201 at 179:18-180:13.  In
other words, debt and interest were treated the same when comparing what FWPs received under
LIHPRHA to what they would have received had they been able to prepay as intended.  Thus,
the Court's criticism about the treatment of principal and interest has no bearing on the economic
losses that were calculated for RCTLP.

The Court incorrectly suggests that Wade's "mathematical contortions rendered inflated
damages estimates."  ECF No. 809 at 37.  Yet, when calculating what FWPs would have
received had they been able to prepay as intended, the subtraction of mortgage principal for all of
the FWPs, and the subtraction of interest as well for RCTLP, had the effect of *reducing* what
their economic losses would have been if Wade had ignored debt and interest as Dr. Riddiough
suggested.  *See* Trial Tr. Vol. 7 at 1283:25-1284:25; ECF No. 809 at 9 (quotations omitted).

### 4.    Wade's use of both *ex ante* and *ex post* data was appropriate.

Wade compared lost income, which FWPs would have received had they been able to
prepay, to *actual* results that FWPs received through LIHPRHA.  *See* JX 201 at 143:11-22.   The
Court suggests that Wade used *ex post* data to estimate what FWPs would have received had they
been able to prepay but only "relied on *ex ante* data to calculate the restricted present value of the
properties."  ECF No. 809 at 39 (citing Trial Tr. Vol. 7 at 1397:6-15; Trial Tr. Vol. 12 at
2382:12-16).  That is incorrect.  As Trout stated in the portion of his testimony cited by the
Court, Wade calculated the "restricted present value" by identifying the "gross sales proceeds,"
which "was a lump sum value received as part of the LIHPRHA process."  Trial Tr. Vol. 7 at

1397:1-15. Those actual LIHPRHA sales proceeds were what FWPs received *after* the prepayment eligibility date for each FWP—it is indisputable that the dates of sale for the four properties that were sold pursuant to LIHPRHA occurred after the prepayment eligibility dates. As such, the sales proceeds constitute *ex post* information, not *ex ante* information.

The Court also suggests that *ex post* data is "conveniently advantageous to the FWPs" because it allowed "Wade to make assumptions about the rents, refinancing, and FWPs' hypothetical market conversions." ECF No. 809 at 40. But, the data is consistent with FWPs' theory of the correct methodology—"that future rental income, rather than fair market value, is the appropriate measure of economic impact because that is what the government actually took from them." *Anaheim Gardens v. United States,* 953 F.3d 1344, 1354 (Fed. Cir. 2020).[10] Assumptions about rents, refinancing, and market conversions were appropriate based on undisputed facts in this case, and FWPs cannot be faulted for relying on the best data available.[11]

Wade used *ex post* data, including "rental indices that are readily available from the Bureau of Labor, BLS, Bureau of Labor Statistics, and Office of the Census American Community Services" for the geographic markets in which FWPs were located to calculate the rental income that FWPs would have received for a period of 20 years after the respective

---

[10]    The fact that market rental rates increased in the 20 years after the prepayment eligibility date in the areas FWPs selected for their properties confirms that their subjective investment-based expectations were prescient.

[11]    Surely the mere use of both *ex ante* and *ex post* data by Wade cannot be problematic. The Court credits Dr. Riddiough's methodology, but it is indisputable that Riddiough's analysis was predicated on the retrospective appraisals prepared by Ms. Konikoff. It is also indisputable that Konikoff relied on some *ex post* data. For example, she relied on LIHPRHA appraisals for Cedar Gardens that were issued after her valuation date and the prepayment eligibility date, see Trial Tr. Vol. 11 at 2213:23-2214:20; she visited FWPs' properties decades after the prepayment eligibility dates, *id.* at 2215:17-2216:24; and she used Google Earth (which did not exist on the prepayment eligibility dates) to learn more about FWPs' properties, *id.* at 2219-1-23. Riddiough also relied on *ex post* data for "actual cash flows" from FWPs' sales to nonprofits and a new use agreement to calculate FWPs' damages. Jul. 9, 2024 Tr. at 339:22-341:1.

prepayment eligibility dates.  JX 201 at 55:13-22, 56:7-11, 90:9-91:3, 91:12-19, 102:7-19.  There is no material evidence to support a finding that use of those rental indices is unreasonable.

