## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ANAHEIM GARDENS, *et al.*,     )
                        )
          Plaintiffs,     )
                        )
        v.            )     No. 93-655C
                        )     (Judge Tapp)
THE UNITED STATES,     )
                        )
          Defendant.     )

### DEFENDANT'S OPPOSITION TO FIRST-WAVE PLAINTIFFS' MOTION FOR RECONSIDERATION OF POST-TRIAL OPINION AND ORDER

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

AMANDA L. TANTUM
EMMA E. BOND
Senior Trial Counsel
A. BONDURANT ELEY
Senior Litigation Counsel
JOSHUA W. MOORE
TATE N. WALKER
BRITTNEY M. WELCH
Trial Attorneys
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-8131
E-mail: amanda.tantum@usdoj.gov

March 25, 2025                Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................1

I.  Standard Of Review ................................................................................1

II.  Reconsideration Is Not Warranted .........................................................2

    A.  RCFC 59 Does Not Afford FWPs A Second Bite At The Apple Regarding Economic Impact .....................................................................2

        1.  Drs. Wade And Trout Offered "Wildly" Different Measurements Of Economic Impact Than Dr. Riddiough – Who The Court Found To Be Credible.........................................................................3

        2.  The Court Articulated Well-Founded Concerns With The Formulas Proffered By Drs. Wade And Trout................................................4

        3.  Dr. Wade's Methods Are Inconsistent With Principles Of Economics .........9

    B.  The Court Reasonably Weighed The *Penn Central* Factors, And Plaintiffs Have Waived Any New Legal Theories That Severe Economic Impact Is Not Required To Establish A Regulatory Taking ...............................................19

    C.  FWPs Provide No Basis For Reconsidering The Court's Careful Factual Analysis Regarding Reasonable Investment-Backed Expectations.................22

        1.  Buckman ...............................................................24

        2.  Chauncy ...............................................................27

            a.  Private Placement Memorandum (PPM) .............................27

            b.  The Section 121A Agreement ..................................28

            c.  The Lack Of Contemporaneous Evidence Of Chauncy's Expectations.......................................................35

        3.  Rock Creek.............................................................36

4.  If The Court Reconsiders Its Opinion, It Should Find That Any
Subjective Intent To Invest Based On Potential Conversion To
Market-Rate Rentals 20 Years In The Future Was Not Reasonable ..........38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1950 Lakeshore Drive, LLC v. United States*,
– Fed. Cl. –, No. 22-902L, 2025 WL 654892 (Fed. Cl. Feb. 27, 2025) .......................... *passim*

*Ak-Chin Indian Community v. United States*,
85 Fed. Cl. 636 (2009) ................................................................................................ 22

*Alimanestianu v. United States*,
888 F.3d 1374 (Fed. Cir. 2018)................................................................................... 31

*Am. Pelagic Fishing Co., LP v. United States*,
379 F.3d 1363 (Fed. Cir. 2004)................................................................................... 37

*Ammex, Inc. v. United States*,
52 Fed. Cl. 555 (2002) ........................................................................................... 2, 21

*Anaheim Gardens, LP, et al. v. United States*,
953 F.3d 1344 (Fed. Cir. 2020).................................................................................... 5

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985)...................................................................................................... 3

*Ark. Game & Fish. Comm'n v. United States*,
568 U.S. 23 (2012)...................................................................................................... 21

*Biery v. United States*,
818 F.3d 704 (Fed. Cir. 2016)....................................................................................... 1

*Bronstein v. Prudential Ins. Co. of Am.*,
390 Mass. 701, 459 N.E.2d 772 (1984) ............................................................... 30, 33

*CCA Assocs. v. United States*,
667 F.3d 1239 (Fed. Cir. 2011)............................................................................. *passim*

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)..................................................................................................... 21

*Chancellor Manor v. United States*,
331 F.3d 891 (Fed. Cir. 2003)............................................................................... 23, 36

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) (*Cienega VIII*) ........................................................ 20

*Cienega Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007) (*Cienega X*) ................................................................ *passim*

*City of Salem v. Salem Heights Apartments Co.*,
    No. 00-CV-00165, 2001 WL 1562418 (Mass. Housing Ct. 2001) ........................................... 30

*Design Basics, LLC v. Forrester Wehrle Homes, Inc.*,
    380 F. Supp. 3d 692 (N.D. Ohio 2019) ................................................................................. 18

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999) ............................................................................... 31, 36

*Hawn v. Speedway, LLC*,
    No. 1:16-CV-359, 2018 WL 2192162 (N.D. Ind. May 14, 2018) ........................................... 25

*Horizon Lines, LLC v. United States*,
    429 F. Supp. 2d 92 (D.D.C. 2006) ................................................................................. 25, 37

*Horne v. Dep't of Agric.*,
    576 U.S. 351 (2015) ................................................................................................ 21, 24

*Hughes Commc'ns Galaxy, Inc. v. United States*,
    998 F.2d 953 (Fed. Cir. 1993) ................................................................................... 32

*In re Back Bay Restorations, Inc.*,
    118 B.R. 166 (Bankr. D. Mass. 1990) ......................................................................... 28, 33

*Lee v. United States*,
    130 Fed. Cl. 243 (2017), *aff'd*, 895 F.3d 1363 (Fed. Cir. 2018) ......................................... 2, 21

*Parsons ex rel. Linmar Property Mgmt. Trust v. United States*,
    174 F. App'x 561 (Fed. Cir. 2006) ................................................................................. 22

*Penn Central Transp. Co. v. City of New York*,
    438 U.S. 104 (1978) ........................................................................................... *passim*

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ................................................................................... 34

*St. Bernard Par. Gov't v. United States*,
    887 F.3d 1354 (Fed. Cir. 2018) ................................................................................... 33

*St. Christopher Assocs., L.P. v. United States*,
    511 F.3d 1376 (Fed. Cir. 2008) ................................................................................... 32

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regl. Plan. Agency*,
   535 U.S. 302 (2002) .......................................................................... 20, 21

*United States v. Hale*,
   422 U.S. 171 (1975) .......................................................................... 14

*United States v. James*,
   955 F.3d 336 (3d Cir. 2020) ............................................................. 18

## STATUTES AND REGULATIONS

U.S. Const. Amend. V ........................................................................... 20

12 U.S.C. § 4101 ................................................................................... 16

12 U.S.C. § 4109 ................................................................................... 16

12 U.S.C. § 4110 ................................................................................... 16

15 U.S.C. § 77*l*(a) .................................................................................. 39

Mass. Gen. Laws Ann. ch. 121A, § 6 (1956) ..................................... 29

Mass. Gen. Laws Ann. ch. 121A, § 6A ............................................. 32, 33

Mass. Gen. Laws Ann. ch. 121A, § 13 (1945) ................................... 29

Mass. Gen. Laws, ch. 121A, § 18C (1975) ........................................ 32, 33

Mass. Gen. Laws, ch. 121A, § 18C (1989) ........................................ 32

## RULES

Fed. R. Evid. 611(a) .............................................................................. 18

Fed. R. Evid. 801(d)(1) ......................................................................... 14

RCFC 30(b)(6) ............................................................................... *passim*

RCFC 59 ......................................................................................... 1, 2, 21

## INTRODUCTION

Pursuant to the Court's February 25, 2025 order, the United States responds to first-wave plaintiffs' (FWPs) motion for reconsideration.[1]  This Court previously stated, when denying plaintiffs' previous request for reconsideration, that "[a]rguments are not pasta to be thrown sporadically at a wall in hopes they will stick."  Order, ECF No. 750.  Yet, FWPs' motion does exactly that.  Despite the high bar for RCFC 59 relief, FWPs take a "kitchen sink" approach, challenging essentially every aspect of the Court's detailed fact and credibility findings, as well as the Court's weighing of evidence.  FWPs not only rehash meritless arguments, but also offer several all-new arguments and previously unaired grievances.  Nowhere do FWPs identify any "extraordinary circumstances" to justify relief under RCFC 59.  *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016).  Accordingly, the Court should deny the motion.

## ARGUMENT

I.    Standard Of Review

"The bar to succeed on a motion for reconsideration of a final judgment under rule 59 is high."  *1950 Lakeshore Drive, LLC v. United States*, – Fed. Cl. –, No. 22-902L, 2025 WL 654892, at *1 (Fed. Cl. Feb. 27, 2025) (appeal pending).  "[A] court, in its discretion, 'may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice.'"  *Biery*, 818 F.3d at 711 (citation omitted).  A reconsideration motion must be supported "by a showing of extraordinary circumstances which justify relief."  *Id.* (quotation omitted).  "The court will not grant a motion for reconsideration when the movant merely

---

[1]  First-wave plaintiffs are Buckman Gardens, L.P. (Buckman), Chauncy House Company (Chauncy), Cedar Gardens Associates (Cedar Gardens), Rock Creek Terrace L.P. (Rock Creek), and 3740 Silverlake Village, L.P. (Silverlake).

restates arguments previously made and considered by the court or when the movant raises entirely new subjects that it could have raised earlier." *1950 Lakeshore*, 2025 WL 654892, at *2 (citing *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002); *Lee v. United States*, 130 Fed. Cl. 243, 253 (2017), *aff'd*, 895 F.3d 1363 (Fed. Cir. 2018)).

II.     Reconsideration Is Not Warranted

Consistent with the nature of regulatory takings claims – which present "essentially ad hoc factual inquiries," *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) – the Court conducted a close analysis of the evidence and made detailed factual and legal findings supported by the record.  Post-Trial Opinion & Order at 6-44, ECF No. 809 (Order).  FWPs present no "extraordinary" basis for reconsideration and instead simply disagree with the Court's detailed factual findings and weighing of evidence after lengthy trial proceedings.

A.      RCFC 59 Does Not Afford FWPs A Second Bite At The Apple Regarding Economic Impact

There is no basis to reconsider the Court's determination that FWPs did not experience severe economic impact from the Preservation Statutes.  *See* Order at 34-43.  Noticeably absent from FWPs' motion is any meaningful discussion of the Court's positive credibility finding regarding Dr. Riddiough's testimony.  The Court affirmatively found "Dr. Riddiough's methodology and conclusions to be credible."  Order at 35.  As the Court explained, "Dr. Riddiough's methodology for calculating economic loss was readily understandable and consistent with principle of economics."  *Id.* at 42.  Furthermore, "Dr. Riddiough clearly explained his methodology and the inputs he used to determine the economic losses for each of the FWPs' properties."  *Id.* at 42.  "Dr. Riddiough's methodology was consistent, replicable, and reliable."  *Id.* at 43.  "Because the Court [found] Dr. Riddiough's methodology credible, it accept[ed] his measurements of economic loss for each of the FWPs."  *Id.*

2

Despite making no effort to challenge the Court's *positive* credibility findings regarding Dr. Riddiough, FWPs dispute the Court's finding of multiple "irredeemable flaws" in Dr. Wade's calculation, offered through Dr. Trout.   *See* Order at 2; Pl. Mot. at 23-34, ECF No. 818 (Pl. Mot.).  None of FWPs' arguments identify any error in the Court's reasoning – much less extraordinary circumstances justifying reconsideration.

