No. 93-655 C
Judge Tapp

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ANAHEIM GARDENS, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS RAISED BY SECOND WAVE PLAINTIFFS GLENVIEW GARDENS LIMITED PARTNERSHIP AND INDIAN HEAD MANOR LIMITED PARTNERSHIP I

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

AMANDA L. TANTUM
EMMA E. BOND
Senior Trial Counsel
A. BONDURANT ELEY
Senior Litigation Counsel
JOSHUA W. MOORE
TATE N. WALKER
BRITTNEY M. WELCH
Trial Attorneys
Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-8131
E-mail: Amanda.Tantum@usdoj.gov

April 17, 2025

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF THE ISSUE ..........................................................................1

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED
MATERIAL FACT ..............................................................................................2

I.      The Development Of Glenview Gardens Apartments ..........................2

II.     The Development of Indian Head Manor Apartments ........................5

III.    The Maryland CDA's Policy Regarding The Prepayment Of Maryland
        CDA Loans ...............................................................................................7

IV.     The Preservation Statutes.......................................................................8

V.      Efforts By The Owners Of Glenview Gardens Apartments And Indian
        Head Manor Apartments To Prepay Their Maryland CDA Loans.....9

SUMMARY OF ARGUMENT ...........................................................................15

ARGUMENT .......................................................................................................15

I.      Standard Of Review................................................................................15

II.     Glenview Gardens Limited Partnership And Indian Head Manor Limited
        Partnership I Cannot Prove That The Preservation Statutes Caused Their
        Alleged Economic Loss Because Their Agreements With The Maryland
        CDA Independently Restricted The Use Of Their Properties ...........16

CONCLUSION....................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................ 16

*Cienega Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007) ............................................................................... 9

*Dairyland Power Coop. v. United States*,
    16 F.3d 1197 (Fed. Cir. 1994) ................................................................................ 16

*Novartis Corp. v. Ben Venue Labs.*,
    271 F.3d 1043 (Fed. Cir. 2001) .............................................................................. 16

*St. Bernard Par. Gov't v. United States*,
    887 F.3d 1354 (Fed. Cir. 2018) .............................................................................. 17

*Yant v. United States*,
    588 F.3d 1369 (Fed. Cir. 2009) .............................................................................. 16

<u>Statutes</u>

12 U.S.C. § 4125 .......................................................................................................... 9, 11

12 U.S.C. § 4103(b)(2) ..................................................................................................... 9

12 U.S.C. § 4109(b) ......................................................................................................... 9

12 U.S.C. § 4110 .............................................................................................................. 9

42 U.S.C. § 1437f ............................................................................................................. 9

42 U.S.C. § 1472(c) .......................................................................................................... 8

Housing Opportunity Program Extension Act of 1996 (HOPE Act),
    Pub. L. No. 104-120, 110 Stat. 834 ....................................................................... 14

Emergency Low Income Housing Preservation Act of 1987 (ELIHPA),
    Pub. L. No. 100-242, 101 Stat. 1877 ................................................................ 1, 8, 9

Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA),
    Pub. L. No. 101-625, 104 Stat. 4249 .................................................................... 1, 9

<u>Rules</u>

RCFC 56 ........................................................................................................................ 2, 15

<u>Other Authorities</u>

H.R. Rep. No. 101-943 (Conf. Rep.),
    *as reprinted in* U.S.C.C.A.N. 6070, 6163, 1990 WL 201583..................................................... 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ANAHEIM GARDENS, *et al.*,    )
                             )
        Plaintiffs,          )
                             )        No. 93-655C
                             )        (Judge Tapp)
                             )
THE UNITED STATES,           )
                             )
        Defendant.           )

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS
RAISED BY SECOND WAVE PLAINTIFFS GLENVIEW GARDENS
LIMITED PARTNERSHIP AND INDIAN HEAD MANOR LIMITED PARTNERSHIP I**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court enter summary judgment in favor of the Government on all claims raised by Second-Wave Plaintiffs (SWP) Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I.

