# **<u>APPENDIX</u>**

## INDEX TO APPENDIX

<u>Document</u>                                                                                                <u>Page</u>

Certificate of Limited Partnership for Glen Burnie Associates, June 15, 1970............................A1

Glenview Gardens Deed of Trust Note, September 21, 1970........................................................A5

Regulatory Agreement for Glenview Gardens, August 27, 1970..................................................A9

Glenview Gardens Limited Partnership Limited Partnership Agreement,
    November 30, 1984...................................................................................................................A19

Excerpts from the Deposition of Nancy Rase, December 27, 2024 ............................................A45

Deed of Trust for Glenview Gardens, September 22, 1986.........................................................A62

Deed of Trust Note for Glenview Gardens, September 22, 1986...............................................A102

Maryland CDA Regulatory Agreement for Glenview Gardens, September 22, 1986 .............A108

Agreement and Declaration of Covenants and Restrictions for Glenview Gardens,
    September 22, 1986 .................................................................................................................A124

Secured Noted for Indian Head Manor Apartments, July 1, 1968............................................A135

Regulatory Agreement for Indian Head Manor Apartments, July 1, 1968...............................A139

Assumption Agreement for Indian Head Manor Apartments, May 26, 1969 ..........................A151

Indian Head Limited Partnership I Limited Partnership Agreement,
    October 17, 1983.....................................................................................................................A154

Maryland CDA Regulatory Agreement for Indian Head Manor Apartments,
    January 8, 1987 .......................................................................................................................A178

Agreement and Declaration of Covenants and Restrictions for Indian Head
    Manor Apartments, January 8, 1987......................................................................................A193

Deed of Trust Note for Indian Head Manor Apartments, October 14, 1988 ...........................A203

Modification Agreement for Indian Head Manor Apartments, October 14, 1988 ...................A210

Modification Agreement for Indian Head Manor Apartments, October 14, 1988 ...................A210

Modification Agreement for Indian Head Manor Apartments, October 14, 1988 ...................A210

Letter, D. Koubek to S. Hamilton, submitting notice of intent for Indian Head
  Manor Apartments, December 21, 1990................................................................A217

Letter, T. McFall to E. Ford, March 22, 1991 .........................................................A224

Memorandum, E. Ford to J. Wall and L. Steen, September 13, 1991 ......................A226

Notice of Election to Proceed, June 5, 1992, for Indian Head Manor Apartments ..............A227

Letter, J. Wall to D. Faulk, December 8, 1994 re Initial Notice of Intent for
  Glenview Gardens Apartments ............................................................................A228

Letter, J. Wall to R. Baxter, June 26, 1996..............................................................A232

Memorandum from S. Sterling to Appraisers, May 16, 1992 .................................A234

Excerpts from the RCFC 30(b)(6) Deposition of Glenview Gardens,
  Limited Partnership, January 9, 2025 .................................................................A240

Memorandum from D. Porter to R. Baxter, October 24, 1996 ................................A246

Letter, S. Sturman to V. Davis and R. Baxter, November 4, 1996..........................A248

Letter, J. Wall to N. Trick, November 17, 1997 ......................................................A253

Memorandum from J. Wall to E. Ford, March 2, 1994 ...........................................A265

Excerpts from the Deposition of John Wall, January 9, 2025 .................................A266

Excerpts from the RCFC 30(b)(6) Deposition of Indian Head Manor
  Limited Partnership I, January 9, 2025 ...............................................................A272

BOOK 3 PAGE 313

CERTIFICATE OF LIMITED PARTNERSHIP

OF

GLEN BURNIE ASSOCIATES

THIS CERTIFICATE is made and entered into as
of the 15th day of June , 1970 by and among the
undersigned parties.

WITNESSETH:

WHEREAS, the parties hereto have formed a limited
partnership known as "GLEN BURNIE ASSOCIATES" (the "partner-
ship") pursuant to the laws of the State of Maryland (Art.
73, §§ 1 ff., Ann. Code of Maryland (1957)).

NOW, THEREFORE, in consideration of the fore-
going, of the mutual promises herein contained, and of
other good and valuable consideration, the receipt and
sufficiency of which is hereby acknowledged, the under-
signed parties agree, and do hereby certify, that:

I. The name of the limited partnership is "GLEN
BURNIE ASSOCIATES".

II. The business of the partnership shall con-
sist of (i) acquiring and owning certain undeveloped real
estate (hereinafter referred to as the "Land") situated
on Crain Highway, in Glen Burnie, Anne Arundel County,
Maryland, which Land (containing approximately 15.00 acres)
is more particularly described in Exhibit B attached hereto
and made a part hereof; (ii) developing and constructing
on the Land garden-type apartment buildings containing
approximately 204 apartment units and appurtenant facilities

RECEIVED FOR RECORD
MARJORIE S. HOLT, CLERK
CIRCUIT COURT, A. A. COUNTY
m. s. N 3 - 313
1970 AUG 21 PM 2: 11

BAM0081102

BOOK 3 PAGE 321

owned by the withdrawing, dissolved, liquidated or bankrupt
general partner shall be assigned to a substitute general
partner or partners to be designated by limited partners
owning at least 70% of the total limited partnership
interests; and (iv) this Certificate shall be amended
to reflect such continuation.

XIV.  No limited partner shall have any right
to demand and receive property, in lieu of cash, in
return of his capital account.  His demand for the return
of his capital account, if otherwise proper under the
terms of paragraph VIII hereof, shall be for cash only.

IN WITNESS WHEREOF, the undersigned partners
individually or by their duly authorized corporate officers
have executed this Certificate and have hereunto affixed
their seals as of the day and year first above written.

ATTEST:

_____
Secretary

(Corporate Seal)

GENERAL PARTNER:

MID-CITY DEVELOPERS, INC., a
District of Columbia corporatio

By _____
Eugene F. Ford, President

LIMITED PARTNERS:

_____
Percy Uris

_____
Harold D  Uris

—9—

BAM0081103

GLEN BURNIE ASSOCIATES LIMITED PARTNERSHIP
AGREEMENT
AND CERTIFICATE OF LIMITED PARTNERSHIP

BOOK 3 PAGE 322

EXHIBIT A

| PARTNER AND ADDRESS | CASH CONTRIBUTION AND DATES | % INTEREST |
|---|---|---|
| GENERAL PARTNER: | | |
| MID-CITY DEVELOPERS, INC. 1133 15th Street, NW Washington, D.C. 20005 | $3,636 on or before September 1, 1970 | 1% |
| LIMITED PARTNERS: | | |
| PERCY URIS 850 Third Avenue New York, N.Y. 10022 | $45,000 on or before September 1, 1970 | |
| | $135,000 on the date of final endorsement of FHA mortgage or 95% occupancy of the project. | 49 1/2% |
| HAROLD D. URIS 850 Third Avenue New York, N.Y. 10022 | $45,000 on or before September 1, 1970 | |
| | $135,000 on the date of final endorsement of FHA mortgage or 95% occupancy of the project. | 49 1/2% |

BAM0081104

A3

August 26, 1970

Section 19A of the Glen Burnie Associates Limited Partnership
is hereby amended by the addition of the following sentence.

In no event will Mid-City Developers, Inc., be
required or permitted to withdraw as General Partner
until a substitute General Partner has been approved
by the Secretary.

General Partner

_____          _____
Secretary                          Mid-City Developers


                                   Limited Partners

                                   _____
                                   Percy Uris

                                   _____
                                   Harold D. Uris

BAM0081105

A4

FHA Form No. 4127-D
(Corporate)
(Revised May 1968)

FHA Project No. 052-44007-LDP
Glenview Gardens
Glen Burnie, Maryland

## D E E D   O F   T R U S T   N O T E

FOR VALUE RECEIVED, GLEN BURNIE ASSOCIATES, a partnership organized and existing under the laws of the State of Maryland, promises to pay to NATIONAL PERMANENT SAVINGS AND LOAN ASSOCIATION, an unincorporated voluntary association organized under the laws of the District of Columbia, or order at its principal office, 14th and G Streets, N. W. Washington, D. C. , 20005, or at such other place as may be designated in writing by the holder of this Note, the principal sum of Two Million Eight Hundred Thirty-Four Thousand Dollars ($2,834,000.00), with interest from date at the rate of eight and one-half per centum (8-1/2%) per annum on the unpaid balance until paid. The principal and interest shall be payable in monthly installments as follows:

Interest alone payable monthly on the first day of September, 1970, and on the first day of each month thereafter up to and including December 1, 1971. Commencing on the first day of January, 1972, installments of interest and principal shall be paid in the sum of Twenty Thousand Seven Hundred Seventy-Five and 89/100ths Dollars ($20,775.89), each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid. In any event, the balance of principal, if any, remaining unpaid, plus accrued interest, shall be due and payable on December 1, 2011. The installments of interest and principal shall be applied first to interest at the rate of Eight and One-Half per centum (8½%) per annum upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal. Provided, the holder hereof may collect a "late charge" equal to two cents (2¢) for each one dollar ($1.00) of each payment to interest and/or principal which is more than fifteen (15) days in arrears to cover the extra expense involved in handling delinquent payments. Provided, however, that so long as the note shall be insured by the Federal Housing Commissioner under Section 236 of the National Housing Act, the amount of the delinquent payment upon which such "late charge" may be imposed shall be limited to the amount actually payable by the undersigned to the holder hereof and shall not include for such purpose the amount payable by the Federal Housing Commissioner pursuant to regulations for Section 236 of the National Housing Act.

In the event of prepayment during any one calendar [...] in excess of fifteen percentum (15%) of the original princ[...] parties liable for payment thereof hereby agree to be joi[...] pay to the holder hereof for its own account a premium or [...]um (3%) of the amount of such excess less one-eighth of one p[...] twelve-month period which has elapsed since the date here[...] of no additional charge shall be collected by the holder here[...] principal which is made by the maker,    or on its behalf [...] the Federal Housing Commissioner. Any such prepayment pen[...] addition to the adjusted premium charges referred to in th[...]

*[handwritten margin note: This does one for "Glen Burnie Associates" — not "Glenview Gardens Limited Partnership"]*

The debt evidenced by this note may not be prepaid eit[...] to the final maturity date hereof without the prior writte[...] Housing Commissioner except where: (1) the prepayment is in[...] of an individual unit for sale to a lower income, elderly, [...] (2) the maker is a limited dividend mortgagor which is not [...] Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of 20 years from the date of final endorsement or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act, as amended.

If this debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment of this debt hereby agree to be jointly and severally bound to pay to the holder hereof the adjusted premium charge referred to in the applicable Regulations.

A5

DOJ0460337

FHA Form No.  4127-D                    FHA Project No. 052-44007-LDP
(Corporate)                             Glenview Gardens
(Revised May 1968)                      Glen Burnie, Maryland


D E E D   O F   T R U S T   N O T E


    FOR VALUE RECEIVED, GLEN BURNIE ASSOCIATES, a partnership organized and existing
under the laws of the State of Maryland, promises to pay to NATIONAL PERMANENT SAVINGS
AND LOAN ASSOCIATION, an unincorporated voluntary association organized under the laws of
the District of Columbia, or order at its principal office, 14th and G Streets, N. W.
Washington, D. C. , 20005, or at such other place as may be designated in writing by the
holder of this Note, the principal sum of Two Million Eight Hundred Thirty-Four
Thousand Dollars ($2,834,000.00), with interest from date at the rate of eight and
one-half per centum (8-1/2%) per annum on the unpaid balance until paid.  The
principal and interest shall be payable in monthly installments as follows:

    Interest alone payable monthly on the first day of September, 1970, and on the first
day of each month thereafter up to and including December 1, 1971.  Commencing on the first
day of January, 1972, installments of interest and principal shall be paid in the
sum of Twenty Thousand Seven Hundred Seventy-Five and 89/100ths Dollars ($20,775.89),
each, such payments to continue monthly thereafter on the first day of each succeeding
month until the entire indebtedness has been paid.  In any event, the balance of
principal, if any, remaining unpaid, plus accrued interest, shall be due and payable
on December 1, 2011.  The installments of interest and principal shall be applied
first to interest at the rate of Eight and One-Half per centum (8½%) per annum upon
the principal sum or so much thereof as shall from time to time remain unpaid, and
the balance thereof shall be applied on account of principal.  Provided, the holder
hereof may collect a "late charge" equal to two cents (2¢) for each one dollar
($1.00) of each payment to interest and/or principal which is more than fifteen (15)
days in arrears to cover the extra expense involved in handling delinquent payments.
Provided, however, that so long as the note shall be insured by the Federal Housing
Commissioner under Section 236 of the National Housing Act, the amount of the delinquent
payment upon which such "late charge" may be imposed shall be limited to the amount
actually payable by the undersigned to the holder hereof and shall not include for
such purpose the amount payable by the Federal Housing Commissioner pursuant to
regulations for Section 236 of the National Housing Act.

    In the event of prepayment during any one calendar year in an amount
in excess of fifteen percentum (15%) of the original principal amount hereof, all
parties liable for payment thereof hereby agree to be jointly and severally bound to
pay to the holder hereof for its own account a premium or charge equal to three percentum
(3%) of the amount of such excess less one-eighth of one percentum (1/8 of 1%) for each
twelve-month period which has elapsed since the date hereof; provided, however,
no additional charge shall be collected by the holder hereof for any partial prepayment of
principal which is made by the maker,   or on its behalf pursuant to a requirement of
the Federal Housing Commissioner.  Any such prepayment penalty or charge shall be in
addition to the adjusted premium charges referred to in the applicable Regulations.

    The debt evidenced by this note may not be prepaid either in whole or in part prior
to the final maturity date hereof without the prior written approval of the Federal
Housing Commissioner except where: (1) the prepayment is in connection with the release
of an individual unit for sale to a lower income, elderly, or handicapped person; or
(2) the maker is a limited dividend mortgagor which is not receiving payments from the
Commissioner under a rent supplement contract pursuant to Section 101 of the Housing
and Urban Development Act of 1965, and the prepayment occurs after the expiration of
20 years from the date of final endorsement or as a result of a sale of the project to
a cooperative or nonprofit corporation or association and the purchase is financed with
a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act, as amended.

    If this debt is paid in full prior to maturity and while insured under the National
Housing Act, all parties liable for payment of this debt hereby agree to be jointly and
severally bound to pay to the holder hereof the adjusted premium charge referred to in
the applicable Regulations.

DOJ0460338

- 2 -

Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note. In no event shall there by a prepayment charge or premium if the prepayment is for the purpose of releasing units for sale to lower income, elderly, or handicapped persons.

If default be made in the payment of any installment under this note, and if such default is not made good prior to the due date of the next such installment, the entire principal sum and accrued interest shall at once become due and payable without notice, at the option of the holder of this note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made equals or exceeds the amount of such required installment of principal.

All parties to this note, whether principal, surety, guarantor, or endorser hereby waive presentment for payment, demand, protest, notice of protest, and notice of dishonor.

The maker hereof hereby represents and warrants that it is a business or commercial organization within the meaning of Article 49, Section 7, Annotated Code of Maryland (1969 Supt.) and further represents and warrants that the loan evidenced by this Deed of Trust Note was made and transacted solely for the purpose of carrying on or acquiring a business or commercial investment within the meaning of said Article 49, Section 7, Annotated Code of Maryland (1969 Supt.).

The maker assumes no personal liability for the payment hereof except as set out in the Deed of Trust of even date given to secure this indebtedness.

IN TESTIMONY WHEREOF, GLEN BURNIE ASSOCIATES, General Partner, on this 27th day of August, 1970, has caused this instrument to be executed by Mid-City Developers, Inc., General Partner.

GLEN BURNIE ASSOCIATES
BY MID-CITY DEVELOPERS, INC., General Partner

By: /s/ Anthony C. Koones
Anthony C. Koones, Vice President

ATTEST: /s/ Janice Lee Lewis
Janice Lee Lewis, Assistant Secretary

This note is identified by the signature of one of the Trustees in the Deed of Trust securing it.

/s/ Joseph Zegowitz, Jr.
Joseph Zegowitz, Jr., Trustee

THIS IS TO CERTIFY that this is the note described in, and secured by, Deed of Trust of even date herewith, and in the same principal amount as herein, and covering real estate in the County of Anne Arundel ---------, State of Maryland.

Dated this ----- 27th ---- day of August -------, 1970.

/s/ Clara M. Marinucci
Clara M. Marinucci

My Commission expires: April 14, 1971.  A7

DOJ0460339

- 3 -

# STATE OF MARYLAND

LOAN NO. _____

## Deed Of Trust Note

GLEN BURNIE ASSOCIATES, Grantor

TO

NATIONAL PERMANENT SAVINGS AND
LOAN ASSOCIATION

No. FHA Project No. 052-44007-LDP

Insured under Section 236 of the
National Housing Act and Regulation pub-
lished thereunder

In effect on June 26, 1970

To the extent of advances approved by the
Secretary of Housing and Urban Develop-
ment acting by and through the Federal
Housing Commissioner

By _____
   (Authorized Agent)

Date _____

A total sum of $ _____ has been
approved for insurance hereunder by the
Secretary of Housing and Urban Develop-
ment acting by and through the Federal
Housing Commissioner

By _____
   (Authorized Agent)

Date _____

Reference is made to the Act and to the
Regulations thereunder covering assign-
ments of the insurance protection on this
note.

4356l-P Rev. 5/68                    HUD-Wash., D. C.

A8

*ORIGINAL*
*FOR RECORDATION*

FHA FORM NO. 3136
Rev. 9/69
(Previous edition obsolete)

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

LIBER 2360 PAGE 329

## REGULATORY AGREEMENT FOR LIMITED DISTRIBUTION MORTGAGORS UNDER SECTION 236 OF THE NATIONAL HOUSING ACT, AS AMENDED

Project No.   052-44007-LDP

Mortgagee   NATIONAL PERMANENT SAVINGS AND LOAN ASSOCIATION

Amount of Mortgage Note   $2,834,000.00                                Date August 27, 1970

Mortgage: Recorded: Concurrently            State  Maryland          County  Anne Arundel   Date August 17, 197
herewith

Book                                      Page

This Agreement entered into this --------27th -------------- day of -----August--------- , 19 70 ,

between  GLEN BURNIE ASSOCIATES, a Maryland partnership------------------------------------

whose address is c/o Mid-City Developers, Inc., General Partner, Suite 701, 1133 Fifteenth St.,

N. W., Washington, D. C. 20005-------------------------------------------------------------------

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors, acting by and through the Federal Housing Commissioner (hereinafter called Commissioner).

In consideration of the endorsement for insurance by the Commissioner of the above described note ~~or in consideration of the consent of the Commissioner to the transfer of the mortgaged property~~, and in order to comply with the requirements of Section 236 of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto, Owners agree for themselves, their successors, ~~heirs~~ and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage, or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, shall promptly make all payments due under the note and mortgage; provided, however, that the Commissioner shall make payments to the mortgagee on behalf of the Owners in accordance with the interest reduction contract between the mortgagee and the Commissioner.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $ 911.25------------per month unless a different date or amount is approved in writing by the Commissioner. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America, shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Commissioner. In the event of a default in the terms of the Mortgage, pursuant to which the loan has been accelerated, the Commissioner may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

~~(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or shorter provisions of the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved or required in writing by the Commissioner.~~

(c) Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, within 60 days after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts shall be under the control of the Commissioner, and shall be disbursed only on the direction of the Commissioner, who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. The Owners covenant and agree that:

(a) with the prior approval of the Commissioner, they will establish for each dwelling unit (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest under a mortgage bearing interest at one percent and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest and mortgage insurance premiums due under the insured mortgage on the project;

RECEIVED FOR RECORD
MARJORIE S. HOLT, CLERK
CIRCUIT COURT, A.A. COUNTY
1970 AUG 27 PM 4: 19

AUG-27-70  3:55 5 1 6  CLK.CT.A.A.C.  Fd0407  27.00

A9

- 2 -

LIBER 2360 PAGE 330

(b) the rental charged for each unit, which will include all utilities except telephone, will be equal to 25% of the tenant's income or the basic rental, whichever is greater, but in no event shall the rental charged exceed the fair market rental;

(c) they shall limit admission to the project to those families whose incomes do not exceed the limits prescribed by the Commissioner, with the exception of those tenants who agree to pay fair market rental;

(d) preference for occupancy shall be given to those families displaced from an urban renewal area, or as a result of governmental action, or as a result of a disaster determined by the President to be a major disaster, and to those families whose incomes are within the lowest practicable limits for obtaining rental units in the project;

(e) on forms approved by the Commissioner they will obtain from each prospective tenant, prior to admission to the project, a certification of income, and a recertification of income from all tenants who are not paying fair market rental at intervals as required by the Commissioner;

(f) if any recertification reveals a change in income whereby the tenant becomes eligible for a lower or higher rental, such adjustment in rental charged shall be made, provided that rental shall never be less than basic rental and shall never exceed fair market rental;

(g) in a manner prescribed by the Commissioner, they will obtain written evidence substantiating the information given on the tenants' certifications and recertifications of income and shall retain the evidence in their files for three years;

(h) they shall require all tenants who do not pay the fair market rental to execute a lease in the form prescribed by the Commissioner, and shall not rent any unit in the project for less than 30 days nor more than one year;

(i) they shall remit to the Commissioner on or before the tenth day of each month the amount by which the total rentals collected on the dwelling units exceeds the sum of the approved basic rentals for all occupied units, which remittance shall be accompanied by a monthly report on a form approved by the Commissioner, provided that a monthly report must be filed even if no remittance is required;

(j) they shall not restrict occupancy by reason of the fact that there are children in the family, except in those projects that are designed primarily for elderly persons;

(k) they will rent commercial facilities, if any, at not less than the rental approved by the Commissioner;

(l) no change will be made in the basic rental or fair market rental unless approved by the Commissioner;

(m) no tenant shall be permitted to rent more than one unit at any given time without the prior written approval of the Commissioner;

(n) if there are rent supplement units in the project, the determination as to the eligibility of tenants for admission to such units and the conditions of continued occupancy shall be in accordance with the Rent Supplement Contract executed by the Owners and the Commissioner which is incorporated in and made a part of this Agreement.