Oddly, quoting Dr. Riddiough, the Court suggests those rents are not "what actually happened with these properties."  ECF No. 809 at 40 (citing Trial Tr. Vol. 11 at 2309:4-13).  But that cannot be held against FWPs.  Four FWPs were coerced by the United States to sell their properties to nonprofit entities who were required to maintain rent restrictions on the properties, and RCTLP was required to maintain rent restrictions on its properties under a LIHPRHA use agreement.  Under these circumstances, the properties were never able to charge market rents, so actual market rents for FWPs' properties during the period of the taking do *not* exist.  As the Supreme Court held long ago, "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).  In other words, "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable."  *Id.*

Because of the long delay between filing of suit and trial, Wade had access to *ex post* data about market rents in the 20 years after the prepayment eligibility date. Such *ex post* data is more accurate than using *ex ante* data.  *See* JX 201 at 103:21-104:22, 105:2-7, 105:16-107:15, 107:17-108:18.  Wade also used verifiable real-world data to estimate proceeds from refinancings, based on undisputed facts about refinancings by RCTLP.  Trial Tr. Vol. 6 at 1202:15-1205:22.  As Trout further explained, the use of such *ex post* data provides a more accurate and verifiable measure of economic impact in this case than an alternative of only using outdated *ex ante*

forecasts or projections. *See* Trial Tr. Vol. 6 at 1144:1-1145:18, 1246:18-1248:9, 1248:18-1250:3, 1251:7-1252:4, 1254:25-1257:1.

> **5.    Wade reasonably applied two different discount rates because, as Wade and Trout testified, there were significant changes in economic conditions during the course of the 20 years of FWPs' economic losses.**

Wade used a discount rate of 9.55% for the first 10 years after prepayment eligibility and then a rate of 6.9% for the following 10 years. *See* JX 201 at 157:6-11. Trout described how those rates were determined, and Trout explained why those rates were reasonable based on historical, *ex post*, data. *See* Trial Tr. Vol. 6 at 1147:12-1148:17, 1157:10-1159:8.

The Court states that it is "dissatisfied" with Trout's explanation of how the two discount rates were determined. ECF No. 809 at 40. Yet, as Trout explained, Wade did a "cost of capital study" that showed how he calculated the discount rates that he used. Trial Tr. Vol. 6 at 1128:13. Those discount rates were 9.55% for years up to 2001 and 6.9% after 2001. *Id.* at 1148:6-8; 1157:10-15. Wade used two different discount rates because, as Trout explained:

> [Wade] correctly noted that the Treasury [rates] which are an important part of the discount rate, had fallen in the early part of the 90s, and they continued to do that for some time…. So he had an equity risk factor on top of the basic rate, the basic discount rate, which is the Treasury rate. And that's what he did for both of those interest rates that he had. So it's just a reflection of … changing investment markets….

*Id.* at 1157:19-1158:5. Wade's use of two rates was sufficiently grounded in real-world data and appropriate under the circumstances. *Id.* at 1158:18-1159:8.

The Court states that Trout previously testified, in a deposition, that "a 9.47% discount rate was the 'best' discount rate to use." ECF No. 809 at 40 (citation omitted). Yet, Trout never used those words. Instead, counsel for the United States, not Trout, used the word "best." Trial Tr. Vol. 6 at 1347:17-25. As Trout explained, he used a 9.47% discount rate as an "alternative" in his sensitivity analysis, to see whether it would have a material impact on the economic

impact to FWPs. *Id.* at 1345:5-12. "[A]n ultimate best is probably impossible because of the factors that go into a discount rate and the range of opinions on what that is." *Id.* at 1345:13-15. What matters is that "the discount rates Dr. Wade used were appropriate for this case and the characteristics of these plaintiffs." *Id.* at 1345:16-18.