       1.      Drs. Wade And Trout Offered "Wildly" Different Measurements Of Economic Impact Than Dr. Riddiough – Who The Court Found To Be Credible

As an initial matter, FWPs claim that the many flaws identified with Drs. Wade and Trout's testimony "miss[ed] the forest for small trees" and "did not materially impact the resulting economic losses calculated by Wade."  Pl. Mot. at 24.  This argument is confusing.  To the extent FWPs argue that each of the flaws identified by the Court are harmless, they misunderstand the Court's credibility findings.  From the "superiority of the trial judge's position to make determinations of credibility," *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985), the Court evaluated "Dr. Wade's deposition, Dr. Trout's prior trial testimony, and [had] the opportunity to assess Dr. Trout's earlier testimony by personally hearing his account of Dr. Wade's methodology."  Order at 36.  "After weighing the abundance of evidence presented at trial, oral argument, and throughout the enormous record, the Court [found] Dr. Trout's explanations of Dr. Wade's methodology and conclusions not credible" and found "Dr. Riddiough's methodology and conclusions to be credible."  *Id.* at 35.

Moreover, Drs. Wade and Trout offered "wildly different measurements of the FWPs' economic losses," compared to Dr. Riddiough.  *Id.*  Dr. Riddiough calculated percentage of economic impact for each FWP ranging from 5.9% and 27.4%."  *Id.* (citing Trial Tr. Vol. 11, Riddiough, 2296:24-2297:9, Jan. 24, 2023).  By contrast, Dr. Wade calculated (and Dr. Trout

endorsed) a percentage of economic impact of "between 92% and more than 100%." *Id.* (citing Rule 63 Hr'g Tr. Vol. 1, Trout, 204:16-205:4, July 8, 2024); *see also* Rule 63 Hr'g Tr. Vol. 1, 127:5-19.

Yet, "Dr. Trout was unable to provide the Court with clear insight into the calculations made by Dr. Wade to arrive at his economic loss conclusions, and the Court [was] not persuaded that Dr. Wade's methods are consistent with principles of economics." Order at 37. The Court identified multiple irredeemable flaws in the methodology – including many described by Dr. Riddiough. *Id.* at 36-43. As Dr. Riddiough explained, even adjusting for only three of the methodological errors and inconsistencies in Dr. Trout's proffered opinion would yield "much lower" calculations of economic impact." *See* Def. Post-Hr'g Br. at 26, ECF No. 782 (citing Rule 63 Hr'g Tr. Vol. 2, 337:15-22; *id.* at 334:23-336:8 (citing DDM D at slide 62)).[2] Given the "wildly" different measurements reached by Dr. Riddiough and Drs. Wade and Trout, and the Court's adoption of Dr. Riddiough's approach, it is confusing how FWPs could contend that the Court's concerns with Dr. Trout's credibility are not material. *See* Pl. Mot. at 24.

　　　　2.　　The Court Articulated Well-Founded Concerns With The Formulas
　　　　　　　Proffered By Drs. Wade And Trout

The Court found that "FWPs argue that they used the formula supported by [*Cienega Gardens v. United States*, 503 F.3d 1266, 1282 (Fed. Cir. 2007) (*Cienega X*)], but in reality, their methodology is 'highly inconsistent' and a 'highly unreliable measure of economic impact.'" Order at 37 (citing Trial Tr. Vol. 12, Riddiough, 2429:7-11, Jan. 25, 2023). Furthermore, "Dr. Wade appeared to use multiple formulas, and a clear articulation of which formula was primarily

---

　　　　2　 In doing this exercise, Dr. Riddiough corrected for three methodological errors: (1) subtracting TPE from the denominator, (2) inconsistent use of equity values, and (3) inconsistent use of ex post data. Def. Post-Hr'g Br. at 25-26.

utilized to calculate economic impact was neither identified by the FWPs nor independently found by the Court." *Id.* Specifically, the Court cited a discussion in which Dr. Trout "struggled through an explanation" regarding the difference between "two formulas" – labeled as 1 and 1A. *Id.* (citing Trial Tr. Vol. 7, Trout, 1336:2-23, Jan. 18, 2023).

As an initial matter, FWPs claim that the Court should have accepted Dr. Wade's formula because it was "the *same formula* that the Federal Circuit concluded that Wade used and held was consistent with *Cienega X*." Pl. Mot. at 24-25 (citing, *e.g.*, *Anaheim Gardens, LP, et al. v. United States*, 953 F.3d 1344, 1352, 1354 (Fed. Cir. 2020)). But as the Court explained, the Federal Circuit's ruling addressed admissibility at the summary judgment posture and did not resolve credibility of the trial testimony. Order at 36 (citing, *e.g.*, *Anaheim*, 953 F.3d at 1355). FWPs previously recognized as much when demanding a Rule 63 re-hearing of Dr. Trout's live testimony. Order at 36 (citing FWPs' Rule 63 Mot. at 1, ECF No. 743).

On the issue of credibility, FWPs disagree with that Dr. Trout "struggle[d]" to provide a cogent explanation of the formula used. According to FWPs, Dr. Trout "clearly" explained the formula as "the NPV market conversion less the NPV actual outcome, divided by the NPV market conversion." Pl. Mot. at 25-26 n.9 (citing Trial Tr. Vol. 7, 1336:21-23).

But the Court's assessment is well-supported by the record. *See* Trial Tr. Vol. 7, Trout, 1336:2-23, Jan. 18, 2023. Dr. Wade expressed economic loss in two different ways, one expressed in terms of NPV or "net present value" and another expressed as PV or "present value. *See* Trial Tr. Vol. 7, Trout, 1328:23-1329:1-2, 1329:17-1330:1 (discussing DDM A at 1). Dr. Wade used "NPV to represent present value minus [transfer preservation equity (TPE)]." *Id.* at

1329:24-1330:1 (discussing DDM A at 1)

| Dr. Wade's Affirmative Report, 5/18/2017 (p. 25) |
|---|

**Economic Losses = NPV (Expected net operating income from conversion to market less TPE) minus**
                                **NPV (actual cash distributions of actual outcome less TPE)**

                                                                                                [1]

| Dr. Wade's Affirmative Report, 5/18/2017 (p. 26) |
|---|

**Economic Loss =  PV [(total net income *without* the restriction over the entire useful life of the property) less (net income *due to* the restriction)]**                                                                      **[1A]**

Where: PV = Cash flows discounted to present value at the date the restriction was imposed, or prepayment date for the six properties.

DDM A at 1.[3]

Dr. Trout struggled to explain how these different formulas for economic loss translated into the formula for economic impact expressed as a percentage. For example, Dr. Trout stated Dr. Wade "is comparing . . . he is using, I'm sorry, equation number [one], he's looking at the NPV of the operating income less the TPE . . . well, no, that's not . . . let's see. I'm sorry. Let me rephrase that." Order at 37 (quoting Trial Tr. Vol. 7, Trout, 1336:2-23). FWPs nonetheless claim that he "clearly" stated the formula for the percentage reduction in economic impact as:

$$\text{Econ Impact}_{\text{WADE}} = \frac{\text{NPV Market Conversion} - \text{NPV Actual Outcome}}{\text{NPV Market Conversion}}$$

Pl. Mot. at 25-26 n.9 (citing Trial Tr. Vol. 7, 1336:21-23). But even this characterization fails to reflect Dr. Trout's testimony during trial, in which he also agreed that "the equations that Dr.

---

[3] Dr. Trout testified that although the words used in the two formulas (1 and 1A) are "a little different," "[t]he meaning of the formulas is the same." Trial Tr. Vol. 7, Trout, 1328:23-1329:1-2 (discussing DDM A at 1). He explained that the second equation – expressed in present value terms – did not deduct transfer preservation equity (TPE) from either side of the equation. *Id.* at 1329:3-16. That is because "TPE cancels out if you are deducting it from both sides of the equation." *Id.*

Wade used to calculate" the percentage of economic impact were reflected in *both* of the following two equations:

$$EconImpact_{WADE} = \frac{(PV^{unrestricted} - TPE) - (PV^{restricted} - TPE)}{PV^{unrestricted} - TPE}$$

$$EconImpact_{WADE} = \frac{(PV^{unrestricted}) - (PV^{restricted})}{PV^{unrestricted} - TPE}$$

Trial Tr. Vol. 7, Trout, 1340:13-18; *id.* at 1338:4-1338:12 (discussing DDM A at 2); *see also* Rule 63 Hr'g Tr. Vol. 1, Trout, 170:20-171:25. Further, as Dr. Riddiough explained, Dr. Wade's report did not directly express the "exact formula he was using to calculate economic impact or severity." Order at 37 (quoting Rule 63 Hr'g Tr. Vol. 2, Riddiough, 277:3-11, July 9, 2023).

During the Rule 63 hearing, moreover, Dr. Trout had trouble explaining the relationship between the various formulas. For example, he agreed that the two formulas for economic loss yielded the same result "mathematically for economic impact," but insisted that "when you go beyond that, then they become different" – without clearly explaining how. Rule 63 Hr'g Tr. Vol. 1, 200:20-201:2. Dr. Trout also failed to answer basic questions about the formula for economic impact. For example, when asked whether "TPE" appeared in the right side of the denominator – which is clear by looking at the equation – Dr Trout did not provide a responsive answer, even after an extended discussion. *See* Rule 63 Hr'g Tr. Vol. 1, 201:25-202:22 (the Court stating "we're getting into a responsiveness issue").

> Q. And the right side in the denominator has transfer preservation equity, right?
> THE COURT: We can all see it. I mean –
> THE WITNESS: No, it doesn't. The denominator has one number, PV unrestricted, minus TPE. You can't just randomly split those apart.

*Id.* at 202:17-22. Dr. Trout ultimately agreed that if restricted present value is the same as TPE, then the ratio in Dr. Wade's formula would be one (*i.e.*, 100 percent). *See id.* at 204:2-6.