## STATEMENT OF THE ISSUE

Whether Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I cannot prove that the Preservation Statutes[1] caused their alleged economic loss because their agreements with the Maryland Community Development Administration (Maryland CDA) independently restricted the use of the properties, and prevented conversion to market rate housing.

---

[1]   The Preservation Statutes are the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA), Pub. L. No. 101-625, 104 Stat. 4249 (1990), or the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), Pub. L. No. 100-242, 101 Stat. 1877 (1988).

**<u>DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED MATERIAL FACT</u>**

Pursuant to RCFC 56(c), we submit the following Defendant's Proposed Findings of Uncontroverted Material Fact (DPFUMF) in support of our motion for summary judgment.

**I.    <u>The Development Of Glenview Gardens Apartments</u>**

1.    Glen Burnie Associates was a partnership created in 1970 by general partner Mid-City Development, Inc. (Mid-City), and limited partners Percy and Harold Uris.  A1-A4.[2]

2.    Glen Burnie Associates developed Glenview Gardens Apartments as low-income housing using funds obtained through a loan secured by a mortgage insured by the Department of Housing and Urban Development (HUD).  A5-A9.

3.    HUD endorsed the deed of trust note on Glenview Gardens Apartments on September 21, 1970.  A8.

4.    The mortgage note provided that it could not be prepaid unless, in relevant part, "the prepayment occurs after the expiration of 20 years from the date of final endorsement."  A8.

5.    September 21, 1990 is twenty years after September 21, 1970.

6.    Glen Burnie Associates also executed a regulatory agreement with HUD that was to continue "so long as the contract of mortgage insurance continues in effect."  A9.

7.    On November 30, 1984, Mid-City and another entity redeemed the Uris's limited partnership interests, A21, and "continue[d] that limited partnership known as Glen Burnie Associates under the name of 'Glenview Gardens Limited Partnership[.]'" A19.

8.    On September 22, 1986, Glenview Gardens Limited Partnership obtained a rehabilitation loan from the Maryland CDA.  A62-A101.

9.    The Maryland CDA is part of the Department of Economic and Community

---

[2]    "A___" is a reference to the appendix filed with this brief.

Development for the State of Maryland, A62, and the Maryland CDA's Multifamily Finance Division processed loans to owners of low-income housing developments that were financed using tax-exempt bonds.  A47 (Rase Tr. 14:4-15).

10.     Maryland CDA loans were generally, if not exclusively, for 20-year terms,  A48-49 (Rase Tr. 19:15-20:1), and, as a condition of receiving the loan, the Maryland CDA required the borrowers to execute regulatory agreements that required the property to remain low-income housing during the period of the loan.  *See* A50-52 (Rase Tr. 24:17-26:3).

11.     The September 22, 1986 Maryland CDA deed of trust for Glenview Gardens stated that it was "payable no later than September 1st, 2006."  A65-66.

12.     The Maryland CDA deed of trust for Glenview Gardens further stated that "[e]xcept as expressly provided in the note, the borrower may not prepay the loan."  A67.

13.     The note, in turn, stated: "Upon the prior approval of CDA or subsequent holder, the promisor may prepay the then-outstanding amount of this note in whole or in part."  A103.

14.     In keeping with the Maryland CDA's standard practice, Glenview Gardens Limited Partnership executed a regulatory agreement in connection with its Maryland CDA loan. A108-23, A53 (Rase Tr. 27:13-19).

15.     The agreement provided that it "shall bind and benefits shall inure to the borrower and its legal representatives, successors in office or interest, and assignee and CDA so long as the mortgage continues in effect."  A117.

16.     In relevant part, that regulatory agreement required that:

> Except as otherwise provided in the Occupancy Agreement of even date between Borrower and CDA, Borrower may not approve any person [or] family for occupancy unless, at the time of such approval, the following conditions have been met with respect to at least 51% of the units in the Project:

> (1) The person or family is a "family of limited income" as defined by the Act and the person or family certifies that the application for occupancy is for the person or family.
>
> (2) The total current income of the person or family shall not exceed the limits established by the CDA then in effect, and the person or family has been certified to the Borrower, on forms prescribed or approved by the CDA, the total current income of such person or family.

A111-12.