5. Upon prior written approval of the Commissioner, the Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owner or others to such tenant upon his request, in addition to the facilities and services included in the approved Rental Schedule.

6. Owners shall not without the prior written approval of the Commissioner:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, other than from surplus cash, except for reasonable operating expenses and necessary repairs;

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the mortgaged property, or the interest of any general partner in a partnership owning the mortgaged property, or any right to manage or receive the rents and profits from the mortgaged property;

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project, except from surplus cash and except on the following conditions:

(1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Commissioner; and the right to such distribution shall be cumulative;

FRC0390158

A10

- 3 -

LIBER 2360 PAGE 331

(2) No distribution shall be made from borrowed funds or prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds;

(4) There shall have been compliance with all outstanding notices of requirements for proper maintainance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project;

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account;

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner;

(i) Incur any liability, direct or contingent, other than for current operating expenses, exclusive of the indebtedness secured by the mortgage and necessarily incident to the execution and delivery thereof;

(j) Pay any compensation, including wages or salaries, or incur any obligations, to themselves, or any officers, directors, stockholders, trustees, partners, beneficiaries under a trust, or to any of their nominees;

(k) Enter into any contract or contracts for supervisory or managerial services.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

8. Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within forty-five days.

9. (a) Owners shall provide for the management of the project in a manner satisfactory to the Commissioner. Any management contract entered into by Owners, or any of them, involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Commissioner addressed to the Owners. Upon receipt of such request Owners shall immediately terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Commissioner.

(e) Within sixty days following the end of each fiscal year the Commissioner shall be furnished with a complete annual financial report based upon an examination of the books and records of the mortgagor prepared in accordance with the requirements of the Commissioner certified to by an officer or responsible Owner and, when required by the Commissioner, prepared and certified by a Certified Public Accountant, or other person acceptable to the Commissioner.

(f) At the request of the Commissioner, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

- 4 -

LIBER 2360 PAGE 332

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project, remittances to the Commissioner as required under Paragraph 4(i) above, or for distributions of surplus cash as limited by Paragraph 6(e) above. Any owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed, or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to that title, and regulations issued pursuant to Executive Order 11063.

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

(a)(1) If the Commissioner holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(2) If said note is not held by the Commissioner - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Commissioner in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain;

(e) Terminate the interest reduction payments to the mortgagee made pursuant to Paragraph 1 hereinabove.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property,. subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any other security for the note identified herein, and endorsed for insurance or held by the Commissioner;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Mortgagor" means the original borrower under the mortgage and its successors and assigns;

(d) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors and assigns;

FRC0390160

A12

- 5 -

LIBER 2360 PAGE 333

(e) "Mortgaged Property" includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is to provide housing and other such activities as are incidental thereto;

(g) "Surplus Cash" means any cash remaining after:

    (1) the payment of:

        (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

        (ii) All amounts required to be deposited in the reserve fund for replacements;

        (iii) All obligations of the project other than the mortgage insured or held by the Commissioner unless funds for payment are set aside or deferment of payment has been approved by the Commissioner;

        (iv) Remittances due to the Commissioner as required by Paragraph 4(i); and

    (2) the segregation of:

        (i) An amount equal to the aggregate of all special funds required to be maintained by the project;

        (ii) All tenant security deposits held;

        (iii) That portion of rentals which must be remitted to the Commissioner in accordance with Paragraph 4(i), but not yet due.

(h) "Residual Receipts" means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of all distributions as that term is defined below and as limited by Paragraph 6(e) hereof;

(i) "Family" means (1) two or more persons related by blood, marriage, or operation of law, who occupy the same unit; (2) a handicapped person who has a physical impairment which is expected to be of long continued and indefinite duration, substantially impedes his ability to live independently, and is of such a nature that his ability to live independently could be improved by more suitable housing conditions; (3) a single person, 62 years of age or older; or (4) a single person less than 62 years of age provided that occupancy by such persons is limited to 10% of the dwelling units in the project;

(j) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project;

(k) "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions allowed by the Commissioner;

(l) "Default" means a default declared by the Commissioner when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Commissioner and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not effect the validity of the remaining portions thereof.

17. The following Owner : ~~GLEN BURNIE ASSOCIATES and the partners thereof,~~ Mid-City Developers, Inc., Percy Uris and Harold D. Uris------------------------------------------------------ do not assume personal liability for payments due under the note and mortgage, to the reserve for replacements, or for matters not under their control, except:

    (a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

    (b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

FRC0390161

A13

-6-

LIBER 2360 PAGE 334

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the the date first hereinabove written.

ATTEST:

/s/ Janice Lee Lewis
Janice Lee Lewis, Assistant Secretary

GLEN BURNIE ASSOCIATES

By: MID-CITY DEVELOPERS, INC.,
      General Partner

By: /s/ Anthony C. Koones
     Anthony C. Koones, Vice President

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL
HOUSING COMMISSIONER

By: _____
          Authorized Agent
    P. CLAY KNICKERBOCKER

DISTRICT OF COLUMBIA:

    I hereby certify that on the 27th day of August, 1970, before me, a Notary Public in and for the District of Columbia, personally appeared Anthony C. Koones, Vice President of Mid-City Developers, Inc., General Partner of Glen Burnie Associates, whose name is signed to the foregoing Regulatory Agreement and did acknowledge the foregoing instrument to be the act and deed of said Glen Burnie Associates for the purposes therein contained.

    WITNESS my hand and official seal.

(SEAL)

/s/ Clara M. Marinucci
Clara M. Marinucci, Notary Public

My Commission expires on April 14, 1971.

FRC0390162

A14

-7-   LIBER 2360 PAGE 335

COUNTY OF BALTIMORE )
                    )   SS
STATE OF MARYLAND   )


On this 27th -day of August --, 1970, before me appeared *P. Clay Knickerbocker*
who, being duly sworn, did say that he is the duly appointed Authorized Agent and
the person who executed the foregoing instrument by virtue of the authority vested
in him by 24 C.F.R. 200.96, and acknowledged the same to be his free and voluntary
act and deed as Authorized Agent for and on behalf of the Federal Housing Commissioner.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notorial seal
on the day and year last above written.

(SEAL)

                                    /s/ _____
                                    HENRY I. LOUIS

My commission expires ___7-1-74___.


The undersigned, a member in good standing of the Bar of the Court of Appeals
of the State of Maryland, hereby certifies that the within instrument was prepared
by him or under his supervision.

                                    /s/ Louis Pohoryles
                                    _____
                                    Louis Pohoryles

LIBER 2360 PAGE 336

DEN DYER ASSOCIATES, INC.
ENGINEERS | SURVEYORS | PLANNERS

J-69239
April 1, 1970
Revised August 3, 1970
Revisions to Courses 34 and 47
August 12, 1970

EXHIBIT "A"
DESCRIPTION

PART OF ERWIN LEE GREENBERG, ET AL, PROPERTY

SECTION 1, GLEN VIEW GARDENS

THIRD (3rd) DISTRICT

ANNE ARUNDEL COUNTY, MARYLAND

..... being part of the lands conveyed by Mary A. Robb, widow, to Erwin Lee Greenberg, et al, by deed dated March 15, 1967 and recorded among the Land Records of Anne Arundel County, Maryland, in Liber 2055 at Folio 95 and being more particularly described as follows:

BEGINNING for the same at a point at the end of the third or South $20\frac{1}{2}°$ East, 119.9 perch line as described in the aforesaid deed and running thence reversely with a part of said third deed line

1.  North 26° 15' 31" West 877.29 feet to a point; thence across the lands of the grantor the following forty-six courses and distances:

2.  North 63° 44' 29" East 121.18 feet to a point;

3.  North 18° 44' 29" East 10.00 feet to a point;

4.  North 26° 15' 31" West 127.24 feet to a point;

5.  North 63° 44' 29" East 147.00 feet to a point;

6.  South 26° 15' 31" East 120.00 feet to a point;

7.  South 63° 44' 29" West 5.00 feet to a point;

8.  South 26° 15' 31" East 112.00 feet to a point;

9.  South 63° 44' 29" West 28.00 feet to a point;

10. South 26° 15' 31" East 50.00 feet to a point;

11. North 63° 44' 29" East 5.00 feet to a point;

FRC0390164

LIBER 2360 PAGE 337

Description  Part of Erwin Lee Greenberg,
  et al Property, Section 1, Glen View Gardens
Page 2

J-69239
April 1, 1970
Revised August 3, 1970

12.  South 26° 15' 31" East 108.00 feet to a point;

13.  South 63° 44' 29" West 60.00 feet to a point;

14.  South 26° 15' 31" East 106.00 feet to a point;

15.  North 63° 44' 29" East 100.95 feet to a point;

16.  North 26° 15' 31" West 136.39 feet to a point;

17.  North 63° 44' 29" East 52.00  feet to a point;

18.  North 26° 15' 31" West 71.60 feet to a point;

19.  South 63° 44' 29" West 15.00 feet to a point;

20.  North 26° 15' 31" West 95.00 feet to a point;

21.  North 63° 44' 29" East 92.00 feet to a point;

22.  North 26° 15' 31" West 50.00 feet to a point;

23.  South 63° 44' 29" West 90.00 feet to a point;

24.  North 26° 15' 31" West 95.00 feet to a point;

25.  North 63° 44' 29" East 65.00 feet to a point;

26.  North 26° 15' 31" West 50.00 feet to a point;

27.  North 63° 44' 29" East 118.00 feet to a point;

28.  South 26° 15' 31" East 9.00 feet to a point;

29.  North 63° 44' 29" East 100.00 feet to a point;

30.  North 26° 15' 31" West 29.00 feet to a point;

31.  North 63° 44' 29" East 28.00 feet to a point;

32.  North 26° 16' 16" West 98.11 feet to a point;

33.  North 54° 10' 43" West 10.00 feet to a point;

34.  154.98 feet along the arc of a curve deflecting to the
     right, said curve having  a radius of 50.00 feet and a
     chord bearing North 55° 22' 25" West 99.98 feet to a point;

35.  North 33° 24' 56" East 23.44 feet to a point;

FRC0390165

LIBER 2350 PAGE 338

Description – Part of Erwin Lee Greenberg,
  et al Property, Section 1, Glen View Gardens
Page 3

J-69239
April 1, 1970
Revised August 3, 197

36. North 26° 16' 16" West 625.59 feet to a point;

37. 271.60 feet along the arc of a curve deflecting to the
    left, having a radius of 135.00 feet and a chord bearing
    North 83° 54' 23" West 228.06 feet to a point of tangency;

38. South 38° 27' 30" West 70.34 feet to a point of curvature;

39. 31.04 feet along the arc of a curve deflecting to the left,
    said curve having a radius of 75.00 feet and a chord bearing
    South 26° 36' 12" West 30.81 feet to a point of tangency;

40. South 14° 44' 55" West 25.00 feet to a point of curvature;

41. 54.92 feet along the arc of a curve deflecting to the right,
    said curve having a radius of 125.00 feet and a chord
    bearing South 27° 20' 08" West 54.48 feet to a point of
    tangency;

42. South 39° 55' 20" West 116.50 feet to a point of curvature;

43. 5.95 feet along the arc of a curve deflecting to the right,
    said curve having a radius of 175.00 feet and a chord
    bearing South 38° 56' 52" West 5.95 feet, to a point;

44. North 52° 01' 36" West 50.00 feet to a point;

45. North 06° 03' 08" West 34.75 feet to a point;

46. North 50° 04' 40" West 85.45 feet to a point;

47. South 85° 16' 08" West 35.14 feet to a point in Crain
    Highway (U. S. Route No. 3); thence with said Highway
    and reversely with the second or South 47° 15' West 25
    perch line of the aforesaid deed,

48. North 40° 36' 56" East 355.61 feet to a point; thence
    leaving said southeasterly line and reversely with the
    outline of the aforesaid deed the three following courses
    and distances:

49. North 76° 00' 34" East 271.08 feet to a point marking the
    point of beginning of the aforesaid deed;

50. South 26° 16' 16" East 1761.27 feet to an iron pipe (found);

51. South 37° 36' 09" West 743.32 feet to the place of beginning,
    containing 15.0000 acres of land.

Mailed to *Nicholas J. Fotos*

FRC0390166

A18

## GLENVIEW GARDENS LIMITED PARTNERSHIP

### LIMITED PARTNERSHIP AGREEMENT

THIS AGREEMENT is made as of _November 30_ , 1984 by and among the undersigned parties.

#### WITNESSETH:

WHEREAS, a limited partnership, known as "Glen Burnie Associates," was formed as of June 15, 1970 pursuant to the laws of the state of Maryland;

WHEREAS, a certificate of Limited Partnership ("Certificate") dated as of June 15, 1970 was recorded by the Clerk of the Circuit Court of Anne Arundel County, Maryland, on August 21, 1970 in Book 3, Page 313;

WHEREAS, the Certificate was amended by an Amended Certificate dated July 1, 1984, and recorded by the Clerk of the Circuit Court of Anne Arundel County, Maryland, on July 27, 1984 in Book 19, Page 432;

WHEREAS, the Certificate was amended by an Amended Certificate dated _November 27, 1984_ .

WHEREAS, a Limited Partnership Agreement dated as of June 15, 1970 ("1970 Agreement") was previously entered into; and

WHEREAS, the parties hereto desire to enter this Limited Partnership Agreement ("Agreement") in order to reflect the terms and conditions of their agreement and understandings and to supersede in their entireties the 1970 Agreement and Certificate as previously amended.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound hereby, agree as follows:

1. _Name of Limited Partnership._ The parties hereby continue that limited partnership known as Glen Burnie Associates under the name of "Glenview Gardens Limited ← New Partnership" (the "Partnership").

2. _Principal Office and Registered Agent of Partnership._ The principal office and place of business of the Partnership shall be located at 4733 Bethesda Avenue, Suite 560, Bethesda, Maryland 20814. The Partnership may

IRH 0215108

have such other or additional offices as the Managing General
Partner (as hereinafter defined in Section 11), in its sole
discretion, shall deem advisable.  The Registered Agent of
the Partnership shall be Mr. Timothy McShea, located at 4733
Bethesda Avenue, Suite 560, Bethesda, Maryland 20814.

        3.   <u>Business of the Partnership</u>.  The business
of the Partnership shall consist of owning and operating
Glenview Gardens (the "Apartments"), situated on Crain
Highway, Glen Burnie, Anne Arundel County, Maryland, and
carrying on any and all activities related thereto.

     The Partnership is authorized to execute a note
and mortgage in order to secure a loan to be insured by the
Assistant Secretary for Mortgage Credit of the Department
of Housing and Urban Development (hereinafter referred to as
the "Commissioner") and to execute a Regulatory Agreement and
other documents required by the Commissioner in connection
with such loan.  So long as a mortgage is outstanding, unpaid
and insured or held by the Commissioner, any incoming Partner
shall, as a condition of receiving an interest in the Part-
nership property, agree to be bound by the note, mortgage and
Regulatory Agreement and other documents required in connec-
tion with the FHA-insured loan to the same extent and on the
same terms as the other Partners; and, upon any dissolution,
no title or right to possession and control of the project,
and no right to collect the rents therefrom, shall pass to
any person who is not bound by the Regulatory Agreement in a
manner satisfactory to the Commissioner.

     The Partnership is further authorized:

        (a)  To provide dwelling accommodations for
families displaced from urban renewal areas or as a result
of governmental action and to assist and further the
provision of housing for moderate and low income families.

        (b)  To construct, operate, maintain and
improve, and to buy, own, sell, convey, assign, mortgage or
lease, any real estate and any personal property necessary or
incident to the provision of such housing.

        (c)  To borrow money and issue evidences of
indebtedness in furtherance of any or all of the objects of
its business; to secure the same by mortgage, pledge or other
alien.

        (d)  To apply for and obtain or cause to
be obtained from the Commissioner a contract or contracts of
mortgage insurance pursuant to the provisions of Section 236
or any other section or sections of the National Housing Act,
as amended.

- 2 -

IRH 0215109

(e)    To enter into any kind of activity, and to perform and carry out contracts of any kind necessary to, in connection with, or.incidental to the accomplishment of the purposes of the Partnership.

(f)    To enter into a Regulatory Agreement or Agreements with the Commissioner and to be bound by the terms thereof to enable the Commissioner to carry out the provisions of the National Housing Act, as amended, which Regulatory Agreement or Agreements, upon execution, shall be binding upon the Partnership, its successors and assigns, so long as a mortgage is outstanding, unpaid and insured or held by the Commissioner.

(g)    To do any and all things necessary and proper for the accomplishment of the objects herein enumerated or necessary or incident to the protection and benefit of the Partnership.

(h)    Any other provisions of this Agreement to the contrary notwithstanding, so long as any property of the Partnership is encumbered by a mortgage insured, owned or held by the Commissioner, the Partnership shall not be voluntarily dissolved without the prior written consent of the Commissioner.

4.    <u>Filing of Certificate.</u>    The General Partners shall promptly prepare (or cause to be prepared), for execution by all of the Partners, an Amended and Restated Certificate of Limited Partnership (the "Amended and Restated Certificate") to be recorded in the appropriate office(s) in Maryland, and shall do all and any other acts and things requisite for the perfection of the Partnership as a limited partnership pursuant to the Revised Uniform Limited Partnership Act of the State of Maryland and may file the Amended and Restated Certificate in any other jurisdiction.

5.    <u>Partners; Partnership Interests.  The General Partners are Mid-City Financial Corporation and Glenview Limited Partnership, a Maryland limited partnership. Glenview Limited Partnership, as set forth on Exhibit A, is being admitted to the Partnership pursuant to this Agreement and the Partnership is redeeming the limited partnership interest of the Limited Partners listed on Exhibit</u> B.    Unless the context otherwise clearly indicates, (i) the terms "Partner" and "Partners" shall include both the General Partners and the new Limited Partner of the Partnership, and (ii) the term "partnership interest" and "partnership interests" shall include both the general

- 3 -

IRH 0215110

and limited partnership interests in the Partnership.
The addresses of the Partners are shown on Exhibit A.  All
references to Exhibit A are references to Exhibit A as
amended and in effect from time to time.

### 6.  Capital Contributions; Capital Accounts.

(a)  Upon the execution of this Agreement,
the Limited Partner shall contribute to the capital of the
Partnership the sum set forth after its name on Exhibit A.

(b)  In the event that at any time (or from
time to time) additional funds (in excess of available loans
and the aforesaid capital contributions) are required by the
Partnership for or in respect of its business or any of its
obligations, expenses, costs, liabilities or expenditures
(including, without limitation of the generality of the fore-
going, operating deficits), the Managing General Partner
shall have the right (but not the obligation) either (i) for
and on behalf of the Partnership, to borrow such funds, with
interest payable at then-prevailing rates, from commercial
banks, savings and loan associations and/or other lending
institutions or persons (including Partners); or (ii) to lend
such additional funds to the Partnership, for such periods of
time and at then-prevailing rates of interest (but not less
than one percent (1%) above the then prime rate at Maryland
National Bank, as the Managing General Partner, in its sole
discretion, may determine.

(c)  The foregoing provisions of this
Section are not intended to be for the benefit of any credi-
tor or other person (other than a Partner in his capacity as
a Partner) to whom any debts, liabilities or obligations are
owed by (or who otherwise has any claim against) the Partner-
ship or any of the Partners; and no such creditor or other
person shall obtain any right under any such foregoing pro-
vision or shall by reason of any such foregoing provision
make any claim in respect of any debt, liability or obliga-
tion (or otherwise) against the Partnership or any of the
Partners.

(d)  The "capital account" of a Partner as
of any date means the amount of cash or the tax basis (net of
liabilities assumed), to the Partnership, of other property
contributed by such Partner to the capital of the Partner-
ship:

(1) increased by his distributive
share of each year's (or part thereof) -

- 4 -

IRH 0215111

   (A) taxable income (or items
      thereof) of the Partnership
      and

   (B) income of the Partnership
      which is exempt from tax.

  (2) decreased by his distributive
    share of each year's (or part
    thereof) —

   (A) losses (or items thereof)
      of the Partnership,

   (B) expenditures of the
      Partnership not deductible
      in computing its taxable
      income and not properly
      chargeable to a capital
      account, and

   (C) the amount of any cash dis-
      tributed to him and the fair
      market value of any property
      distributed to him in kind.