###### 6.    Wade properly compared what FWPs received under LIHPRHA to what FWPs would have received but for LIHPRHA.

The Court was "not persuaded of the accuracy of Dr. Wade's calculations of 'offsetting benefits'" of the FWPs, such as "below market-rate interest, extended mortgage terms, and tax incentives" in the analysis of economic impact. ECF No. 809 at 40. Yet, as the Federal Circuit held in *CCA*, "[o]ffsetting benefits, if there are any, must be established by the government to rebut the plaintiff's economic impact case." *CCA*, 667 F.3d at 1245. The United States did not prove any offsetting benefits apart from what FWPs received from selling their properties or signing a new use agreement under LIHPRHA. Moreover, "below market-rate interest, extended mortgage terms, and tax incentives" were not offsetting benefits of the Preservation Statutes, and therefore are irrelevant to the economic impact analysis. *See id.* ("[A]ny economic impact to the plaintiffs must be weighed against any offsetting benefits that they received *from the preservation statutes*.") (emphasis added). The Court states that it is not clear "whether Dr. Wade accounted for the rent FWPs received during the period at issue or the 'reserves' that were incorporated by Dr. Riddiough." ECF No. 809 at 40. The Court also questions whether "laundry income was incorporated as an offsetting benefit." *Id.* at 41. Yet, it is an undisputed fact that cash distributions to FWPs were restricted by FWPs' regulatory agreements under the 221(d)(3) and 236 programs and only possible when there was sufficient surplus cash from operations. As Trout explained, Wade included the distributions that FWPs received under LIHPRHA. Using

Buckman Gardens as an example, and describing the BR.5 table in PDM H,[12] Trout explained that Wade included a $20,000 cash distribution, plus the amount BGLP received from sale of its property. *See* Trial Tr. Vol. 6 1177:5-22. Again, the United States had the burden to identify and quantify any other offsetting benefits.

> **7.** **The "missing column" of discount factors in "Chart SL.9B" did not impact FWPs' economic losses, and those numbers are easily calculated based on numbers in that table.**

Curiously, the Court characterized this issue as "[s]ignificant[]." ECF No. 809 at 41. Yet, that column of "missing" numbers had *no impact* on the results for SVLP, and certainly had no impact on results for any other FWP. As Trout explained, the "column of values … just doesn't appear on this exhibit," but Wade "has a string of numbers for the 6.9 discount rate" in the complete "Excel file." Jul. 8, 2024 Tr. at 85:25-86:16, 87:15-17; *see also id.* at 92:10-24. Wade then multiplied the discount factors by the NOI numbers in the second column, which generates the results in the fifth column for "PV Sept 13, 1993," *i.e.*, the present value of the NOI as of September 13, 1993. *See id.* at 86:8-13.

The Court seems to unfairly fault Trout for not being able to quickly identify the discount factors from memory. Yet, Wade's use of the discount factors to calculate end results in the fifth column in chart SL.9B can be readily confirmed, without the aid of an economist, by looking at the results for 1993-2001. For example, for year 1993 in SL.9B, multiplying the NOI number, $30,314, by the discount factor in the same row, .9731, results in the present value as of September 13, 1993, which is $29,499 (rounded to the nearest dollar).

---

[12]    Contrary to the Court's suggestion otherwise, see ECF No. 809 at 5 n.5, this is an instance in which the demonstratives that included charts and tables used by FWPs at trial, would have helped the Court understand.

And although the discount factors used for years 2002-2013 are not shown in SL.9B, they can be identified by simply dividing the results in the fifth column, "PV Sept 13, 1993" by the "NOI" numbers in the second column of the table for the same year.  This is basic algebra.  For example, in 2002, the discount factor can easily be calculated by dividing the present value in the fifth column, $219,258, by the NOI in the second column, $499,644.  As a result, the discount factor for 2002 was approximately 0.4388, which is consistent with Dr. Trout's testimony.  *See, e.g.*, Jul. 8, 2024 Tr. at 92:13-21 (explaining that the discount factor for 2002 was approximately 0.439).  The same calculation can be completed for years 2003 to 2013.