Because TPE is derived from the transfer preservation value, as is the restricted present value, *id.* at 204:7-22, the similarity between TPE and PV$^{restricted}$ supports the conclusion that Dr. Wade's formula is designed to approximate 100 percent. Thus, it was no surprise that Dr. Wade's calculation of the economic impact for all five FWPs was "in the vicinity of 100 percent." *Id.* at 204:16-22.

Even the inputs for Dr. Wade's equations were confusing, with Dr. Wade using different terms for similar concepts – supporting the Court's concern regarding "the inconsistency of Dr. Trout's explanation of the inputs in FWPs' economic loss equation." Order at 37; *see also id.* at 38 (citing Hr'g Tr., 60:7-61:22, Oct. 15, 2024). For example, "Dr Wade sometimes referred to the restricted PV as the "actual cash outcome," or "present value of actual proceeds" or "the present value of the LIHPRHA outcome." Rule 63 Hr'g Tr. Vol. 1, 148:4-13. Dr. Trout testified "I think those are all similar, yeah." *Id.* Dr. Wade also used terms such as "projected outcome" and "market conversion" to describe unrestricted present value. *Id.* at 131:3-16, 142:11-17. Dr. Trout could not explain "why" Dr. Wade used "different terms" to mean the same thing. *See id.* at 131:17-22. As the Court explained, this "mélange of economic terminology appears to be a master class in obfuscation." Order at 41.

As a final example, when asked whether "Dr. Wade's present value analysis offered "'the value of the properties as of the prepayment date,'" Dr. Trout responded: "'I don't believe [Dr. Wade] ever said that'" – which was "later shown to be incorrect." Order at 38 (quoting Trial Tr. Vol. 7, Trout, 1378:20-1380:18, Jan. 18, 2023).

In short, the Court was on solid ground when concluding that "Dr. Trout was unable to provide the Court with clear insight into the calculations made by Dr. Wade to arrive at his economic loss conclusions." Order at 37.

### 3. Dr. Wade's Methods Are Inconsistent With Principles Of Economics

The Court also explained that it was "not persuaded that Dr. Wade's methods are consistent with principles of economics, Order at 37, and ultimately found "both Dr. Trout and Dr. Wade's methodology and testimony inconsistent and the results unreliable," *id.* at 42. Plaintiffs' efforts to wave away each of these concerns is unpersuasive and – again – provides no extraordinary basis for reconsideration.

The Court highlighted several primary concerns with Dr. Wade's methodology and Dr. Trout's attempt to explain it:

(1) Dr. Trout was unable to "adequately justify" Dr. Wade's practice of subtracting TPE from the denominator.  Order at 38.

(2) Dr. Trout also "did not inspire confidence that subtracting debt in calculations of economic loss was methodologically correct, let alone subtracting only partial debt amounts."  Order at 39.

(3) "Dr. Wade inconsistently utilized *ex post* and *ex ante* data in the same equation, which was not reasonably supported by Dr. Trout's testimony or general economic principles, especially in light of the other inconsistencies in Dr. Wade's formula inputs."  Order at 39.

(4) The Court was "dissatisfied with Dr. Trout's explanation of how Dr. Wade arrived at the 'discount rates' used throughout his economic loss analysis."  Order at 40.

(5) The Court was "not persuaded of the accuracy of Dr. Wade's calculations of 'offsetting benefits' of the FWPs."  Order at 40.

(6) Dr. Trout "could not clearly explain" the "missing a column of numbers called the 'interest factor,'" appearing in one of Dr. Wade's charts.  Order at 41-42 (citations omitted).

As Dr. Riddiough explained, taking certain steps to correct the first three methodological errors alone would yield "much lower" economic impact calculations.  *See* Rule 63 Hr'g Tr. Vol. 2, 337:7-22; *id.* at 334:23-336:8 (discussing DDM D at 62); Trial Tr. Vol. 12, Riddiough, 2491:10-

2493:11 (discussing DDM D at 62).[4]  Collectively, all of these concerns cast doubt on "Dr. Wade's methodology, as illuminated by his deposition testimony, and exhibits utilized by FWPs at trial."  Order at 42.  "When the secondary expert, Dr. Trout, cannot understand or explain the primary expert's calculations, the Court's apprehension is validated."  *Id.*

FWPs laboriously tick through the Court's multiple concerns, without unearthing any basis for reconsideration.  *See* Pl. Mot. at 26-34.  Each of their arguments is addressed below.

**Subtraction of TPE from the Denominator**

Regarding subtraction of TPE from the denominator, this issue has already been heavily briefed by the parties.  *See*, *e.g.*, FWPs Post-Hr'g Br. at 6, 13-14, ECF No. 781; Def. Post-Hr'g Br. at 19-21.  As the Court explained, Dr. Trout's effort to justify the subtraction of TPE yielded "vague and contradictory answers," with Dr. Trout stating "it was necessary for the value to be 'net of something.'"  Order at 38 (citing Trial Tr. Vol. 7, Trout, 1421:23-1422:6).  FWPs now assert that "the subtraction of TPE values from the denominator was for the purpose of determining the severity of the economic losses suffered by FWPs."  Pl. Mot. at 26 (citations omitted).  But this clarifies nothing.  Even if it did, Dr. Trout testified that he did not "'have an independent opinion' on why it makes sense to delete TPE from the denominator."  Order at 38 (citing Trial Tr. Vol. 7, Trout, 1422:7-1423:4).  The belated assertion of counsel cannot rehabilitate the expert witnesses' inability to justify the calculation.

FWPs also suggest that the Court should have altered Dr. Wade's formula for calculating economic impact and relied on Dr. Wade's economic loss formula "without subtracting TPE values."  Pl. Mot. at 26-27.  But the Court found that the methodology and results proffered by

---

    [4]  In doing this exercise, Dr. Riddiough corrected for three methodological errors: (1) subtracting TPE from the denominator, (2) inconsistent use of equity values, and (3) inconsistent use of ex post data.  Def. Post-Hr'g Br. at 25-26.

Drs. Wade and Trout were not credible.  *See, e.g.*, Order at 38-42.  The Court instead relied on Dr. Riddiough's opinion – which the Court found credible – without any need to tinker with the "inconsistent" and "unreliable" methodology and results offered by plaintiffs' experts.  *Id.* at 42.

### Subtraction of Debt from the Economic Impact Calculation

Next, FWPs attempt to provide an economic justification for the subtraction of principal debt (but not interest) in the unrestricted world.  *See* Pl. Mot. at 27-28.  But they identify no basis to second-guess the Court's credibility findings.  The Court could not "say with certainty whether subtracting debt when performing economic impact analysis is methodologically sound, but the Court is certainly not convinced by Dr. Trout's reasoning."  Order at 39.  For example, Dr. Trout admitted that "generally in his economic loss calculations he 'would not subtract either interest or principal.'"  Order at 39 (citing Trial Tr. Vol. 7, Trout, 1407:11-17, Jan. 18, 2023).  Dr. Trout also "characterized debt as 'an issue of how the property is financed, not about its operations.'"  *Id.* (citing Trial Tr. Vol. 7, Trout, 1409:1-4).  The Court also found Dr. Riddiough's explanation credible, namely, that "[t]he amount that's borrowed is really a side issue," and that "even if Dr. Wade had consistently employed equity values in his equation, it still would not have accurately reflected the regulation's economic impact on the property."  Order at 39 (citing Trial Tr. Vol. 12, Riddiough, 2398:18-2399:15, Jan. 25, 2023; Rule 63 Hr'g Tr. Vol. 2, Riddiough, 270:1-277:1, July 9, 2024; DDM D at 30).

FWPs argue that Dr. Wade subtracted "debt *and* interest when calculating economic losses" for Rock Creek.  Pl. Mot. at 28.  But this presents the same problem of "subtracting debt in calculations of economic loss," Order at 39 (citations omitted), so it is not apparent how this helps FWPs.

FWPs argue that the subtraction of mortgage principal would have the effect of "reducing" the NPV in the unrestricted world – suggesting that even if the calculation makes no sense, the error was not outcome-oriented. Pl. Mot. at 28 (citations omitted). But even this is wrong because FWPs tellingly ignore the effect of the error on the percentage of economic impact. Subtracting debt from the unrestricted present value reduced the denominator without any economic justification, thereby inflating the appearance of economic impact. *See*, *e.g.*, Def. Post Hr'g Br. at 14, 16-17.

**Use of Ex Ante and Ex Post Data**

FWPs disagree with the Court's finding that Dr. Wade selectively used ex post data in the unrestricted world and not in the restricted world, arguing that the "gross sales proceeds" used in the restricted world were technically received "*after* the prepayment eligibility date for each FWP" and thus could not qualify as ex ante. Pl. Mot. at 28-29 (citations omitted).

This overly technical argument ignores the substance of the Court's finding, which highlighted that "[u]sing the *ex post* data to include years of rapid rental growth appears to vastly overstate Dr. Wade's unrestricted present value for each of the FWPs." Order at 39 (citing Trial Tr. Vol. 12, Riddiough, 2431:21-2432:8, 2481:11-23, 2482:8-13, Jan. 25, 2023)). There is no dispute that Dr. Wade did not include this "rapid rental growth" in the restricted world. Furthermore, Dr. Trout admitted that the LIHPRHA sale price used in the restricted world was derived from the HUD appraisals, Rule 63 Hr'g Tr. Vol. 1, 152:24-153:3, and listed the "HUD appraisals" as an example of "ex ante data Dr. Wade relied on." *Id.* at 125:18-24.

FWPs claim there is "no material evidence" that the use of ex post rental data was "unreasonable," but this ignores the credible testimony from Dr. Riddiough. Pl. Mot. at 30. Dr. Riddiough explained that incorporating rapid rental growth only in the unrestricted world

"generates very skewed results, whereby, in the unrestricted world, plaintiffs' experts assume that plaintiffs get the benefit of an unexpectedly robust and good property market."  Trial Tr. Vol. 12, Riddiough, 2431:12-20; *see also* Order at 39 (citing Trial Tr. Vol. 12, Riddiough, 2431:21-2432:8, 2481:11-23, 2482:8-13, Jan. 25, 2023)).  Dr. Wade did not include the rapid rental growth in the restricted world, even though plaintiffs who wanted "exposure" to real estate markets could have invested LIHPRHA proceeds "in the property market" and generated the same returns.  Trial Tr. Vol. 12, Riddiough, 2432:18-2433:18.  Dr. Riddiough explained that he "stay[ed] ex ante the entire time" to avoid "having to make a number of speculative assumptions about what an ex post world looks like."  *Id.* at 2433:19-24.  As the Court found, incorporating the hypothetical scenario of rapid rental growth only in the unrestricted world was "conveniently advantageous to the FWPs."[5]  Order at 39-40.