17.     In addition, "[a]mong eligible applications, preference shall be given to the elderly, those displaced by urban renewal, slum clearance, and other governmental actions, and those currently living in substandard housing."  A112.

18.     The "Act" referred to in the regulatory agreement was identified as "Sections 266DD-1 through 266DD-8 of Article 41 of the Annotated Code of Maryland, as amended[.]" A108.

19.     On the same date that it executed the regulatory agreement with the Maryland CDA, Glenview Limited Partnership also executed a declaration of covenants and restrictions, detailing the separate covenants that ran with the land.  A124-34.

20.     The declaration of covenants and restrictions specified that "[a]t least 20% of the dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently becomes, a 'targeted area project') shall be occupied by 'Individuals of Low or Moderate Income,'" A125, as "determined by the Secretary of the United States Department of Treasury in a manner consistent with determination of lower income families under Section 8 of the United States Housing Act of 1938 ('Section 8') (or if such program is terminated, under such program as is in effect immediately before such termination), except that the percentage of median gross income which qualified as low or moderate income shall be 80%."  A128.

**II.    <u>The Development of Indian Head Manor Apartments</u>**

21.    Indian Head Manor Apartments was developed as low-income housing using funds obtained through a loan secured by a mortgage insured by the Department of Housing and Urban Development (HUD).  A135-38.

22.    The joint venture that took out the mortgage, Indian Head Joint Venture, also executed a regulatory agreement with HUD that was to continue "so long as the contract of mortgage insurance continues in effect."  A139.

232.    The mortgage did not contain any restrictions on prepayment.  A135 (striking through paragraph limiting prepayment in time to 20 years after the date of final endorsement).

24.    On May 26, 1969, Indian Head Manor Associates Limited Partnership executed an assumption agreement with respect to the mortgage and regulatory agreement on Indian Head Manor Apartments.  A151-53.

25.    HUD endorsed the deed of trust note on Indian Head Manor Apartments on February 25, 1970.  A138.

26.    In 1983, Indian Head Manor Associates Limited Partnership was continued under the name Indian Head Limited Partnership I.  A154-77.

27.    On January 8, 1987, Indian Head Limited Partnership I executed a regulatory agreement with the Maryland CDA.  A178-92.

28.    The recitals in the regulatory agreement between Indian Head Manor Limited Partnership I and the Maryland CDA state that Indian Head Manor Limited Partnership I had "applied to CDA for a loan."  A178.

29.    The agreement further stated that it "shall bind and benefits shall inure to the borrower and its legal representatives, successors in office or interest, and assignee and CDA so long as the mortgage continues in effect."  A187.

30.     The regulatory agreement further stated that:

> Except as otherwise provided in the Occupancy Agreement of even
> date between Borrower and CDA, Borrower may not approve any
> person [or] family for occupancy unless, at the time of such
> approval, the following conditions have been met with respect to at
> least 51% of the units in the Project:
>
> (1) The person or family is a "family of limited income" as defined
> by the Act and the person or family certifies that the application for
> occupancy is for the person or family.
>
> (2) The total current income of the person or family shall not
> exceed the limits established by the CDA then in effect, and the
> person or family has been certified to the Borrower, on forms
> prescribed or approved by the CDA, the total current income of
> such person or family.

A181-82.

31.     In addition, the regulatory agreement stated that "[a]mong eligible applications,
preference shall be given to the elderly, those displaced by urban renewal, slum clearance, and
other governmental actions, and those currently living in substandard housing."  A182.

32.     The "Act" referred to in the regulatory agreement for Indian Head Manor
Apartments was identified as "Sections 11-301 through 11-308 of Article 41 of the Annotated
Code of Maryland (formerly Sections 266DD-1 through 266DD-8 of Article 41)."  A178.

33.     On the same date that it executed the regulatory agreement, Indian Head Manor
Limited Partnership I also executed a declaration of covenants and restrictions, detailing the
separate covenants that ran with the land as a condition of receiving the loan.  A194-202.