    If property is distributed, in kind, to one or more
Partners, then, to the extent such distribution does not
result in the Partnership recognizing income or loss equal to
the difference, if any, between the fair market value and tax
basis of the distributed property, each Partner's capital
account shall be adjusted to reflect his proportionate share
of such difference, except that if property is distributed in
kind to one or more Partners in reduction or satisfaction of
their interests in the Partnership and the Partnership does
not recognize gain or loss upon such distribution then the
capital accounts of the remaining Partners shall be adjusted
in proportion to their remaining percentage interests in the
Partnership to reflect the difference between the basis of
the property so distributed and the portion of the capital
accounts of the distributees eliminated by such distribu-
tion.

    The Limited Partner's capital account shall not be
credited with any amount represented by a promissory note to
the Partnership until such promissory note has been either
paid or the Partnership has sold such note without recourse.

Interest paid by the Limited Partner on any such promissory
note shall be income to the Partnership and shall not be

— 5 —

IRH 0215112

credited to the Limited Partner's capital account except as it may share in all items of Partnership income.

(e)  The Limited Partner, in its capacity as such, shall not be required or obligated to contribute to the capital of the Partnership any amount beyond that set forth after its name in Exhibit A.

(f)  Except as specifically provided in this Agreement, no interest or other compensation shall be paid by the Partnership to any Partner with respect to his capital contribution to the Partnership or his capital account in the Partnership.

7.    Profits and Losses.

(a)  For bookkeeping purposes, the profits of the Partnership shall be shared, and the losses of the Partnership shall be borne, by the Partners each year in the same manner as set forth in Section 7(b).  In no case, however, shall the Limited Partner (in its capacity as a Limited Partner) be personally liable for any losses, expenses, costs, obligations or liabilities in excess of the amount of its capital contribution set forth after its name in Exhibit A.

(b)  (1)  Except as provided in subparagraphs (2) and (3) of this Section 7(b), for the purposes of Sections 702 and 704 of the Internal Revenue Code of 1954 (the "Code"), or the corresponding provisions of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, the Partners' distributive share of all Partnership items of income, gain, loss, deduction, credit or allowance for any Partnership accounting year or other period shall be allocated 98% to the Limited Partner and 2% to the General Partners in proportion to their respective percentages of Partnership interest.

(2)  Subject to the provisions of subparagraph (3) of this Section 7(b), the Partners' distributive share of all Partnership items of income, gain, loss, deduction or credit allocable to any property contributed to the Partnership by a Partner shall be allocated so as to take into account the variation between the basis of the property to the Partnership and its fair market value at the time of contribution.  Items of depreciation recapture and investment tax credit recapture shall be allocated to the persons holding the interests to which the deductions and credits giving rise to the recaptured items were allocated.

- 6 -

IRH 0215113

A24

(3)  If it is determined by the Managing General Partner (either upon the advice of the Partnership's counsel or tax accountants or as a result of an audit by the Internal Revenue Service) that an allocation of an item of deduction or loss to the Limited Partner under subparagraph (1) of this Section 7(b) did not (or would not) have substantial economic effect within the meaning of Section 704(b) of the Code, such item of deduction or loss shall be reallocated in a manner which does have substantial economic effect.  In the event of such a reallocation the Managing General Partner shall, as soon as possible thereafter, make such compensating special allocations of taxable income or of items of deduction and loss (having substantial economic effect) as will restore the capital accounts of the Partners to the balance such capital accounts would have had if the allocations pursuant to subparagraph (1) had had substantial economic effect.  If it deems it in the overall interests of the Partnership and the Partners to do so, the Managing General Partner may accomplish all or a part of the restoration of the capital accounts (to the balances which would have existed had the allocation under subparagraph (1) had substantial economic effect) by making special allocations of gross income.

(c)  In the event of the transfer of all or any part of a partnership interest (in accordance with the provisions of this Agreement) at any time other than the end of a Partnership accounting year, the distributive share of the partnership items referred to in Section 7(b) above (in respect of the partnership interest so transferred), as computed for income tax purposes, shall be allocated between the transferor and the transferee in such manner as they reasonably agree but not in contravention of Federal income tax regulations, and absent such agreement by April 1 following the year of the transfer, then in such equitable manner as the Managing General Partner shall determine.

(d)  The Limited Partner acquired its interest in the Partnership by purchase from prior Partners. Under the Code the Limited Partner is therefore deemed to have contributed its proportionate share of the assets of the Partnership as of the date of this Agreement (such proportionate share of assets being hereinafter referred to as the "Contributed Assets").  All items of Partnership income, gain, loss, deduction or credit shall therefore be adjusted consistently with Section 704(c)(3) of the Code so as to treat the Limited Partner (in both its capacity as a General Partner and its capacity as a Limited Partner) as if such Limited Partner owned directly its undivided interest in the

- 7 -

IRH 0215114

Contributed Assets. Without limiting the generality of the foregoing, the following adjustments shall be made:

(1) depreciation and amortization with respect to any Contributed Asset shall be allocated among the Partners in proportion to their respective tax bases in such Contributed Asset as of the date of this Agreement; and

(2) any ordinary income recapture realized by the Partnership which is attributable to the sale or other disposition of a Contributed Asset shall be allocated among the Partners in proportion to the amount of depreciation or amortization allocated to each Partner with respect to such Contributed Asset prior to such sale or other disposition (including depreciation or amortization allocated to each Partner prior to the date of this Agreement).

8. Distributions to Partners.

(a) For the purposes of this Agreement, subject to applicable FHA regulations, "Net Cash Flow" means:

(1) The taxable income for Federal income tax purposes as shown on the books of the Partnership -- increased by (i) the amount of depreciation deductions or amortization or similar non-cash deductions in lieu of depreciation taken in computing such taxable income, (ii) other non-cash deduction items including, but not limited to, pre-paid interest and prepaid management fees, if any, and (iii) any non-taxable income or receipts of the Partnership (excluding capital contributions and the proceeds of any mortgages or of any other obligations or loans of the Partnership) -- and reduced by (i) payments upon the principal of any mortgages upon Partnership property or of any other Partnership obligations or loans (including loans from Partners), (ii) expenditures for the acquisition of Partnership property (excluding inventory items) and for capital improvements and/or replacements (except to the extent financed through capital contributions, mortgages on Partnership property or any other Partnership obligations or loans or reserves previously set aside by the Partnership for such purposes), and (iii) such reserves for capital improvements and/or replacements, for repairs, for escrows, security deposits or the like, for tax and insurance payments, and for meeting anticipated expenses or other contingencies, as the Managing General Partner, in its sole discretion, shall deem to be reasonably necessary in the efficient conduct of the Partnership business; plus

- 8 -

IRH 0215115

(2)  Any other funds (including amounts previously set aside as reserves by the Managing General Partner, where and to the extent no longer regarded as reasonably necessary in the efficient conduct of the Partnership business) deemed available for distribution and designated as Net Cash Flow by the Managing General Partner, in its sole discretion.

(3)  In computing Net Cash Flow, the gain or loss and proceeds from a sale of all or a substantial portion of, or interest in, the property of the Partnership and the proceeds of refinancing or financing the Apartments shall be disregarded.

(b)  The Net Cash Flow of the Partnership shall be distributed semi-annually (on a non-cumulative basis) for each calendar year or portion thereof 98% to the Limited Partner and 2% to the General Partners in proportion to their respective percentages of Partnership interest, but such distributions may be made more or less frequently if the Managing General Partner, in its sole discretion, shall deem it advisable to do so.

(c)  The Net Cash Flow distribution by the Partnership attributable to the Apartments is strictly limited by the FHA to an amount equal to six percent (6%) of eleven and eleven one-hundredths percent (11.11%) of the principal amount of the permanent first mortgage on the Apartments as finally endorsed.  The foregoing Net Cash Flow shall be proportionately reduced in the event the permanent first mortgage is reduced as a result of FHA cost certification requirements.  It is also understood that, under the FHA regulations, an excess Net Cash Flow distribution over the aforesaid amount may be allowed to the extent that the prior year's distributions were less than the allowable FHA Net Cash Flow distribution.

(d)  All distributions made to the Limited Partner shall be paid as set forth on Exhibit A, on the date of the distributions or on such record dates as the Managing General Partner may designate for this purpose.  Distributions so made shall completely discharge and acquit the Partnership and the General Partners from any liability to any other person claiming a right to receive distributions from the Partnership.

(e)  The proceeds from a sale of all or a substantial portion of, or interest in, the property of the Partnership, and the proceeds of refinancing or financing the property of the Partnership to the extent not necessary for

- 9 -

IRH 0215116

the conduct of Partnership's business or not used, or commit-
ted for use, in the conduct of the Partnership's business
within twelve months after receipt, after payment of all
debts and other obligations or liabilities of the Partnership
(excluding a mortgage placed on the property of the Partner-
ship as a result of a financing or refinancing) shall be
distributed, in the case of sale proceeds, in accordance with
the Partners' capital accounts and, in the case of refinanc-
ing or financing proceeds, shall be distributed 98% to the
Limited Partner and 2% to the General Partners in proportion
to their respective percentages of Partnership interest.

          (f)  All distributions made within the
Partnership accounting year are subject to adjustment by
reference to the financial statements for such Partnership
accounting year.  If any additional amount is to be distri-
buted by reason of such financial statements, such additional
amount shall be deemed a distribution for such Partnership
accounting year; and if any excess amount was distributed
during such Partnership accounting year, as reflected by
such financial statements, the excess amount shall be taken
into account in reducing subsequent  distributions.

          9.  **Term of Partnership**.  The term of the
Partnership shall continue until December 31, 2020, and
thereafter from year to year, unless previously terminated in
accordance with provisions hereinafter stated.  On or after
December 31, 2020, the Limited Partner, upon ninety (90)
days' written notice by such Limited Partner to all other
Partners, shall be entitled to the return of its capital
account as of the date of such notice, provided that the
assets of the Partnership are at such time sufficient to
cover all of the Partnership's liabilities, including
liabilities to Partners in respect of their capital
accounts.

          10.  **Legal Title to Partnership Property**.  Legal
title to the Partnership property shall be held in the name
of the Partnership, or in whatever other manner the Managing
General Partner, in its sole discretion, shall determine to
to be in the best interests of the Partnership.  Without
limiting the foregoing grant of authority, the Managing
General Partner may arrange to have title taken and held in
the name of trustees, nominees or straw parties for the Part-
nership.  Subject to the other provisions of this Agreement,
the Managing General Partner shall have the right, power and
authority (without regard to the term of the Partnership),
acting for and on behalf of the Partnership, to lease, sell,
mortgage, convey, refinance, grant easements on or dedicate
the property (or any part thereof) of the Partnership, to
borrow money and execute promissory notes, to secure the same

- 10 -

IRH 0215117

with Partnership property, to convey Partnership property in fee simple by deed, mortgage or otherwise, and to create straw corporations to act as straw parties and nominees solely for and on behalf of the Partnership. In no event shall any party dealing with the Managing General Partner with respect to any property of the Partnership, or to whom any such property shall be conveyed, contracted to be sold, leased, mortgaged or refinanced by the Managing General Partner for and on behalf of the Partnership, be obligated to see that the terms of this Agreement have been complied with, or be obligated to inquire into the authority of any act or action of the Managing General Partner.

## 11.  Management of Business.

(a)  The Limited Partner (in its capacity as a Limited Partner) shall not have nor exercise any rights in connection with the management of the Partnership's business. Subject to the provisions of this Agreement, such management shall in every respect be the full and complete responsibility of Glenview Limited Partnership, who shall be the Managing General Partner ("Managing General Partner"). The Managing General Partner, as such, shall devote to the management of the Partnership's business so such of its time as it (in its sole discretion) deems reasonably necessary to the efficient operation of the partnership. All decisions made for and on behalf of the partnership by the Managing General Partner shall be binding upon the Partnership. Except as expressly otherwise set forth elsewhere in this Agreement, the Managing General Partner (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given it by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purposes of the Partnership. Notwithstanding the foregoing, the prior approval of the Managing General Partner and Limited Partners owning at least a majority of the Units shall be required for the sale or other disposition of all or substantially all (which term does not include financing or refinancing by way of mortgage, deed of trust or other security agreement as defined in this Agreement) of the property of the Partnership.

(b)  The Managing General Partner may, in its sole discretion, contract, for and on behalf of the Partnership, with any person, firm or corporation, including itself, or any of the other Partners of the Partnership, or any firm, corporation or other entity in which a Partner may

- 11 -

IRH 0215118

have an interest, at reasonable and competitive rates of compensation, commission or remuneration, for the performance of property management and any and all other services which may at any time be necessary, proper, convenient or advisable to carry on the business of the Partnership. Pursuant to the provisions of this subsection, the Managing General Partner is authorized to cause the Partnership to, and it is the intention of the Partners that the Partnership shall, continue to contract with Edgewood Management Corporation to manage the Apartments, pursuant to the existing FHA form management agreement, at the maximum rate approved by FHA and such management agreement shall be terminated only for cause. The Managing General Partner is also authorized to execute a Regulatory Agreement or Agreements (FHA Form 3136) with the Secretary of Housing and Urban Development (and more particularly with his designee, the Commissioner), and to execute any and all other documents as shall be required by the FHA in connection with the FHA loan, including but not limited to executing any mortgage, note, contract, building loan agreement, Rent Supplement Contract (FHA Form 2503), bank resolution and signature card, release, discharge or any other instrument in any way pertaining thereto.

        (c) The Partnership to the extent of its assets, and then the Managing General Partner to the extent any amount due remains unpaid, agree to indemnify and hold harmless Mid-City Financial Corporation ("Mid-City") against any and all losses, claims, damages, liabilities, judgments and actions resulting from or relating to Mid-City's general partnership interest in the Partnership, other than any loss, claim, damage, liability, judgment or action (i) attributable in part or in whole to action taken by Mid-City at any time in violation of this Agreement or (ii) arising before the date of this Agreement. The Partnership agrees to reimburse Mid-City for any legal or other expenses reasonably incurred by him in connection with the investigation of any loss, claim, damage, liability, judgment or action for which he is indemnified pursuant to this subparagraph.

        (d) The Managing General Partner is designated as the "Tax Matters Partner" of the Partnership for purposes of Section 6231 of the Internal Revenue Code of 1954 ("Code") and the regulations thereunder. As provided by law, the Tax Matters Partner shall furnish the name, address, partnership interest and taxpayer identification number of each Partner to the Secretary of the Treasury or his delegate ("Secretary"). All expenses of the Tax Matters Partner shall be borne by the Partnership or reimbursed to the Tax Matters Partner by the Partnership. Subject to the prior approval of a majority in interest of the general partnership interests,

- 12 -

IRH 0215119

the Tax Matters Partner is authorized to take all or any of the following actions:

(i) to enter into any settlement with the Internal Revenue Service or the Secretary with respect to any tax audit or judicial review, and in the settlement agreement the Tax Matters Partner may expressly state that such agreement shall bind the other Partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and regulations thereunder) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on behalf of such Partner;

(ii) in the event that a notice of a final administrative adjustment at the Partnership level of any item required to be taken into account by a Partner for tax purposes (a "final adjustment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a position for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or in the United States Claims Court;

(iii) to intervene in any action brought by any other Partner for judicial review of a final adjustment;

(iv) to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is disallowed by the Secretary, to file a petition for judicial review with respect to such request;

(v) to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(iv) to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial Federal tax proceeding to the extent permitted by applicable law or regulations.

- 13 -

IRH 0215120

A31

### 12. Fees for Management Services; Surplus Cash.

(a)  As a supervisory management fee, in respect of each calendar year of the Partnership, the Partnership shall be obligated to pay (on a cumulative basis) one-half of the first $10,000 of Surplus Cash (as defined by the HUD Regulatory Agreement) of the Partnership for such calendar year to McShea & Company, Inc., and one-half of the first $10,000 of Surplus Cash for such calendar year of the Partnership to Mid-City (the "Supervisory Management Fee Amount").

(b)  The Partnership shall be obligated to apply fifty percent (50%) of such Surplus Cash remaining after the disbursement of the Supervisory Management Fee Amount for each calendar year towards the debt service under that certain promissory note of the Limited Partner to Murray Haber dated of even date herewith in the principal amount of One Million Three Hundred Fifty Thousand Dollars ($1,350,000).

### 13. Bank Accounts.

The funds of the Partnership shall be deposited in such bank account or accounts as may be required, and the Managing General Partner shall arrange for the appropriate conduct of all such accounts.

### 14. Books of Account.

(a)  There shall be kept at the principal office of the Partnership (or at such other office as the Managing General Partner may designate) accurate books of account, in which shall be entered fully and accurately each and every transaction of the Partnership.  Each Partner shall have access thereto at all reasonable times.  Such books, which shall be maintained in accordance with the FHA regulations, shall be kept on the cash receipts and disbursements method or on an accrual method, and for such accounting year (calendar or fiscal) as the Managing General Partner, in its sole discretion, may determine.  A certified audit shall be prepared as of the end of each accounting year (and/or at such other intervals as may be required by FHA or any mortgage lender) by such certified public accountants or certified public accountants as the Managing General Partner, in its sole discretion, may designate, and each Partner shall be entitled to a copy of the audit report, as well as a summary of such other information as is relevant to such Partner for Federal income tax purposes.  Any Partner shall further have .the right to a private audit of the books and records of the Partnership, provided such audit is made at

- 14 -

IRH 0215121

A32

the expense of the Partner desiring it and is made at a reasonable time after due notice.

(b)  Within the earlier of six months of the commencement of sale of the Units or upon completion of such offering, each Partner shall be provided with a detailed written statement of the application of the proceeds of such offering.

## 15.  Assignability of Partnership Interest.

(a)  The General Partners shall have no right to assign their general partnership interests, or any part thereof, without the unanimous consent of the Partners.  The preceding sentence shall not limit the right of a Limited Partner in Glenview Limited Partnership to assign his interest in such partnership.  Notwithstanding the foregoing, Mid-City shall have the right to withdraw as a general partner upon giving not less than 30 days notice to the Managing General Partner.

(b)  The partnership interest of each Limited Partner (including such partner's right to receive a share of the profits and a return of his capital account) shall not be assignable without the consent in writing of the General Partners.  Even if the General Partners consent in writing to any such assignment, the assignee shall not become a substituted Limited Partner of the Partnership unless (i) the assigning Limited Partner so provides in the instrument of assignment; (ii) the assignee agrees in writing to be bound by the provisions of this Agreement, the Amended and Restated Certificate and the other documents described herein in Section 3; (iii) the assignment complies in all respects with applicable Federal and state securities laws; (iv) the assignee pays to the Partnership a fee of Five Hundred Dollars ($500) to cover the costs and expenses of preparation, execution and recordation of an amendment to the Amended and Restated Certificate; and (v) the assignment would not cause the Partnership to terminate for Federal income tax purposes.  If all of such conditions are satisfied, the General Partners shall prepare (or cause to be prepared) for recordation an appropriate amendment to the Amended and Restated Certificate to be signed and sworn to by them, by each of the Limited Partners, by the assigning Limited Partner, and by the assignee.  Unless named in this Agreement, admitted to the Partnership as above provided in this Section or unless admitted to the Partnership by unanimous consent of all Partners, no person shall be considered a Partner.  The Partnership, each Partner and any other person having business with the Partnership need deal only with

- 15 -

IRH 0215122

Partners so named or so admitted; they shall not be required to deal with any other person by reason of an assignment by a Partner or by reason of the death of a Partner, except as otherwise provided in this Agreement. In the absence of the substitution (as provided herein) of a Limited Partner for an assigning or deceased Limited Partner, any payment to a Partner or to his executors or administrators shall acquit the Partnership of all liability to any other persons who may be interested in such payment by reason of an assignment by, or the death of, such Partner.

(c)  Notwithstanding any other provision of this Section, the Limited Partner shall not dispose of any part or all of its limited partnership interest without first giving to the General Partners, at least thirty (30) days in advance of such proposed disposition, written notice of its intention to make such disposition. No such notice shall be considered effective under this Section unless (i) the Limited Partner desiring to make such disposition (hereinafter in this Section 15(c) referred to as the "offering Partner") shall have first obtained a bona fide offer in writing to purchase such partnership interest and (ii) a true copy of such offer, setting forth all of the terms and conditions of the proposed purchase, with the names and addresses of the proposed purchaser or purchasers, shall have been attached to such written notice. For a period of thirty (30) days from the receipt of such written notice, the General Partners shall have the option to make (or cause to be made by another party) the purchase from the offering Partner under the same terms and conditions as set forth in the written offer. Such option shall be exercised by giving written notice to the offering Partner. If notice has not been given by the expiration of the aforesaid thirty (30) day period, the offering Partner shall be free to make the disposition if the General Partners so consent in writing; provided, however, that the disposition shall be made within ninety (90) days after such expiration and in accordance with the terms and conditions of the bona fide offer, and shall be subject to the provisions of Section 15(b).

16.  Bankruptcy or Dissolution of the Limited Partner. The bankruptcy or dissolution of the Limited Partner shall not dissolve the Partnership. In such event, the legal representative of such Limited Partner, shall, for the purposes of settling the estate, have all the rights of a Limited Partner, including the same right (subject to the same limitations) as such Limited Partner would have had under the provisions of Section 15 hereof to assign the limited partnership interest (including the right to receive a share of the Partnership profits and a return of the capital

- 16 -

IRH 0215123

A34

account) of such Limited Partner and to provide in the instrument of assignment that the assignee may become a substituted Limited Partner in accordance with the procedure specified in Section 15.