As Trout explained to the Court, that mistake in SL.9B was not present in the 9B tables for other properties, *id.* at 88:25-89:2, which would have been apparent to the Court had it permitted FWPs to use the demonstratives that FWPs used at trial.  Indeed, during trial, instead of describing the inputs and calculations for Silverlake Village, Trout described them for Buckman Gardens, while discussing PDM M, which was table BR.9B.  That demonstrative very clearly shows the discount factors for each year, from 1995 to 2015, including *all* the discount factors in the fourth column of BR.9B.

For that reason, the Court's opinion that the "excluded demonstratives" would not have helped FWPs or "affect[ed] the Court's credibility determination" is puzzling.  ECF No. 809 at 5 n.5.  To the contrary, those demonstratives showed, among other important aspects of Wade's calculations, the comparable discount factors that were "missing" in SL.9B, which the Court considered *significant* to its credibility determination.  *Id.* at 41; *see also* n.12, *supra*.

**B.    Contrary to the Post-Trial Opinion, the Court *did* prohibit FWPs from using many charts and tables as demonstratives in the Rule 63 hearing, to the unfair prejudice of FWPs.**

In its Post-Trial Opinion, the Court discussed the procedural history of the charts in Dr. Wade's report, which the Federal Circuit characterized as Dr. Wade's "opinions" about the severity of FWPs' injury and their economic losses. The Court also discussed the demonstratives related to those charts. ECF No. 809 at 4-6. The Court summarized its findings with respect to the charts and demonstratives in footnote 5 in which it (1) identified the demonstratives, (2) said it "finds" that even if the demonstratives were admitted it would not affect the Court's credibility determination, and (3) determined that the "Court did not preclude their use as *demonstrative* aids" during the Rule 63 hearing and FWPs' failure to do so "undercuts any claim of prejudice arising from their exclusion from evidence." *Id.* at 5. FWPs move the Court to reconsider all three of those findings to correct clear legal and factual errors and to prevent manifest injustice.

The charts and demonstratives were the subject of much discussion in hearings beginning in the fall of 2023, and that history is important. Ultimately, at the hearing held on May 21, 2024, the Court was succinct and direct when it said, "I will assess their [the experts] credibility, *but you may not introduce evidence which was not previously introduced*." Hearing Tr. 5/21/2024 at 24:3-5 (emphasis added). The Court then said, "So don't misunderstand me. The exhibits or the demonstratives which were excluded before, this is not an opportunity for you to try to yet again get those into the record." *Id.* at 24:7-10. Those rulings by the Court were not made in a vacuum; they followed lengthy argument at the hearing on January 24, 2024, at which the Court and the United States expressed concern that by seeking a Rule 63 hearing, FWPs were simply trying to get the charts and the demonstratives into the record through the back door. Hearing Tr. 1/24/2024 at 17:9-14 (the Court: "I don't need to be concerned that the Plaintiffs are going to seek to introduce testimony from Dr. Trout which has not been previously raised in his

other—in his prior testimony and *you're going to adhere to my ruling about the demonstratives from Dr. Wade."*) (emphasis supplied).[13]

Where, as here, the FWPs were repeatedly admonished not to attempt to reintroduce the demonstrative exhibits at the August hearing, it is manifestly unjust to suggest that FWPs could have understood that the May 21st statement—"The exhibits or demonstratives which were excluded before, *this is not an opportunity for you to try yet again to get those into the record*"— did not mean the demonstratives and charts could not be used at the Rule 63 hearing.  Hearing Tr. 5/21/2024 at 24:7-10 (emphasis added).  If the FWPs had attempted to use them, it would have been an attempt to put them in the record through Trout's testimony, and the United States certainly would have objected.  And, to hold that failure to use the demonstratives "undercuts any claim of prejudice" by FWPs only further magnifies the errors in the Post-Trial Opinion and is manifestly unjust.  ECF No. 809 at 5, n.5.  This is a clear case of the FWPs being damned if they did, and now damned because they did not.