### Different Discount Rates

FWPs next dispute the Court's dissatisfaction with Dr. Trout's explanation of the two different discount rates used by Dr. Wade.  Pl. Mot. at 31-32.  As the Court explained, Dr. Trout adopted Dr. Wade's two different discount rates – including 9.55 percent until 2001 and 6.9 percent after 2001 – despite previously testifying that a "9.47% discount rate was the 'best' discount rate to use."  Order at 40 (quoting Trial Tr. Vol. 7, Trout, at 1347:17-1348:3).  FWPs contend that Dr. Trout should not be held to his prior testimony because he merely agreed that

---

[5]  To the extent FWPs also suggest that Ms. Konikoff, an expert appraiser, used *ex post* information in an inconsistent fashion, they are incorrect.  Instead, Ms. Konikoff applied established real estate appraisal guidelines for conducting retrospective appraisals, which, as the Court explained, "are generally restricted 'to *ex ante* data' with a 'limited exception' allowing use of *ex* post data 'that would have been known by investors in the market prior to or at the date of the appraisal.'"  Order at 42-43 n.27 (quoting Trial Tr. Vol. 11, Konikoff, at 2209:7-10, 2209:22-2210:15, 2213:5-9, Jan. 24, 2023, ECF No. 674)).  This is a far cry from Dr. Wade's use of rental data post-dating the prepayment eligibility dates by decades.

the 9.47 percent discount rate was best, rather than himself coming up with the term "best." *See* Pl. Mot. at 31 (citing Trial Tr. Vol. 7, 1347:17-25).

> Q: So, Dr. Trout, I'll just turn your attention again, so the question was asked of you in your deposition, "So, in your opinion, is a discount rate of 9.47 the best rate to use in this – in analyzing this case?" And do you see that you responded, "Yes?"
>
> A. Yes. …

Trial Tr. Vol. 6 at 1347:17-25.  The Court was free to hold Dr. Trout to his prior inconsistent deposition testimony – both for the truth of the matter and in assessing credibility.  *See* Fed. R. Evid. 801(d)(1) (explaining that a statement is not hearsay when  it "is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition"); *see also United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness.").  Thus, the record supports the Court's explanation that it was "dissatisfied" with Dr. Trout's explanation of Dr. Wade's discount rates.  Order at 40.

**Offsetting Benefits**

FWPs next take aim at the Court's concerns regarding Dr. Wade's calculation of "offsetting benefits" of the FWPs.  Pl. Mot. at 32-33.  As the Federal Circuit has explained, "[t]he sale and use agreement options" available pursuant to the Preservation Statues "conferred considerable benefits on the owners."  *Cienega X*, 503 F.3d at 1286.  Those benefits "must be considered as part of the takings analysis."  *Id.* at 1283-84.

Among other issues regarding offsetting benefits, the Court expressed concern that it could not "discern" Dr. Wade's treatment of certain income.  Order at 40-41.  The Court stated that "the only offsetting benefit incorporated into Dr. Wade's analysis was what the FWPs actually received from the LIHPRHA process."  *Id.* at 40 (citing Hr'g Tr. 63:16-25, Oct. 15,

2024).  It was not "clear to the Court whether Dr. Wade accounted for the rent FWPs received during the period at issue or the 'reserves' that were incorporated by Dr. Riddiough." *Id.* Additionally, although Dr. Wade included laundry income in calculations of lost future income for each of the properties, the Court could not "discern whether this laundry income was incorporated as an offsetting benefit during the years that FWPs continued to own the properties after the enactment of the Preservation Statutes but before their respective sales or agreement with HUD." *Id.* at 41 (citing Rule 63 Hr'g Tr. Vol. 1, Trout, 53:12-17, July 8, 2024).  "Including laundry income, a relatively modest sum, while excluding rental income, proportionately a much more significant sum, is irreconcilable." *Id.*  The Court acknowledged that "[i]t may be that Dr. Wade accounted for both, but trial testimony does not establish that he did so." *Id.* at 41.

Rather than answering this question, FWPs suggest their experts need not account for offsetting benefits because the Government bears the burden to establish offsetting benefits and that "[t]he United States did not prove any offsetting benefits apart from what FWPs received from selling their properties or signing a new use agreement under LIHPRHA."  Pl. Mot. at 32; *see also id.* (citing *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011)).  But as Dr. Riddiough explained, offsetting benefits included (1) "the restricted property value also included the amount of previously restricted reserves that would be released upon sale," and (2) "the income that property owners would receive while operating the property as affordable pending a sale" – "all discounted back to the prepayment eligibility date."  Order at 43 (citing Rule 63 Hr'g Tr. Vol. 2, Riddiough, 252:22, 252:23-253:2, 253:3-8).  FWPs have not disputed that these offsetting benefits were provided, so this case presents no factual dispute about the offsetting benefits received.  Rather, at issue here is whether the expert methodology for incorporating offsetting benefits made economic sense.  The Court was rightfully concerned that

neither Dr. Wade nor Dr. Trout explicitly addressed how their methodology accurately and completely accounted for LIHPRHA's offsetting benefits.

FWPs also challenge the Court's statement that "FWPs did not cohesively articulate how the below market-rate interest, extended mortgage terms, and tax incentives factor into the economic impact of the Preservation Statutes on the FWPs." Order at 40. FWPs argue that these offsetting benefits are limited to benefits "received *from the preservation statutes*," not from the original section 236 or 221(d)(3) programs. Pl. Mot. at 32 (citing *CCA*, 667 F.3d at 1245). FWPs are correct that the offsetting benefits at issue are those in the preservation statutes. They fail to acknowledge, however, that the original section 236 or 221(d)(3) subsidies would remain in place under LIHPRHA unless or until modified by incentives or prepayment. *See, e.g.*, 12 U.S.C. §§ 4101, 4109, 4110. Regardless, FWPs' argument reflects no error in the Court's analysis, which critiques Drs. Wade and Trout's failure to coherently *articulate* their treatment of offsetting benefits. *See, e.g.*, Order at 40, 43. Indeed, "below market-rate interest, extended mortgage terms, and tax benefits" were likewise "not obviously included in Dr. Riddiough's analysis of offsetting benefits," *id.* at 43, but the Court nonetheless found Dr. Riddiough credible when "[u]nlike Dr. Trout, Dr. Riddiough *clearly explained* the offsetting benefits he incorporated into his analysis." *Id.* (emphasis added).

**Missing Column**

Finally, FWPs challenge the Court's discussion of Dr. Trout's testimony involving Dr. Wade's Chart SL.9B (Silverlake Present Value Net Operating Income), "which was missing a column of numbers called the 'interest factor.'" Order at 41 (citing Rule 63 Hr'g Tr. Vol. 1, Trout, 88:21-94:25, July 8, 2024 (discussing PDM DD at 5)); *see also* Pl. Mot. at 33-34. As the Court explained, "Dr. Trout could not clearly explain what the interest factor was or how the

Court could verify the total numbers presented in Dr. Wade's lost income analysis." Order at 41 (citing Rule 63 Hr'g Tr. Vol. 1, Trout, at 88:21–92:2, 92:15-20, July 8, 2024). FWPs complain that the Court "seems to unfairly fault Trout for not being able to quickly identify the discount factors from memory," and argue that the missing column had "*no impact*" on the results for Silverlake. Pl. Mot. at 33. As the Court explained, however, "[t]he issue critical to the resolution of damages is Dr. Wade's methodology," and "[w]hen the secondary expert, Dr. Trout, cannot understand or explain the primary expert's calculations, the Court's apprehension is validated." Order at 42. Dr. Trout's inability to "clearly explain" the missing information is certainly "significant[]" in the Court's assessment on this issue. *Id.* at 41.

Moreover, the Court "had the unique opportunity to be made 'aware of the variations in demeanor and tone of voice' that bear so heavily on the Court's understanding of what was said." *Id.* at 36 (citation omitted). The Court's conclusion that Dr. Trout was unable to "clearly" explain key parts of Dr. Wade's methodology is entitled to significant deference. *Id.* at 41-42.

**There Is No Basis To Re-Re-Consider Admissibility Of Plaintiffs' Demonstratives**

On a procedural note, FWPs effectively seek re-reconsideration of the admissibility of FWPs' demonstratives, after the Court previously denied reconsideration of Judge Campbell-Smith's admissibility ruling. *See* Order at 4-6 (describing history of the admissibility dispute and decisions). The Court found that "even if these exhibits were admitted, it would not affect the Court's credibility determination herein, and thus, the final decision would remain unchanged." *Id.* at 5 n.5. The Court also noted that FWPs did not attempt to use the demonstratives in the Rule 63 hearing "as *demonstrative* aides," thus "undercut[ting] any claim of prejudice arising from their exclusion from evidence." *Id.*

FWPs argue that it is "manifestly unjust" to suggest that they could have "used" the disputed demonstratives at the Rule 63 hearing, because the Court had previously warned that the hearing was not an opportunity to try to get the disputed material "*into the record*."  Pl. Mot. at 36 (citing Hr'g Tr., 24:7-10, May 21, 2024) (emphasis in FWPs' motion).  This argument reflects FWPs' misunderstanding of the difference between demonstrative aides and admissible evidence – a misunderstanding that may explain FWPs' trial strategy that led to this dispute.

Demonstrative aides may be useful to aid the factfinder's comprehension of substantive evidence in the record.  *See, e.g.*, *United States v. James*, 955 F.3d 336, 344 n.6 (3d Cir. 2020) (citing, *e.g.*, Fed. R. Evid. 611(a) & advisory committee's note) (explaining that disputed chart "was not admitted into evidence," but rather "was used as a demonstrative aid").  But the use of such a demonstrative aide does not mean that the demonstrative itself is admitted as "substantive evidence."  *See*, *e.g.*, *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 380 F. Supp. 3d 692, 699 (N.D. Ohio 2019).  The Court reasonably concluded that FWPs' failure to rely on the disputed exhibits even *as demonstrative aides* during the Rule 63 hearing undermines any claim of prejudice from the Court's evidentiary ruling.

FWPs also ask the Court to reconsider "its decision to support its credibility determination, in part, on charts and demonstratives that were excluded from evidence."  Pl. Mot. at 36.  That is not what the Court did.  The Court explained that consideration of those excluded materials *would not affect* its credibility findings, which were based on the evidence at trial and the Rule 63 hearing.  Order at 5 n.5.  Such a factual finding is helpful to clarify the scope of the Court's credibility determination that was made based on the record evidence.