34.     This declaration of covenants and restrictions specified that "[a]t least 20% of the
dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently
becomes, a 'targeted area project') shall be occupied by 'Individuals of Low or Moderate
Income,'" A194, as "determined by the Secretary of the United States Department of Treasury in

6

a manner consistent with determination of lower income families under Section 8 of the United States Housing Act of 1938 ('Section 8') (or if such program is terminated, under such program as is in effect immediately before such termination), except that the percentage of median gross income which qualified as low or moderate income shall be 80%." A197.

35.     Despite a diligent search of plaintiffs' productions and public records, a copy of the January 8, 1987 loan documents referenced in both the regulatory agreement and declaration of covenants and restrictions could not be located.

36.     The documentary record explains, however, that Indian Head Manor Limited Partnership I did obtain such a loan on January 8, 1987.   A203, A210.

37.     In 1988, the Maryland CDA determined that the final mortgage amount should be $478,817, rather than the $385,000 previously provided, and that, therefore, the Maryland CDA would extend an additional $93,817 in financing.  A210-11.

38.     On October 1, 1988, therefore, Indian Head Manor Limited Partnership I executed a deed of trust with the Maryland CDA for "the principal sum of Ninety-three Thousand Eight Hundred Seventeen Dollars ($93,817.00), or so much of that sum that may be advanced by CDA under the rehabilitation loan agreement dated January 8, 1987 between Promisor and CDA (the 'Rehabilitation Loan Agreement') with interest payable as set forth below (the 'Loan')."  A203.

39.     The October 1, 1988 deed of trust provided for the amortization of "the entire principal debt" by April 1, 2007.  A203.

40.     The deed of trust further provided that Indian Head Manor Limited Partnership I could prepay any outstanding amount "[u]pon prior approval of CDA or subsequent holder," and meeting certain procedural requirements.  A204.

**III.**     **The Maryland CDA's Policy Regarding The Prepayment Of Maryland CDA Loans**

41.     Beginning in the 1970s through 1994, Nancy Rase served as the Director of the

Maryland CDA's Multifamily Finance Division.  A46-47 (Rase Tr. 13:11-14:3).

42.    Ms. Rase testified that a prepayment restriction was standard in deed of trust notes involving the Maryland CDA, A49 (Rase Tr. 20:13-17), and that, generally speaking, the Maryland CDA did not permit prepayment of a Maryland CDA-subsidized loan.  A54 (Rase Tr. 31:2-15).

43.    Ms. Rase further explained that the fact that the Maryland CDA did not generally permit prepayment of its subsidized loans *did not have anything to do with any Federal requirements.*  A54  (Rase Tr. 31:16-21).

44.    It was the policy of the Maryland CDA to permit property owners who received loans to convert their projects to conventional market rate housing "[o]nly after full compliance with the period for low income service that was required."  A52 (Rase Tr. 26:4-11); *see also* A55 ("Actually, prepayment of mortgage was not an issue that would arise in our department.") (Rase Tr. 34:17-19).

**IV.    The Preservation Statutes**

45.    On February 5, 1988, Congress passed ELIHPA.  *See* Pub. L. No. 100–242, 101 Stat. 1877 (1988), codified as amended at 42 U.S.C. § 1472(c).

46.    ELIHPA was a "temporary measure."  H.R. Conf. Rep. No. 101-943,, *as reprinted in* 1990 U.S.C.C.A.N. 6070, 6163, 1990 WL 201583; ELIHPA, Pub. L. No. 100-242, 101 Stat. 1877, § 221(b).

47.    ELIHPA permitted prepayment if stringent criteria were met, *see* Pub. L. No. 100-242, 101 Stat. 1815 §§ 221, 225(a), and offered incentives to property owners to maintain the affordability of their properties.  *See* Pub. L. No. 100-242, 101 Stat. 1815, § 224.

48.    On November 28, 1990, Congress enacted LIHPRHA.  Pub. L. No. 101-625, 104 Stat. 4249 (1990).

49.    "[I]nitially planned as a permanent measure[,]" *Cienega Gardens v. United States*, 503 F.3d 1266, 1272 (Fed. Cir. 2007) (*en banc*) (*Cienega X*), LIHPRHA restricted property owners' ability to unilaterally prepay the HUD-insured mortgage, and offered incentives to extend affordability.