### 17.  Dissolution of Partnership.

(a)  The Partnership shall be dissolved upon the occurrence of any of the following events:

        (1)  The decision of all Partners.

        (2)  The retirement, death, bankruptcy or incompetency of a General Partner, unless the Partnership is.continued under Section 17(e).

(b)  Any General Partner may resign effective at the end of a Partnership accounting year by giving not less than 90 days's advance written notice to all other Partners.

(c)  Upon the retirement, death, bankruptcy or incompetency of a General Partner, the General Partner's partnership interest shall be converted automatically to a limited partnership interest, and the provisions of Section 17(e) shall apply to determine whether the Partnership shall be continued.

(d)  The death, bankruptcy or incompetency of a Limited Partner shall not dissolve the Partnership.  In such event, the successor or legal representative of the dead, bankrupt or incompetent Limited Partner shall have all the rights of the Limited Partner.

(e)  Upon the occurrence of retirement, death, bankruptcy or incompetency of a General Partner, the Partnership shall not dissolve but shall continue, if the remaining General Partner agrees to continue the business of the Partnership or, if there is no remaining General Partner, if within 90 days after such event, all remaining Limited Partners agree in writing to continue the business of the Partnership and appoint, as of the date of such event, one or more additional General Partners.

(f)  If the Partnership is dissolved and not continued, the net proceeds from the sale or other disposition of the Partnership property, and any other liquid assets of the Partnership, after payment of or due provisions

- 17 -

IRH 0215124

for all liabilities of the Partnership to creditors, shall be distributed in accordance with the Partners' capital accounts.

(g)  In the event any property of the Partnership is to be distributed in kind, such property shall, for the purpose of such distribution, be valued at its fair market value and the capital accounts of the Partners shall be adjusted as though such property had been sold for its fair market value.

(h)  The Partnership shall terminate when all property and assets owned by the Partnership shall have been disposed of, and the net proceeds therefrom and any other liquid assets of the Partnership, after payment of or due provision for all liabilities to creditors of the Partnership, shall have been distributed in accordance with the provisions of this Agreement.

### 18. Meetings

(a)  Special Meetings of the Partners may be called by the Managing General Partner, in its discretion.

(b)  The Partnership will maintain at its offices a list of the names and addresses of the Partners which will be available for inspection by any Partner or his authorized representative.

19.  References to FHA.  The provisions in this Agreement concerning the FHA, the FHA Regulatory Agreement and the Commissioner shall remain in effect so long as the Apartments referred to in this Agreement are encumbered by a mortgage insured by the FHA and during such further time, if any  as the Commissioner shall be the owner, holder or reinsurer of any such mortgage or obligated to reinsure any such mortgage.

20.  Liability and Indemnity of the General Partners.

(a)  A General Partner shall not be liable, responsible or accountable in damages or otherwise to any of the Partners, as follows:

(1)  for any act or omission performed or omitted by him in good faith on behalf of the Partnership and in a manner reasonably believed by him to be within the scope of the authority granted to him by this Agreement and

- 18 -

IRH 0215125

A36

in the best interests of the Partnership; provided that such conduct does not constitute gross negligence or willful and wanton misconduct and provided that any action taken on advice of counsel for the Partnership or the certified public accountants for the Partnership shall be deemed as having been taken in good faith;

(2)   for any failure of any third parties to comply with their obligations under any agreements; however, the foregoing shall not apply if such General Partner was grossly negligent and failed to act in good faith in contracting with any such third party; and

(3)   for any unbudgeted or unforeseen catastrophes or for any loss or damage to Partnership property caused by strikes, labor troubles, riots, fires, tornadoes, floods, acts of a public enemy, insurrections, acts of God, breakdowns or failure of plant or machinery, failure to carry out the provisions hereof due to provisions of law, rules and regulations promulgated by any governmental agency, any demand or requisition by any government, or from any other cause beyond the control of the General Partner.

(b)   The Partnership shall indemnify and hold harmless each General Partner (including former General Partners who have not ceased to be liable as General Partners), as follows:

(1)   In any threatened, pending, or completed action, suit, or proceeding by or in the right of the Partnership, to which a General Partner was or is a party or is threatened to be a party, involving an alleged cause of action by one or more limited partners for damages arising from the activities of the General Partner in performance of the management of the internal affairs of the Partnership as prescribed by this Agreement and/or the law of Maryland, the Partnership shall indemnify the General Partner against expenses, including, but not limited to, attorneys' fees, actually and reasonably incurred by the General Partner in connection with the defense and/or settlement of such action, suit, or proceeding if the General Partner acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Partnership other than acts or omissions involving gross negligence or willful and wanton misconduct.  Any action taken on advice of counsel for the Partnership or the certified public accountants for the Partnership shall be deemed as having been taken in good faith.

(2)   In any threatened, pending or completed action, suit, or proceeding, except for those

- 19 -

IRH 0215126

described in §20b(1) above, brought by any person or entity, to which a General Partner was or is a party or is threatened to be a party, involving any claim or liability incurred by him to any person or entity by reason of any act or failure to act performed or made by him in good faith and in a manner reasonably believed by im to be in or not opposed to the interests of the Partnership, other than acts or omissions involving gross negligence or willful and wanton misconduct, the Partnership shall indemnify the General Partner against any claim, judgment, loss or expense, including, but not limited to, attorney's fees actually and reasonably incurred by the General Partner in connection with the defense and/or settlement of such action, suit or proceeding.  Any action taken on advice of counsel for the Partnership or the certified public accountant for the Partnership shall be deemed as having been taken in good faith.

### 21. Miscellaneous Provisions.

(a)  Unless otherwise so provided in this Agreement, no Partner shall be liable to any other Partner or to the Partnership by reason of his actions in connection with the Partnership, except in the case of actual fraud, gross negligence or dishonest conduct.

(b)  Except as provided herein, nothing herein contained shall be construed to constitute any Partner the agent of any other Partner or to limit in any manner the Partners in the carrying on of their own respective businesses or activities.

(c)  Any Partner may engage in and/or possess any interest in other business and real estate ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property; and neither the Partnership nor any Partner shall have any rights in or to any such independent venture or the income or profits derived therefrom.

(d)  Any claim or controversy arising out of or relating to this Agreement or a breach hereof shall, upon the request of any party involved, be submitted to and settled by arbitration in accordance with the rules then obtaining in the State of Maryland of the American Arbitration Association (or any other form of arbitration mutually acceptable to the parties so involved).  The decision made pursuant to such arbitration shall be binding and conclusive on all parties involved; and judgment upon such decision may be entered in

- 20 -

IRH 0215127

A38

the highest court of any forum, state or Federal, having
jurisdiction.

   (e)  All notices provided for herein shall be
sent by certified or registered mail, return receipt
requested, and first-class postage prepaid, to the address
of the Partner to whom such notice is addressed, as shown on
Exhibit A, unless notice of a change of address is given to
the Partnership pursuant to the provisions of this Section.
Unless otherwise provided herein, time periods shall commence
on the date of mailing of a notice.  Any notice which is
required to be given within a stated period of time shall be
considered timely if postmarked before midnight of the last
day of such period.

   (f)  The Limited Partner does hereby appoint the
Managing General Partner, and the general partners of the
Managing Partner, or any one of them, as its true and lawful
attorney-in-fact, in such Limited Partner's name and behalf,
to prepare any amendment to the Amended and Restated Certifi-
cate and to sign, certify under oath and acknowledge any and
every such amendment to the Amended and Restated Certificate
(such power of attorney being irrevocable so long as the
Managing General Partner herein named remains a General Part-
ner of the Partnership) where such an amendment is necessary
to reflect:

   (1)  a change in the name of the Partner-
ship or in the amount or character of the contribution of any
limited partner (including a change by reason of the return
to any Limited Partner of all or any part of his capital
account);

   (2)  the admission of an additional or
substituted Limited Partner in accordance with the provisions
of Section 15(b) or as otherwise provided in this Agreement
or by unanimous agreement of all Partners;

   (3)  the admission of an additional or
substituted General Partner by unanimous agreement of all
Partners;

   (4)  the change of the Managing General
Partner by unanimous agreement of all Partners;

   (5)  a change in the character of the busi-
ness of the Partnership;

- 21 -

IRH 0215128

(6) the correction or clarification of any incorrect statement in the Amended and Restated Certificate (or any amendment thereof);

(7) a change in the time stated in the Amended and Restated Certificate (or any amendment thereof) for the end of the term of the Partnership or for the return of the capital account of any Partner; or

(8) any other change or modification of the Amended and Restated Certificate (or any amendment thereof) made in order to represent accurately the agreement among the Partners. The Limited Partner does further agree, whenever requested to do so, personally to sign, certify under oath and acknowledge any such amendment (made pursuant to this Section, or pursuant to Section 15) to the Amended and Restated Certificate and to execute whatever further instruments may be requisite. The General Partners shall attend to the due execution and recordation of each and any such amendment to the Amended and Restated Certificate.

(g) The terms "bankruptcy" and "bankrupt," and derivations thereof, shall be deemed to refer to (i) the commencement of a voluntary case under the United States Bankruptcy Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or (ii) the issuance of an "order for relief" in an involuntary case under the United States Bankruptcy Code, or (iii) the commencement before a court having jurisdiction in the premises of an involuntary case under any other applicable federal or state bankruptcy, insolvency or other similar law, and the continuance of any such proceeding unstayed and in effect for a period of ninety (90) consecutive days.

(h) The use of any gender herein shall be deemed to be or include the other genders and the use of the singular herein shall be deemed to be or include the plural (and vice versa), wherever appropriate.

(i) This Agreement sets forth all (and is intended by all parties hereto to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to the Partnership, the Partnership business and the property of the Partnership, and there are no such promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, among them other than as set forth herein.

- 22 -

IRH 0215129

(j)    So long as the Secretary of Housing and Urban Development, or his successors or assigns, is the insurer or holder of the mortgage on Glenview Gardens, FHA Project No. 052-44007-LDP, no amendment to this Amended and Restated Agreement of Limited Partnership of Glen Burnie Associates which results in any of the following shall be of force or effect without the prior written consent of HUD: (1) any amendment which modifies the duration of the partnership agreement; (2) any amendment which results in the requirement that a HUD prior participation certification be obtained for any additional party; and (3) any amendment which in any way impacts on or affects the HUD mortgage or Regulatory Agreement.

-22(a)-

**IRH 0215130**

22. **Governing Law.**  It is the intention of the parties hereto that all questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Maryland.

23. **Burden and Benefit.**  This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective spouses, heirs, executors or administrators, personal and legal representatives, beneficiaries, distributees, successors and assigns.

IN WITNESS WHEREOF, the undersigned partners have hereunto affixed their signatures and seals as of the day and year first above written.


**GENERAL PARTNERS:**

[Corporate Seal]

GLENVIEW LIMITED
PARTNERSHIP

ATTEST:

By McShea & Company, Inc.,
    a general partner

By _Jeffrey P Cohen_
      _Secretary_

By _Timothy B. McShea_
      Timothy B. McShea, Executive Vice President

ATTEST:

MID-CITY FINANCIAL
CORPORATION

By _____
[Corporate Seal]

By _____
    Eugene Ford, President

- 23 -

IRH 0215131

A42

LIMITED PARTNER:

[Corporate Seal]
GLENVIEW LIMITED
PARTNERSHIP

ATTEST:
By McShea & Company, Inc.,
    a general partner

By _~Jeffrey S. Cann~_          By _Timothy B. McShea_
    _Secretary_                   Timothy B. McShea, Executive Vice Presid

— 24 —

IRH 0215132

A43

<u>EXHIBIT A</u>

<u>GLENVIEW GARDENS LIMITED PARTNERSHIP</u>

<u>GENERAL PARTNERS</u>

| Name and Address | Capital Contribution | Percentage of Partnership Interest |
|---|---|---|
| Glenview Limited Partnership<br>4733 Bethesda Avenue<br>Suite 560<br>Bethesda, Maryland  20815 | $100.00 | 1% |
| Mid-City Financial Corporation<br>4340 East-West Highway<br>Suite 900 – South Tower<br>Bethesda, Maryland  20814 | $3636.00 | 1% |

<u>LIMITED PARTNER</u>

| Name and Address | | |
|---|---|---|
| Glenview Limited Partnership<br>4733 Bethesda Avenue<br>Suite 560<br>Bethesda, Maryland  20815 | $14,900.00 | 98% |

IRH 0215133

1   ANAHEIM GARDENS,        *   IN THE

2   et al.,                 *   UNITED STATES

3       Plaintiffs,         *   COURT OF

4   vs.                     *   FEDERAL CLAIMS

5   THE UNITED STATES,      *   CASE NUMBER:

6       Defendant.          *   93-655

7                   *    *    *    *    *

8   DEPOSITION OF:

9                       NANCY RASE,

10  was held on Friday, December 27, 2024, commencing

11  at 1:04 p.m., at Annapolis Towne Center Offices,

12  1910 Towne Center Boulevard, Suite 250, Room 229,

13  Annapolis, Maryland, 21401, transcribed by

14  Brenda Staley.

15                  *    *    *    *    *

16

17

18

19

20

            TRUSTPOINT/ALDERSON COURT REPORTING
21          1029 Vermont Avenue, N.W., 10th Floor
                 Washington, D.C.  20005
22                  1-800-367-3376

TP One

1    that gives me a move forward.

2            So, I was asked to be the Deputy

3    Director of the Multifamily Financing Programs.

4    And I got offered that job because I had worked on

5    another project that had some real serious

6    financing issues and Section 8 issues and was able

7    to take that to court and get it taken care of.

8    So, I was offered the better job, which is the one

9    job I wanted when I came to the state.  It just

10   took me a while to get there.

11       Q.    What year did you become the Deputy

12   Director of Multifamily Financing?

13       A.    Let's see.  I started in '72.  No, I'm

14   sorry, I shouldn't have said that.  I started in

15   '78, and I guess it was, jeez, probably about five

16   years after I had been there, so.

17       Q.    And at some point, it's my

18   understanding you became the Director of

19   Multifamily Finance?

20       A.    I was, yes.  It wasn't very long after

21   I went into the position in the department I

22   became the Director.


TP One

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1      Q.      And did you remain the Director until

2    1994?

3      A.      Yes.

4      Q.      Generally speaking, what did the

5    Multifamily Financing Division of the Maryland

6    Community Development Administration do?

7      A.      We basically processed loans.  We would

8    have loan requests that would come in to us and we

9    would process loans.  And in the early years, they

10   were mostly loans that we would finance with tax-

11   exempt bonds.  And we also had an allocation of

12   Section 8 assistance that we could provide to the

13   projects.  HUD gave us an allocation of Section 8

14   assistance, and we could provide those to the

15   projects.

16           And I think I did that until '98 (sic),

17   and that's the point at which the -- I guess it

18   was '98 or '99 (sic), when the Low-Income Housing

19   Tax Credits came into play.  And when they came

20   into play, we had to revise our entire operation

21   because we were using tax credits and we were no

22   longer getting HUD Section 8 set-asides.


Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1      Q.    Let's look at Page 3, the third

2  physical page, together.  You see at the bottom in

3  the righthand corner the page that says

4  "IRH0001841."

5            I'd like to direct your attention to

6  the last paragraph, which reads:  "To secure to

7  the beneficiary a) the full and punctual repayment

8  of the loan evidenced by the borrower's note with

9  interest thereon providing for monthly

10  installments of principal and interest with the

11  balance of the loan, if not sooner paid, due and

12  payable no later than September 1st, 2006."  Do

13  you see that?

14      A.    Yeah.

15      Q.    Okay.  Given that we've seen on the

16  front that this was dated September 1986, is it

17  fair to say that Exhibit 1 provides for a loan of

18  a 20-year term?

19      A.    That's right.  And that's what most of

20  the loans at that time were, 20-year terms.

21      Q.    Are you aware of any that had less than

22  a 20-year term?

 TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1       A.      No, I'm not.

2       Q.      All right.  Let's look at the fifth

3  physical page, IRH0001844.

4       A.      Okay.

5       Q.      And I have some questions about

6  Paragraph 5 there, "Prepayment of Loan."  Do you

7  see that in the midpoint of the page?

8       A.      I see that.

9       Q.      Okay.  It states:  "Except as expressly

10 provided in the note, the borrower may not prepay

11 the loan."  Do you see that?

12      A.      I see it.

13      Q.      Ms. Rase, to your knowledge, was that

14 restriction standard in the deed of trust notes

15 involving the Maryland CDA in your experience?

16      A.      During this era, yes, that was

17 standard.

18              MS. ELEY:  I'm going to take a look at

19 the deed of trust note associated with this

20 property.  I'm going to ask the Court Reporter to

21 mark Exhibit 2.

22              THE REPORTER:  Counsel -- can I put the

TP One

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1     finance these projects.  So, we issued bonds.

2     There would be a bond holder that would manage the

3     bonds and then what was in effect repaid as --

4     through the mortgage on the loan.  So, that's what

5     the bond holder was.

6          CDA was the bond holder in most cases.

7     Sometimes it was Fannie Mae, sometimes it was

8     Freddie Mac, where they would actually, I guess,

9     pay off the bonds and take the loan.

10     Q.     Did the fact that the Maryland

11     Community Development Administration subsidized

12     loans dependent on bonds have any impact on the

13     timeframe in which they could be prepaid?

14     A.     I don't think we ever had a request for

15     an early prepayment on one of our bond projects.

16     Not when I was there.

17     Q.     Now, Ms. Rase, was it also the practice

18     of the Maryland Community Development

19     Administration to require the execution of a

20     regulatory agreement --

21     A.     Yes.

22     Q.     -- in connection with receiving a loan



1    from --

2         A.    Yes, absolutely.   Every one of our

3    loans had a regulatory agreement.

4         Q.    And why was that?

5         A.    It was so that we could have a very

6    clear understanding between us and the owner what

7    their obligations were for payments, what their

8    obligations were for tenant issues and, you know,

9    managing of the project.   It was just basically

10   all the rules, the day-to-day rules of operating

11   the project.

12        Q.    Was it the intent of the Maryland

13   Community Development Administration that, upon

14   receiving a loan from the organization, the owner

15   would be obligated to keep the project in a manner

16   that served low-income housing applicants?

17        A.    Absolutely.   Yes.

18        Q.    I'd like to mark --

19        A.    And there were specific percentages.

20   In other words, some cases were all low-income

21   housing because they had all Section 8 for the

22   entire property.   And others, there would be a  --



1    there might have been a percentage requirement for

2    low-income housing and then another percentage for

3    a higher income range.

4         Q.     Was it the policy of the Maryland

5    Community Development Administration to permit

6    project owners who received loans to then convert

7    their projects to conventional market rate

8    housing?

9         A.     Only after full compliance with the

10   period for low income service that was required.

11   Yes.

12              MS. ELEY:  I'd like to mark Exhibit 3.

13              MR. HAYES:  Thanks.

14              THE REPORTER:  What was Exhibit Number

15   2?

16              MS. ELEY:  Exhibit Number 2 was the

17   deed of trust note.

18              THE REPORTER:  Deed of trust note.  Got

19   it.

20              (Rase Exhibit Number 3 was marked for

21   identification.)

22



Case 1:93-cv-00655-DAT    Document 833-1    Filed 04/17/25    Page 56 of 103

1          BY MS. ELEY:

2      Q.      Ms. Rase, I've handed you what the

3  Court Reporter has marked Exhibit 3.  Do you

4  recognize Exhibit 3?

5      A.      Yes.  It's pretty much the standard

6  form that we had.

7      Q.      And does Exhibit 3 purport to be a

8  regulatory agreement involving Glen Burnie

9  Associates dated September 22nd, 1986?

10      A.      Mm-hmm.

11              THE REPORTER:  That's a yes?

12              THE WITNESS:  Yes.  I'm sorry.

13      Q.      And is Exhibit 3 an example of the type

14  of regulatory agreement that the Maryland

15  Community Development Administration required in

16  connection with advancing loans to low income

17  property owners?

18      A.      Yeah, this is pretty standard for that

19  era.  Yes.

20      Q.      I'd like for you to look with me at the

21  fifth physical page.  It should have IRH -- excuse

22  me.  That's not right.  A little off here.  Right.


Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1    and that was a requirement in the document.

2         Q.      During the time that you were working

3    in the -- what I think you said was the

4    Multifamily Financing Division of the Maryland

5    Community Development Administration, were you

6    aware of any instance where the administration

7    permitted the prepayment of a Maryland Community

8    Development Administration-subsidized loan?

9         A.      Interesting.  I'm not aware of any

10   during that period.  The one thing I would say is,

11   after the Low-Income Housing Tax Credit program

12   came into play, we did allow sale at earlier than

13   the 30 years.  We would allow a sale after 15

14   years.  But that was not a standard during this

15   earlier period.

16        Q.      Okay.  Did the fact that the Maryland

17   Community Development Administration did not

18   generally permit the prepayment of its subsidized

19   loans have anything to do with any federal

20   requirements?

21        A.      I'm not aware of any, no.

22        Q.      Do you recall whether you ever fielded



Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1  signed to get our funding.  So, you know, we'd

2  have some discussions around that.