Finally, FWPs respectfully submit that the Court should reconsider its decision to support its credibility determination, in part, on charts and demonstratives that were excluded from evidence by Judge Campbell-Smith and by this Court.  That is tantamount to saying FWPs

---

[13]    *See also, e.g.*, Hearing Tr. at 1/24/2024 23:14-25; Hearing Tr. 1/24/2024 at 32:1-14, 38:5-22 (Ms. Eley: "And, so, I mean, my real concern is that that is not—this about—it is really about the charts and demonstratives that weren't presented to Judge Campbell-Smith the first time around."); Hearing Tr. 1/24/2024 at 50:9-12 (the Court: "I really don't have anything, and I appreciate—I'll call them concessions about if I grant the Plaintiffs' motion what I'm not going to be confronted with.  I accept those as they've been stated."); Hearing Tr. 1/24/2024 at 54:9-18 (the Court: "It seems inexplicably [sic] tied to the Dr. Wade's demonstratives, and, Counsel, and I very candidly admit, frankly, if I change my mind on that motion to reconsider, well, we don't need to hear from Dr. Trout.  I think that's essentially a motion to reconsider the denial of what I've styled a motion to reconsider. It also, as I said, makes me very concerned about what the real purpose of this record would be.").

cannot use the charts and demonstratives, but the Court can use them—despite their exclusion

from the trial evidence—to support its credibility determination, which is adverse to FWPs.

## III.    THE COURT INCORRECTLY BALANCED THE THREE *PENN CENTRAL* FACTORS.

The Court questions whether the *Penn Central* test is a "balancing test" or a "one strike

and you're out" test, and ultimately appears to apply a "one strike and you're out" test.  ECF No.

809 at 22.  This was a manifest error of law.

FWPs submit that they have proven all three of the *Penn Central* factors necessary to

support a taking in this case.  At a minimum, however, the Court acknowledges that SVLP and

CGA have proven two of the *Penn Central* factors support a finding of a taking in this case.  *See*

ECF No. 809 at 24, 34.  The Court also recognizes that it is undisputed that FWPs suffered

economic losses of millions of dollars in the aggregate.  *See id.* at 43.  Yet, irrespective of all

other facts and the other two *Penn Central* factors, the Court holds, or at least implies, that no

regulatory taking can be proven "where the economic impact was less than fifty percent."  *Id.*

That conclusion is incompatible with controlling law.

The holding of the Court sends a message that the government may enact and implement,

without paying just compensation, any regulation to deliberately target a segment of American

property owners and reduce, by up to 50% at least, the value of, or income generated by, their

properties.  Such a message, with the imprimatur of this Court, is unjust and incompatible with

the purpose of the Fifth Amendment.  *See, e.g.*, *Armstrong v. United States*, 364 U.S. 40, 49

(1960) (explaining that the purpose of the Takings Clause is to prevent the government from

"forcing some people alone to bear public burdens which, in all fairness and justice, should be

borne by the public as a whole").

The Supreme Court has repeatedly characterized the *Penn Central* test as a fact specific "balancing test."  *E.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 146 (2021); *Horne v. Dep't of Agric.*, 576 U.S. 351, 377 (2015).  There are no "magic formula[s]" and "few invariable rules."  *Horne*, 576 U.S. at 377 (quoting *Ark. Game & Fish. Comm'n v. United States*, 568 U.S. 23, 31 (2012) (alterations in original).

In this case, where FWPs have shown that they have satisfied at least two of the *Penn Central* factors and suffered economic losses, the Court should reconsider its conclusion and instead conclude that a taking occurred.  Even if the Court does not credit the economic losses calculated by Wade, the economic losses calculated by Riddiough should be considered a floor when determining just compensation.

**CONCLUSION**

For the reasons stated herein, FWPs respectfully request that the Court reconsider its Post-Trial Opinion.

Dated: February 24, 2025                    Respectfully submitted,


                                            */s/ Harry J. Kelly*
                                            Harry J. Kelly
                                            NIXON PEABODY LLP
                                            799 9th Street N.W., Suite 500
                                            Washington, D.C. 20001
                                            (202) 585-8000
                                            hkelly@nixonpeabody.com


                                            Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Motion for Reconsideration to be served electronically on this 24th day of February 2025, electronically on the following recipients:

AMANDA L. TANTUM
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Ben Franklin Station
P.O. Box 480
Washington, D.C. 20044
amanda.tantum@usdoj.gov

*/s/ Harry J. Kelly*
Harry J. Kelly