In sum, the Court's credibility findings are well-supported by the record.  Because the Court found Dr. Riddiough's methodology credible, it adopted his calculations of economic

impact of between 5.9 percent and 27.4 percent for the FWPs. *See* Order at 43. As the Court explained, "[e]ven the high end of Dr. Riddiough's range does not approach the accepted diminution in value threshold to find that a taking occurred," and thus, "FWPs were not able to tip the scales of the economic impact element of *Penn Central* in their favor." *Id.* at 43-44.

B.    The Court Reasonably Weighed The *Penn Central* Factors, And Plaintiffs Have Waived Any New Legal Theories That Severe Economic Impact Is Not Required To Establish A Regulatory Taking

Having failed to establish severe economic impact, FWPs contend that satisfying the other two *Penn Central* factors should be enough. Pl. Mot. at 38. Specifically, plaintiffs claim that "at least two of the *Penn Central* factors" should be enough to "conclude that a taking occurred." *Id.* Based on this theory, plaintiffs contend that "the economic losses calculated by [the government's expert, Timothy Riddiough] should be considered a floor when determining just compensation." *Id.*[6]

FWPs' argument ignores the Court's careful evaluation of the parties' arguments for weighing the three *Penn Central* factors. *See, e.g.*, Order at 34, 43-44; *see also id.* at 25 n.21. The Court held that two FWPs met their burdens regarding reasonable investment-backed expectations, *id.* at 34, and stated that "[b]ut for the economic impact precedent," the Court would award these two FWPs "damages in accordance with Dr. Riddiough's economic loss figures," *id.* at 25 n.21 (citations omitted). "However, try as it might," the Court explained that it could not "logically avoid using the economic impact element of *Penn Central* as a threshold inquiry as applied in *CCA*." *Id.* at 25 n.21 (citing *CCA*, 503 F.3d at 1242; *Penn Central*, 438 U.S. 104).

---

[6]    This argument also conflicts with the Court's finding that three FWPs did *not* establish reasonable investment-backed expectations. *See* Order at 25-30; *see also* Section II.C.

In explaining its analysis, the Court recognized that there is "no exact threshold for establishing whether an economic impact is severe enough to warrant finding a regulatory taking." Order at 43. The Federal Circuit has held that an economic impact of 18 percent was not sufficient to establish a regulatory taking, but a 77 percent loss was. *Id.* (citing *CCA,* 667 F.3d at 1246-48; *Cienega Gardens v. United States*, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (*Cienega VIII*)). "Like the Federal Circuit," however, "the Court here [was] unable to cite any cases that have found a taking where the economic impact was less than fifty percent." *Id.* (citing *CCA*, 667 F.3d at 1246). "[E]ven the high end of Dr. Riddiough's range" did not "approach" this level. *Id.*

"Importantly," the Court found that "FWPs do not directly challenge that the severity requirement is a threshold issue." Order at 44. "FWPs tiptoe on both sides of the severity line, encouraging the Court to 'weigh all relevant considerations' but also that 'the economic impact on FWPs was severe.'" *Id.* (citing FWPs' Post-Trial Br. at 17). "Nowhere" in the briefing or oral argument – including the post-trial brief, post-hearing brief, or oral argument – did "FWPs clearly articulate the law in such a way as to convince the Court that an economic impact of less than fifty percent is sufficient to establish a regulatory taking." *Id.*

Even now, FWPs do not identify any cases finding a taking where the economic impact was less than 50 percent – much less where the economic impact ranged from approximately 5 to 27 percent. *See*, *e.g.*, Pl. Mot. at 37-38. That is no surprise. As the Supreme Court explained, determining whether "government action affecting property is an unconstitutional deprivation of ownership rights under the Just Compensation clause" requires interpreting "the word 'taken.'" *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regl. Plan. Agency*, 535 U.S. 302, 322 n.17 (2002); *see also* U.S. Const. Amend. V ("nor shall private property be taken for public use,

20

without just compensation"). "When the government condemns or physically appropriates the property, the fact of a taking is typically obvious and undisputed." *Tahoe-Sierra*, 535 U.S. at 322 n.17. But the analysis is more complex in regulatory takings cases like this one, where "the owner contends a taking has occurred because a law or regulation imposes restrictions *so severe that they are tantamount to a condemnation or appropriation*[.]" *Id.* (emphasis added).

FWPs have made no coherent argument that a diminution of value between 5.9 and 27.4 percent constitutes a restriction "tantamount to a condemnation or appropriation" of the multi-family housing properties at issue.[7] They argue that *Penn Central* is a "fact specific 'balancing test,'" and that there are no "magic formula[s]" for applying that test. Pl. Mot. at 38 (citing, *e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 146 (2021); *Horne v. Dep't of Agric.*, 576 U.S. 351, 377 (2015) (Sotomayor, J., dissenting); *Ark. Game & Fish. Comm'n v. United States*, 568 U.S. 23, 31 (2012)). Both points are true enough, and the Court's detailed and fact-specific analysis aligns with those maxims. But neither of these general principles supports finding a regulatory taking when the economic impact of the challenged government action falls far short of being "tantamount" to a condemnation or appropriation of the property as a whole. *See Tahoe-Sierra*, 535 U.S. at 322 n.17. FWPs fail to establish any basis for reconsidering the Court's well-supported balancing analysis.

---

[7]    Regardless, an RCFC 59 motion for reconsideration is not a vehicle to raise new arguments that could have been presented before the Court's post-trial opinion and order. "The court will not grant a motion for reconsideration when the movant merely restates arguments previously made and considered by the court or when the movant raises entirely new subjects that it could have raised earlier." *1950 Lakeshore*, 2025 WL 654892, at *2 (citing *Ammex*, 52 Fed. Cl. at 557; *Lee*, 130 Fed. Cl. at 253).

C.    FWPs Provide No Basis For Reconsidering The Court's Careful Factual Analysis
Regarding Reasonable Investment-Backed Expectations

FWPs spend the bulk of their motion rehashing the factual basis for the Court's findings

that three FWPs failed to establish reasonable investment-backed expectations of prepayment.

Pl. Mot. at 2-23.  On this point as well, FWPs fail to establish any basis for reconsideration.

As an initial matter, FWPs fail to show that their arguments regarding reasonable

investment-backed expectations – even if accepted as true – "could affect the outcome" of the

regulatory takings analysis.  *1950 Lakeshore*, 2025 WL 654892, at *1 (citing *Parsons ex rel.*

*Linmar Property Mgmt. Trust v. United States*, 174 F. App'x 561, 563 (Fed. Cir. 2006); *Ak-Chin*

*Indian Community v. United States*, 85 Fed. Cl. 636, 639 (2009)).  As discussed above, FWPs'

failure to demonstrate a severe economic impact tantamount to a condemnation or appropriation

of their property is fatal to their regulatory takings claims.  This alone suffices to deny the

request for reconsideration regarding reasonable investment-backed expectations.  *See id.*

Regardless, FWPs establish no legal or factual error in the Court's analysis.  As the Court

explained, it was not writing on a blank slate in applying the *Penn Central* analysis to the

property interests regulated by the preservation statutes.  *See* Order at 24-25 (citing, *e.g.*,

*Cienega X*, 503 F.3d at 1275-82; *CCA*, 667 F.3d at 1244).  With regard to the "reasonable

expectations prong" of the *Penn Central* analysis, the Federal Circuit has explained that the

"expectations" must be "investment backed."  *Cienega X*, 503 F.3d at 1289.  "The first step of

the analysis is to determine the actual investment that the general and limited partners made in

the property."  *Id.*  "The second step is to determine the benefits that the owners reasonably

could have expected at the time they entered into the investment."  *Id.*  "The third step is to

determine what expected benefits were denied or restricted by the government action."  *Id.*  "In

other words, it is impossible to determine whether the owners' expectations were reasonable

without knowing the total value of the investment; its relationship to the benefits available to the owners, including any tax benefits; and the anticipated benefits that were denied or restricted by the government action." *Id.* "Finally, the claimant must establish that it made the investment *because of its reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits.*" *Id.* (emphasis added).

Applying this test in *CCA*, the Federal Circuit rejected the plaintiffs' arguments regarding investment-backed expectations, holding that none of the evidence submitted was "enough to demonstrate it was objectively reasonable to view the 20[-]year prepayment clause as the but for or primary reason for investment."[8]  *CCA*, 667 F.3d at 1248.

The Court's analysis aligns with this precedent.  The Court explained, for example, that satisfaction of the reasonable investment-backed expectations requirement "is not a *de minimus* box which can be checked by anyone with some familiarity with low-income housing investments," simply by "proclaim[ing] 'of course they did' when asked if the prepayment options was the primary, or but for, justification for investment."  Order at 26 n.22.  Moreover, the Court's assessment of the relevant factual criteria was complicated by the passage of time since the case was filed, which "hinders potential plaintiffs in meeting th[e] subjective element as memories fade, witnesses pass, and documents are lost to passing decades[.]"  *Id.*

As discussed below, FWPs provide no basis for reconsidering the Court's findings that Buckman, Chauncy, and Rock Creek failed to meet their burden to show reasonable investment-backed expectations in the prepayment provision.

---

[8]  The right to prepay itself "is not really the issue here, except insofar as it is a trigger for exiting the federal housing program," and "[t]he only value this right provided [FWPs] was the ability to terminate the regulatory restrictions imposed on [FWPs'] real property" requiring them to maintain units of the property as low-income housing, rather than market-rate housing or another use.  *Chancellor Manor v. United States*, 331 F.3d 891, 903 (Fed. Cir. 2003).

1.    Buckman

FWPs fail to undermine the Court's conclusion that Buckman failed to show that "the prepayment and conversion to market rate rentals was *the* primary reason, or even *a* primary reason for the investment in Buckman."  Order at 27 (emphasis in original).

FWPs contend that the Court "applied the wrong legal standard," and that "at most, the Court should apply a 'but for' standard."  Pl. Mot. at 3-5.  As an initial matter, the Court's findings for Chauncy and Rock Creek *did* explicitly find that both FWPs failed to satisfy the primary *or* but-for standards, thus incorporated FWPs' preferred standard.  *See* Order at 29-30.  FWPs' apparent insistence that the Court must also incant the words "but for" with respect to Buckman amounts to a magic words requirement that conflicts with FWPs' simultaneous position that "[t]here are no 'magic formula[s]' and 'few invariable rules'" in regulatory takings cases.  *See* Pl. Mot. at 38 (quoting *Horne*, 576 U.S. at 377 (Sotomayor, J., dissenting)).