50.    One option was to sell the property to a qualified purchaser at a price reflecting the property's highest and best use, *i.e.*, fair market value without HUD restrictions, 12 U.S.C. §§ 4103(b)(2), 4110(b)(1), with HUD facilitating the sales by offering HUD-insured loans and grants to potential purchasers, and by offering the purchasers increased revenues by allowing higher rents, increased payments for Section 8 housing assistance payments, and other assistance. 12 U.S.C. §§ 4109(b), 4110(d); *see also* 42 U.S.C. § 1437f, 12 U.S.C. § 4125.

## V.    Efforts By The Owners Of Glenview Gardens Apartments And Indian Head Manor Apartments To Prepay Their Maryland CDA Loans

51.    In December 1990, Indian Head Manor Limited Partnership I submitted to HUD a notice of intent to prepay the HUD-insured mortgage on Indian Head Manor Apartments pursuant to ELIPHA.  A217-23.

52.    In March 1991, having been informed of that submission, the Maryland CDA wrote to the property owners as follows:

> This letter is to inform you that if you pursue prepayment under the 1987 ELIPHA, you will be subject to the provisions of the Maryland Assisted Housing Preservation Act, which became effective July 1, 1989.  The Maryland law is not preempted by the federal law when owners filed under the 1987 ELIHPA . . . . Full compliance with all provisions of the State law would be required if you have filed or elect to file under the 1987 ELIHPA.

A224.

53.    In September 1991 or around that time, Eugene Ford, a representative of the owners of Glenview Gardens Apartments and Indian Head Manor Apartments, among other

properties, met with Nancy Rase of the Maryland CDA "concerning the position of the CDA with respect to approving transactions involving the sale to priority purchase[r] or the recasting to continue ownership under ELI[HP]A."  A226.

54.     According to a contemporaneous memorandum by Mr. Ford:

> Where they [the Maryland CDA] have loans to projects that required their consent for payment, they are willing to approve such prepayments [of the Maryland CDA notes] in either case subject to bond prepayment restrictions on the HELP loans which run for ten (10) years from the time CDA sold the HELP bonds, which in both cases I am familiar with, Indian Head and Glenview Gardens, Nancy said would be in 1993.

A226.

55.     Ms. Rase testified that "[w]e didn't have early payoff on any of these loans . . . They were structured with a specific term.  And we didn't have owners coming in wanting to do early payment on those.  They just . . . went their full course and then that was it."  A60 (Rase Tr. 44:10-15).

56.     Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I ultimately elected to proceed under LIHPRHA.  A227-31.

57.     As recounted in 1996 by John Wall, a representative of the owners of both partnerships:

> [d]uring the months of April, May and June 1992 several conversations and meetings took place between Nancy Rase, Stephanie White, my council (sic) Scott Sterling and myself wherein CDA was asked to consent to the prepayment of the Glenview [Gardens] and Indian Head Second Mortgages pursuant to HUD's preservation program known as LIHPRHA.  The request was denied on the grounds that the second mortgages were financed as part of a larger tax exempt bond funding that could not be prepaid.

A232.

58.    Mr. Wall further wrote that he "challenged the response but was emphatically told that the mortgages could not be prepaid." *Id.*

59.    In May 1992, Scott A. Sterling of Dunnells, Duvall & Porter, identified as "special counsel to the Owner" of Glenview Gardens Apartments, drafted a memorandum "set[ting] forth a summary of those non-HUD use restrictions that currently affect this Project." A235.

60.    Mr. Sterling extensively summarized the Maryland CDA use restrictions on Glenview Gardens, which mandated that the property be maintained as low-income housing, A235-38; *see also* A241-42 (RCFC 30(b)(6) witness for Glenview Gardens acknowledging that Mr. Sterling's memorandum reflected the use restrictions that the Maryland CDA placed on the property) (Glenview Gardens Limited Partnership RCFC 30(b)(6) Tr. 18:15-19:7).