3           I don't think we ever had a serious

4  argument, you know, go tough kind of thing, but he

5  always liked to -- I actually have great respect

6  for him.  He's one of the people that I -- Gene

7  Ford was just an amazing man.

8           But he sometimes was more interested in

9  profits that he could apply to other things, not

10  just the affordable side, and we were more focused

11  on the affordable side, so we had to work through

12  issues.  But I don't recall ever failing to

13  resolve something that was acceptable to both of

14  us.

15     Q.    Do you recall ever discussing the topic

16  of prepaying a mortgage with Mr. Ford?

17     A.    No.  Actually, prepayment of mortgage

18  is not an issue that would arise in our

19  department.

20     Q.    Is that because your department didn't

21  allow it?

22     A.    Pardon me?


Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1          A.        No.    I have not seen that before.

2          Q.        You see that Exhibit 5 at least

3    purports to be a September 13th, 1991, memo from

4    Eugene Ford to some individuals that include John

5    Wall.    In this memo, Mr. Ford makes the

6    representation "I talked with Nancy Rase

7    concerning the position of CDA with respect to

8    approving transactions involving the sale to

9    priority purchasers for the recasting to continue

10   ownership under ELIHPA," E-L-I-H-P-A.    Do you see

11   that?

12         A.        I see that.

13         Q.        My first question for you is:    Do you

14   know what is referred to by the term "ELIHPA"?

15         A.        It's a federal terminology that was

16   basically put on these projects to ensure that

17   they stayed structured as they were said to be

18   until the debt was entirely paid off.

19         Q.        Now, did the unwillingness of the

20   Maryland Community Development Administration to

21   approve prepayments of state-subsidized loans have

22   anything to do with that federal requirement,



1  ELIHPA?

2      A.    Yeah, everything to do with it.  Under

3  the ELIHPA, you couldn't pay off early on the

4  debt.

5      Q.    But isn't it true that, separate and

6  apart from ELIHPA, the state also had its own

7  prepayment restriction?

8      A.    Yes.

9            MR. HAYES:  Object to the form.

10     A.    That's correct, yeah.

11           MR. HAYES:  You can answer.

12     A.    That is correct.  We had prepayment

13  restrictions.  When I look back on that now in the

14  world we're in now, I wonder why we did because it

15  would have been nice to have the cash flow in.

16  But, you know, we didn't do that at that time.

17  Not at all.

18     Q.    Do you recall having a discussion with

19  Mr. Ford about the position of CDA with respect to

20  approving transactions involving the sale to

21  priority purchasers or recasting to continue

22  ownership under ELIHPA in the 1991 timeframe?



1          A.        We had discussions, and he knew what

2   our requirements were.   He knew that we couldn't

3   pay off the ELIHPA and he knew that he couldn't

4   pay off the CDA loans.

5          Q.        Okay.   Mr. Ford, or I assume it's Mr.

6   Ford.   The writer of this memo goes on to state:

7   "Where they have loans to projects that require

8   their consent for payoff, they are willing to

9   approve such prepayments in either case subject to

10  bond prepayment restrictions on the HELP loans,

11  which run for 10 years from the time CDA sold the

12  HELP bonds."   Do you see that?

13         A.        I see that, and I don't see that it

14  fits here because the HELP loans were small loans

15  for properties with one to four units.   So, we

16  didn't do HELP loans for the big, larger

17  construction projects.   The HELP program was a

18  one-to-four-unit program.

19         Q.        Yeah, that was my question for you.   I

20  was wondering what a HELP loan is.

21         A.        Well, it was a thing our bond company

22  came up with that other organizations like ours



1    were doing around the country where they were

2    issuing bonds to do small housing renovations and

3    improvements for affordable households.  So, you

4    know, most of our HELP projects had four units.

5    Some had more than that, but they weren't big,

6    giant-sized projects.

7         Q.    The writer of the memo describes the

8    HELP loans as "running for 10 years from the time

9    CDA sold the HELP bonds."  Does that make any

10   sense to you?

11        A.    It was probably about a ten-year

12   requirement on the HELP loans, yeah.

13        Q.    So, earlier today, we've been

14   discussing, in Exhibit 1 and Exhibit 4, I believe,

15   regulatory agreements and loans in connection with

16   Indian Head Manor and Glenview -- well, the

17   property owned by Glen Burnie Associates.

18        A.    Yes.

19        Q.    Are those larger projects than those

20   that would be serviced by HELP loans?

21        A.    Yes.

22             MR. HAYES:  Object to the form.



1          A.      Yes, they were.

2          Q.      Okay.   Was there any restriction that

3    you're aware of in connection with the bonds that

4    financed those projects, again the project owned

5    by Glen Burnie Associates and Indian Head Manor,

6    that -- were there any restrictions associated

7    with prepaying those bonds that affected -- that

8    would cause the owner to have to remain in the

9    Maryland program until the bonds were paid off?

10         A.      We didn't have early payoffs on any of

11   those loans.   I mean, they went through the whole

12   process.   They were structured with a specific

13   term.   And we didn't have owners coming in wanting

14   to do early payments on those.   They just -- they

15   went their full course and then that was it.

16         Q.      And to the best of your recollection,

17   then, that included Mr. Ford; is that correct?

18         A.      Yes.   Yes.   We treated everyone the

19   same.   All of our developers were treated equally.

20              MS. ELEY:   I would like to have the

21   Court Reporter to mark Exhibit 6.

22



1    going to serve the low-income households.

2        Q.      Okay.  So, in connection with this

3    discussion, did Mr. Wall make any representations

4    that the intent was to convert to conventional

5    housing?

6        A.      No, he did not.

7        Q.      Okay.  And to the extent that the

8    Maryland Community Development Administration gave

9    its consent to prepayment, is it fair to say that

10   prepayment was conditioned on continuing

11   restrictions on --

12       A.      Says it right there.  Yes.

13              MR. HAYES:  Objection to form.

14       Q.      The prepayment that the Maryland

15   Community Development Administration was willing

16   to authorize was limited to prepayment that would

17   not change the low income character.

18       A.      That's exactly right.

19       Q.      And was that a product of what you

20   considered your obligations to be under state law?

21              MR. HAYES:  Object to the form.  You

22   can answer.



Mortgage ( 5-Sep-86 10:44 D/37/4)
Glenview - HELP Deed of Trust

When recorded return to:
Department of Economic and
 Community Development
Legal Office
45 Calvert Street
Annapolis, Maryland 21401
Attention:  Counsel - DECD

DEED OF TRUST

SECURITY AGREEMENT AND ASSIGNMENT OF RENTS

THIS  DEED  OF  TRUST,  SECURITY  AGREEMENT  AND
ASSIGNMENT OF RENTS (this "Deed of Trust") made this 22nd day
of September , 1986, by and among GLEN BURNIE ASSOCIATES
LIMITED PARTNERSHIP (the "Borrower") whose address is 4733
Bethesda Avenue, Suite 560, Bethesda, Maryland 20814 and PAUL
K. CASEY and M. MARGARET McFARLAND (collectively, the
"Trustee") whose address is 45 Calvert Street, Annapolis,
Maryland 21401, and the Community Development Administration
(the "CDA"), a division of the Department of Economic and
Community Development of the State of Maryland, whose address
is 45 Calvert Street, Annapolis, Maryland 21401 (CDA and any
subsequent holder of the Note referred to below being
hereinafter called the "Beneficiary");

WITNESSETH:

WHEREAS, the Borrower proposes to rehabilitate, own
and operate a "community development project" designated CDA
Project No. 02.0002 (the "Project"), within the meaning of
Section 266DD-8, of the Annotated Code of Maryland, as
amended, and the regulations promulgated pursuant thereto,
located on the Mortgaged Premises (as hereinafter defined);
and

WHEREAS, the Borrower is justly indebted to CDA in
the principal sum of FOUR HUNDRED FORTY-SEVEN THOUSAND, TWO
HUNDRED EIGHTY FIVE DOLLARS ($447,285.00) (the "Loan"), which
Loan is evidenced by a Deed of Trust Note made by the
Borrower on even date herewith (the "Note"), or so much
thereof as may be advanced by or on behalf of CDA under the
terms of this Deed of Trust and a rehabilitation loan
agreement of even date herewith executed by the Borrower (the
"Rehabilitation Loan Agreement"); and

IRH 0001839

A62

WHEREAS, it was a condition precedent to the making of the Loan that the performance of all the Borrower's obligations to CDA now or hereafter contracted would be secured by the execution of this Deed of Trust;

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the Borrower irrevocably grants and conveys to the Trustee, in trust for the Beneficiary, in fee simple, all of that land located in Anne Arundel County, State of Maryland (the "Land") which is more particularly described in Exhibit A attached hereto, together with:

(a) all buildings and improvements of every kind and description now or hereafter erected or placed on the Land, and all fixtures and articles of personal property which are, or which may hereafter be, attached to and used with the Land (except such personal property belonging to any tenants);

(b) all the rights, roads, alleys, ways, waters, privileges, easements, profits, and appurtenances thereunto belonging or in any way appertaining, and including any right, title, interest, and estate hereafter acquired by the Borrower in the Land;

(c) all building materials and other chattels on the Land now owned or hereafter acquired by the Borrower and incorporated or intended to be incorporated in the buildings and improvements on the Land and all fixtures, equipment, accessories, and furniture which are attached to or affixed to the buildings and improvements including, but not limited to kitchen cabinets, hot water heaters, gas and electric ranges, laundry equipment and tubs, medicine cabinets, lighting fixtures, heating plant, air conditioning equipment, piping, tubing, duct work, radiators, storm windows, storm doors, screens, screen doors, window shades and awnings, all of which fixtures, accessories and equipment now or hereafter placed upon the Land are hereby declared by the Borrower to be fixtures and permanent additions to the Land and intended to be included as part of the Land hereby conveyed, except in all cased personal property owned by any tenants.

(d) any award made in the nature of compensation for condemnation or appropriation for any of the foregoing property by any governmental body, including awards or damages for matters other than a direct taking which nonetheless affect any of the foregoing property;

(e) all rents, revenues and other moneys of whatever nature that Borrower may receive or be entitled to receive, including those now due, past due, or to become due

IRH 0001840

(hereinafter called collectively ("Rents") as a result of any lease or other occupancy agreement, for the company or use of all or any part of the Mortgaged Premises and hereinafter defined, now existing or hereafter created, and all renewals and guaranties thereof (hereinafter called collectively "Leases");

(f) all amounts payable to or recoverable by the Borrower under the terms of any contract for the rehabilitation of the Project or any surety bond issued on account of rehabilitation;

(g) all rights under and amounts recoverable under warranties as to quality or performance of any material, part, subassembly, appliance or other component part of the Project;

(h) all reserves created pursuant to the terms of this Deed of Trust or pursuant to a certain Regulatory Agreement of even date between Borrower and CDA (the "Regulatory Agreement") recorded or intended to be recorded after this Deed of Trust including, but not limited to, cash, escrows and reserves and letters of credit;

(i) all proceeds of casualty insurance on the Project or any part thereof;

(j) any real estate tax rebates or refunds which it is determined by Borrower is entitled to receive; and

(k) any amounts in the project accounts or funds described in this Deed of Trust.

**TO HAVE AND TO HOLD** said Land, property, improvements and other property and rights described above (hereinafter called collectively the "Mortgaged Premises") to the Trustee, in fee simple, and subject, however, to the terms and conditions of that certain mortgage from Borrower to National Permanent Savings and Loan Association, dated August 27, 1970, and recorded among the Land Records of Anne Arundel County in Liber 2360, folio 321, as modified by a Modification Agreement dated January 1, 1972 and recorded in the aforesaid Land Records of Anne Arundel County, Md. in Liber 2523, folio 833 (herein called the "First Mortgage"), and the Note secured by said First Mortgage assigned to the Federal National Mortgage Association (the "First Mortgage") on February 27, 1973, in trust for the following purposes:.

To secure to the Beneficiary (a) the full and punctual repayment of the Loan evidenced by the Borrower's Note, with interest thereon, providing for monthly installments of principal and interest with the balance of the Loan, if not sooner paid, due and payable no later than

IRH 0001841

Glenview - HELP Deed of Trust                                    Page 1

September 1, 2006; (b) the payment of all other sums, with interest thereon, advanced according to this Deed of Trust to protect the security of this Deed of Trust; (c) the performance of the covenants and agreements of the Borrower herein contained; and (d) the repayment of any future advances, with interest thereon, made to the Borrower by the Beneficiary or the Trustee;

PROVIDED, HOWEVER, that if the Borrower, or its successors or assigns, shall pay in full the Note and any such future advances, together with interest thereon from the date hereof in the manner provided in the Note and this Deed of Trust, and keeps and performs every obligation, term, covenant, condition and warranty contained herein and in the Note, then this Deed of Trust shall be void.

The Borrower, in order to more fully protect the security of this Deed of Trust covenants and agrees with the Beneficiary, its successors and assigns, as follows:

1. <u>Representations and Warranties.</u> The Borrower represents and warrants to the Beneficiary that:

(a) the Borrower is duly organized and validly existing under the laws of the State of Maryland, is qualified to do business in the State of Maryland and may hold title to real property in the State of Maryland, and Borrower has filed with the Beneficiary a true and complete copy of its certificate of incorporation, or its certificate of limited partnership and partnership agreement, as the case may be, with all amendments thereto;

(b) all statements or information contained in all applications, correspondence or other materials delivered to the Beneficiary for its consideration of the Loan or relating to the Project are true and correct in all material respects, and Borrower has not failed to state any fact necessary in order to make the statements or information in such statements, in light of the circumstances under which they were made, not misleading;

(c) the Borrower is seized and possessed of fee simple title to the Mortgaged Premises, subject only to such exceptions as are described in Exhibit B hereto (the "Permitted Encumbrances");

(d) no event has occurred and no condition exists which constitutes an Event of Default under this Deed of Trust or which, but for a requirement of notice or lapse of time, or both, would constitute such an Event of Default;

(e) the Rehabilitation Contract with the general conditions annexed thereto dated November 1, 1985, amended May 28, 1986 between the Borrower and the Mathy

IRH 0001842

Company (the "Rehabilitation Contract") is in full force and effect and no default has occurred thereunder, and a true copy of the entire Rehabilitation Contract with all modifications and to date have been filed with the Beneficiary;

(f) the Borrower has received any and all necessary building permits for rehabilitation of the Project according to the plans and specifications, and the Rehabilitation Contract approved by the Beneficiary and the Project is now (to the extent rehabilitated) and on completion of rehabilitation will be, in compliance with all applicable zoning, building and environmental codes and other regulations, rules and standards of any governmental body exercising jurisdiction over the Project.

(g) <u>Residential Use</u>. The Project when completed, will consist of permanent structures used primarily for year-round residential use.

(h) <u>Use of Proceeds</u>. The proceeds of the Loan will not be used to finance debt existing or work in place prior to October 18, 1983.

(i) no agreement has been reached with the present mortgagee under the First Mortgage which affects the terms and conditions of the First Mortgage.

2. <u>Rehabilitation Loan Agreement</u>. The Loan evidenced by the Note and secured by this Deed of Trust represents funds to be used for the rehabilitation of the Project according to the terms of the Rehabilitation Loan Agreement (provided, however, that if and to the extent that the Rehabilitation Loan Agreement is inconsistent herewith, this Deed of Trust shall govern). If a default occurs under the Rehabilitation Loan Agreement which is not cured within the applicable grace period, if any, provided for therein, then, in addition to any other rights or remedies that the Beneficiary may have under this Deed of Trust, the Beneficiary is hereby vested with full and complete authority to enter upon the Land, to employ watchmen to protect the Mortgaged Premises from depredation or injury and to preserve and protect the personal property therein, to continue any and all outstanding contracts and obligations wherever necessary, either in its own name or in the name of the Borrower, and to pay and discharge all debts, obligations and liabilities incurred thereby. All such sums so advanced by the Beneficiary (exclusive of advances of the principal of the indebtedness secured hereby) shall be secured by this Deed of Trust and shall be due and payable on demand with interest at the rate provided in the Note. The principal sum of the Note and the other charges provided for herein shall, at the option of the Beneficiary, become due and payable on the failure of the Borrower to keep and perform any of the

IRH 0001843

covenants, conditions and agreements of the Rehabilitation
Loan Agreement. This covenant shall be terminated upon the
completion of the Project to the satisfaction of the
Beneficiary and the making of the final advance as provided
in the Rehabilitation Loan Agreement.

3. _Payment of Principal and Interest._ The
Borrower covenants to pay promptly the principal of and
interest accruing on the indebtedness evidenced by the Note,
at the date and place, and in the manner provided in the
Note.

4. _Payment of Additional Sums._ The Borrower
shall repay to the Beneficiary or the Trustee, as the case
may be, at the times and in the manner provided herein, any
additional sums advanced or expended by the Trustee or the
Beneficiary for the Borrower's account pursuant to the
provisions of this Deed of Trust, together with interest
thereon as provided in the Note.

5. _Prepayment of Loan._ Except as expressly
provided in the Note, the Borrower may not prepay the Loan.
Any permitted prepayment of the Loan shall be applied against
the unpaid principal balance thereof in inverse oder of the
respective due dates; and no partial prepayment shall extend
or postpone the due date of any subsequent monthly
installments due hereunder, or change the amount of such
installments, unless the Beneficiary shall agree otherwise in
writing.

6. _Maryland Housing Fund._ This Deed of Trust
shall at all times be subject to Article 41, Section 257K,
Annotated Code of Maryland, as amended and the Regulations of
the Maryland Housing Fund (the "MHF") promulgated pursuant
thereto (collectively, the "MHF Act") and the Borrower shall
pay any and all MHF insurance premiums so as to keep the MHF
insurance of this Deed of Trust in full force and effect,
provided the premiums are at all times at the rate as
specified in the MHF Act at the time of the execution of
this Deed of Trust. The parties acknowledge that the rates
now in effect are 1% of the original principal amount of this
Deed of Trust for each of the first two years of this Deed of
Trust payable in advance (i.e., 1% of the original Deed of
Trust principal payable at closing for insurance coverage for
the first year), plus an application fee of $1,000 dollars.
The Borrower shall pay the annual renewal premium of 1/2% of
the outstanding principal balance, yearly in advance, the
first such premium being payable in full one month prior to
the first principal and interest payment under Section 3
hereof; and commencing on the date of the first principal and
interest payment, the Borrower shall pay in each month 1/12
of 1/2% of the outstanding principal balance, as projected
for the next successive anniversary date, payable in
accordance with this Section 6 hereof. The Borrower shall

IRH 0001844

pay the MHF insurance premiums directly to MHF, unless
directed by the Beneficiary pursuant to Section 9 hereof to
make such payments to the Beneficiary.

      7. <u>Warranty of Title</u>. The Borrower hereby
warrants specially the Mortgaged Premises and every part
hereof, whether now owned or hereafter acquired, to the
Beneficiary ad its successors and assigns subject only to the
Permitted Encumbrances. The Borrower covenants that it will
comply with all the terms, covenants and conditions of all
agreements and instruments of record or known to Borrower
affecting the Mortgaged Premises.

      8. <u>Further Assurances</u>. The Borrower shall,
within fifteen (15) days after being requested to do so,
execute and record, or file, all and every such further
instrument, document, renewal, or assurance as may be
requisite in the Beneficiary's sole opinion to (a) subject
the Mortgaged Premises to the lien of this Deed of Trust, (b)
perfect, preserve or protect such lien, (c) secure the rights
and remedies of the Borrower and the Trustee, (d) better
assure, assign and confirm to the Beneficiary the Leases and
Rents, or (e) transfer the Mortgaged Premises to any new
trustee or trustees. The Borrower shall repay to the
Beneficiary on demand all expenses, charges and taxes in
connection therewith.

      9. <u>Payment of Taxes and Insurance Premiums;
Application of Payments</u>.

      (a) the Borrower covenants duly and
punctually to pay and discharge all taxes, water rents,
assessments, public and private, and other governmental or
municipal dues, charges, levies ad impositions (collectively
"Taxes"), which are or may be imposed upon the Mortgaged
Premises or on the Loan together with all insurance premiums.
In order to more fully protect the security of this Deed of
Trust, the Borrower, together with and in addition to the
monthly payments of principal and interest under the terms of
the Note secured by this Deed of Trust will pay to the
Beneficiary the below enumerated sums commencing on the first
day of the calendar month after written notice is given by
the Beneficiary to the Borrower. Said notice will state the
amount of such payment and the purpose therefor, and
thereafter said payment will be made monthly on the first day
of each calendar month thereafter until the Loan is fully
paid and satisfied. The Beneficiary may, in its discretion,
from to time, amend the monthly amount to be paid by the
Borrower, but the Beneficiary will give the Borrower notice
of any change as provided herein. The monthly amount shall
in each case equal the sums next due less all sums already
paid therefor divided by the number of months to elapse
before one month prior to the date when the sums are next
due. Upon notice from the Beneficiary, the following sums

IRH 0001845

MHF:gfg ( 5-Sep-96 15:15 03740)
Glenview - HELP Deed of Trust                                      Page 8

will be paid by Borrower to the Beneficiary and held by the
Beneficiary in a non-interest bearing account which may be
commingled with other monies of Beneficiary until applied for
the purpose intended:

> (i)  an amount sufficient to provide the
Beneficiary with monies to pay, on behalf of the Borrower,
the MHF insurance premium next due;

> (ii)  an amount sufficient to provide the
Beneficiary with monies to pay on behalf of the Borrower (a)
the premiums that will next become due and payable on
policies of fire and other property insurance covering the
Mortgaged Premises, as required by Section 15 hereof and (b)
the Taxes next due on the Mortgaged Premises; unless the
First Mortgage provides for payment of all such sums to be
paid to and through the First Mortgagee.