Regardless, the Court's findings that the prepayment and conversion to market-rate rentals was *not* the primary or even "a" primary basis for investment shows that – consistent with the standard announced in *Cienega X* – Buckman did not establish that it "made the investment because of its reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits."  *Cienega X*, 503 F.3d at 1289.  Thus, logically, the remaining benefits (not the prepayment right and ability to convert) were the primary reason for the investment.  The case thus aligns with *Penn Central* itself, in which the Court concluded that the challenged zoning restriction did "not interfere with what must be regarded as Penn Central's *primary expectation* concerning the use of the parcel."  *Penn Central*, 438 U.S. at 136 (emphasis added); *see also Cienega X*, 503 F.3d at 1289-90.  Thus, although there are good reasons to conclude that *Penn Central* itself requires that the restricted benefits

must be "*the* 'primary' expectation," *Cienega X*, 503 F.3d at 1290 (emphasis added), there is no

need to reach that decision in this case, in which Buckman failed to show that the prepayment

right was even *one of* multiple primary expectations at the time of the investment.

Moreover, FWPs' bare "disagreement" "with how the Court weighed the facts" related to

Buckman "provides no basis for the Court to reconsider its decision." *Horizon Lines, LLC v.

United States*, 429 F. Supp. 2d 92, 97 (D.D.C. 2006).  With regard to Mr. Gosnell, FWPs

improperly base part of their argument, Pl. Mot. at 8, on testimony that the Court excluded as

inadmissible hearsay (JX 202 at 48:17-49:2), *see* ECF No. 716 at 13-14, 20, and on testimony the

parties *agreed* should be excluded (JX 202 at 48:6-13).  ECF No. 716 at 21-22; ECF No. 710 at

1.  The remaining statements from Mr. Gosnell on which FWPs rely related to the Gosnell

family's business and general perspective about holding properties for the "long-term" and

confusingly described his assumption about his father and uncle's consideration of tax benefits,

given the family's general "long-term hold sort of perspective on things."  JX 202 at 48:14-17,

51:4-14.  This testimony does not undermine the Court's conclusion that "Mr. Gosnell was not

particularly involved in the partnership and could not speak to the motivations of the investors,"

particularly when he testified that he was "not sure the exact reasoning behind" his father and

uncle's decision to develop the property under Section 236.  Order at 26; JX 202 at 47:9-13.

Buckman's RCFC 30(b)(6) testimony,[9] from Mr. Wall as its designee, "can be used as

evidence," but "like any other deposition testimony, can be contradicted," *Hawn v. Speedway,

LLC*, No. 1:16-CV-359, 2018 WL 2192162, at *4 (N.D. Ind. May 14, 2018) (unpublished) –

here, by Mr. Wall's acknowledgment that he "was not involved with Buckman until his firm was

---

[9]    The Court admitted RCFC 30(b)(6) deposition testimony, designated by FWPs, of
FWP witnesses testifying at trial, ECF No. 560 at 3, over our objection.  ECF No. 519 at 8-14.

retained to assist with the LIHPRHA process," well after the initial investment. Order at 26.

Thus, in both his testimony as an RCFC 30(b)(6) designee and his personal testimony, he lacks

direct knowledge of the investment decisions, meaning that his testimony was "attenuated," as

the Court concluded. Pl. Mot. at 9 n.4 (quoting Order at 26). In any event, Mr. Wall's

statement, as designee, that "[t]he partnership expected to have the right to prepay the mortgage

after 20 years" and "convert the . . . project to a different [us]e" does not demonstrate that this

was the primary or "but for" reason for the investment; indeed, he only noted that the

prepayment right "made varying options available" – not that Buckman intended to convert to

market-rate rentals. JX 191 at 22:8-23:11, 25:9-19, 71:16-72:6. And, even if the Gosnell

brothers did develop the project because its location "was a significant growth area and

opportunity for investment," as Mr. Wall testified, and included a reference to refinancing in

their partnership agreement, Trial Tr. Vol. 4 at Tr. 728:6-12; JX 38 at DOJ 0030011; DX 191 at

36:17-37:14, this does not provide directly evidence an expectation to exit low-income housing

restrictions and use the property as market-rate rentals after 20 years – let alone that it was the

primary or but for reason they invested.

 Criticizing the Court's conclusions with regard to Mr. Haber, FWPs point to his

purported testimony that "his expectation of an increase in value of Buckman . . . could only be

realized by prepaying" and his communications, "'almost 20 years'" after the investment, about

the "'anticipation'" of the "'opportunity'" to prepay and be "'free and clear of government

regulations.'" Pl. Mot. at 6-7 (quoting JX 45 at IRH0039729). Yet this is not evidence that

prepayment and conversion to market-rate rentals was his primary or but for reason for investing.

Although FWPs criticize the Court's conclusion as to Mr. Haber's "determin[ation] whether to

'*syndicate*' a property," the purportedly contradictory Haber testimony only suggests that the

right to prepay was described in the documentation he provided to potential investors, and says nothing about *his* "determin[ation]" about investing.  Order at 27 (emphasis added); JX 186 at 36:5-22.  Regardless of Mr. Haber's views on whether he could have "attracted investors without the right to prepay," Pl. Mot. at 7, and opinion about the motivation of potential investors (also repeated by Mr. Wall as Buckman's RCFC 30(b)(6) designee, JX 191 at 22:21-23:12 (cited at Pl. Mot. at 9)), he had "[n]o specific" "discussions with any of the investor limited partners that ultimately joined the Buckman . . . partnership about the ability to prepay after 20 years."  JX 186 at 36:23-37:4.  Thus Mr. Haber's testimony cited by FWPs does not reflect firsthand knowledge of the reason that limited partners invested.

2.    Chauncy

FWPs make no serious challenge to the Court's finding that the "Chauncy [] investors did not view prepayment as the primary or 'but for' reason for investment in Chauncy."  Order at 29.

a.    Private Placement Memorandum (PPM)

FWPs' challenge to the Court's reliance on the Chauncy PPM as a source of investment expectations is at odds with their own such use of it.  Pl. Post-Trial Br., Proposed Findings of Fact (PFOF) ¶ 39; Pl. Post-Trial Br. at 8, 10, 13 (citing PFOF ¶ 39).  Although FWPs now dismiss the PPM as "directed" only to limited partners, Pl. Mot. at 23, the Federal Circuit rejected a similar assertion that a prospectus (that is, a PPM) "only described the[ir] expectations" and not those of "the partnership as a whole," explaining that a PPM is "the most reliable indication of the relative importance of the . . . benefits" of investment "anticipated" by "*both* the limited and general partners[.]"  *Cienega X*, 503 F.3d at 1291 (emphasis added).  FWPs fail to explain why the limited partners' exit from the partnership before the prepayment date is relevant to the *partnership's* investment-backed expectations at the time of the original

27

investment in the property in late 1973/early 1974, given that the partnership, not the individual

partners, is the "claimant" here. *Penn Central*, 438 U.S. at 124-25.

The Court correctly noted that Chauncy's PPM places no importance on a possible

prepayment and conversion to market-rate rentals. Order at 27-28. FWPs fail to show that "the

general partners' interest in the properties," *Cienega X*, 503 F.3d at 1291, changed during the gap

of less than three months between the November 21, 1973 mortgage (and "late December, 1973"

start of construction) and the February 14, 1974 PPM – or that this short gap makes the

expectations of limited partners investing during a project's development irrelevant. PX 213; JX

65 at IRH0048502, 48508. That the PPM's financial projections "only show results through

1995, twenty years after the final endorsement date of the mortgage," Pl. Mot. at 23 (emphasis

omitted), does not demonstrate that prepayment and conversion to market-rate rentals was the

primary or but for reason for the investment – particularly when these goals were not listed in the

PPM's "economic incentives for investment in the Partnership," nor was any plan for

conversion. Order at 27. The PPM, thus, stymies FWPs' claim regarding investment goals.

### b.    The Section 121A Agreement

Chauncy could not have had an expectation of prepaying, exiting low-income housing

restrictions, and converting the property to market-rate rentals when it developed this property

through a partnership with the BRA, a city government entity, created by Section 121A of the

Massachusetts General Laws.

"Chapter 121A is one of the principal Massachusetts urban redevelopment statutes,"

creating 121A projects, which are "partnership[s] between the public sector and the private

sector designed to accomplish a public purpose – the elimination of urban blight and

underdevelopment." *In re Back Bay Restorations, Inc.*, 118 B.R. 166, 167 (Bankr. D. Mass.

1990).  "Under 121A," a developer "receives relief from the requirement to pay property taxes

on the project" and, "[i]n return," the developer "agrees to operate the property as initially

approved" and "in accordance with [Chapter] 121A and executes a Regulatory Agreement" to

that effect and "agrees to a limitation on net income on a project for the term of its [Chapter]

121A status." *Id.*  Chauncy, likewise, received "exemption from taxation of real and personal

property and betterments and special assessments and from the payment of any tax, excise or

assessment to or from the Commonwealth [of Massachusetts] or any of its political subdivisions

on account of the Project," DX 85 at 3, and agreed, with certain exceptions, "not [to] 'receive or

accept, while this Regulatory Agreement is in force, as net income from the Project any sum in

excess of six percent (6%) of the amount invested by them in the Project for each year in which

they own for have owned the Project.'"  Order at 28 (quoting DX 85 at 3).  As the Court

concluded, this agreement had a 40-year term.  *Id.* (citing DX 85 at 3-4).

Although a property owner could later "*apply* to the housing board *for leave to change

the type and character of the buildings on a project*," Chapter 121A only provided that "[t]he

housing board *may* approve such application," but could not do so if

> in its opinion the proposed change is a fundamental one, in which
> case the provisions of section five, so far as apt, shall apply to an
> application for such change.  The housing board shall in such case
> transmit the application to the mayor of the city or the selectmen of
> the town in which the project is located, and the provisions of
> section six [requiring a property owner to seek project approval
> from a town or city] . . . shall be applicable[.]

Mass. Gen. Laws Ann. ch. 121A, § 13 (1945) (emphasis added); *see id.* § 6 (1956).  A

Massachusetts court has concluded that a "proposed change from project-based subsidized low

and moderate income rental housing to market rate rental housing" requires owners to apply "for

leave to change the type and character of the buildings on a project" and is a "fundamental"

change under Chapter 121A, section 13. *City of Salem v. Salem Heights Apartments Co.*, No. 00-CV-00165, 2001 WL 1562418, at *16 (Mass. Housing Ct. 2001); *see also Bronstein v. Prudential Ins. Co. of Am.*, 459 N.E.2d 772, 778 (Mass. 1984) (finding that a "conversion" that would result in "residential use . . . not serv[ing] the same demands from the same tenants" and "will force some tenants to move" was a "fundamental change"). A property owner developing a project under Chapter 121A, therefore, could not reasonably expect that it would be able to change the character of the property from low-income housing to market-rate.