61.    Mr. Sterling further noted that the owner was requesting CDA's prior written approval to prepay the CDA Loan in full in order to obtain incentives under LIHPRHA. A237.

62.    The Maryland CDA offered different reasons at different times as to why the agency was refusing to permit prepayment of the Maryland CDA loans.

63.    As noted above, some documents suggest, for example, that the refusal was tied to the term of the bonds that financed the Maryland CDA loans. *See, e.g.,* A246-47 (opinion from the Attorney General of the State of Maryland that "[t]he Agreement and Declaration of Covenants and Restrictions requires that the units in the project be continuously rented or available to the general public and that at least 20% of the units be occupied by 'Individuals of Low or Moderate Income.' These restrictions are tied not to the term of the mortgage but to the term of the bonds that provided funds for the loan . . . . In each case, the Qualified Project Period will continue as long as HUD Section 8 assistance is provided to the project. The period is

11

further extended if the original bonds have been refunded by a later series of bonds."); A232

(request to prepay Maryland CDA mortgages on Glenview Gardens Apartments and Indian

Head Manor Apartments in 1992 "was denied on the grounds that the second mortgages were

financed as part of a larger tax exempt bond funding that could not be prepaid"); A226 (1991

memo regarding effect of HELP loans on ability to prepay Maryland CDA mortgages on

Glenview Gardens Apartments and Indian Head Manor Apartments).

64.    The plaintiff in this case, Glenview Gardens Limited Partnership, is not in

possession of any information regarding the underlying term of the bonds implicated by the

Maryland CDA loan, A243 (Glenview Gardens RCFC 30(b)(6) Tr. 36:2-6), and, therefore, is not

in a position to contradict the documentary evidence, described above, that the terms of the

bonds underlying the Maryland CDA precluded prepayment.

65.    Additionally, as a policy matter, the Maryland CDA was also unwilling to consent

to the prepayment of its CDA loans due to a desire to maintain financed properties as low-

income housing. To the extent that the Maryland CDA ever indicated that it would relent on its

position that the Maryland CDA loans could not be prepaid, it also expressly conditioned its

consent on a continuation of low-income restrictions on the property. *See* A61 (Rase indicating

that "[t]he prepayment that the Maryland Community Development Administration was willing

to authorize was limited to prepayment that would not change the low income character[]" of the

property) (Rase Tr. 57:7-18); *see also* A56-57 (Rase stating that although Maryland CDA's

unwillingness to approve prepayment had "everything to do" with ELIHPA, but clarifying that

the Maryland CDA had its own prepayment restrictions "separate and apart" from ELIHPA)

(Rase Tr. 40:19-41:17).

66.    Indeed, Mr. Sterling also recounted that, with respect to Glenview Gardens

Apartments, the Maryland CDA indicated that it would consent to the requested prepayment

provided that, in relevant part, "[t]he 'Low- and Moderate-Income Occupancy Requirement' also

remains in effect, notwithstanding the prepayment of the CDA Note and the redemption of that

portion of the CDA Bonds allocable to the CDA Loan, for the 'Qualified Project Period' (Section

4.1.2). Again, this would mean that this use restriction would last until the later of January 15,

1998 or the expiration of any Section 8 HAP contract executed in connection with the LIHPRHA

process." A238.

68.     Even when Glenview Gardens Apartments was ultimately sold to a non-profit

under LIHPRHA, which had the effect of maintaining affordability restrictions, A248, the

owners had to arrange for the sale of the Maryland CDA loan "in response to a condition set by

CDA in order to obtain the agency's approval of the LIHPHRA transfer." A253.

68.     Importantly, the partnership that is the plaintiff in this action – Glenview Gardens

Limited Partnership – was not *itself* permitted prepay the Maryland CDA mortgage on Glenview

Gardens Apartments, let alone for the purpose of converting the property to market-rate housing.

Rather, the *non-profit* that pledged to retain the low-income housing character of the property

under LIHPRHA was the entity that was permitted to prepay:

> Q. Did Glenview Gardens end up prepaying its Maryland CDA
> loan?
>
> A. No.
>
> Q. Okay.
>
> A. Yes and no.
>
> Q. Okay.
>
> A. The partnership did not. At the closing of Glenview Gardens, in
> the closing sale to the nonprofit, Marble Mortgage purchased the
> loans from CDA and they eventually prepaid them. But to facilitate

the closing of Marble Mortgage, a related party to Mid-City bought
the mortgages.