> (b)  all sums required to be paid as described
in paragraph (a) of this Section 9 and all payments of
principal and interest to be made under the Note secured
hereby shall be added together and the aggregate amount
thereof shall be paid each month in a single payment and
shall be applied by the Beneficiary to the following items in
the order set forth below:

> (i)  First, to premium charges due to
MHF;

> (ii)  Second, to Taxes and property
insurance premiums (unless paid to and through the First
Mortgagee);

> (iii)  Third, to interest on the Note;

> (iv)  Fourth, to amortization of the
principal of the Note.

> (c)  Any deficiency in the amount of any such
aggregate monthly payment shall constitute an Event of
Default under this Mortgage unless paid before the due date
of the next such payment.

> (d)  Any excess funds accumulated under
Section 9(a)(ii) remaining after payment of the items therein
mentioned, may be credited to subsequent monthly payments of
the same nature required thereunder; but if any such item
shall exceed the estimate therefor, the Borrower shall
without demand therefor make good the deficiency and failure
to do so before the due date or such item shall be an Event
of Default.  In case of termination of the MHF's Endorsement
for Mortgage Insurance by prepayment of the debt in full,
according to the terms of the Note, or otherwise (except as
hereinafter provided), the excess accumulation of monies

IRH 0001846

MMcP:gfg ( 5-Sep-95 10:45 DJT'9)
Glenview - HELP ed Of Trust                                    Page 9

under this Section 9(a)(ii) which were not required to meet payments due under the MHF's Endorsement for Mortgage Insurance shall be credited to the Borrower, according to the MHF Act.    If the Mortgaged Premises are sold under foreclosure or are otherwise acquired by the Beneficiary upon the occurrence of an Event of Default, any remaining balance of the accumulations under this Section 9 shall be credited to the principal of the debt secured hereby as of the date or commencement of foreclosure proceedings or as of the date the Mortgaged Premises are otherwise acquired; and accumulations under this Section 9(a)(ii) shall be likewise credited unless required to pay sums due to the MHF under the Endorsement for Mortgage Insurance.

(e)    The Borrower will pay all Taxes and MHF insurance premiums before the same become delinquent or subject to interest or penalties and failure to do so is an Event of Default, and the Beneficiary may elect to pay the same.    All such sums so paid by the Beneficiary shall be added to the principal sum secured by this Deed of Trust, and shall bear interest at the rate specified in the Note from the date of the advance and shall be due and payable to the Beneficiary upon demand.

10.  Reserve Fund for Replacements.    Concurrently with the commencement of amortization of the principal amount of the Loan as provided in Section 3 hereof, the Borrower shall establish and thereafter maintain a Reserve Fund for Replacements by depositing to such reserve fund with the Beneficiary or in a depository designated by the Beneficiary, the sum of THREE THOUSAND SIX HUNDRED FIFTY DOLLARS ($3,650.00) payable monthly without demand therefor, unless a different date or amount is approved or directed in writing by the Beneficiary.    The monthly payment into  the Reserve Fund for Replacements shall continue until the Loan is paid in full or, in the sole and absolute discretion of CDA, sufficient reserves have been established for the purposes set forth in this Section 10.    Such account shall at all times be under the sole control and direction of Beneficiary. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the Project or for any other purpose, may be made only after receiving the written direction or consent of the Beneficiary.    Upon the occurrence of an Event of Default hereunder, pursuant to which the Loan has been accelerated, the Beneficiary may apply or authorize the application of the balance f the Reserve Fund for Replacements to the amount due on the Loan as accelerated, or for any other  purpose, including without limitation, payment of such amounts as may be necessary to cause performance of the covenants hereof before making any advances under Section 16 hereof.    If any sums are paid out of, or applied from, the Reserve Fund, Borrower shall promptly, but in not event later than twenty (20) days from the   date of such payment, pay into the

IRH 0001847

Glenview - HELP Deed of Trust                                    Page

Reserve Fund an amount equal to the amount so paid or applied. The Beneficiary may in its sole discretion deposit the monies paid to it pursuant to this Section 10 into a non-interest bearing account or an interest bearing account invested or reinvested at the discretion of the Beneficiary; and any interest accruing on the Reserve Fund for Replacements shall be held by the Beneficiary for the benefit of the Project and shall be deposited into the Reserve Fund for Replacements. Within six (6) months after the payment in full of the Loan and of any other sums due to the Beneficiary, all moneys remaining in the Reserve Fund for Replacement, including any investment income or gain, if any, shall be paid to the Borrower.

11.  <u>Use of Mortgaged Premises: Project Revenues</u>. The Borrower shall not, without the prior written approval of the Beneficiary:

(a) sell, assign, encumber or otherwise transfer, the Mortgaged Premises or any part thereof, or permit the sale, assignment, transfer or encumbrance of the Mortgaged Premises, or any part thereof, or permit any other lien against the mortgaged premises;

(b) sell, assign, encumber or otherwise transfer any personal property which is used with, or is part of, the Project, including Rents, or pay out any funds, except for reasonable operating expenses and necessary repairs;

(c) sell, assign, encumber or otherwise transfer any beneficial interest in the Mortgaged Premises, or the Borrower's right to manage or receive the Rents;

(d) sell, assign, encumber or otherwise transfer any right or interest in, or title to, any funds, including, without limitation, letters of credit and other assets, deposited by the Borrower with the Beneficiary, or reserved by the Beneficiary for the Borrower;

(e) except as required by this Deed of Trust, remodel, add too, reconstruct, or demolish any part of the Mortgaged Premises or subtract from any real or personal property of the Project;

(f) make or receive any distribution of assets or any income of any kind of the Mortgaged Premises, except for payment for reasonable expenses incident to the operation and maintenance of the Mortgaged Premises;

(g) engage in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not for the Mortgaged Premises;

IRH 0001848

A71

MMcF:gfg ( 5-Sep-90 10:15 DST/1)
Glenview - HELP Deed of Trust                    Page 11

    (h)  require as a condition of  the occupancy or leasing of any unit in the Project, any payment   or deposit other than the prepayment of the first monthly rent and a security deposit not exceeding one month's rent;

    (i)  permit the use of the dwelling units of the Project for any purpose except the use which was originally intended, or permit commercial use greater than that approved by the Beneficiary; or

    (j)  incur any liability direct or contingent, including wages or salaries, other than for current operating expenses.

    12.  <u>Management of Project</u>.

    (a)  The  Borrower  shall  provide  for  the management of the Project in a manner satisfactory to the Beneficiary.  Any management contract entered into by the Borrower involving the Project shall contain provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Beneficiary addressed to Mortgagor.  Upon receipt of such request the Borrower shall terminate the contract within a period of not more than thirty days and shall make arrangements satisfactory to the Beneficiary for continuing proper management f the Project.

    (b)  Payment for  services,  supplies,  or materials shall not exceed the amount ordinarily paid for such services, supplies or materials in the area where the services are rendered or the supplies or materials furnished.

    (c)  The  Mortgaged  Premises,  equipment, buildings,  plans,  offices,  apparatus,  devices,  books, contracts, records, documents, and papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the Beneficiary or its duly authorized agents.  The Borrower shall keep copies of all written contracts or other instruments which affect the Mortgaged Premises, all of which are subject to inspection and examination by the Beneficiary or its duly authorized agents.

    (d)  The books and accounts of the operations of the Mortgaged Premises and of the Project shall be kept according to the requirements of the Beneficiary and in accordance with generally accepted accounting procedures.

    (e)  Within ninety days following the end of each fiscal year, the Beneficiary shall be furnished with a complete annual financial report based upon an examination of

IRH 0001849

WMcP:gfg ( 5-Sep-86 '0:15 PM '1)
Glenview - HELP    ed of Trust                              Page '2

the books and records of the Borrower prepared in accordance
with the requirements of the Beneficiary, certified by an
officer of the Borrower, and prepared and certified as true
and correct by an independent certified public accountant.
If the Borrower is an individual, certified copies of
Borrower's federal and state income tax returns shall be
provided to Beneficiary instead of an audited annual
financial report.

(f)  All Rents shall be deposited in the name
of the Project in a bank or financial institution whose
deposits are insured by an agency of the United States or
Maryland government.  Such funds shall be withdrawn only
according to the provisions of this Deed of Trust for
expenses of the Project.

(g)  Within three days after written request
is made, the Borrower will deliver to the Beneficiary a list
of the names and addresses of all contractors,
subcontractors, suppliers, and personnel who have performed
work on or delivered materials to the Project together with
all compensation demanded by them.

(h)  Notwithstanding anything to the contrary
in this Section 12, so long as the First Mortgage is insured
by HUD or the Project is held by HUD, the HUD requirements
concerning management, as contained in the Regulatory
Agreement identified in Section 46 hereof, shall control;
provided, however, that Beneficiary from the date hereof
forward shall be subject to subparagraphs (b), (c), (e) and
(g) of this Section 12.

13.  <u>Monthly Charges: Submission of Budget</u>.  The
Borrower shall establish and collect monthly charges subject
to the terms and conditions contained in this Deed of Trust.
Such charges shall be according to a schedule of charges
filed with and approved in writing by the Beneficiary and
shall be in amounts sufficient to meet all items of estimated
expense contained in Borrower's proposed operating budget for
the Project.  Borrower shall prepare and submit to
Beneficiary its proposed operating budget for the Project not
less than sixty (60) days before the beginning of each fiscal
year of the Borrower.  The proposed operating budget shall
set forth the anticipated income of the Project and a
detailed estimate of expenses, including but not limited to,
separate documentation of administrative expenses, operating
expenses, maintenance expenses, utilities, hazard insurance.
Taxes and assessments, principal and interest on the Loan and
any other indebtedness of the Borrower, mortgage insurance
premium, deposits to the reserve Fund for the Replacements
and deposits to any other reserves required by the
Beneficiary and established by the Borrower.  Upon approval
by the Beneficiary, such proposed operating budget shall be
effective for the next fiscal year of its operations except

IRH 0001850

HMcF:gfg (5-Sep-86 ...
Glenview - HELP ... nd 52 Trust                                    Page 17

according to the schedule of charges for the particular
fiscal year approved by the Beneficiary. The Beneficiary may
waive any or all of the provisions of this Section 13 for a
Borrower who is an individual.

14. <u>Maintenance of Mortgaged Premises.</u>  The
Borrower (a) will keep the Mortgaged Premises in good order,
condition, and repair, and will not permit or suffer any
waste thereof; (b) will make all needed and proper renewals,
replacements, repairs and additions of and to the same and
will permit the Beneficiary or its designee to enter upon and
inspect the property at any reasonable time or times; (c)
will not alter or tear down the improvements to be made
therein nor permit them to be altered or torn down, without
the written consent of the Beneficiary; (d) will not make any
improvements to or on the Mortgaged Premises that have not
been approved in writing by the Beneficiary; (e) will not
sell, abandon, cease to own, assign, encumber, transfer or
dispose of the Mortgaged Premises or any interest therein,
without the written consent of the Beneficiary; (f) will obey
and comply with all statutes, laws, ordinances, regulations,
orders or other requirements of any governmental body
exercising jurisdiction over the Mortgaged Premises, or the
use, condition or occupancy of the Mortgaged Premises; and
(g) will observe and comply with all conditions and
requirements necessary to preserve and extend any and all
rights, licenses and permits applicable to the Mortgaged
Premises.

15. <u>Insurance.</u>  Subject to the rights of the
holder of the First Mortgage, and any insurance requirements
of such holder which are greater than these specified below,
the Borrower agrees as follows.

(a)  The Borrower shall maintain the following
insurance coverage at all times during the term of the
indebtedness secured hereby:

(1) Apartment Multi-peril Insurance with
an agreed amount endorsement, as adjusted by escalation, in
an amount determined at the time of substantial completion of
the Project to be not less than one hundred percent (100%) of
the amount of the indebtedness secured hereby and by the
First Mortgage, or the full replacement value of the Project,
whichever is the greater, written on a Lloyds of London form
or equal with endorsements, which will include, but not be
limited to coverage for: fire, lightning, hail, aircraft,
vehicles, smoke, collapse; explosion; differences in
conditions; wind driven rain, personal injury liability
coverage; loss of rent or business interruption based on one
hundred percent (100%) of the gross annual rent potential of
the Project; vandalism and malicious mischief; and
comprehensive general liability insurance coverage with
endorsements, which will include, but not be limited to

IRH 0001851

Glenview - HELP ed of Trust                                    Page

products-completed operations: broad form property damage;
blanket contractual, blanket XCU; vandalism and malicious
mischief; operations-premises liability; assumed and
contractual liability with broad form bodily injury with both
the employee and contractual exclusions deleted; knowledge,
notice and unintentional errors; employees named as insureds;
and cross liability in an amount with a combined single limit
of not less than $1,000,000; and

(2) Comprehensive Automobile Liability
written on vehicles owned and now owned by Borrower with a
combined single limit of not less than $1,000,000; and

(3) Workmen's compensation insurance
covering, to the fullest extent required by applicable law,
employees of Borrower.

(b) All insurance policies, exclusions and
certificates shall be prepaid, in form and substance
acceptable to Beneficiary and licensed to do business in
Maryland. Said policies shall carry deductibles, if any, of
not more than $1,000 except that the deductible for special
endorsements only may be written in higher amounts, if
generally accepted in the industry. Such insurance shall not
be cancelled, allowed to expire or changed in any manner that
will reduce coverage without 30 days prior written notice to
the Beneficiary. Prepaid policies meeting the requirements
of paragraph (a) above shall be furnished by the Borrower to
the Beneficiary at or prior to the execution and delivery of
this Deed of Trust, and thereafter on the anniversary date of
each such policy. On an annual basis, from the time of
substantial completion of the Project, insurable values shall
be reviewed thirty (30) days prior to the anniversary date by
the Borrower and the Beneficiary and any necessary amendments
in amounts of coverage will be made effective on each
anniversary of the policy.

(c) The buildings, property and loss of rent
or business interruption insurance policies shall be written
on the basis of one amount of insurance for buildings and one
amount of insurance for gross rent potential, applying
blanket coverage over all buildings included in the
Mortgaged Premises. The insurance referred to in paragraph
15(a) shall name the Borrower and the Beneficiary as insureds
as their respective interests may appear, and each policy
shall have attached thereto a standard noncontributing
mortgagee clause (in favor of the Beneficiary and entitling
the Beneficiary to collect any and all proceeds payable under
all such insurance), as well as a standard waiver of
subrogation endorsement, all in such forms as is acceptable
to the Beneficiary. The Borrower hereby authorizes and
empowers the Beneficiary at attorney-in-fact for Borrower to
make proof of loss, to adjust and compromise any claim under
the insurance policies referred to in paragraph 15(a), to

IRH 0001852

appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom the Beneficiary's expenses incurred in the collection of such proceeds; provided, however, that nothing contained herein shall require the Beneficiary to incur any expense or take any action hereunder. If the Borrower is the payee, or one of the payees, of any check or other instrument representing payment of any insurance proceeds referred to in subparagraph 15(a), the Borrower will endorse the same to the order of the Beneficiary and deliver the same to the Beneficiary; and if the Borrower fails to do so, the Borrower hereby irrevocably authorizes any officer of the Beneficiary to endorse and deliver the same to the order of the Beneficiary as the Borrower's attorney-in-fact. The policies for the insurance required by subparagraph 15(a)(1) shall provide that any losses thereunder payable to the Beneficiary shall be paid to the Beneficiary notwithstanding any act or neglect of the Borrower or other interested party which might otherwise result in a forfeiture of such insurance. The Borrower covenants that it will take all action, or cause the same to be taken, which may be necessary to enable recovery upon the aforesaid insurance policies.

(d) The Beneficiary may require the Borrower to furnish additional insurance, at the Borrower's expense, for any hazards involved in the property which, in the opinion of the Beneficiary at any time appears to require special endorsements.

(e) If the Borrower fails to maintain any insurance as provided in this Section 15, the Beneficiary may (but shall be under no obligation to), upon such notice to the Borrower as is reasonable under the circumstances, procure and maintain such insurance, and any amounts so advanced therefor by the Beneficiary shall become an additional obligation of the Borrower to the Beneficiary, which amounts, together with interest thereon at the rate provided in the Note from the date thereof, the Borrower agrees and covenants to pay and such payments and interest shall be considered to be additional indebtedness secured hereby. The Borrower shall not carry separate insurance, concurrent in kind or form, or contributing in the event of loss, with any insurance required hereunder.

(f) In the event of any damage to the Mortgaged Premises, the Borrower shall immediately notify the Beneficiary. If the casualty insurance proceeds exceed $5,000 an estimate of costs of repairing or replacing the damaged property and such plans and specifications as may, in the judgment of the Borrower, be required therefor, shall be prepared by an architect selected by Borrower and approved by Beneficiary, and shall be filed with the Beneficiary. Provided that no Event of Default hereunder exists and is

IRH 0001853

WHCF:gfg ( 5-Sep-86 10:45 DST/1)
Glenview - HELP     ed of Trust                          Page 45

continuing, the casualty insurance proceeds less the costs
and expenses, if any, of collecting the same, shall, to the
extent necessary, be applied to repair and replacement of the
damaged property; provided, however, that if the Borrower and
the Beneficiary agree in writing either that such repair or
replacement is not economically feasible, or that the failure
to repair or replace will not adversely affect the payment of
the principal of and interest on the Note, such proceeds
shall be retained by the Beneficiary and applied to
prepayment of the Note.  If such proceeds are to be applied
to repair or replacement, the Beneficiary shall, in such
manner as the Beneficiary may prescribe, apply such proceeds
to the payment of the costs of repair or replacement.  If
such proceeds are more than sufficient for repair or
replacement, the balance shall be applied to prepayment of
the Note as aforesaid.  If the insurance proceeds are applied
to the prepayment of the Note, any such application of
proceeds to principal shall not extend or postpone the due
dates of the monthly installments referred to in Sections 3
and 9 hereof or change the amounts of such installments.  If
the Mortgaged Premises are sold pursuant to Section 26 hereof
or if the Beneficiary acquires title to the Mortgaged
Premises, the Beneficiary shall have all of the right, title
and interest of Borrower in and to any insurance policies and
unearned premiums thereon and in and to the proceeds
resulting from any damage to the Mortgaged Premises prior to
such sale or acquisition.

     (g)  Except in cases where the Borrower and
the Beneficiary agree not to make repairs or replacements,
the Borrower shall commence and diligently prosecute the
repair or replacement of the damaged property according to
any plans and specifications prepared by the Architect;
provided, however, that no plans and specifications need be
prepared where the amount of loss or damage does not exceed
$5,000.

     (h)  The Beneficiary shall hold the proceeds
of the loss of rent or business interruption insurance and
apply the same:  first, to payments required by the First
Mortgage, second, to the payments required by Section 3
hereof; and third, to the payment from time to time of the
reasonable and necessary salaries and expenses payable by the
Borrower during any period of reconstruction, rebuilding or
repair of the Mortgaged Premises.

     16.  Advances by Beneficiary.  If the Borrower
shall fail to perform any of the covenants or obligations
contained herein, and does not rectify such matter within ten
(10) days after written notice or does not commence to
rectify such matter within said 10 days and thereafter
diligently pursue the remedy, the Beneficiary may make
advances or payments to perform the same but shall be under
no obligation to do so; and any amount so advanced shall

IRH 0001854

become part of the indebtedness secured hereby and bear interest at the rate provided in the Note. No such advance of payment shall relieve the Borrower of any obligation or waive any Event of Default hereunder.

17. <u>Discharge of Liens; Compliance with Laws</u>. The Borrower shall (a) keep the Mortgaged Premises free from all liens and claims of every kind, except such as are approved by the Beneficiary in writing and except as permitted by this Deed of Trust; and (b) promptly and faithfully comply with and obey the Act and all laws, ordinances, rules, regulations, requirements and orders of every duly constituted governmental authority or agent having jurisdiction over the premises with respect to the Mortgaged Premises.

18. <u>Non-Discrimination</u>. The Borrower will comply with the provisions of the Federal, State and local law prohibiting discrimination in housing on the grounds of race, color, creed, national origin, sex, marital status, or physical or mental handicap, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352) and Title VIII of the Civil Rights Act of 1968 (Public Law 90-284). In selecting residents, the Borrower shall not discriminate against any person or persons by reason of the fact that there are children in the family.

19. <u>Security Deposits</u>. Monies paid to the Borrower by a tenant under any lease as a security deposit for the payment of Rent shall be deposited in an interest bearing bank account, separate from all other accounts and funds, with a financial institution whose deposits are insured by an agency of the United States or Maryland government, and interest earned on such account shall be credited to each resident in accordance with Maryland law. The amount in such account shall at all times equal or exceed the aggregate of all outstanding obligations with respect to security deposits. Borrower shall, from time to time, at the request of Beneficiary, submit reports to Beneficiary setting forth the amount in such account and all outstanding obligations with respect to security deposits.