FWPs contend that the 121A Agreement has no relevance to what Chauncy expected at the time of its "original investment" because Chauncy had "been in existence for nearly a year" (through a partnership agreement dated January 29, 1973) "before the 121 Agreement was executed" on January 2, 1974. Pl. Mot. at 17; PX 208 at BST0310244. However, the partnership agreement gave the partnership the power to enter into "the Contract between the City of Boston and the Partnership pursuant to Chapter 121A" and a "Regulatory Agreement[]" with the BRA. PX 208 at BST0310245, 310269. And, on January 31, 1973, *just two days after* executing the partnership agreement, Chauncy submitted its "application . . . for approval under the terms and provisions of Chapter 121A . . . to undertake and carry out a project[.]" DX 85 at 1. These contemporaneous documents show that Chauncy plainly anticipated operating the project under Chapter 121A at the time the partnership was formed.

Although, as FWPs assert, the 121A Agreement did not prevent prepayment after 20 years, Pl. Mot. at 18, its restriction on annual returns had a 40-year term. No reasonable investor would have an "investment strategy" of converting the property to market-rate rentals after 20 years when this would yield no return beyond the annual six percent ($13,352) already gained from the property's operation as low- and moderate-income housing. *CCA*, 667 F.3d at 1247-48;

Def. Post-Trial Br. at 44.  Moreover, no reasonable investment-backed expectation could be grounded in pure speculation that Massachusetts government entities "would have . . . granted" approval for "'leave to change the type and character of the buildings on [the] project,'" Pl. Mot. at 20, under Chapter 121A, section 13, as described above.  *See Alimanestianu v. United States*, 888 F.3d 1374, 1384 (Fed. Cir. 2018) (concluding that plaintiffs provided no evidence of an investment-backed expectation in their possible recovery on a claim against Libya because it was speculative, given that recovery depended on a cooperative Libyan court or coercion by another governmental body without "any evidence that such efforts have been successful in the past, or would have been successful in this case"); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (concluding that plaintiff's "hope" of obtaining a permit and "realiz[ing] . . . development goals" "is not enough").  FWPs cannot show what these entities would have done simply based on the purpose of Chapter 121A, the assistance provided through Section 236, and Mr. Reagan's subjective opinion of the purpose of the 121A agreement.  Pl. Mot. at 20-21.

FWPs also provide no support for their perfunctory assertion that the restriction on annual returns "would have evaporated upon prepayment of the HUD-insured mortgage loan" and "been eliminated entirely but for the Preservation Statutes."  Pl. Mot. at 19 (emphasis omitted).  The 121A Agreement at no point implies that *its* restriction on return was affected by supposed "background law" about prepayment rights, Pl. Mot. at 21, and would end if the same restriction on returns imposed by the HUD regulatory agreement ended with the termination of that agreement upon prepayment.  *See* JX 67 at IRH0052161-62 (restrictions in HUD regulatory agreement, including on returns, applying "so long as the contract of mortgage insurance continues in effect").  FWPs identify no statutory or regulatory provisions related to prepayment rights and, even if they had, the Court should not "incorporate[] [them] into" the 121A

31

Agreement when "the contract [does not] explicitly provide[] for their incorporation." *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008).  The automatic cessation of such HUD restrictions cannot be equated with HUD "'*allow[ing]* a change in the allowable distribution.'"  Pl. Mot. at 20 (quoting Mass. Gen. Laws, ch. 121A, § 18C (1989)).  Moreover, the 40-year term of the 121A Agreement would be superfluous and nonsensical if such agreements automatically terminated upon prepayment allowed after 20 years.  *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993).  In any event, the portion of Section 18C cited by FWPs dates from 1989, well after the initial investment.

FWPs ground their assertions in an assumption that, due to a revision to Chapter 121A, section 18C's language in 1975, Chauncy was able to exit the 121A Agreement's restrictions after 15 years, rather than 40.  Pl. Mot. at 18-19.  Even assuming that a revision to section 18C's language in 1975 could have reduced the agreement's term to 15 years, neither Chauncy nor any reasonable investor was aware, at the time of the investment in late 1973/early 1974 that the law would be revised – thus, it is irrelevant to the Court's analysis of investment-backed expectations.  *Cienega X*, 503 F.3d at 1288.

This revision is only relevant to the Court's separate conclusion that "any reasonable investment-backed expectations that might have existed were frustrated by the existence of" the 121A Agreement, not the Preservation Statutes, or a similar analysis of what caused Chauncy's alleged economic loss.  Order at 28; *see* Def. Post-Trial Br. at 52-53.  However, FWPs fail to demonstrate that the 15-year limit could or did apply to Chauncy.  FWPs assert that the 1975 revision to section 18C applied to Chauncy because the 121 Agreement "does not include . . . a provision" stating that "subsequent amendment" of Chapter 121A "shall not affect the project," citing Chapter 121A, section 6A.  Pl. Mot. at 18.  But Section 6A relates not to a *regulatory*

*agreement* called for by Section 18C(e) (like the 121A Agreement here), but to the separate "contract for the carrying out of [a 121A] project" between the owner and "the city in which its project has been authorized," under Section 6A.  Mass. Gen. Laws, ch. 121A, § 6A; *id.*, § 18C(e) (1975); *Back Bay*, 118 B.R. at 167, 168 (distinguishing between the "6A Contract" and the regulatory agreement).  No contract under Section 6A is in the record, so there is no way to know if it contained the provision referenced by FWPs or not.[10]

Even assuming that Chauncy fell within revised Section 18C, a portion of that law excised by FWPs (and replaced by an ellipsis), Pl. Mot. at 18, provides that an owner could exit Chapter 121A's restrictions only *if BRA determined* that the owner had performed its duties "to the satisfaction of [BRA], as evidenced by a certificate issued . . . by said authority."  Mass. Gen. Laws, ch. 121A, § 18C.  There is no evidence that BRA did so or that Chauncy requested it do so – or requested approval to change the use of the property to market-rate rentals.  Order at 29.  Instead, Chauncy understood that "'any [such] change in the use of the property after October 1995 and before April 2015 would require the approval of the [BRA],'" which was unlikely to be granted due to "'opposition.'"  *Id.* (quoting JX 69 at IRH48558).  Given this understanding and failure to request approval, Chauncy did not prove that the Preservation Statutes caused economic loss.  *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018).

Finally, FWPs incorrectly assert that the Court should be prohibited from relying on the 121A Agreement.  Pl. Mot. at 14.  FWPs cite no authority for their argument and, in any event,

---

[10]    Further, FWPs do not support their assertion that the revision to Section 18C was automatically retroactive based on *Bronstein*.  Pl. Mot. at 19.  The *Bronstein* court did not find a new prohibition on condominium conversion in a different section (Section 18D) to be retroactive, but instead concluded that the requirements for approval of a fundamental change, existing even under the earlier version of Chapter 121A, would require the owner to seek approval anew, under the revised law.  *Bronstein*, 459 N.E.2d at 777-79.

waived it by choosing not to object at trial to the admission of the 121A Agreement.  Trial Tr. Vol. 3 at 609:12-16; Trial Tr. Vol. 11 at 2141:18-2142:14.  Prior to that, FWPs raised no objection beyond relevance to the inclusion of the agreement (DX 85) on our exhibit list.  ECF No. 505 at page 4 of 23 (Table B at 4).  The lack of Bates numbers does not change the fact that the United States produced the 121A Agreement to FWPs at Mr. Reagan's 2014 deposition, Pl. Mot. at 15-16 – which FWPs do not dispute.[11]  Trial Tr. Vol. 10 at 1947:2-3 ("We're not saying it wasn't produced[.]").  In any event, FWPs' later complaint about our use of DX 85, Trial Tr. Vol. 10 at 1943:19-1947:21, 2131:14-2133:24, was ended when they "reserve[d] [their] rights at an appropriate time to file a motion, should [they] decide to do so."  *Id.* at 2133:11-12.  FWPs filed no such motion.

FWPs cannot seriously argue that the United States "alluded to its factual and legal contentions with respect to the 121A Agreement" for the first time at trial or in our post-trial brief.  Pl. Mot. at 16.  As FWPs note, we questioned Mr. Reagan about it during his 2014 deposition.  *Id.* at 15-16.  FWPs cite no authority barring a party from raising an argument simply because it was not mentioned in a pretrial meeting of counsel, and waive this argument by failing to develop it.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006).  In any event, we used the 121A Agreement and Mr. Reagan's testimony about it to impeach his testimony that Chauncy's "intention" when investing "was to convert the property to market-rate rents," but LIHPRHA prevented this.  Trial Tr. Vol. 3 at 581:7-14; *id.* at 517:12-18; *id.* at 591:11-22; *id.* at 531:1-15.  Impeachment evidence need not be revealed in pretrial

---

[11]    The absence of Bates numbers is hardly evidence of nefarious discovery practices, as FWPs suggest.  Pl. Mot. at 15.  FWPs were provided the 121A Agreement in 2014, it is an agreement to which Chauncy itself is a party, and Mr. Reagan was generally familiar with such agreements, JX 194 at 26:18-27:4, 27:8-9.  FWPs can hardly claim surprise based on its use.

submissions, RCFC App'x ¶¶ 13-16, but, nonetheless, DX 85 was.  Since the import of Chapter 121A was plain from the questioning and testimony of Mr. Reagan and Maurice Barry, as well as FWPs' attempts to exclude DX 85, FWPs plainly had notice of the issue prior to filing their post-trial brief.  And, despite moving for leave to file a reply in support of its post-trial brief, FWPs did not at any point, in nine pages of argument, assert that they needed to respond to our arguments related to the 121A Agreement, or to assert that RCFC Appendix A somehow prevented us from making those arguments.  ECF No. 765.  The Court should not grant reconsideration to review these "entirely new subjects" raised after entry of judgment "that [FWPs] could have raised earlier."  *1950 Lakeshore*, 2025 WL 654892, at *2 (citations omitted).

           c.       The Lack Of Contemporaneous Evidence Of Chauncy's Expectations

In an effort to contradict the Court's conclusion, FWPs claim that several documents contain contemporaneous evidence of Chauncy's expectations.  Pl. Mot. at 18.  A quick review of these documents shows that FWPs are incorrect.  Only one of the documents is a communication by a Chauncy partner; but, given that the letter was an effort to obtain HUD approval and assistance for a rent-restricted property, it did not – and would not be expected to – propose the possibility of future conversion to market-rate rentals.  PX 141 at GOV-AH_55560.