A244 (Glenview Gardens Limited Partnership RCFC 30(b)(6) Tr. at 37:4-15).

69.    Indian Head Manor Apartments proceeded along a similar trajectory.  As noted above, the Maryland CDA denied requests to prepay the Maryland CDA loan on Indian Head in 1991 and 1992.  A226, A232.

70.    In 1994, Indian Head Manor Limited Partnership I noted that it faced an "inability to prepay the CDA Second Mortgage ($428,000)[,]"  and, as it weighed options under the Preservation Statutes, predicted that the Maryland CDA mortgage "could potentially preclude a sale."  A265.

71.    On March 28, 1996, Congress passed the Housing Opportunity Program Extension Act of 1996 (HOPE Act), P.L. No. 104-120, 110 Stat. 834 (March 28, 1996), restoring prepayment rights for HUD-insured mortgages.

72.    As of June 1996, two months later, Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I were still pursuing a sale for Glenview Gardens Apartments and a use agreement for Indian Head Manor Apartments under LIHPRHA.  A232-33.

73.    Indian Head Manor Limited Partnership I ultimately did not obtain incentives under the Preservation Statutes.  A267 (Wall Tr. 46:15-17).

74.    Indian Head Manor Limited Partnership I also did not prepay the HUD-insured mortgage on the property, A268 (Wall Tr. 47:10-12), because it did not have funds to pay the mortgage off.  A273-74 (Indian Head Limited Partnership I RCFC 30(b)(6) Tr. at 20:21-21:4).

75.    Rather, the partnership sold the outstanding note, and the individual who purchased it "refinanced the property paying off the mortgage and refinancing with CDA."

14

A271 (Wall Tr. 50:13-19).

## SUMMARY OF ARGUMENT

The United States is entitled to summary judgment on claims advanced by Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I that the Preservation Statutes constituted a taking of their right to convert their properties from low-income to conventional housing. The undisputed evidence of record demonstrates that, in 1986 and 1987 respectively, and prior to the enactment of the Preservation Statutes, the owners of both properties at issue took out loans with the Maryland CDA, and, as a condition, agreed to regulatory agreements with a term of 20 years requiring the properties to remain low-income housing. The evidence of record further demonstrates that the Maryland CDA would not consent to prepayment of the Maryland CDA loans if the result would have been a conversion to conventional housing. As such, Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I cannot demonstrate that the Preservation Statutes caused them any economic loss, and the United States is entitled to summary judgment in its favor.

## ARGUMENT

### I.    Standard Of Review

The Court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine issue of material fact is one that can change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

The moving party has the initial responsibility to identify the legal basis of its motion and to point to those portions of the record that it believes demonstrate the absence of a genuine issue

of material fact. *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A party moving for summary

judgment on the nonmoving party's claim, on which the nonmoving party has the burden of

proof, need not negate the nonmoving party's claim, but rather need only point out the lack of

evidence for an essential element of the nonmoving party's claim as to which the nonmoving

party has the burden of proof. *Celotex*, 477 U.S. at 325. "The moving party . . . need not

produce evidence showing the absence of a genuine issue of material fact but rather may

discharge its burden by showing the court that there is an absence of evidence to support the

nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.

Cir. 1994) (citation omitted).

Once the moving party has made the showing described above, the burden shifts to the

nonmoving party "to designate specific facts showing that there is a genuine issue for trial."

*Novartis*, 271 F.3d at 1046 (citing *Celotex*, 477 U.S. at 324. In considering a motion for

summary judgment, "all justifiable inferences are to be drawn in the nonmovant's favor." *Yant

v. United States*, 588 F.3d 1369, 1371 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255).