20. <u>Tax Exempt Status of Bond Anticipation Note and Bonds</u>. The Borrower covenants that it shall take no action or suffer any action to be taken which would have an adverse impact on the tax exempt status of any bonds or notes issued to finance the Project. The Borrower further covenants that, notwithstanding any other provision of this Deed of Trust or any other instrument, it will neither make nor instruct the Beneficiary to make any investment or other use of the proceeds of any such notes or bonds which would cause such bonds or notes to be arbitrage bonds under Sections 103(c) or 103A of the Internal Revenue Code of 1954, as amended, and the Regulations thereunder, and that Borrower

IRH 0001855

MNoF:gfg ( 5-Sep-56 '1:15 PM'')
Glenview - HELP  eed of Trust                                    Page '5

will comply with the requirements of such Sections and the regulations thereunder throughout the term of such notes or bonds.

21. Events of Default. The occurrence of any one or more of the following events shall be deemed an "Event of Default" for purposes of this Deed of Trust:

(a) if the Borrower fails to make any payment on account of the principal sum of the indebtedness secured hereunder or interest thereon or of any sum required to be paid under Section 9 hereof, or of any other monetary amount required to be paid under this Deed of Trust or the Note when and as the same shall become due and payable as herein or in the Note provided; or

(b) if the Borrower fails to observe or perform any one or more of the non-monetary terms, covenants or conditions on the part of the Borrower herein contained and the same is not rectified within ten (10) days after written notice thereof is sent to the Borrower or Borrower does not commence to rectify such matter within said 10 days and thereafter diligently and continuously pursue the remedy; or

(c)(i) if Borrower, or any party on behalf of or against Borrower, (A) files any petition for relief under the Bankruptcy Code, as amended from time to time, (B) files any petition or pleading initiating any State or federal insolvency proceeding, (C) makes, or files any petition to initiate, an assignment or composition for the benefit of creditors, or (D) files any petition or pleading initiating any action seeking a judicial modification or alteration of the rights of Beneficiary; (ii) or if the Borrower shall (A) become insolvent, as that term is defined in the Bankruptcy Code, Annotated Code of Maryland, or other applicable law, or (B) becomes unable to pay debts generally as they become due; (iii) or if any court of competent jurisdiction enters an order appointing a trustee or receiver of or for the Mortgaged Premises, or a substantial portion of the Mortgaged Premises, or for Borrower.

(d) if the Borrower fails to observe or perform any one or more terms, covenants or conditions on the part of the Borrower contained in the Rehabilitation Loan Agreement, the Regulatory Agreement, the Agreement and Declaration of Covenants and Restrictions, or any document executed in connection with the Loan;

(e) if the Borrower is a corporation, and it (i) consolidates or merges into any other corporation; (ii) carries into effect any plan of reorganization of Borrower; (iii) effects any changes whatsoever in its capital structure or alters or amends its Articles of Incorporation or by-laws

IRH 0001856

A79

HMcF:gfg ( 5-Sep-86 10:15 DST'1)
Glenview - HELP   ed of Trust                              Page '3

without the prior written consent of Beneficiary; (iv)
institutes any proceedings for its dissolution or
liquidation; (v) fails to protect and preserve its
independent corporate franchise or to pay taxes imposed in
connection therewith or to comply with any and all additional
requirements under applicable laws necessary thereto, or (vi)
fails to secure and protect a certificate of authority to do
its business within the State of Maryland; or

    (f)  if the Borrower is a partnership, and any
general partner sells, assigns, encumbers or otherwise
transfers any partnership interest without the prior written
approval of the Beneficiary; or

    (g)  if the Borrower fails to pay or perform
any obligation contained in any other mortgage, deed of
trust, security agreement or other instrument that creates a
lien upon the title to the Mortgaged Premises, including but
not limited to the First Mortgage, which is not cured within
any permissible grace period, if any, specified in any such
instrument; or

    (h)  if any representation or warranty of the
Borrower contained in this Deed of Trust, the Note, the
Rehabilitation Loan Agreement, or any other document or
certificate executed in connection with the Loan shall be
untrue in any material respect; or

    (i)  if the Mortgaged Premises or any part
thereof is taken in condemnation or otherwise appropriated by
any governmental authority.

    22.  **Beneficiary's Rights Upon Event of Default.**
Upon the occurrence of any Event of Default, the Beneficiary
(or the Trustee upon written authorization of the
Beneficiary) may in addition to any remedy granted or
existing by law or equity, or by custom, usage or otherwise,
without further notice to or demand upon the Borrower or any
other party having an interest in the Mortgaged Premises,
and without regard to the value of the Mortgaged Premises
held as security for the indebtedness due hereunder or the
solvency of any entity liable for the payment of such
indebtedness, at its option and whether or not electing to
declare the whole indebtedness due and payable, do any or all
of the following:

    (a) declare the entire amount of the
indebtedness evidenced by the Note which is then unpaid,
including any interest and other unpaid sums accruing
thereunder, and any other amounts payable under the
provisions of this Deed of Trust or of any other document
executed in connection therewith, to be immediately due and
payable;

IRH 0001857

MfcF:gfg ( 5-Sep-96 '0:15 D37'')
Glenview - HELP   ed of Trust                                    Page 20

(b) terminate the license granted to the Borrower under the provisions of Section 30 and, either personally or by any attorney or agent without bringing any action or proceeding, or by a receiver appointed by a court of competent jurisdiction, enter upon and take possession of any or all of the Mortgaged Premises;

(i) upon such entry, the Beneficiary shall have the right (A) to exclude the Borrower, its agents and servants wholly from the Mortgaged Premises, and to have, hold, manage, lease, use, operate and control it on such terms and for such period of time as the Beneficiary may deem proper in it sole discretion, or (B) to collect and receive all Rents, for which this Deed of Trust shall be sufficient authority whether or not any such Lease has been assigned to the Beneficiary;

(ii) upon every such entry, the Beneficiary, at the expense of the Mortgaged Premises, may from time to time (A) take such steps and expend such sums as are reasonably necessary to preserve and protect the Mortgaged Premises, and (B) make all necessary and proper repairs, renewals, replacements and useful or required alterations and improvements to the Mortgaged Premises as, in the Beneficiary's sole judgment, maybe reasonably necessary or desirable;

(iii) after deducting the expenses of or incident to managing and operating the Mortgaged Premises, conducting the business thereof, making any repair, maintenance, renewals, replacements, alterations and improvements thereto, taking and retaining possession of the Mortgaged Premises, and keeping it properly insured, the Beneficiary shall be entitled to apply the residue of the Rents in such order or priority as the Beneficiary may determine, any statute, law, custom or use to the contrary notwithstanding, to the payment of (A) any tax the lien of which may have priority over the lien of this Deed of Trust, (B) premiums for all insurance which the Beneficiary may deem necessary or desirable with interest thereon, (C) the interest and principal due and secured by the First Mortgage, (D) the interest and principal due and secured by this Deed of Trust, and (E) all costs and attorneys' fees incurred in connection therewith;

(c) cure any Event of Default hereunder or under the First Mortgage without releasing the Borrower from any obligation hereunder or under the First Mortgage;

(d) commence and maintain one or more actions at law or in equity or by any other appropriate remedy (i) to protect and enforce the Beneficiary's rights, whether for the specific performance of any covenant or agreement herein contained (which covenants and agreements the borrower agrees

IRH 0001858

shall be specifically enforceable by injunctive or other appropriate equitable remedy), or (ii) to collect any sum then due hereunder, or (iii) to aid the execution of any power herein granted, or (iv) to foreclose this Deed of Trust, or (v) to sell the Mortgaged Premises, without regard to whether or not any sum secured by this Deed of Trust is then due and payable and without prejudice to the right of the Beneficiary thereafter to pursue and enforce any other appropriate remedy against the Borrower, whether such remedy is provided for hereunder or by any applicable law for any Event of Default which may have occurred at the time which any such earlier action was commenced;

(e) use, convert to cash, dispose of, transfer, sell or assign any and all reserves, deposits or escrows held for its benefit, including letters of credit for any purpose necessary, desirable, or useful, in Beneficiary's sole discretion, for the construction, maintenance, protection or preservation of the Mortgaged Premises or the Loan secured hereby.

23.  Assent to decree; power of sale.  The Borrower hereby, upon the occurrence of an Event of Default, (a) declares its assent to the passing of a decree for the sale of any or all of the Mortgaged Premises or any estate or interest therein by any equity court having jurisdiction over the sale of the Mortgaged Premises, subject to the lien of the First Mortgage, and (b) authorizes and empowers the Trustee to take possession of any or all of the Mortgaged Premises and to sell any or all of it or any estate or interest therein according to the provisions of Rule W of the Maryland Rules of Procedure, of Title 14 of the Real Property Article of the Annotated Code of Maryland (1974 edition, as amended), and of laws, statutes, or ordinances relating to or affecting deeds of trust or security agreements, including any amendments thereof or additions thereto, subject to the lien of the First Mortgage. Neither the foregoing assent to decree nor the foregoing power of sale shall be exhausted if such proceeding or sale is dismissed or cancelled before the indebtedness secured hereby is paid in full.

24.  Foreclosure Sale.  If any or all of the Mortgaged Premises or any estate or interest therein is to be sold under the provisions of this Deed of Trust, by virtue of a judicial sale or otherwise, it may be sold at public auction, as an entirety or in one or more parcels, by one sale or by several sales held at one time or at different times, with such postponement of any such sale as the Trustee may deem appropriate and without regard to any right of the Borrower or any other person to the marshalling of assets. Any such sale or sales shall be held at such time or times and such place or places, and shall be made upon such terms and conditions and after such previous public notice as required by law, as the Trustee may deem appropriate. The

IRH 0001859

MMoF:gfg : 5-Sep-86 12:15 DST44
Glenview - HELP ed of Trust                                    Page 12

Beneficiary may bid and become the purchaser at any such sale, and shall, upon presentation of the Note or a true copy thereof at such sale, be credited for the unpaid balance due under the Note and any interest accrued and unpaid thereon, or such portion of such unpaid balance or interest as the Beneficiary may specify, against any price bid by the Beneficiary thereat. The terms of sale being complied with, the Trustee shall convey to and at the cost of the purchaser at such sale the Borrower's interest in so much of the Mortgaged Premises as is so sold, free of and discharged from all estate, right, title or interest of the Borrower at law or in equity, such purchaser being hereby discharged from all liability to see to the application of the purchase money.

25. <u>Assignment to MHF.</u> So long as this Deed of Trust remains insured by MHF, the Beneficiary may, upon the occurrence and during the continuation of an Event of Default, assign this Deed of Trust and all of the Beneficiary's rights and remedies hereunder, to MHF according to the applicable statute and regulations in effect at the time of the execution of this Deed of Trust, and title shall vest in the MHF.

26. <u>Application of Proceeds of Sale of Mortgaged Premises.</u> In the case of any sale of the Mortgaged Premises or of any part thereof, whether under the power of sale herein granted, assent to decree or other judicial proceedings, the purchase money, proceeds and avails thereof, together with any other sums which may then be held as security hereunder or be due under any of the provisions hereof as a part of the property, shall be applied as follows:

FIRST, to pay all proper costs, charges, attorneys' fees and expenses, including the fees and costs of the Trustee, and to pay or repay to the Beneficiary all money advanced by the Beneficiary for taxes, insurance or otherwise, with interest thereon at the rate set forth in the Note, and to pay all taxes due upon the property at the time of sale unless said sale is made subject to any such taxes and if necessary, to pay a commission to the person or persons making the sale equal to the commission allowed trustees for making sales of property under decrees of the equity court having jurisdiction;

SECOND, to pay whatever may then remain unpaid of the principal indebtedness hereunder and interest thereon to the date of payment; whether the same shall be due or not, it being agreed that the indebtedness shall, upon such sale being made before the maturity of the indebtedness, be and become immediately due and payable at the election of the Beneficiary;

THIRD, to pay the remainder of said proceeds, if any, less the expense, if any, of obtaining possession, to

IRH 0001860

the Borrower or other party lawfully entitled to receive the
same, upon the delivery and surrender of possession of the
property sold and conveyed and delivery of all records,
books, leases, agreements, security deposits of the lessees
and all other material relating to the operation of said
purchase or purchasers. Immediately upon the first insertion
of any advertisement or notice of any sale of the Mortgaged
Premises, or any part thereof under this Deed of Trust, there
shall become due and owing by the Borrower expenses incident
to such advertisement or notice, all court costs and all
expenses incident to any foreclosure proceeding brought under
this Deed of Trust or otherwise, and a commission on the
total amount of the indebtedness secured hereby equal to
one-half the percentage allowed as commissions to trustees
making sales under orders or decrees of the equity court
having jurisdiction, and the Beneficiary shall not be
required to receive the principal and interest in
satisfaction of the indebtedness secured hereby, but said
sale may be proceeded with unless, prior to the day appointed
therefor, tender is made of said principal, interest,
commissions and all expenses and costs incident to such sale
and all other sums that are part of the indebtedness secured
hereby, including any amounts which would be required in the
event of voluntary prepayments.

    27. Condemnation Awards. Subject to the rights of
the First Mortgagee which may otherwise conflict herewith.

        (a) The Borrower hereby assigns the
Beneficiary any condemnation damages or awards and, in
addition, for itself and its successors and assigns, appoints
the Beneficiary and its successors and assigns as the
Borrower's Attorney-in-Fact, and empowers such Attorney at
his option, on behalf of the Borrower, to adjust or
compromise any claims; to collect any proceeds; to execute in
Borrower's name any documents necessary to effect such
collection; and to endorse any checks representing such
proceeds. The Borrower also assigns to the Beneficiary any
award made hereafter to it during the pending or foreclosure
proceedings hereunder in any court procedure involving any
tenant of any portion of the Mortgaged Premises in any
bankruptcy, insolvency or reorganization proceeding in any
state or federal court and any and all payments in lieu of
rent by any tenant of any portion of the Mortgaged Premises.

        (b) Immediately after the commencement of any
condemnation or similar proceeding by a third party in the
exercise of a power of eminent domain, or a power in the
nature of eminent domain, the Borrower shall immediately
notify the Beneficiary in writing. The proceeds of any
condemnation damages or award, less any costs or expenses
incurred by the Borrower or the Beneficiary in respect of
such condemnation, shall be applied to prepayment of the
Note; provided, however, that any such proceeds received by

IRH 0001861

HMcF:gfg ( 5-Sep-86 ':':15 DST'')
Glenview - HRLP    ed of Trust                    Page ::

the Beneficiary for a taking of less than substantially all of the Mortgaged Premises shall be applied by the Beneficiary as follows:

(1) if no dwelling unit in the Mortgaged Premises is taken or damaged and if the Borrower and the Beneficiary agree in writing that the efficient utilization of the Mortgaged Premises is not impaired by such taking, the net condemnation award shall be applied to the prepayment of the Note; and

(2) if any dwelling unit in the Mortgaged Premises is taken or if no such agreement is reached, then the Beneficiary shall apply, in such manner as the Beneficiary may determine, the net condemnation award to the repair, rebuilding, and restoration of the Mortgaged Premises or to the rearrangement of the Mortgaged Premises insofar as may be possible, so as to make all dwelling units suitable for occupancy. The Beneficiary shall apply the balance of the award to the prepayment of the Note as aforesaid; provided, however, that if the Beneficiary determines that such repair, rebuilding, restoration, or rearrangement is not possible so as to make all dwelling units suitable for occupancy, all of the net condemnation award shall be applied to the prepayment of the Note.

28. <u>Effect of Payment</u>. Any payment made according to the provisions of this Deed of Trust by any subsequent owner of any or all of the Mortgaged Premises, by any other person whose interest in the Mortgaged Premises might be prejudiced in the event of a failure to make such payment, or by any stockholder, officer or director or a corporation which at any time is liable for such payment or owns or has an interest in the Mortgaged Premises or in the Borrower, shall be deemed, as between the Beneficiary and all persons who at any time may be liable as aforesaid or may own any or all of the Mortgaged Premises or the Borrower, to have been made on behalf of all such persons.

29. <u>Use of Mortgaged Premises in Absence of Default</u>. Until one or more of the Events of Default shall happen (but not thereafter), the Borrower shall have possession of the Mortgaged Premises and shall have the right to use and enjoy the same and to receive any Rents, subject to the terms of this Deed of Trust.

30. <u>Assignment of Rents; Appointment of Receiver</u>.

(a) As part of the consideration for the indebtedness evidenced by the Note, the Borrower hereby absolutely and unconditionally assigns and transfers to the Beneficiary all the Rents. The Borrower hereby authorizes the Beneficiary or the Beneficiary's agents to collect the Rents and hereby directs each occupant of the Property to pay

IRH 0001862

A85

such Rents to the Beneficiary or the Beneficiary's agents;
provided, however, that the Borrower shall have a license,
terminable by the Beneficiary upon the occurrence of an Event
of Default, to collect and receive all Rents when due and to
hold them in trust as trustee for the benefit of the
Beneficiary, and to apply the Rents so collected first to the
sums secured by the First Mortgage and second to the sums
secured by this Deed of Trust in the order provided in
Section 9(b) hereof with the balance, so long as no Event of
Default has occurred, to the account of the Borrower, subject
to the provisions of the First Mortgage or Regulatory
Agreement, if any, identified in paragraph 46 hereof, it
being intended by the Borrower and the Beneficiary that this
assignment of Rents constitutes an absolute assignment and
not an assignment for additional security only.  Upon
delivery of written notice by the Beneficiary to the Borrower
that the Beneficiary exercises its rights to such Rents, and
without the necessity of the Beneficiary entering upon and
taking and maintaining full control of the Mortgaged Premises
in person, by agent or by a court-appointed receiver, the
Beneficiary shall immediately be entitled to possession of
all Rents as specified in this Section 30, as the same become
due and payable, including, but not limited to Rents then due
and unpaid, all such Rents shall immediately upon delivery of
such notice be held by the Borrower as trustee for the
benefit of the Beneficiary only.  Borrower agrees that
commencing upon delivery of such written notice, each
occupant of the Mortgaged Premises shall make such Rents
payable to and pay such Rents to the Beneficiary or the
Beneficiary's agents on the Beneficiary's written demand to
each occupant therefor, delivered to each occupant
personally, by mail or by delivering such demand to each
dwelling unit, without any liability on the part of said
occupant to inquire further as to the existence of a default
by the Borrower.

(b)  The Borrower hereby covenants that the
Borrower has not executed any other assignment of said Rents
except as may be contained in the First Mortgage; that the
Borrower has not performed, and will not perform, any act or
has not executed, and will not execute, any instrument which
would prevent the Beneficiary from exercising its rights
under this Section 30; and that at the time of execution of
this Deed of Trust there has been no anticipation or
prepayment of any of the Rents of the Mortgaged Premises for
more than two months prior to the due dates of such Rents.
The Borrower further covenants that it will execute and
deliver to the Beneficiary such further assignments of Rents
as the Beneficiary may from time to time request.

31.  Security Agreement; Financing Statements.

(a)  It is the intention of the parties hereto
that this Deed of Trust shall also constitute a security

IRH 0001863

agreement under the Maryland Uniform Commercial Code so that the Beneficiary shall have and may enforce a security interest, to secure payment of the indebtedness secured hereby, in any and all of the property described in the granting clause hereof and other articles of real, personal or mixed property in addition to (but not in limitation of) the grant made hereby to the Trustee as part of the realty, such security interest to attach at the earliest moment permitted by law and also to include and attach to all substitutions and replacements therefor, all contract rights, rental payment and general intangibles of the Borrower obtained in connection with or relating to the operation, construction and maintenance of the Mortgaged Premises as well as any and all items of property in the foregoing classifications which are hereafter acquired, and all proceeds and products (cash and non-cash) of any of the foregoing including insurance and proceeds of insurance thereon.

(b) The Borrower hereby irrevocably authorizes the Beneficiary to execute on its behalf one or more financing statements or continuations thereof in respect of the security interests granted by this Deed of Trust.

32. <u>Remedies Under Uniform Commercial Code</u>. Upon an Event of Default, the Beneficiary may at its discretion require the Borrower to assemble some or all of the Mortgaged Premises and make it available at a place reasonably convenient to both parties to be designated by the Beneficiary. If the Beneficiary elects to proceed under the Maryland Uniform Commercial Code to dispose of some of the Mortgaged Premises, it shall give the Borrower notice, by mail postage prepaid, of the time and place of any public sale of any of such property or of the time after which any private sale or other intended disposition thereof is to be made by sending, or requiring the Trustee to send, said notice to the Borrower at least 15 days before the time of the sale or other disposition; provided, however, that nothing herein shall preclude the Beneficiary from proceeding as to all the Mortgaged Premises in accordance with the rights and remedies of the Beneficiary in respect of the real property, as provided in Section 9-501(4) of the Commercial Law Article of the Annotated Code of Maryland, as amended from time to time.