The remainder of the documents are not communications by Chauncy, do not contain communications from Chauncy, and do not reflect its expectations.  Pl. Mot. at 18.  For example, FWPs misread a 1972 internal HUD memorandum discussing the "future market appeal" of the project to refer to future market-rate rentals.  PX 26 at GOV-AH_55362.  However, the document says nothing about market-rate rentals.  Instead, it reflects only that HUD, in deciding whether to "process[]" Chauncy's "proposal" for HUD assistance under Section 236, was considering whether an urban renewal plan reducing commercial and industrial developments

would increase the project's "present and future market appeal" to expected low- and moderate-income tenants, not potential market-rate tenants 20 years in the future. *Id.* at GOV-AH_55362-63. Similarly, the other documents cited by FWPs say nothing about market-rate rentals. None of these documents undermine the Court's findings as to Chauncy's expectations.

### 3.    Rock Creek

Finally, the Court did not err in its analysis of Rock Creek's expectations. Order at 30. FWPs argue that the Court cannot rely on the reasons that early partners National Corporation of Housing Partnerships (NCHP) and National Housing Project (NHP)[12] invested because they were no longer partners in Rock Creek after December 31, 1984, and were not adversely affected by the 1988 regulations at issue. Pl. Mot. at 10-11. FWPs' argument has no merit.

FWPs agree that the relevant investment-backed expectations are those of the claimant. Pl. Mot. at 10 (quoting *Penn Central*, 438 U.S. at 124). The claimant here is the Rock Creek *partnership* – not its individual members. That partnership is the same entity that made the investment to build the property at issue. The Federal Circuit has grounded the investment-backed expectations analysis on the "position" of the plaintiff *partnerships* at "the time at which the complaining party entered into the activity that triggered the obligation, . . . specifically when the [plaintiffs] entered the programs," *Chancellor Manor*, 331 F.3d at 904; *id.* at 893, 902 (noting that plaintiff-appellant "Owners" were partnerships and distinguishing them from their general partners), and purchased the property. *Cienega X*, 503 F.3d at 1290; *Forest Props.*, 177 F.3d at 1367 (considering whether plaintiff "bought [its] property in reliance on the non-existence of the challenged regulation").

---

[12]    NHP obtained NHCP's interest, through assignment, as of October 13, 1970 – not in 1971, as FWPs state. JX 89 at IRH0224868-69 n.2; JX 90 at IRH0224853 n.2.

Because Rock Creek entered into the HUD program and secured its mortgage by October 1970, it is this point in time, which the Court correctly examined, that is relevant to Rock Creek's expectations.  Order at 30; *id.* at 24-25.  Moreover, because Rock Creek entered into the mortgage, Joint Stipulations ¶¶ 86-88, ECF No. 546, and the Deed of Trust Note containing the prepayment right, JX 79 at GOV-WAS_5647-50, Rock Creek is the entity "with a valid property interest at the time of the taking" and, thus, the only entity "entitled to compensation."  *Am. Pelagic Fishing Co., LP v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

FWPs instead propose that the analysis of investment-backed expectations should reset every time a new general or limited partner enters the partnership, like Viers Mill Limited Partnership (Viers Mill) did in 1984.  Pl. Mot. at 10-11.  Not only is it too late for FWPs to propose this novel position for the first time in a motion for reconsideration, but this position is at odds with FWPs' focus on the earliest partners of Chauncy.  Pl. Mot. at 22-23.  FWP's new approach would result in a quagmire of different expectations – at different points in time – for the Court to analyze.  Moreover, FWPs do not demonstrate that the addition of Viers Mill as a partner altered Chauncy's purpose as stated in its partnership agreement – to "operate the Project as a low and moderate income rental housing project development under Section 236."  JX 78 at IRH0014927.  Even if Viers Mill's expectations were relevant, the testimony relied on by FWPs discusses Viers Mill's expectation, but at no point makes clear that this was its *primary or but-for reason* for investing.  Trial Tr. Vol. 4 at 842:25-843:16 (vague discussion of increased market-rate rents in the area), 846:5-847:5 ("the expectation"), 879:4-10 ("intent"); JX 198 at 93:8-94:5 ("understanding . . . that the note could be paid off with the opportunity to prepay").

In addition, FWPs improperly challenge the Court's "weigh[ing] [of] the facts" and testimony from Messrs. Billings and Wall.  *Horizon*, 429 F. Supp. 2d at 97.  Although Mr. Wall

testified, as Mid-City's RCFC 30(b)(6) designee, that Mid-City would not have invested it the mortgage could not have been prepaid, Pl. Mot. at 12, he addressed prepayment prior to the end of the 40-year mortgage, not necessarily after 20 years.  JX 195 at 32:15-18.  In any event, as the Court explained, it cannot be enough for a single witness to proclaim, years after the fact, what one partner's primary or but-for expectation was.  Order at 26 n.22.  The Court properly weighed Mr. Wall's testimony cited by FWPs against his other statements demonstrating his lack of knowledge about investment goals and his lack of "direct[] involve[ment] in Rock Creek investors' decision-making process."  Order at 30 (citations omitted).  In contrast, Mr. Billings was able to express concrete expectations of NCHP and NHP – that they were specifically created for the purpose of "acquiring, developing, [and] managing affordable housing."  Order at 30 (citing JX 197 at 13:13-23).

Thus, there is no basis for the Court to reconsider its findings on investment expectations.

4.    If The Court Reconsiders Its Opinion, It Should Find That Any Subjective Intent To Invest Based On Potential Conversion To Market-Rate Rentals 20 Years In The Future Was Not Reasonable

To the extent the Court reconsiders the subjective investment-backed expectations of Buckman, Chauncy, and Rock Creek, we respectfully request that the Court also reconsider whether any such subjective expectations were reasonable.  Buckman, Chauncy, and Rock Creek developed their respective properties in the early 1970s.  *See* Joint Stipulations ¶¶ 16-17, 70, 86. Each plaintiff bears the burden to prove that, to the extent that a subjective expectation of prepayment and conversion to market rate housing *in 20 years* was a primary or but-for reason for investing, that expectation was reasonable in light of the expectations of the industry as a whole.  *See Cienega X*, 503 F.3d at 1289-91.  Plaintiffs cannot satisfy that standard.

As the Court recognized, the incentives for investing in section 236 and 221(d)(3) projects "were significant." Order at 7. "For example, because HUD insured the mortgages, owners could borrow up to ninety percent of the cost of the project, which was a higher leverage ratio than the seventy to eighty percent financing available for conventional housing." Order at 7 (citing *Cienega X*, 503 F.3d at 1270-71; Trial Tr. Vol. 9, Malek,1766:22-1767:1, Jan. 20, 2023, ECF No. 670). "After borrowing ninety percent of the project's cost, the remaining ten percent was further reduced by the 'Builder's and Sponsor's Profit and Risk Allowance.'" *Id.* (citation omitted). "Furthermore, the forty-year mortgages were longer than what was typically commercially available, which was an advantage for investors." *Id.* at 8 (citation omitted). "In addition, the low upfront equity and leveraged structure of the mortgage meant that the property owners were eligible for significant tax benefits[.]" *Id.* (citing *Cienega X*, 503 F.3d at 1271; Trial Tr. Vol. 9, Malek, 1746:3-1747:2, Jan. 20, 2023).

"In determining whether expectations of prepayment were reasonably investment backed, it is necessary to inquire as to the *expectations of the industry as a whole*." *Cienega X*, 503 F.3d at 1290 (emphasis added). In answering this question in *Cienega X*, the Federal Circuit focused on the "few contemporaneous documents" reflecting investment expectations – namely prospectuses advertising the opportunity to invest in section 221(d)(3) or 236 programs, which the Court held were "the most reliable indication of the relative importance of the anticipated benefits." *Id.* at 1291.

In this case, as in *Cienega X*, the only documentation of industry expectations that is *contemporaneous* with the initial investments in the early 1970s can be found in prospectuses or PPMs advertising the opportunity to potential investors. *See Cienega X*, 503 F.3d at 1291 (citing 15 U.S.C. § 77*l*(a)(2)). And as in *Cienega X*, these PPMs indicate that "the owners placed little

value on the right to sell the property (or in the absence of a sale, the right to prepay the

mortgage)." *Id.*; *see also* JX 65 at IRH48538, IRH0048548 (calculating returns based on the

assumption of a $1 sale of the partnership interest in year 22); DX 62 at IRH48300, IRH48330

(same); DX 63 at IRH48202, IRH48233 (same); DX 60 at IRH48103, IRH48131 (same); DX 64

at CGII3479-80, CGII3398 (assuming project sold at the end of year 21 for $1); DX 58 at

A500317, A500321; DX57 at A500281, A500285; DX 66 at A500339, A500351-52; JX 134 at

IRH224206; *see*, *e.g.*, DDM B at 16-34 (summarizing these prospectuses).  Instead, the PPMs

showed that tax benefits were the primary reason for investment in low income housing.  *See*,

*e.g.*, DDM B at 16-34 (summarizing prospectuses).

The testimony of expert Kenneth Malek is persuasive because he explains—in

mathematical terms – why the prepayment right paled in comparison with the immediate tax

benefits offered by the investments.  *See*, *e.g.*, Trial Tr. Vol. 9, Malek, 1845:11-1849:10

(discussing DDM B at 42).  Because of the time value of money, the rate of return was driven by

other benefits of the section 236 and 221(d)(3) programs – which were available immediately.

*See id.* at 1832:15-1833:18 (describing "immediate[]" payoff from tax benefits); *id.* at 1839:9-19

(discussing "time value of money").  Any increase in the residual value in *20 years* provided

comparatively little benefit once discounted to present value.  *See id.* at 1839:20-1840:3.  Thus,

even accepting the Court's concern that Mr. Malek was unfamiliar with facts about FWPs'

properties, *see* Order at 34, Mr. Malek's accounting expertise supports the contemporaneous

evidence showing that the tax benefits were the primary benefit and that the residual value of the

property in 20 years was of comparatively little value.

## **CONCLUSION**

For these reasons, the Court should deny the motion for reconsideration.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Amanda L. Tantum
AMANDA L. TANTUM
EMMA E. BOND
Senior Trial Counsel
A. BONDURANT ELEY
Senior Litigation Counsel
JOSHUA W. MOORE
TATE N. WALKER
BRITTNEY M. WELCH
Trial Attorneys
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-8131
E-mail: amanda.tantum@usdoj.gov

March 25, 2025                          Attorneys for Defendant