## II. Glenview Gardens Limited Partnership And Indian Head Manor Limited Partnership I Cannot Prove That The Preservation Statutes Caused Their Alleged Economic Loss Because Their Agreements With The Maryland CDA Independently Restricted The Use Of Their Properties

Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I

"bear[] the burden of proof to establish that the government action caused the injury" of an

alleged taking supposedly effected by the Preservation Statutes by showing that "in the ordinary

course of events, absent government action, plaintiff[] would not have suffered the injury." *St.

Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018). Neither partnership

can meet this burden.

In advance of the enactment of either ELIHPA or LIHPRHA – and, specifically in 1986 and 1987 respectively – the owners of Glenview Gardens Apartments and Indian Head Manor Apartments took out loans from the Maryland CDA, and encumbered their properties with regulatory agreements that obligated them to maintain the low-income character of their properties, for a period of 20 years, absent the consent of the Maryland CDA to prepay the loans. A65-67, A103, A108-34, A178-216.

The undisputed evidence of record establishes that, for reasons that were separate and apart from any Federal requirements, A54 (Rase Tr. 31:16-21) – *i.e.*, that were rooted either in the nature of the bonds that financed the loans, *see, e.g.*, A226, A232, A246-47, or the Maryland CDA's own policy objective of preserving financed properties as low-income housing, *see, e.g.*, A56-57, A61, A238, A253, or both considerations – the Maryland CDA did not generally consent to the prepayment of its loans. *See* A49 (Rase Tr. 20:13-17); A54 (Rase Tr. 31:2-15); *see also* A55 ("Actually, prepayment of mortgage was not an issue that would arise in our department.") (Rase Tr. 34:17-19). Rather, it was generally the policy of the Maryland CDA to permit property owners who received loans to convert their projects to conventional market rate housing "[o]nly after full compliance with the period for low income service that was required." A52 (Rase Tr. 26:4-11).

In the case of Glenview Gardens Apartments and Indian Head Manor Apartments, the term of the Maryland CDA-imposed restriction was 20 years, ensuring that the properties remained low-income housing through 2006 and 2007, respectively. A65-66, A203. The record reflects that the Maryland CDA repeatedly refused to permit prepayment of the Maryland CDA loans in the 1990s, A226, A232, and relented only upon being assured that the properties would remain low-income. *See* A61, A238. Thus, even if the Preservation Statutes had never been

17

enacted, and even if prepayment of *HUD-insured* mortgages had never been restricted, the Maryland CDA loans on Glenview Gardens Apartments and Indian Head Manor Apartments, and their attendant regulatory agreements prevented a conversion to market-rate housing.

This consideration is fatal to the takings claim now brought against the United States by Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I. Because of the independent, Maryland CDA-imposed limitations on Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I's ability to convert their respective properties to a use free of any low-income rental restrictions, neither of those partnerships can demonstrate that the *Preservation Statutes* caused them any economic loss. Regardless of whether or not Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I prepaid their HUD-insured mortgages, they still could not extricate themselves from the low-income restrictions imposed under their respective agreements with the Maryland CDA, and the Maryland CDA did not consent to any arrangement that did not retain the low-income character of the properties. *See* A61, A238. As such, the Government is entitled to summary judgment in its favor on the claims that the partnerships have advanced.

## <u>CONCLUSION</u>

For these reasons, the Court should conclude that Glenview Gardens Limited Partnership and Indian Head Manor Limited Partnership I cannot prove a taking, that trial on their claims is unnecessary, and that dismissal of their claims is warranted.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

18

        s/ Franklin E. White, Jr.
        FRANKLIN E. WHITE, JR.
        Assistant Director

        s/ Amanda L. Tantum by s/ A. Bondurant Eley
        AMANDA L. TANTUM
        EMMA E. BOND
        Senior Trial Counsel
        A. BONDURANT ELEY
        Senior Litigation Counsel
        JOSHUA W. MOORE
        TATE N. WALKER
        BRITTNEY M. WELCH
        Trial Attorneys
        Commercial Litigation Branch
        Civil Division, Department of Justice
        P.O. Box 480, Ben Franklin Station
        Washington, D.C. 20044
        Telephone: (202) 616-8131
        E-mail: Amanda.Tantum@usdoj.gov

April 17, 2025

        Attorneys for Defendant