33. <u>Indemnity</u>. The Beneficiary shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by the Borrower under any Lease; and the Borrower hereby agrees to indemnify the Beneficiary for and to save it harmless from any and all liability or expense (including that of attorneys' fees and expenses) arising from any Leases, or assignment thereof and any assignment shall not place the responsibility for the control, care, management or repair of the property upon the

IRH 0001864

HMcF:gfg ( 5-Sep-86 '0:15 DET'')
Glenview - HELP    ed of Trust                    Page 27

Beneficiary, nor make the Beneficiary liable for any
negligence in the management, operation, upkeep, repair or
control of the property resulting in loss or injury or death
to any cooperative member, or any lessee, agent or stranger.

34. Beneficiary's Expenses.    The Borrower shall
pay all costs, charges and expenses, including reasonable
attorney fees, unless covered by title insurance, which the
Beneficiary may incur or expend in defending or enforcing the
validity or priority of this Deed of Trust,or any term,
covenant or condition hereof, or in collecting any sum
secured hereby, or in protecting the security of the
Beneficiary, or, if an Event of Default shall happen, in
administering and performing its powers, privileges and
duties hereunder.    The Beneficiary may make advances or
payments for such purposes but all advances or payments made
by the Beneficiary for such purposes shall be repayable at
once by the Borrower and shall bear interest at the default
rate provided in the Note from the date the same shall become
due and payable until the date paid, and any such sum or sums
with interest as aforesaid shall become a part of the
indebtedness secured hereby; but no such advance or payment
shall relieve the Borrower from any Event of Default
hereunder.

35. Extensions, Amendments and Waivers.    The
Beneficiary may at any time, and from time to time:    (a)
extend the time for payment of the indebtedness secured
hereby, or any art hereof, or interest thereon, and waive,
modify or amend any of the terms, covenants or conditions in
this Deed of Trust or in any other paper or document executed
for the Loan, in whole or in part, either at the request of
the Borrower or of any person having an interest in the
Mortgaged Premises; (b) consent to the release of all or any
part of the Mortgaged Premises from the lien of this Deed of
Trust; (c) release any party primarily or secondarily liable
hereunder or on such other security, grant extensions,
renewals or indulgences therein, or herein; (d) apply to the
payment of the principal and interest and premium, if any, of
the indebtedness secured hereby any part or all of the
proceeds obtained by sale or otherwise as provided herein,
without resort or regard to other security; or (e) resort to
any one or more of the securities or remedies which the
Beneficiary may have and which in its absolute discretion it
may pursue for the payment of all or any part of the
indebtedness secured hereby, without in any way releasing the
Borrower or any party secondarily liable from any of the
terms, covenants or conditions of this Deed of Trust or other
paper or document executed for the Loan, or relieving the
unreleased property from this Deed of Trust for all amounts
due under this Deed of Trust.    No such modification,
alteration, extension, release or waiver shall be effective
unless expressly made in writing, and executed by
Beneficiary.

IRH 0001865

A88

36. <u>Additional Equipment</u>. The Borrower shall not, without the prior written permission of the Beneficiary, which permission shall not be unreasonably withheld, place any personal property upon the Mortgaged Premises or any part thereof or attach any fixture thereto that is subject to a title retention agreement, security agreement, or other encumbrance, whether said lien or interest is senior or junior to this Deed of Trust, and the security interest granted hereunder.

37. <u>Estoppel Certificate</u>. Within five (5) business days of demand therefor by the Beneficiary, the Borrower will furnish to the Beneficiary in writing a statement certifying to the Beneficiary the principal amount remaining due on this Deed of Trust together with a statement of any defenses which may exist to any liability of the Borrower on the Mortgage Loan or otherwise hereunder.

38. <u>Change in Tax Status</u>. If after the date of this Deed of Trust any law is passed imposing a tax on this Deed of Trust, or changing the manner of collection of any such taxation so as to affect this Deed of Trust, the Beneficiary may give thirty (30) days written notice to the Borrower requiring the payment of the indebtedness secured hereby. If such notice be given, the indebtedness secured hereby shall become due and payable at the expiration of said thirty (30) days;p provided, however that such requirement of payment shall be ineffective if the Borrower is permitted by law to pay the whole of such tax in addition to all other payments required hereunder, without any penalty thereby accruing to the Beneficiary, and if the Borrower in fact pays such tax prior to the date upon which payment is required by such notice.

39. <u>Future Advances</u>. Upon request of Borrower, the Beneficiary, at its option so long as this Deed of Trust Secures indebtedness held by the Beneficiary, may make such additional advances and readvances to Borrower ("Future Advances"). Such Future Advances, with interest thereon,shall be secured by this Deed of Trust to the fullest extent permitted by law.

40. <u>Notices</u>. Any notice or demand upon the Borrower which may be given or made hereunder or with reference to this Deed of Trust shall be a sufficient notice or demand if made in writing and delivered to the Borrower at its address set forth hereinbefore or if deposited in any United States Government mail receptacle enclosed in a postpaid envelope, addressed to the Borrower, at its address set forth hereinbefore or at such other address as the Borrower may notify the Beneficiary in writing. Mailed notices to the Borrower shall be considered to have been given at the time they are deposited. Notwithstanding the

IRH 0001866

HHoF:gfg ( 5-Sep-86 10:45 DST'1)
Glenview – HELP   ed of Trust                              Page 29

aforesaid procedures, any notice or demand upon the Borrower in fact received shall be sufficient notice or demand. All notices to the Beneficiary shall be effective when written notice is received in hand by the Beneficiary. Except as otherwise provided herein, whenever any approval or notice by the Beneficiary is required under this Deed of Trust, or whenever any action by the Beneficiary is required or permitted, the Director of the Beneficiary or his successor shall have the power and right to approve and give notice of it on behalf of the Beneficiary.

41. <u>Governing Law</u>.  This Deed of Trust shall be construed according to the law of the State of Maryland.

42. <u>Time of Essence</u>.  Time is of the essence of this Deed of Trust.

43. <u>Rights Cumulative, Non-Exclusive</u>.  The rights, powers, privileges and discretions specifically granted to the Beneficiary under this Deed of Trust are not in limitation  of but in addition to those which they are entitled under any general or local law relating to deeds of trust and mortgages in the State of Maryland, now or hereafter existing.  The rights, powers, privileges and discretions (hereinafter collectively called the "rights") to which the Beneficiary may be entitled shall inure to the benefit of its successors and assigns.  All the rights of the Beneficiary are cumulative and not alternative and may be enforced successively or concurrently.  Failure of the Beneficiary to exercise any of  its rights shall not impair any of its rights nor be deemed to apply to any other such rights nor shall it be  effective unless in writing and signed by the party waiving the right.

44. <u>Successors and Assigns</u>.  The terms and conditions agreed  to by the Borrower and the grants and covenants of the Borrower hereof shall run with the land and shall be biding upon the Borrower, and successors and assigns of the Borrower and shall inure to the benefit of the Beneficiary, its successors and assigns, but this provision does  not waive any prohibition of assignment or any requirement of consent to an assignment under the other provisions of this Deed of Trust; any consent to any assignment shall not be consent to any further assignment, each of which must be specifically obtained in writing.

45. <u>Successor Trustees</u>.  The Beneficiary, at its discretion, may from time to time remove the Trustee(s) and appoint a successor Trustee(s) to any Trustee appointed hereunder.  Without conveyance of the Mortgaged Premises, the

IRH 0001867

MMcF:gfg ( 5-Sep-86 10:45 DST'1)
Glenview - HELP  ed of Trust                    Page 52

successor Trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

46. Subordination.  If the First Mortgage is insured by the United States Department of Housing and Urban Development ("HUD"),

(a) The Beneficiary, for itself and its successors and assigns, covenants and agrees that all of its rights and powers under this Deed of Trust are subordinate and subject to the rights of First Mortgagee under the First Mortgage and under that certain security agreement dated August 27, 1970 as modified by Modification Agreement dated January 1, 1972 and the rights of the Secretary of Housing and Urban Development under that certain regulatory agreement dated August 27, 1970 as amended by Amendment to the Regulatory Agreement dated November 8, 1971 and incorporated by reference in the above described mortgage;

(b) If the First Mortgage is assigned to HUD as the insurer of the First Mortgage and thereafter the Secretary of HUD acquires title to the Mortgaged Premises by foreclosure, the lien of this Deed of Trust shall automatically terminate, and

(c) The Beneficiary, for itself and its successors and assigns, further covenants and agrees that in the event of the appointment of a receiver or of the appointment of CDA as a mortgagee-in-possession, such receiver or mortgagee-in-possession shall operate the project in accordance with all of the provisions of the First Mortgage and the HUD Regulatory Agreement.

Addendum 1 to Addendum 1, attached hereto, if any, is incorporated herein and together herewith constitute the entire Agreement.

**IN WITNESS WHEREOF,** this Deed of Trust has been duly executed by the Borrower and the Beneficiary on the first day hereinbefore written.

IRH 0001868

HMcF:gdg ( 5-Sep-86 '0:15 037/1)
Glenview - HELP   ed of Trust                          Page 31

WITNESS:                        GLEN BURNIE ASSOCIATES LIMITED
                                          PARTNERSHIP

_____       By: _____ (SEAL)
                                    Dennis Koubek, General Partner

                                By: Glenview Limited Partnership,
                                      General Partner

_____          By: _____ (SEAL)
                                        John Mergner,
                                        General Partner

                                By: McShea & Company,
                                      General Partner

ATTEST: [Corporate Seal]            By: _____
                                        John F. McShea, III
                                        Senior Vice President


        The Undersigned execute this instrument as Secured
Parties under the Maryland Uniform Commercial Code, it being
intended that this Deed of Trust shall constitute and be a
Security Agreement and Financing Statement under the laws of
Maryland.

WITNESS:                        COMMUNITY DEVELOPMENT ADMINISTRATION

_____       By: _____
                                    Authorized Officer


Endorsement for Insurance by the Maryland Housing Fund:

        This Deed of Trust is found to be eligible for
insurance by the Maryland Housing Fund pursuant to Article
41, Section 257K et seq. of the Annotated Code of Maryland
and the Regulations promulgated thereunder, as amended.
Subject to aforesaid law, I hereby endorse this Deed of Trust
for insurance in an amount not to exceed $447,285.00,
which insurance shall take effect upon the recording of this
Deed of Trust. However, insurance by the Maryland Housing
Fund does not cover an Event of Default arising out of the
Borrower's failure to comply with the Agreement and
Declaration of Covenants and Restrictions of even date and

IRH 0001869

MHGF:grg ( 5-Sep-86 10:15 DST\*\)
Glenview - HELP ied of Trust                          Page 72

recorded with this Deed of Trust.    All proceeds payable to
CDA shall be paid on behalf of the Beneficiary to the Trustee
named in the Trust Indenture providing for the issuance of
Home and Energy Loan Revenue Bonds dated as of April 1, 1983.

MARYLAND HOUSING FUND

By: _____

FoR    Director

IRH 0001870

MMcF:gfg ( 5-Sep-86 '0:45 DFT ')
Glenview - HELP    ed of Trust                                      Page 33

ADDENDUM

1.    Reserve Fund for Replacement

        The provisions of paragraph 10 shall not apply
so long as the Borrower maintains a Reserve Fund for
Replacements in accordance with the terms and conditions of
that certain Regulatory Agrement for Limited Distribution
Mortgagors Under Section 236 of the National Housing Act, as
amended, dated August 27, 1970, as amended by Amendment to
Regulatory Agreement dated November 8, 1971.

IRH 0001871

STATE OF MARYLAND, COUNTY OF Montgomery, To Wit:

I HEREBY CERTIFY that on this *19* day of September, 1986, before me, the subscriber, a Notary Public in and for the State of Maryland, personally appeared John Mergner, General Partner of Glenview Limited Partnership, the General Partner of Glen Burnie Associates Limited Partnership and did acknowledge that he executed the foregoing Deed of Trust on behalf of the said Glenview Limited Partnership for the purposes therein contained, and further acknowledged the foregoing Deed of Trust to be the act of the said Glenview Limited Partnership.

AS WITNESS my hand and Notarial Seal.

_Virginia A. Wilburn_
Notary Public

My Commission Expires:
     July 1, 1990

STATE OF MARYLAND, COUNTY OF Montgomery, To Wit:

I HEREBY CERTIFY that on this *19th* day of September, 1986, before me, the subscriber, a Notary Public in and for the State of Maryland, personally appeared Dennis Koubek, General Partner of Glen Burnie Associates Limited Partnership, and did acknowledge that he executed the foregoing Deed of Trust on behalf of the said Glen Burnie Associates Limited Partnership for the purposes therein contained, and further acknowledged the foregoing Deed of Trust to be the act of the said Glen Burnie Associates Limited Partnership.

AS WITNESS my hand and Notarial Seal.

Notary Public

My Commission Expires:
     July 1, 1990

IRH 0001872

MMcP:gfg ( 5-Sep-36 10:45 D#7/1)
Glenview - HELP    ed of Trust                                    Page 7#

STATE OF MARYLAND, COUNTY OF <u>Montgomery</u>      , To Wit:

    I **HEREBY CERTIFY** that on this <u>19</u> day of <u>September</u>   ,
1986, before me, the subscriber, a Notary Public in and for
the State of Maryland, personally appeared John F. McShea, III,
the Senior Vice President      of McShea and Company, Inc., the
General Partner of Glenview Limited Partnership, the Managing
General Partner of Glen Burnie Associates Limited Partnership
and did acknowledge that he executed the foregoing Deed of
Trust on behalf of the said McShea & Company, Inc. for the
purposes therein contained, and further acknowledged the
foregoing Deed of Trust to be the act of the said McShea &
Company, Inc.

    **AS WITNESS** my hand and Notarial Seal.

                         *Virginia A. Wilburn*
                             Notary Public

My Commission Expires:
    July 1, 1990


STATE OF MARYLAND, COUNTY OF <u>Anne Arundel</u>   , To Wit:

    I **HEREBY CERTIFY** that on this 22nd day of <u>September</u>   ,
19~~86~~, before me, the subscriber, a Notary Public in and for
the State of Maryland, personally appeared <u>Nancy S. Rase</u>
_____ of the Community Development
Administration; and he acknowledged to me that he executed
the foregoing Deed of Trust on behalf of the said
<u>Community Development Administration</u> the purposes therein
contained, and further acknowledged the foregoing Deed of
Trust to be the act of the said    <u>Administration</u>.

    **AS WITNESS**, my hand and Notarial Seal.


                         *Virginia C. Sallitt*
                           Notary Public

My Commission expires:    <u>7-1-90</u>

IRH 0001873

STATE OF MARYLAND, COUNTY OF _Anne Arundel_ , To Wit:

    I HEREBY CERTIFY that on this _22nd_ day of _September_,
19 _86_ before me, the subscriber, a Notary Public in and for
the State of Maryland, personally appeared _Charles S. Colson_
_for_ Director of the Maryland Housing
Fund; and he acknowledged to me that he endorsed for
insurance the foregoing Deed of Trust for the purposes stated
in said endorsement.

      AS WITNESS my hand and Notarial Seal.

               _Virginia C. Sallitt_
                   Notary Public

My Commission Expires:
    July 1, 1990


STATE OF MARYLAND, COUNTY OF _____, To Wit:

    I HEREBY CERTIFY that on this _____ day of _____,
19__, before me, the subscriber, a Notary Public in and for
the State of Maryland, personally appeared
_____, an authorized officer acting on behalf
of the Federal Housing Commissioner for the Secretary of the
U. S. Department of Housing and Urban Development; and he
acknowledged to me that he executed the foregoing
acknowledgment to the Deed of Trust for the purposes stated
in said endorsement.

      AS WITNESS my hand and Notarial Seal.


               _____
                  Notary Public

My Commission expires: _____

IRH 0001874

MMcF:gfg ( 5-Sep 86 10:45 DFT 1)
Glenview - HELP Deed of Trust                                    Page 57

## RELEASE

I **HEREBY RELEASE** the above Deed of Trust, which was originally made between _____, as Borrower, and Paul K. Casey and Margaret McFarland, as Trustees for the Community Development Administration, and recorded in Liber _____, folio ____, in _____ County, Maryland.

**WITNESS** my hand this ___ day of _____, 198__.

COMMUNITY DEVELOPMENT
ADMINISTRATION

By: _____

IRH 0001875

A98

## DESCRIPTION
### RESIDUE SECTION ONE, GLENVIEW GARDENS
### THIRD ELECTION DISTRICT
### ANNE ARUNDEL COUNTY, MARYLAND

. . . being part of SECTION ONE, as shown on a plat of subdivision entitled, "SECTION ONE and TWO, GLENVIEW GARDENS," recorded among the Land Records of Anne Arundel County, Maryland, in Plat Book 41 at Folio 5, and being more particularly described as follows:

BEGINNING for the same at a point on the northerly or North 76°00' 34" East, 271.08 foot line, as shown on the aforesaid plat of subdivision, distant 98.21 feet easterly of the westerly end thereof, said point also being on the easterly right of way line of Crain Highway, U.S. Route 301, as shown on State Roads Commission of Maryland Right of Way Plat No. 45802, distant 51.53 feet right of and radial to baseline station 52+78.58, as shown on said right of way plat and running thence with said easterly right of way line and with the southerly, westerly and northerly plat lines, as shown on plats of subdivision entitled, "Revised Plan of Section One, Rippling Estates" and "Section Two, Rippling Estates," recorded among the aforesaid Land Records in Plat Book 34 at Folio 44, and Plat Book 34 at Folio 32, respectively, the following three (3) courses:

1. North 76°00'34" East, 172.87 Feet to a point;
2. South 26°16'16" East, 1761.27 Feet to a point; and
3. South 37°36'09" West, 743.32 Feet to the southeasterly corner of "Crainmont Apartments," as per plat thereof, recorded among said Land Records in Plat Book 35 at Folio 23; thence with a part of the easterly or North 26°15'45" West, 1975.43 foot line, as shown on said plat of subdivision;
4. North 26°15'31" West, 877.29 feet to the point of division between the aforesaid Sections One and Two, Glenview Gardens; thence with said division line, the following thirty-two (32) courses:
5. North 63°44'29" East, 121.18 feet to a point;
6. North 18°44'29" East, 10.00 feet to a point;
7. North 26°15'31" West, 120.00 feet to a point;
8. North 63°44'29" East, 147.00 feet to a point;
9. South 26°15'31" East, 127.24 feet to a point;
10. South 63°44'29" West, 5.00 feet to a point;
11. South 26°15'31" East, 112.00 feet to a point;
12. South 63°44'29" West, 28.00 feet to a point;
13. South 26°15'31" East, 50.00 feet to a point;
14. North 63°44'29" East, 5.00 feet to a point;
15. South 26°15'31" East, 108.00 feet to a point;
16. South 63°44'29" West, 60.00 feet to a point;
17. South 26°15'31" East, 106.00 feet to a point;
18. North 63°44'29" East, 100.95 feet to a point;
19. North 26°15'31" West, 136.39 feet to a point;

IRH 0001876

A99

- 2 -

20.  North 63° 44'29" East, 52.00 feet to a point;

21.  North 26° 15'31" West, 71.60 feet to a point;

22.  South 63° 44'29" West, 15.00 feet to a point;

23.  North 26° 15'31" West, 95.00 feet to a point;

24.  North 63° 44'29" East, 92.00 feet to a point;

25.  North 26° 15'31" West, 50.00 feet to a point;

26.  South 63° 44'29" West, 90.00 feet to a point;

27.  North 26° 15'31" West, 95.00 feet to a point;

28.  North 63° 44'29" East, 65.00 feet to a point;

29.  North 26° 15'31" West, 50.00 feet to a point;

30.  North 63° 44'29" East, 118.00 feet to a point;

31.  South 26° 15'31" East, 9.00 feet to a point;

32.  North 63° 44'29" East, 100.00 feet to a point;

33.  North 26° 15'31" West, 29.00 feet to a point;

34.  North 63° 44'29" East, 28.00 feet to a point;

35.  North 26° 16'16" West, 98.11 feet to a point; and

36.  North 54° 10'43" West, 10.00 feet to a point on the easterly right way line of Nolpark Court, 50 feet wide, conveyed by Glen Burnie Associates to Anne Arundel County, Maryland, and recorded among said Land Records in Liber 2926 at Folio 737; thence with said easterly and northerly right of way lines of said Nolpark Court, the following eleven (11) courses:

37.  68.39 feet along the arc of a curve, deflecting to the left, having a radius of 50.00 feet and a chord bearing North 03° 21'34" East, 63.18 feet to a point of reverse curvature;

38.  21.30 feet along the arc of a curve, deflecting to the right, having a radius of 75.00 feet and a chord North 34° 24'20" West, 21.22 feet to a point of tangency;

39.  North 26° 16'16" West, 645.57 feet to a point of curvature;

40.  372.19 feet along the arc of a curve, deflecting to the left, having a radius of 185.00 feet and a chord bearing North 83° 54'23" West, 312.53 feet to a point of tangency;

41.  South 38° 27'30" West, 70.34 feet to a point of curvature;

42.  51.73 feet along the arc of a curve, deflecting to the left having a radius of 125.00 feet and a chord bearing South 26° 36'12" West, 51.36 feet to a point of tangency;

43.  South 14° 44'53" West, 25.00 feet to a point of curvature;

44.  32.95 feet along the arc of a curve, deflecting to the right, having a radius of 75.00 feet and a chord bearing South 27° 20'08" West, 32.69 feet to a point of tangency;

IRH 0001877