45.  South 39°55'20" West, 15.00 feet to a point;

46.  South 84°55'20" West, 35.36 feet to a point; and

47.  North 50°04'40" West, 39.14 feet to a point on said easterly right of way line of Crain Highway; thence with said easterly right of way line the following nine (9) courses:

48.  North 37°12'57" East, 17.58 feet to a point;

49.  North 40°06'05" East, 49.93 feet to a point;

50.  North 61°40'45" East, 27.30 feet to a point;

51.  North 39°59'33" East, 25.03 feet to a point;

52.  North 30°19'01' East, 51.60 feet to a point;

53.  North 38°14'07" East, 50.91 feet to a point;

54.  North 34°59'07" East, 50.93 feet to a point;

55.  North 41°50'37" East, 51.16 feet to a point; and

56.  North 28°39'22" East, 29.31 feet to the place of beginning, containing 548,910 square feet or 12.6012 acres of land.

SUBJECT TO a right of way for ingress and egress to Crain Highway, recorded among the aforesaid Land Records in Liber JHH 707 at Folio 207.

SUBJECT TO an agreement recorded among said Land Records in Liber 2367 at Folio 218.

SUBJECT TO a subdivision agreement recorded among said Land Records in Liber 2357 at Folio 126.

IRH 0001878

DR:dal (22-Aug-86 '3:33 B20/9)
Glenview Garden  ed of Trust Note

PROJECT: GLENVIEW GARDEN APARTMENTS

CDA PROJECT NO.: 02.0002
MHF PROJECT NO.: H-0007-001-02

### DEED OF TRUST NOTE

$447,285.00                                    Annapolis, Maryland

September 22_____, 1986

FOR **VALUE RECEIVED**, GLEN BURNIE ASSOCIATES LIMITED PARTNERSHIP, duly organized and validly existing under the laws of the State of Maryland (the "Promisor"), promises to pay to the Community Development Administration ("CDA"), a division of the Department of Economic and Community Development of the State of Maryland, or order, the principal sum of FOUR HUNDRED FORTY-SEVEN THOUSAND, TWO HUNDRED EIGHTY-FIVE DOLLARS ($447,285.00), or so much of that sum that may be advanced by CDA under the rehabilitation loan agreement of even date between Promisor and CDA (the "Rehabilitation Loan Agreement"), with interest payable as set forth below.

Promisor promises to pay to CDA the principal sum of this Note, together with interest at the rate of 10.50 percent per annum (the "Interest Rate"), and all assessments, taxes and premiums as follows:

A.   On the first date of each and every calendar month after the date of this Note, to and including the first to occur of (1) the first day of October, 1986, or (2) the first day of the month immediately following final closing of the Loan the promisor shall pay to CDA interest only on the outstanding principal balance advanced under the Rehabilitation Loan Agreement, at the Interest Rate.

B.   Beginning on the first day of the month following the date established in Paragraph A above, and on the first day of each calendar month after that date, Promisor shall pay to CDA principal and interest in equal monthly installments, each of which installments shall be in an amount which, when applied first to the Interest Rate and then to the reduction of principal, shall amortize the entire principal debt by the date that is 19 years and 11 months after the due date of the first payment of principal (the "Maturity Date").

IRH 0001895

CR:dial .22-Aug-96 '3:33 50 6
Glenview Garden  ed of Trust Note

Page 2

C.  Beginning with the first payment of principal and interest under Paragraph B above, the Promisor shall make monthly payments to CDA for any taxes, assessments, insurance premiums for mortgage, property, hazard, and all other policies of insurance, and reserves at the times and in the manner prescribed by CDA in accordance with the terms of the Deed of Trust (defined below).

D.  If any installment of interest or principal or any other payment due under this Note is not paid within 10 days from the date that the installment or payment is due, Promisor promises to pay CDA a "late charge" equal to 5% of the aggregate monthly payment required by this Note.

E.  This Note is secured by a Deed of Trust, Security Agreement, and Assignment of Rents of even date from Promisor to PAUL K. CASEY and M. MARGARET McFARLAND, trustees for the benefit of CDA (the "Deed of Trust") covering real estate located in Anne Arundel County, Maryland, to which Deed of Trust reference is made for a description of the property, definition of terms, the nature and extent of the security, and the rights of CDA and its successors and assigns, in respect of such security.

F.  Upon the prior approval of CDA or subsequent holder, the Promisor may prepay the then outstanding amount of this Note, in whole or in part, if no default exists under this Note or the Deed of Trust, on the first day of any calendar month, in multiples of (except in the case of the prepayment of the then total principal balance of the Note) not less than $10,000 upon not less than 30 days nor more than 90 days prior written notice to CDA or subsequent holder specifying the date on which prepayment is to be made and the amount which is to be prepaid. Any prepayment must include:

(i)  Interest accrued and unpaid on the principal balance of this Note to and including the date of prepayment;

(ii)  all other sums due or owing under this Note or the Deed of Trust;

(iii)  the interest which shall accrue on the bonds to be redeemed in a principal amount equal to the amount of the prepayment to be applied to reduce the principal balance due under this Note, the proceeds of which bonds were used to fund the loan evidenced by this note (the "Bonds") from the date of prepayment until the next optional redemption date for the Bonds, as defined in CDA's applicable Trust Indenture, which period shall not exceed 6 months from the date of prepayment;

(iv)  an amount equal to the pro-rate share of the costs and expenses incurred in connection with the issuance of the Bonds; and

IRH 0001896

Glenview Garden Deed of Trust Note                          Page 3

        (v)  the costs and expenses of CDA in effecting the
redemption.

        Any partial prepayment of the principal balance of this
Note shall be applied to the installments of principal and
interest last due under this Note and shall not release the
Promisor from the obligation to pay the installments of principal
and interest next becoming due under this Note.

    G.   Upon an Event of Default, as defined in the Deed of
Trust, the unpaid principal with interest and all other sums
secured by the Deed of Trust shall at the option of the holder of
this Note become immediately due and payable.  Failure to
exercise this option shall not constitute a waiver of the right
to exercise this option in the event of any subsequent default.

    H.   As to this Note, the Deed of Trust, the Rehabilitation
Loan Agreement, and any other documents or instruments evidencing
or securing the indebtedness (the "Loan Documents"), Promisor and
all guarantors, if any, severally waive all applicable exemption
rights, whether under any state constitution, homestead laws or
otherwise, and also severally waive valuation and appraisement,
presentment, protest and demand, notice of protest, demand and
dishonor and nonpayment of this Note, and expressly agree that
the maturity of this Note, or any payment under this note, may be
extended from time to time without in any way affecting the
liability of Promisor and all guarantors.

    I.   If the principal amount of this Note is not paid when
due or any installment of interest, principal, or the
administrative fee, or any other payment due under this Note is
not paid within 10 days of the date when due, whether by maturity
or acceleration, Promisor authorizes the clerk or any attorney of
any court of record to appear for it and enter judgment by
confession for the balance then due on this Note together with
interest, court costs, and reasonable attorney's fees.

    J.   All payments due under this Note shall be made during
regular business hours at the principal office of Bogman Inc., at
7355 Wisconsin Avenue, Bethesda, Maryland 20814, or at any other
place that CDA may designate in writing, and shall be made in
coin or currency of the United States of America which at the
time of payment is legal tender for the payment of public or
private debts.

    K.   The Promisor represents and warrants that it is either
(a) a natural person or (b) a business or commercial organization
within the meaning of subtitle 1 of title 12 of the Commercial
Law Article of the Annotated Code of Maryland, as amended, and
the Promisor further represents and warrants that the loan
evidenced by this Note was made and transacted solely for the
purpose of carrying on or acquiring a business or commercial
enterprise within the meaning of that subtitle.

IRH 0001897

A104

Glenview Garden ed of Trust Note                                    Page 1

L.    Neither the Promisor nor any partner or member of the Promisor assumes personal liability for payments and deposits due under this Note, except for:

(i)  funds or property of the project financed by the loan evidenced by this Note coming into their hands which, by the provision of this Note, the Deed of Trust, the Rehabilitation Loan Agreement, the Regulatory Agreement by and between the Promisor and CDA of even date 9the "Regulatory Agreement"), or any other Loan Document, they are not entitled to retain; and

(ii)  their own acts, deeds, and omissions, or the acts, deeds, and omissions of others which they authorized in violation of the provisions of the Note, Deed of Trust, Rehabilitation Loan Agreement, Regulatory Agreement, or any other Loan Document.

M.    Addendum 1 to Addendum 1, attached hereto, if any, is incorporated herein and together herewith constitute the entire Agreement.

**IN WITNESS WHEREOF**, Promisor has caused this Note to be executed and delivered on its behalf on the date first written above.

WITNESS:                          GLEN BURNIE ASSOCIATES LIMITED
                                          PARTNERSHIP

                                  By: _____ (SEAL)
_____             Dennis Koubek
                                      General Partner

                                  By: Glenview Limited Partnership
                                      General Partner

                                      By: _____ (SEAL)
_____             John Mergner
                                      General Partner

                                  By: McShea & Company, General
                                      Partner

ATTEST: [CORPORATE SEAL]          By: _____
                                      John F. McShea III
                                      Senior Vice President

----------------------------------------------------------------

This Deed of Trust Note is identified by the signature of one of the Trustees in the Deed of Trust securing it.

                          By: _____

IRH 0001898

Glenview Garden Deed of Trust Note                                    Page 5

      THIS IS TO CERTIFY, that this is the Note described in, and secured by, the Deed of trust of even date, and is in the same principal amount, covering real estate in <u>Anne Arundel County</u>, State of Maryland.

      Dated this 19th day of <u>September</u>, 1986.

<u>                    </u>
                            Notary Public

My Commission Expires:
<u>July 1, 1990</u>

IRH 0001899

DR:dal (22-Aug-86 13:58 III )
Glenview Garden  ed of Trust Note                              Page 6

ADDENDUM

1. Except for the payment to CDA for the mortgage
insurance premium for the Maryland Housing Fund, the provisions
of Paragraph C hereof shall not apply so long as the Borrower is
in compliance with the terms and conditions of Paragraph 7 of
that certain Deed of Trust dated August 27, 1970 and recorded
among the Land Records of Anne Arundel County, Maryland, in Liber
No. 2360, folio 321, as modified by that certain Modification
Agreement dated January 1, 1972 and recorded among the aforesaid
Land Records in Liber No. 2523, folio 833.   Beginning with the
first payment of principal and interest under Paragraph B hereof,
the Promisor shall make monthly payments to CDA of the MHF
insurance premium.

IRH 0001900

MMcF:ial , 5-Sep-86 12:05 D:55/2)
Glenview Regular y Agreement


When recorded return to:
Department of Economic and
 Community Development
Legal Office
45 Calvert Street
Annapolis, MD  21401
Attn:  Counsel – DECD
MHF Insured – Market


Project Name: Glenview Garden         CDA Project No.: 02.0002
              Apartments


# REGULATORY AGREEMENT


    THIS **AGREEMENT** is made this **22nd** day of September_____,
1986, by and between GLEN BURNIE ASSOCIATES LIMITED
PARTNERSHIP ("Borrower"), whose address is 4733 Bethesda
Avenue, Suite 560, Bethesda, Maryland 20815 and the Community
Development Administration ("CDA"), a division of the
Department of Economic and Community Development of the State
of Maryland, whose address is 45 Calvert Street, Annapolis,
MD  21401.


## RECITALS

    The Borrower, as the owner of the Mortgaged Premises (as
defined in the Mortgage), has applied to CDA for a loan in
the principal amount of $447,285.00 ( the "Loan") evidenced
by a Note of even date (the "Note") to aid Borrower in the
rehabilitation and operation of a "community development
project", known as GLENVIEW GARDEN APARTMENTS (the
"Project"), in accordance with the drawings and
specifications forming a part of the rehabilitation documents
executed in respect to the Loan.

    The Loan will make possible the rehabilitation and
operation of safe, sanitary, and adequate housing, which
could otherwise not be provided, for "families of limited
incomes" within the meaning of Sections 266DD-1 through
266DD-8 of Article 41 of the Annotated Code of Maryland, as
amended (the "Act"), and the regulations promulgated under
the Act.

    The Maryland Housing Fund ("MHF") will insure the Deed
of Trust, Security Agreement and Assignment of Rents of even
date from Borrower to certain trustees for the benefit of CDA
(the "Mortgage") encumbering the Project and the Mortgaged
Premises.


IRH 0001879

MMcF:dal ( 5-Sep-36 12:36 036/2)
Glenview Regulatory Agreement

Page 2

Because of its obligation to accomplish the public purposes set forth in the Act, CDA is unwilling to make the Loan unless Borrower agrees to be regulated in the manner set forth below. Borrower is willing to execute and abide by this Agreement as a condition of obtaining financing.

NOW THEREFORE, in consideration of the making of the Loan by CDA and Borrower's agreement to be regulated and restricted by CDA so as to assure the public purpose of the Project, CDA agrees, and Borrower agrees for itself, and its successors, and assigns, to abide by the following terms and provisions so long as the Loan remains outstanding:

1. As used in this Agreement the term:

(a) "Borrower" means the original borrower under the Mortgage and its successors and assigns.

(b) "CDA" includes persons to whom the Mortgage is assigned.

(c) "Default" means a default declared by CDA when it determines that there has been a violation of this Agreement.

(d) "Distribution" means any withdrawal or taking of cash or any assets of the Project within the limitations of paragraph 6 below.

(e) "Family" means (1) two or more persons who occupy the same unit; or (2) a single person.

(f) "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions and considerations determined by the Secretary pursuant to the Act.

(g) "Final Closing" is the date on which the final principal amount of the Mortgage is accepted and approved by both MHF and CDA.

(h) "Mortgage" means the "Deed of Trust", and any other document evidencing or securing the Loan.

(i) "Mortgaged Premises" is defined in the Mortgage.

(j) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) all sums due or currently required to be paid under the terms of any Mortgage or Note held by

IRH 0001880

CDA; and

        (ii)  all amounts required, if any, to be deposited in the reserve fund for replacements; and

        (iii)  all obligations of the Project other than the Mortgage held by CDA, unless funds for payment have been set aside or deferment of payment has been approved by CDA; and

      (2)  the segregation of:

        (i)  an amount equal to the aggregate of all special funds required to be maintained by the Project; and

        (ii)  all tenant security deposits held.

    (k) Capitalized terms not specifically defined have the meanings given them in the Mortgage.

    2.   This Agreement shall be recorded with the Mortgage and any default under the terms of the Mortgage shall constitute a default under this Agreement; any default under the terms of this Agreement shall be a default under the Mortgage.

    3.   Borrower shall promptly make all payments due under the Note and Mortgage.

    4.   Concurrently with the beginning of amortization of the principal amount of the Loan as provided in the Note, Borrower may be required by CDA to establish and thereafter maintain a Reserve Fund for Replacements by depositing to such reserve fund with CDA or in a depository designated by CDA, the amount of $3,650.00, payable monthly without demand, unless a different date or amount is approved by CDA.  The monthly payment into the Reserve Fund for Replacements shall continue until the Mortgage Loan is paid in full. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the Project or for any other purpose, may be made only after receiving the written consent of CDA.  In the event of a default in the terms of the Mortgage, pursuant to which the Loan has been accelerated, CDA may apply or authorize the application of the balance of this fund to the amount due on the Loan as accelerated.

    5.   CDA may in its sole discretion deposit the moneys paid to it pursuant to paragraph 4 into a non-interest bearing account or an interest bearing account, to be invested or reinvested at the discretion of CDA; however, CDA shall hold any interest accruing on these moneys for the benefit of the Project.  Within 6 months after the payment in

IRH 0001881

MMcFidal ( 5-Sep-96 12:06 036/2)
Glenview Regula ry Agreement                          Page 1

full of the Loan and of any other sums due to CDA, CDA shall pay all moneys remaining in the Reserve Fund for Replacement to Borrower.

6.    Borrower shall not, without the prior written approval of CDA make, or receive and retain, any distribution of assets or any income of any kind of the Project except from Surplus Cash and on the following conditions:

(a)   All distributions shall be made only as of or after the end of a fiscal year and only as permitted by the law of the jurisdiction.

(b)   No distribution may be made from borrower moneys, and no distribution may be made when there is any default under this Agreement or under the Note or Mortgage.

(c)   Any distribution of any moneys of the Project, which the Borrower or any other holder is not entitled to retain, shall be held in trust separate and apart from any other moneys for the benefit of CDA and the Project. Borrower shall restore any such improper distributions immediately upon request by CDA.

(d)   Before any distribution, Borrower shall have complied with all outstanding notices or requirements for proper maintenance of the Project.

7.    Borrower shall provide CDA with written notice of any rent increases for units in the Project within 30 days of any such increases.    If CDA determines, in its sole discretion, that rent increases are excessive and contrary to the public interest, then CDA may require the Borrower to reduce or otherwise adjust rents and to establish any subsequent rents only after approval by CDA.

8.    Borrower assures that it shall pay all expenses of the Project, including debt service payments and reserve deposits, if any.

9.    Unless otherwise directed or approved by CDA, the rental rates for initial occupancy of the Project shall be those set forth in the Commitment for the Mortgage Loan or in CDA's Financial Analysis Form.

10.   (a)   Except as otherwise provided in the Occupancy Agreement of even date between Borrower and CDA, Borrower may not approve any person or family for occupancy unless, at the time of such approval, the following conditions have been met with respect to at least 51% of the units in the Project:

(1)   The person or family is a "family of limited income" as defined by the Act and the person or family certifies that the application for occupancy is for

IRH 0001882

the purpose of providing housing in the Project for the person or family.

(2)  The total current income of the person or family shall not exceed the limits established by CDA then in effect, and the person or family has certified to the Borrower, on forms prescribed or approved by CDA, the total current income of such person or family.

(3)  In a manner prescribed or approved by CDA, the Borrower shall obtain written evidence substantiating the information given on the certification of income and shall retain this evidence in its files for a period of 3 years from the date of initial occupancy by such person or family.

(b)  If the Borrower fails to comply with the marketing plan for the Project, as approved by CDA, CDA may require that no further applications be accepted or acted upon by or on behalf of Borrower until and unless strict compliance with the marketing plan shall have been instituted.

(c)  Among eligible applications, preference shall be given to the elderly, those displaced by urban renewal, slum clearance, and other governmental actions, and those currently living in substandard housing.

(d)  In selecting tenants, Borrower shall not discriminate against any person or persons because there are children in the family.

11. (a)  Borrower shall require all residents to execute a lease in a form approved by CDA, which lease shall comply with applicable State and local laws, and which may not be modified in any manner without CDA's approval. Borrower may not rent any unit in the Project for a term of less than 30 days nor more than one year.

(b)  Borrower may not require as a condition of the occupancy or leasing of any dwelling unit in the Project, and may neither accept nor allow any employee or agent to accept, any consideration other than the prepayment of the first month's rent plus a security deposit not in excess of one month's rent to guarantee the performance of the covenants of the lease or occupancy agreement.

(c)  Moneys paid to Borrower by a residential tenant as a security deposit for the payment of rent shall be deposited in an interest bearing bank account, separate from all other accounts and funds, with a financial institution whose deposits are insured by an agency of the United States or Maryland government, and interest earned on such account shall be credited to each resident in accordance with

IRH 0001883

Maryland law.  The amount in such account shall at all times equal or exceed the aggregate of all outstanding obligations with respect to security deposits.

12.  When requested by CDA at any time, Borrower shall obtain and verify recertifications of income and other criteria of eligibility from residents of the Project.

13.  Borrower shall maintain the Mortgaged Premises in good repair and condition.  If all or any portion of the Project is destroyed or damaged by fire or other casualty, the money derived from any insurance on the project shall be applied in accordance with the terms of the Mortgage.

14.  Upon prior written approval of CDA, Borrower may charge to and receive from any tenant any amounts that from time to time Borrower and the tenant may mutually agree upon for any facilities or services which Borrower or other persons may furnish to the tenant upon his or her request in addition to the facilities and services included in the approved rental schedule.

15.  At the request of CDA, Borrower shall furnish occupancy reports and shall give specific answers to any questions or requests for information that CDA puts to Borrower.

16.  Borrower shall comply with the provisions of all federal, State and local law prohibiting discrimination in housing on the grounds of race, color, creed, national origin, sex, marital status, or physical or mental handicap.

17.  (a)  At Initial Closing of the Mortgage Loan, Borrower shall deliver to CDA as an Operating Expense Deficit Deposit the amount of $ N/A___ in cash or an unconditional irrevocable letter of credit acceptable in all respects to CDA and MHF, to be held by CDA in the Operating Expense Deficit fund to cover the Project's Cumulative Operating Deficit (as defined in the CDA Commitment Letter, dated December 17, 1985.

(b)  The amount of the Operating Expense Deficit Fund may be reviewed from time to time at the discretion of CDA and MHF and may be adjusted as determined by CDA and MHF. Borrower shall maintain the Operating Expense Deficit Fund in the amount required by CDA and MHF until CDA and MHF determine that for each of N/A___ consecutive months (the "sustaining Occupancy Period") the Project's effective gross income (gross income adjusted for vacancies and collections) equals all Project costs and expenses, including any required reserves, plus 110% of debt service (principal and interest, plus CDA override and the MHF premium) ("Sustaining Occupancy").  The sustaining Occupancy Period may be modified by CDA and MHF acting jointly, as a result of any

IRH 0001884

MMcF:dal ( 5-Sep-86 12:06 036/2)
Glenview Regulary Agreement                                    Page 7

circumstances affecting the Project of a unique or unusual nature which, in the joint determination of CDA and MHF, support such a modification.

(e) the moneys in the Operating Expense Deficit Fund may be disbursed upon the joint direction or joint approval of CDA and MHF to pay operating expenses of the Project, to pay principal and interest installments or any other payment due under the Note and to pay any other costs, expenses or payments related to the Project and required by the Loan Documents. After any disbursement, Borrower, upon 10 days written notice from CDA or MHF, shall reimburse the Operating Expense Deficit Fund so that such fund is maintained at the amount required by CDA and MHF. CDA may in its sole discretion deposit the moneys in the Operating Expense Deficit Fund into a non-interest bearing account or an interest bearing account, to be invested or reinvested at the discretion of CDA. Within six months after Sustaining Occupancy is achieved the Operating Expense Deficit Fund shall terminate and all moneys therein shall be paid to Borrower.

18. (a) In the event that any Rehabilitation Cost Savings, as defined herein, are realized in rehabilitating the Project they will be used to reduce the amount of the Mortgage Loan at final Closing.

(b) Rehabilitation Cost Savings shall be calculated at the time of final cost certification of the rehabilitation of the Project ("final cost certification") as the sum of (1) and (2) as follows:

(1) The difference between the actual rehabilitation costs which are approved at final cost certification and the rehabilitation cost amount as listed on CDA's Financial Analysis at initial closing of the Mortgage Loan; and

(2) The difference between the actual total of fees, financing and carrying charges, as described in CDA's Financial Analysis which are approved at final cost certification, and the amount of fees, financing and carrying charges as listed on CDA's Financial Analysis at initial closing of the Mortgage Loan.

(c) Any moneys in the Rehabilitation surplus Fund shall be disbursed at the sole discretion of CDA for Project related improvements.

(d) CDA may in its sole discretion deposit the moneys in the Rehabilitation Surplus Fund into a non-interest bearing account or an interest bearing account, to be invested or reinvested at the discretion of CDA; however, CDA shall hold any interest accruing on these moneys for the

IRH 0001885

benefit of the Project.  Within six months after the payment in full of the Mortgage Loan and of any other sums due to CDA, all moneys remaining in the Rehabilitation Surplus Fund, including any investment income or gain, shall be paid to the Borrower.

19.  (a)  Upon a violation of any of the provisions of this Agreement by Borrower, CDA may give written notice to Borrower by first class mail, postage prepaid, at the address stated in this Agreement, or such other address that Borrower subsequently designates in writing to CDA as Borrower's legal business address.  If the violation is not rectified to CDA's satisfaction within 10 days after the date the notice is mailed or within such further time that CDA reasonably determines is necessary to correct the violation, CDA may without further notice declare a default under this Agreement effective on the date of such declaration.  Upon such declaration CDA may, in addition to those actions permitted under the Note or Mortgage or under Maryland or federal law:

(1)  declare the whole of the indebtedness under the Note immediately due and payable and then proceed with foreclosure of the Mortgage;

(2)  collect all rents and charges in connection with the operation of the Project and use such collections to pay Borrower's obligations under this Agreement and under the Note and Mortgage and the necessary expenses of preserving the Mortgaged Premises and operating the Project;

(3)  take possession of the Project, bring any action necessary to enforce any rights of Borrower growing out of the Project's operation, and operate the Project in accordance with the terms of this Agreement until such time that CDA in its discretion determines that Borrower is again in a position to operate the Project in accordance with the terms of this Agreement and in compliance with the requirements of the Note and Mortgage;

(4)  apply to any court, State or federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Project in accordance with the terms of this Agreement, or for such other relief that may be appropriate; in this regard, Borrower acknowledges that any injury to CDA arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

(b)  No failure by CDA to exercise and no delay in exercising any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any

IRH 0001886

single or partial exercise of any right, power or privilege preclude any other exercise thereof or the exercise of any other right, power, or privilege.

20. Borrower shall not transfer, assign or pledge any right or interest in or title to any funds, including without limitation letters of credit and other assets, deposited by the Borrower with CDA or reserved by CDA for Borrower, without the prior written approval of CDA.

21. Nothing contained in the Mortgage shall be deemed to be a release or impairment of any obligation of the Borrower contained in this Regulatory Agreement; however, neither Borrower nor any partner or member assumes personal liability for payments and deposits due under the Note and Mortgage, for deposits to the Reserve Fund for Replacements and other deposits required by this Agreement, for matters not under their control or for any obligation under this Agreement, except for:

(a) funds or property of the Project coming into their hands which, by the provisions of this Agreement, the Note, the Mortgage or any other Loan document they are not entitled to retain; and

(b) their own acts, deeds, and omissions, or the acts, deeds and omissions of others which they have authorized in violation of the provisions of this Agreement, the Mortgage, the Note or any other Loan document.

22. Except as otherwise provided in this Agreement, whenever any approval or notice by CDA is required under this Agreement, or whenever any action by CDA is required or permitted, the Secretary of Economic and Community Development, Director of CDA, or any Authorized Officer of CDA may approve, give notice, or act on behalf of CDA.

23. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions.

24. This Agreement may not be altered, modified or amended except in writing signed on behalf of the Borrower and CDA.

25. (a) No member, officer, or employee of CDA, no member of the governing body of the State or locality in which the Project is situated, and no other public official of the State or such locality who exercises any functions or responsibilities with respect to the Project, during his tenure or for one year after the end of such tenure may have any interest, direct or indirect, in this Agreement or in any proceeds or benefits arising from it. If the Project is owned by a public housing agency, this prohibition shall also

IRH 0001887

apply to members of the governing body of the locality in which the public housing agency operates.

(b) The Borrower shall insert the provisions of paragraph (a) above in each of its contracts entered into in connection with the project.

26. This Agreement shall bind and the benefits shall inure to Borrower, its legal representatives, successors in office or interest, and assigns, and to CDA so long as the Mortgage continues in effect. Upon payment in full of the indebtedness evidenced by the Note and Mortgage, or foreclosure of the Mortgage or deed in lieu of foreclosure, or assignment to the Maryland Housing Fund (except when resulting in a conveyance to the Borrower or any related person), this Agreement shall terminate and be released of record. CDA shall execute any documents necessary to effect the release.

27. Borrower warrants that it will not execute any agreement with provisions contradictory to, or in opposition to, the provisions of this Agreement, and that in any event the requirements of the Agreement are paramount and controlling and they supersede any other requirements in conflict with this Agreement, except as set forth in paragraph 28 hereof.

28. Notwithstanding anything contained herein to the contrary, if the Mortgaged Premises are subject to a superior lien securing a loan (the "Superior Mortgage") which loan is insured by the United States Department of Housing and Urban Development ("HUD"), then CDA, for itself and its successors and assigns acknowledges and agrees that all of its rights and powers under this Regulatory Agreement are subordinate and subject to the rights of the Secretary of HUD under the HUD Regulatory Agreement recorded in connection with the Superior Mortgage, and further acknowledges and agrees that CDA will not attempt to enforce any of the covenants of Borrower contained herein, until such time as the Superior Mortgage is paid in full or the HUD Regulatory Agreement is released of record.

IRH 0001888

MMcP:dal ( 5-Sep-86 12:06 D36/2)
Glenview Regulatory Agreement                                    Page 11

**IN WITNESS WHEREOF**, the parties by their duly authorized representatives have signed and delivered this Regulatory Agreement as of the date first written above.

WITNESS:                          GLEN BURNIE ASSOCIATES LIMITED
                                  PARTNERSHIP

_____         By: _____ (SEAL)
                                      Dennis Koubek, General Partner

                                  By: Glenview Limited Partnership,
                                      General Partner

_____             By: _____ (SEAL)
                                          John Mergner
                                          General Partner

                                  By: McShea & Company, General
                                      Partner

ATTEST: [Corporate Seal]              By: _____

WITNESS:                          COMMUNITY DEVELOPMENT
                                  ADMINISTRATION

_____         By: _____ (SEAL)

APPROVED by the Maryland Housing Fund:

By: _____
        FOR   Director

STATE OF MARYLAND, COUNTY OF _Montgomery_ , to wit:

**I HEREBY CERTIFY** that on this _19_ day of _September_, 1986, before me, the subscriber, a Notary Public in and for the State and County, personally appeared John Mergner, General Partner of Glenview Limited Partnership, the General Partner of Glen Burnie Associates Limited Partnership who acknowledged the foregoing Regulatory Agreement to be the act of that Glenview Limited Partnership and who acknowledged to me that he or she executed the Regulatory Agreement for the purposes contained in it.

**AS WITNESS** my hand and Notarial Seal.

IRH 0001889

MMcF:ial ( 5-Sep-86 12:06 356/2)
Glenview Regulatory Agreement

Page '2

*Virginia A. Wilburn*
Notary Public

My Commission Expires:

7/1/90

STATE OF MARYLAND, COUNTY OF _Montgomery_ , to wit:

I HEREBY CERTIFY that on this 19th day of September,
1986, before me, the subscriber, a Notary Public in and for
the State and County, personally appeared Dennis Koubek,
General Partner of Glen Burnie Associates Limited Partneship
who acknowledged the foregoing Regulatory Agreement to be the
act of that Glen Burnie Associates Limited Partnership and
who acknowledged to me that he or she executed the Regulatory
Agreement for the purposes contained in it.

AS WITNESS my hand and Notarial Seal.

Notary Public

My Commission Expires:

July 1, 1990

STATE OF MARYLAND, COUNTY OF _Montgomery_ , to wit:

I HEREBY CERTIFY that on this 19 day of September,
1986, before me, the subscriber, a Notary Public in and for
the State and County, personally appeared John F. McShea, III
The Senior  Vice President of McShea & Company, Inc., the
General Partner of Glenview Limited Partnership, the Managing
General Partner of Glen Burnie Associates Limited Partnership
who acknowledged the foregoing Regulatory Agreement to be the
act of that McShea & Company, Inc. and who acknowledged to me
that he or she executed the Regulatory Agreement for the
purposes contained in it.

AS WITNESS my hand and Notarial Seal.

*Virginia A. Wilburn*
Notary Public

My Commission Expires:

7/1/90

STATE OF MARYLAND, COUNTY OF _Anne Arundel_ , to wit:

I HEREBY CERTIFY that on this 22nd day of September,
1986, before me, the subscriber, a Notary Public in and for
the State and County aforesaid, personally appeared Nancy S.

IRH 0001890

_Rose_          an   Authorized   Officer   of   the   Community
Development Administration, a division of the Department of
Economic  and  Community  Development  of  Maryland,  who
acknowledged the foregoing Regulatory Agreement to be the act
of  the  Community  Development  Administration,  and  who
acknowledged to me that he or she executed the Regulatory
Agreement for the purposes contained in it.

        AS WITNESS my hand and Notarial Seal.

                                    _Virginia C. Sallitt_
                                       Notary Public

My Commission Expires:
        _7-1-90_


STATE OF MARYLAND, COUNTY OF _Anne Arundel_____, to wit:

        I HEREBY CERTIFY that on this _22nd_ day of _September_____,
19_86_, before me, the subscriber, a Notary Public in and for
the  State  and  County  aforesaid,  personally  appeared
_Charles S. Colson_____, Maryland Housing Fund,
and who acknowledged to me that he or she approved the
foregoing Regulatory Agreement on behalf of the Maryland
Fund.

        AS WITNESS my hand and Notarial Seal.

                                    _Virginia C. Sallitt_
                                       Notary Public

My Commission Expires:
        _7-1-90_


IRH 0001891

DESCRIPTION
RESIDUE SECTION ONE, GLENVIEW GARDENS
THIRD ELECTION DISTRICT
ANNE ARUNDEL COUNTY, MARYLAND

. . . being part of SECTION ONE, as shown on a plat of subdivision entitled, "SECTION ONE and TWO, GLENVIEW GARDENS," recorded among the Land Records of Anne Arundel County, Maryland, in Plat Book 41 at Folio 5, and being more particularly described as follows:

BEGINNING for the same at a point on the northerly or North 76°00' 34" East, 271.08 foot line, as shown on the aforesaid plat of subdivision, distant 98.21 feet easterly of the westerly end thereof, said point also being on the easterly right of way line of Crain Highway, U.S. Route 301, as shown on State Roads Commission of Maryland Right of Way Plat No. 45802, distant 51.53 feet right of and radial to baseline station 52+78.58, as shown on said right of way plat and running thence with said easterly right of way line and with the southerly, westerly and northerly plat lines, as shown on plats of subdivision entitled, "Revised Plan of Section One, Rippling Estates" and "Section Two, Rippling Estates," recorded among the aforesaid Land Records in Plat Book 34 at Folio 44, and Plat Book 34 at Folio 32, respectively, the following three (3) courses:

1.  North 76°00'34" East, 172.87 Feet to a point;

2.  South 26°16'16" East, 1761.27 Feet to a point; and

3.  South 37°36'09" West, 743.32 Feet to the southeasterly corner of "Crainmont Apartments," as per plat thereof, recorded among said Land Records in Plat Book 35 at Folio 23; thence with a part of the easterly or North 26°15'45" West, 1975.43 foot line, as shown on said plat of subdivision;

4.  North 26°15'31" West, 877.29 feet to the point of division between the aforesaid Sections One and Two, Glenview Gardens; thence with said division line, the following thirty-two (32) courses:

5.  North 63°44'29" East, 121.18 feet to a point;

6.  North 18°44'29" East, 10.00 feet to a point;

7.  North 26°15'31" West, 120.00 feet to a point;

8.  North 63°44'29" East, 147.00 feet to a point;

9.  South 26°15'31" East, 127.24 feet to a point;

10.  South 63°44'29" West, 5.00 feet to a point;

11.  South 26°15'31" East, 112.00 feet to a point;

12.  South 63°44'29" West, 28.00 feet to a point;

13.  South 26°15'31" East, 50.00 feet to a point;

14.  North 63°44'29" East, 5.00 feet to a point;

15.  South 26°15'31" East, 108.00 feet to a point;

16.  South 63°44'29" West, 60.00 feet to a point;

17.  South 26°15'31" East, 106.00 feet to a point;

18.  North 63°44'29" East, 100.95 feet to a point;

19.  North 26°15'31" West, 136.39 feet to a point;

IRH 0001892

- 2 -

20. North 63° 44'29" East, 52.00 feet to a point;

21. North 26° 15'31" West, 71.60 feet to a point;

22. South 63° 44'29" West, 15.00 feet to a point;

23. North 26° 15'31" West, 95.00 feet to a point;

24. North 63° 44'29" East, 92.00 feet to a point;

25. North 26° 15'31" West, 50.00 feet to a point;

26. South 63° 44'29" West, 90.00 feet to a point;

27. North 26° 15'31" West, 95.00 feet to a point;

28. North 63° 44'29" East, 65.00 feet to a point;

29. North 26° 15'31" West, 50.00 feet to a point;

30. North 63° 44'29" East, 118.00 feet to a point;

31. South 26° 15'31" East, 9.00 feet to a point;

32. North 63° 44'29" East, 100.00 feet to a point;

33. North 26° 15'31" West, 29.00 feet to a point;

34. North 63° 44'29" East, 28.00 feet to a point;

35. North 26° 16'16" West, 98.11 feet to a point; and

36. North 54° 10'43" West, 10.00 feet to a point on the easterly right way line of Nolpark Court, 50 feet wide, conveyed by Glen Burnie Associates to Anne Arundel County, Maryland, and recorded among said Land Records in Liber 2926 at Folio 737; thence with said easterly and northerly right of way lines of said Nolpark Court, the following eleven (11) courses:

37. 68.39 feet along the arc of a curve, deflecting to the left, having a radius of 50.00 feet and a chord bearing North 03° 21'34" East, 63.18 feet to a point of reverse curvature;

38. 21.30 feet along the arc of a curve, deflecting to the right, having a radius of 75.00 feet and a chord North 34° 24'20" West, 21.22 feet to a point of tangency;

39. North 26° 16'16" West, 645.57 feet to a point of curvature;

40. 372.19 feet along the arc of a curve, deflecting to the left, having a radius of 185.00 feet and a chord bearing North 83° 54'23" West, 312.53 feet to a point of tangency;

41. South 38° 27'30" West, 70.34 feet to a point of curvature;

42. 51.73 feet along the arc of a curve, deflecting to the left having a radius of 125.00 feet and a chord bearing South 26° 35'12" West, 51.36 feet to a point of tangency;

43. South 14° 44'53" West, 25.00 feet to a point of curvature;

44. 32.95 feet along the arc of a curve, deflecting to the right, having a radius of 75.00 feet and a chord bearing South 27° 20'08" West, 32.69 feet to a point of tangency;

IRH 0001893

A122

- 3 -

45. South 39°55'20" West, 15.00 feet to a point;

46. South 84°55'20" West, 35.36 feet to a point; and

47. North 50°04'40" West, 39.14 feet to a point on said easterly right of way line of Crain Highway; thence with said easterly right of way line the following nine (9) courses:

48. North 37°12'57" East, 17.58 feet to a point;

49. North 40°06'05" East, 49.93 feet to a point;

50. North 61°40'45" East, 27.30 feet to a point;

51. North 39°59'33" East, 25.03 feet to a point;

52. North 30°19'01' East, 51.60 feet to a point;

53. North 38°14'07" East, 50.91 feet to a point;

54. North 34°59'07" East, 50.93 feet to a point;

55. North 41°50'37" East, 51.16 feet to a point; and

56. North 28°39'22" East, 29.31 feet to the place of beginning, containing 548,910 square feet or 12.6012 acres of land.

SUBJECT TO a right of way for ingress and egress to Crain Highway, recorded among the aforesaid Land Records in Liber JHH 707 at Folio 207.

SUBJECT TO an agreement recorded among said Land Records in Liber 2367 at Folio 218.

SUBJECT TO a subdivision agreement recorded among said Land Records in Liber 2357 at Folio 126.

IRH 0001894

McF:gfg ( 5-Sep-86  7:41 9:59/3)
MHF Multi-Family HELP

BOOK **4154** PAGE  254

**AGREEMENT AND DECLARATION**
**OF COVENANTS AND RESTRICTIONS**

THIS **AGREEMENT AND DECLARATION OF COVENANTS AND**
**RESTRICTIONS** (the "Declaration") is made on September 22   ,
1986, by and between GLEN BURNIE ASSOCIATES LIMITED
PARTNERSHIP a limited partnership organized and existing
under the laws of the State of Maryland ("Declarant") and the
COMMUNITY DEVELOPMENT ADMINISTRATION ("CDA"), a division of
the DEPARTMENT OF ECONOMIC AND COMMUNITY DEVELOPMENT
("DECD"), a principal department of the State of Maryland.

**EXPLANATORY STATEMENT**

Declarant has requested CDA, and CDA has agreed, to
provide construction and permanent financing in the amount of
$447,285.00 (the "Loan") to rehabilitate a "community
development project "within the meaning of Sections 266DD-1
through 266DD-2 of Article 41 of the Annotated Code of
Maryland, as amended, known as "Glenview Garden Apartments"
(the "Project") which Project will be located on a certain
parcel of real property owned in fee simple by the Declarant,
described in Exhibit A, composed of 12.6012 acres, more or
less, and located in Glen Burnie, Maryland (the "Property").
The Loan is secured by a deed of trust of even date herewith
by and between Declarant and certain trustees for the benefit
of CDA (the "CDA Mortgage").  In order to induce CDA to make
the Loan for the Project, and to satisfy certain conditions
existing under Section 103 of the Internal Revenue Code of
1954, as amended, and the regulations promulgated thereunder
(collectively, the "Code") applicable to CDA's tax-exempt
revenue obligations, the proceeds of which are to be used to
fund the Loan (the "Tax Exempt Bonds" or the "Bonds"), the
Declarant is willing to subject the Property to certain
covenants and restrictions which are contained in this
Declaration.  The Property is subject to the lien of a
mortgage or deed of trust (the "Superior Mortgage") which is
superior to the CDA Mortgage and this Declaration.

NOW, **THEREFORE**, in consideration of the premises
set forth in the Explanatory Statement and for other good and
valuable consideration, the receipt and sufficiency of which
the parties acknowledge, the parties agree as follows:

1.   Covenants Running with the Land

A124

XMcF:sfs ( 5-Sep-86  8:13 D36/9)
MHP Multi-Family HELP                                    Page 2

BOOK **4154** PAGE  **255**

        Declarant declares that the Property and every part of it is and shall be owned (legally and beneficially), leased, or otherwise conveyed, transferred, developed, rehabilitated, improved, built upon, occupied, or otherwise used, subject to the covenants and restrictions set forth in paragraphs 2-4 below (collectively, the "Restrictive Covenants").  The Restrictive Covenants shall run with the Property and every part of it for all purposes and shall be binding upon Declarant and all property owners, tenants, licensees, occupants, and their successors in interest with respect to the Property and shall inure to the benefit of Declarant and CDA and their respective successors and assigns.

    2.   Rental Requirement.

        All of the dwelling units in the Project shall be rented or available for rental on a continuous basis to the general public.

    3.   Low or Moderate Income Occupancy Requirement.

        At least 20% of the dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently becomes, a "targeted area project") shall be occupied by "Individuals of Low or Moderate Income" as defined below.

    4.   Duration and Modification.

    4.1   Duration.  Unless terminated sooner in accordance with the provisions of Paragraph 4.2, the Restrictive Covenants shall continue and remain in full force and effect at all times with respect to the Property and each part of it, now or hereafter made subject to the Restrictive Covenants for the following periods:

    4.1.1    With respect to the Rental Requirement set forth in Paragraph 2 above, for the longer of (a) the Qualified Project Period or (b) the remainder of the term during which the portion of Tax Exempt Bonds allocable to the Loan are outstanding;

    4.1.2    With respect to the Low or Moderate Income Occupancy Requirement set forth in paragraph 3 above, for the Qualified Project Period.

    4.2   Termination and Modification.

Glenview_000002

BOOK **4154** PAGE 256

4.2.1    This Declaration, or any provisions of it, or any of the Restrictive Covenants, may be terminated, extended, modified, or amended upon an amendment to or modification of Section 103(b)(4)(A) of the Code, and, in each case, only upon approval by the Maryland Housing Fund ("MHF"), which is the entity insuring the Loan (the "Mortgage Insurer"), and receipt by CDA of an opinion of bond counsel of nationally recognized standing in the field of law applicable to municipal finance acceptable to CDA and the trustee under the indenture authorizing the issuance of the Bonds, to the effect that upon such termination, extension, modification or amendment interest on the Bonds shall remain exempt from federal income taxation.  Such termination, extension, modification, or amendment shall be in writing and shall be effective only after approval by the Mortgage Insurer, execution by CDA and Declarant, and recordation among the land records of Anne Arundel County, Maryland.  For purposes of execution of  the instrument evidencing such termination, extension, modification or amendment, Declarant irrevocably appoints CDA its attorney-in-fact, with full power and authority to execute all documents and do all acts necessary or desirable to give effect to such termination, extension, modification, or amendment.

4.2.2    Notwithstanding any provisions of Paragraph 4.1 or 4.2.1 to the contrary, this Declaration and the Restrictive Covenants shall automatically terminate in the event of foreclosure or conveyance by deed in lieu of foreclosure; however, the provisions of this Paragraph 4.2.2 shall cease to apply in the event of foreclosure or conveyance by deed in lieu of foreclosure or similar event if, at any time subsequent to such event and during the Qualified Project Period, the obligor of the acquired purpose obligation (as defined in Treas. Reg. §1.103-13(b)(4)(iv)(A)) or a related person (as defined in Treas. Reg. §1.103-10(e)) obtains an ownership interest in the Project for tax purposes.

5.    Effect of Headings.

The headings of the paragraphs in this Declaration are for convenience only and do not affect the meanings or interpretation of the contents.

6.    Legal Action Upon Violation.

6.1  Violation of any of these Restrictive Covenants may be enjoined, abated, restrained or otherwise remedied by appropriate legal or equitable proceedings. Proceedings to restrain violation of these Restrictive

A126

Glenview_000003

BOOK 4154 PAGE 257

Covenants may be brought at any time that such violation
appears reasonably likely to occur in the future. In the
event of proceedings brought by CDA or any person acting on
behalf of CDA to enforce or restrain violation of any of
these Restrictive Covenants, or to determine the rights or
duties of any person under this Declaration, CDA or any
person acting on behalf of CDA, if it or they prevail in such
proceedings, may recover reasonable attorneys' fee to be
fixed by the court, in addition to court costs and any other
relief awarded by the court in such proceedings.

　　　　6.2  If HUD is the insurer of the loan secured
by the Superior Mortgage

　　　　　　(a)  failure to comply with any of the
Restrictive Covenants shall not be a default under the
Superior Mortgage; and

　　　　　　(b)  enforcement of  these Restrictive
Covenants will not result in any claim against the Project,
the Superior Mortgage proceeds, any reserve or deposit
required by HUD in connection with the Superior Mortgage
transaction, or the rents or other income from the Property
other than (i) available surplus cash, if the Mortgagor is
profit-motivated, or (ii) available distributions and
residual receipts authorized for release by HUD, if the
Mortgagor is limited-distribution.

　　7.　　Enforceability.

　　　　　The Restrictive Covenants shall bind Declarant
and its heirs, successors and assigns, and shall inure to the
benefit of and be enforceable by CDA and its successors and
assigns.  The failure of CDA to enforce any of the
Restrictive Covenants shall not be deemed a waiver of the
right to enforce them thereafter.  There shall be no waiver
of any of the Restrictive Covenants except in accordance with
Paragraph 4.2 above.

　　8.　　Grantee's Covenants.

　　　　　Each grantee accepting a deed, lease or other
instrument conveying any interest in the Property, whether or
not it incorporates or refers to this Declaration, covenants
for itself, and its heirs, successors and assigns to observe,
perform and be bound by the Restrictive Covenants and, unless
otherwise specifically permitted by CDA, to incorporate them
by reference in any instrument of conveyance; however, this
covenant shall not bind a grantee (other than the Declarant
or a related person as defined in the Code) upon involuntary

A127

BOOK **4154** PAGE **258**

conveyance of the Property (e.g., through foreclosure or deed
in lieu of foreclosure), as specifically permitted by the
Code.

    9.   <u>Definitions</u>.

        As used in this Declaration, the following
terms have the following respective meanings:

        "Individuals of Low or Moderate Income" means
"individuals of low or moderate income" as determined by the
Secretary of the United States Department of the Treasury in
a manner consistent with determinations of lower income
families under Section 8 of the United States Housing Act of
1937 ("Section 8") (or if such program is terminated, under
such program as in effect immediately before such
termination), except that the percentage of median gross
income which qualifies as low or moderate income shall be
80%.

        "Qualified Number of Days" means 50% of the
number of days from the date of issuance of the Tax Exempt
Bonds until the maturity date of the Tax Exempt Bonds with
the longest maturity, which is a period equal to 4,133 days.

        "Qualified Project Period" means a period
beginning on the first day on which 10% of the units in the
Project are occupied until the later of (1) the date which is
10 years after the date on which 50% of the units in the
Project are occupied, (2) the date which is a Qualified
Number of Days after the date of initial occupancy of the
Project, or (3) the date on which any assistance provided
with respect to the Project under Section 8 terminates.  For
purposes of this definition and Paragraph 3 above, "occupied"
or "occupancy" refer only to occupancy on or after the
initial closing of the Loan and do not include occupancy
before such initial closing.

    10.   <u>Terminology</u>.

        Terminology expressed in any gender and number
is employed for convenient expression and not for purposes of
limiting the applicability of the provisions of this
Declaration.  The use of the singular includes the plural and
the use of any gender includes all genders.

    11.   <u>Subordination</u>.

        This Declaration and the Restrictive Covenants
are subordinate to the deed of trust on the Property insured

Glenview_000005

MMcPlgfg ( 5-Sep-86  8:13 D36/9)
MHP Multi-Family HELP                                    Page 6

BOOK 4154 PAGE 259

by the Mortgage Insurer.  In the event of foreclosure or
conveyance by deed in lieu of foreclosure, this Declaration
and the Restrictive Covenants shall automatically terminate;
however, the provisions of this Paragraph shall   cease to
apply in the event of foreclosure or conveyance by deed in
lieu of foreclosure or similar event if, at any time
subsequent to such event and during the Qualified Project
Period, the obligor of the acquired purpose obligation (as
defined in Treas. Reg. §1.103-13(b)(4)(iv)(A)) or a related
person (as defined in Treas. Reg. §1.103-10(e)) obtains an
ownership interest in the Project for tax purposes.

        IN WITNESS WHEREOF, the parties have signed and
delivered this Agreement and Declaration of Covenants and
Restrictions as of the date first written above.


WITNESS:                    COMMUNITY DEVELOPMENT
                               ADMINISTRATION

Virginia C. Sallett      By: _Nancy S. Rase_
                             Authorized Officer

                             _Nancy S. Rase_
                             [printed name of declarant]


WITNESS:                    GLEN BURNIE ASSOCIATES LIMITED
                                 PARTNERSHIP

_Cynthia Holland_        By: _Den Koubek_        (SEAL)
                             Dennis Koubek, General Partner

                         By: Glenview Limited Partnership,
                             General Partner

_Ang. M. Uklinig_        By: _John Mergen_       (SEAL)
                             John Mergen
                             General Partner

                         By: McShea & Company,
                             General Partner

ATTEST: [Corporate Seal] By: _John F. McShea III_
                             John F. McShea, III
                             Senior Vice President

A129

MMcF:gfg ( 5-Sep-86  9:13 D*6/9)
MHF Multi-Family HELP                                    Page 7

BOOK **4154** PAGE **260**

STATE OF MARYLAND:              COUNTY OF <u>Montgomery</u>  : To Wit:

    **I HEREBY CERTIFY** that on this <u>19</u> day of <u>September</u> ____, 1986, before me, a Notary Public for the State and county described above, personally appeared John F. McShea, III,  known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he or she is the Senior    Vice President of McShea & Company, Inc.,a General Partner of Glenview Limited Partnership, the Managing General Partner of Glen Burnie Associates, a Maryland partnership, that he or she has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    **IN WITNESS WHEREOF**, I have set my hand and Notarial Seal, the day and year first above written.

                         *Virginia A. Wilburn*
                            Notary Public

My Commission expires: ___7/1/90___

STATE OF MARYLAND:              COUNTY OF <u>Montgomery</u>  : To Wit:

    **I HEREBY CERTIFY** that on this <u>19</u> day of <u>September</u> ____, 1986, before me, a Notary Public for the State and county described above, personally appeared John Mergner, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he or she is the General Partner of Glenview Limited Partnership, a General Partner of Glen Burnie Associates Limited Partnership, a Maryland partnership, that he or she has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    **IN WITNESS WHEREOF**, I have set my hand and Notarial Seal, the day and year first above written.

                         *Virginia A. Wilburn*
                            Notary Public

My Commission expires: ___7/1/90___

A130

MMcF:gfg ( 5-Sep-86  8:13 036/9)
MHP Multi-Family HELP                                      Page 9

BOOK **4154** PAGE **261**

STATE OF MARYLAND:            COUNTY OF <u>Montgomery</u>  : To Wit:

    **I HEREBY CERTIFY** that on this 19ᵗʰ day of September
_____, 1986, before me, a Notary Public for the State and
county described above, personally appeared Dennis Koubek,
known to me or satisfactorily proven to be the person whose
name is subscribed to the foregoing instrument, who
acknowledged that he or she is the General Partner of Glen
Burnie Associates Limited Partnership,  a Maryland
partnership, that he or she has been duly authorized to
execute and has executed, such instrument on its benalf for
the purposes set forth in it, and that such execution is its
act and deed.

    **IN WITNESS WHEREOF**, I have set my hand and Notarial
Seal, the day and year first above written.

                                _____
                                     Notary Public

My Commission expires: July 1, 1990

STATE OF MARYLAND:            COUNTY OF <u>Anne Arundel</u> : To Wit:

    **I HEREBY CERTIFY** that on this 22nd day of September
_____, 1986, before me, a Notary Public for the State
and county described above, personally appeared Nancy S.
Rose_____, known to me or satisfactorily proven
to be the person whose name is subscribed to the foregoing
instrument, who acknowledged that he or she is an Authorized
Officer of the Community Development Administration, a
division of the Department of Economic and Community
Development, that he or she has been duly authorized to
execute and has executed, such instrument on its behalf for
the purposes set forth in it, and that such execution is its
act and deed.

    **IN WITNESS WHEREOF**, I have set my hand and Notarial
Seal, the day and year first above written.

                                _____
                                     Notary Public

My Commission expires: 7-1-90

A131

BOOK 4154 PAGE 262

## DESCRIPTION
### RESIDUE SECTION ONE, GLENVIEW GARDENS
### THIRD ELECTION DISTRICT
### ANNE ARUNDEL COUNTY, MARYLAND

. . . being part of SECTION ONE, as shown on a plat of subdivision entitled, "SECTION ONE and TWO, GLENVIEW GARDENS," recorded among the Land Records of Anne Arundel County, Maryland, in Plat Book 41 at Folio 5, and being more particularly described as follows:

BEGINNING for the same at a point on the northerly or North 76°00' 34" East, 271.08 foot line, as shown on the aforesaid plat of subdivision, distant 98.21 feet easterly of the westerly end thereof, said point also being on the easterly right of way line of Crain Highway, U.S. Route 301, as shown on State Roads Commission of Maryland Right of Way Plat No. 45802, distant 51.53 feet right of and radial to baseline station 52+78.58, as shown on said right of way plat and running thence with said easterly right of way line and with the southerly, westerly and northerly plat lines, as shown on plats of subdivision entitled, "Revised Plan of Section One, Rippling Estates" and "Section Two, Rippling Estates," recorded among the aforesaid Land Records in Plat Book 34 at Folio 44, and Plat Book 34 at Folio 32, respectively, the following three (3) courses:

1. North 76°00'34" East, 172.87 Feet to a point;

2. South 26°16'16" East, 1761.27 Feet to a point; and

3. South 37°36'09" West, 743.32 Feet to the southeasterly corner of "Crainmont Apartments," as per plat thereof, recorded among said Land Records in Plat Book 35 at Folio 23; thence with a part of the easterly or North 26°15'45" West, 1975.43 foot line, as shown on said plat of subdivision;

4. North 26°15'31" West, 877.29 feet to the point of division between the aforesaid Sections One and Two, Glenview Gardens; thence with said division line, the following thirty-two (32) courses:

5. North 63°44'29" East, 121.18 feet to a point;

6. North 18°44'29" East, 10.00 feet to a point;

7. North 26°15'31" West, 120.00 feet to a point;

8. North 63°44'29" East, 147.00 feet to a point;

9. South 26°15'31" East, 127.24 feet to a point;

10. South 63°44'29" West, 5.00 feet to a point;

11. South 26°15'31" East, 112.00 feet to a point;

12. South 63°44'29" West, 28.00 feet to a point;

13. South 26°15'31" East, 50.00 feet to a point;

14. North 63°44'29" East, 5.00 feet to a point;

15. South 26°15'31" East, 108.00 feet to a point;

16. South 63°44'29" West, 60.00 feet to a point;

17. South 26°15'31" East, 108.00 feet to a point;

18. North 63°44'29" East, 100.95 feet to a point;

19. North 26°15'31" West, 136.39 feet to a point;

A132

BOOK **4154** PAGE **263**

- 2 -

20.  North 63°44'29" East, 52.00 feet to a point;

21.  North 26°15'31" West, 71.60 feet to a point;

22.  South 63°44'29" West, 15.00 feet to a point;

23.  North 26°15'31" West, 95.00 feet to a point;

24.  North 63°44'29" East, 92.00 feet to a point;

25.  North 26°15'31" West, 50.00 feet to a point;

26.  South 63°44'29" West, 90.00 feet to a point;

27.  North 26°15'31" West, 95.00 feet to a point;

28.  North 63°44'29" East, 65.00 feet to a point;

29.  North 26°15'31" West, 50.00 feet to a point;

30.  North 63°44'29" East, 118.00 feet to a point;

31.  South 26°15'31" East, 9.00 feet to a point;

32.  North 63°44'29" East, 100.00 feet to a point;

33.  North 26°15'31" West, 29.00 feet to a point;

34.  North 63°44'29" East, 28.00 feet to a point; and

35.  North 26°16'16" West, 98.11 feet to a point; and

36.  North 54°10'43" West, 10.00 feet to a point on the easterly
     right way line of Nolpark Court, 50 feet wide, conveyed by Glen
     Burnie Associates to Anne Arundel County, Maryland, and
     recorded among said Land Records in Liber 2926 at Folio 737;
     thence with said easterly and northerly right of way lines of
     said Nolpark Court, the following eleven (11) courses:

37.  68.39 feet along the arc of a curve, deflecting to the left,
     having a radius of 50.00 feet and a chord bearing North
     03°21'34" East, 63.18 feet to a point of reverse curvature;

38.  21.30 feet along the arc of a curve, deflecting to the right,
     having a radius of 75.00 feet and a chord North 34°24'20" West,
     21.22 feet to a point of tangency;

39.  North 26°16'16" West, 645.57 feet to a point of curvature;

40.  372.19 feet along the arc of a curve, deflecting to the left,
     having a radius of 185.00 feet and a chord bearing North
     83°54'23" West, 312.53 feet to a point of tangency;

41.  South 38°27'30" West, 70.34 feet to a point of curvature;

42.  51.73 feet along the arc of a curve, deflecting to the left
     having a radius of 125.00 feet and a chord bearing South
     26°30'12" West, 51.36 feet to a point of tangency;

43.  South 14°44'53" West, 25.00 feet to a point of curvature;

44.  32.95 feet along the arc of a curve, deflecting to the right,
     having a radius of 75.00 feet and a chord bearing South
     27°20'08" West, 32.69 feet to a point of tangency;

A133

Glenview_000010

BOOK **4154** PAGE **264**

- 3 -

45. South 39°55'20" West, 15.00 feet to a point;

46. South 84°55'20" West, 35.36 feet to a point; and

47. North 50°04'40" West, 39.14 feet to a point on said easterly right of way line of Crain Highway; thence with said easterly right of way line the following nine (9) courses:

48. North 37°12'57" East, 17.58 feet to a point;

49. North 40°06'05" East, 49.93 feet to a point;

50. North 61°40'45" East, 27.30 feet to a point;

51. North 39°59'33" East, 25.03 feet to a point;

52. North 30°19'01" East, 51.60 feet to a point;

53. North 38°14'07" East, 50.91 feet to a point;

54. North 34°59'07" East, 50.93 feet to a point;

55. North 41°50'37" East, 51.16 feet to a point; and

56. North 28°39'22" East, 29.31 feet to the place of beginning, containing 548,910 square feet or 12.6012 acres of land.

SUBJECT TO a right of way for ingress and egress to Crain Highway, recorded among the aforesaid Land Records in Liber JHH 707 at Folio 207.

SUBJECT TO an agreement recorded among said Land Records in Liber 2367 at Folio 218.

SUBJECT TO a subdivision agreement recorded among said Land Records in Liber 2357 at Folio 126.

*After recording please return to:*

THE SENTINEL TITLE CORPORATION
400 E. PRATT ST., SUITE 606
BALTIMORE, MARYLAND 21202
547-1111

Mailed to:

A134

FHA FORM NO. 1734
Revised April 1966
(Corporate, Sec. 221 (d) (3))
(Below Market Interest Rate)

## SECURED NOTE

6-19-610432

July 1, 1968
*(Date)*

Prince George's County, Ma
*(County and State)*

$ 2,247,800.00

FOR VALUE RECEIVED, the undersigned, __F & S CORPORATION__ , with its pr
a corporation organized and existing under the laws of the State of __Maryland__ , with its pr
office and place of business at __1832 M Street, N. W., Washington, D. C.__
acting by and through its duly authorized officers, promises to pay to __ASSOCIATED MORTGAGE__
__COMPANIES, INC.__ , a corporation organized and existing under the
__the State of Delaware__ , or order, the principal sum of __Two Million Tw__
__Forty-Seven Thousand Eight Hundred__ Dollars ($ __2,247,800.00__ ), with
from the date hereof at the rate of __six and three-quarters__ , per centum ( __6 3/4__
~~per annum (market rate) on the unpaid balance up to and including the date of final endorsement hereof I~~
~~Federal Housing Commissioner; thereafter interest shall be payable at the rate of~~
~~per centum ( %) per annum (below market rate)~~ on the unpaid balan
paid.

The principal and interest under this note shall be payable in the following manner:

Interest payable monthly on the first day of __August__ , 19 __68__ , and on the first
each month thereafter as hereinabove set forth. Commencing on the first day of __May__
19 __70__ , installments of interest and principal shall be paid in the sum of __Eight Thousand Forty-Si__
__and Seventy-Eight Cents__ ——Dollars ($ __8,046.78__ ), each, suc
ments to continue monthly thereafter on the first day of each succeeding month until the entire indebted
has been paid. In any event, the balance of principal, if any, remaining unpaid, plus accrued interest,
due and payable on __April 1, 2010__ ——19——. The installments of interest and principal
applied first to interest at the rate of __six and three-quarters__ per centum ( __6 3/4__
annum upon the principal sum or so much thereof as shall from time to time remain unpaid, and the bala
thereof shall be applied on account of principal. ~~In the event that final endorsement has not taken plac~~
~~one month prior to the aforesaid date for commencement of installments of interest and principal, then~~
~~signed shall be required to pay the aforesaid installments of principal and interest (calculated at the t~~
~~ket interest rate), plus an additional amount representing the difference between interest at the below~~
~~ket interest rate), plus an additional amount representing the difference between interest at the below~~
~~and interest at the market rate specified in the preceding paragraph for each month or part of a month r~~
~~cedes final endorsement. Notwithstanding anything herein to the contrary, such payment shall be appli~~
~~interest at the market rate and then as principal. After final endorsement the additional interest amoun~~
~~longer be payable.~~

Both principal and interest under this note, together with additional payments set forth in the m
(deed of trust) (security deed), shall be payable at the office of __Associated Mortgage Companies__
__1120 Connecticut Avenue, N. W.__ in __Washington, D. C.__
or such other place as the holder may designate in writing.

In the event that any installment due hereunder becomes delinquent for more than 15 days, there
due, in addition to any other sums due hereunder, a sum equal to two cents on each dollar so delinqu

~~The debt evidenced by this note may not be prepaid either in whole or in part prior to the final~~
~~date hereof without the prior written approval of the Federal Housing Commissioner except a maker w~~
~~limited dividend corporation may prepay without such approval after 20 years from the date of final e~~
~~of this note by the Federal Housing Commissioner. Prepayments may only be made in an amount equa~~
~~or more monthly payments on principal next due on the first day of any month prior to maturity upon a~~
~~thirty (30) days' prior written notice to the holder of this note.~~

If default be made in the payment of any installment due under this note or the ~~mortgage (deed o~~
(security deed) securing this note, and if such default is not remedied prior to the due date of the ne
ing installment, or upon the breach of any covenant under the terms of the ~~mortgage~~ (deed of trust) (s
deed), the holder of this note, at its option, may declare the whole of the principa
any balance thereof, and other sums of money secured by said ~~mortgage~~ (deed of trust) (security dee
ately due and payable. Failure to exercise this option shall not constitute a waiver of the right to e
the same in the event of any subsequent default.

No default shall exist by reason of nonpayment of any required installment of principal so long
amount of optional additional prepayments of principal already made equals or exceeds the amount o
quired installment.

IRH 0003850

This note is secured by a ~~mortgage~~ (deed of trust) ~~(security deed)~~ of even date herewith on real and personal property located in __Prince George's__ County, __Maryland__ and all the provisions of said instrument are incorporated herein and are to be deemed a part hereof as fully as though herein set out.

If this note be placed in the hands of an attorney for collection, or if action be instituted thereon, all parties now or hereafter personally liable for the indebtedness hereby evidenced jointly and severally agree to pay, in addition to the principal and interest due, all such costs, expenses and attorney's fees as may be allowable under the laws of the jurisdiction and found by the court to be reasonable and just.

Presentment, protest, and notice of protest are hereby waived by the maker.

IN WITNESS WHEREOF, the undersigned __F & S Corporation__ has caused this note to be executed in its name and behalf by its President __Eugene F. Ford__ and its corporate seal to be hereunto affixed, attested by its/Secretary, both thereunto duly authorized the day and year first above written.            Assistant

(CORPORATE SEAL)

ATTEST:

By __Lee Rays__
Asst. Secretary

F & S CORPORATION

By __Eugene F. Ford__
Eugene F. Ford,    President

I HEREBY CERTIFY that this is the note described in, and secured by a ~~mortgage~~ (deed of trust) ~~(security deed)~~ of even date herewith and in the same principal amount as herein stated, on real estate in the County of __Prince George's__, State of __Maryland__

Dated this __29__ day of __July__, 19 __68__.

__Lillian M. M. Gowan__
Notary Public, D. C.

My Commission expires __August 31, 1971.__

STATE OF _____

LOAN No. _____

**NOTE**

TO

No. 000-55036-LDP

Insured under Section 221(d)(3) of the National Housing Act and Regulations thereunder of the Federal Housing Commissioner

In effect on __Feb. 14, 1968__

To the Extent of Advances Approved by the Commissioner

FEDERAL HOUSING COMMISSIONER

By ____
(Authorized Agent)

Date __Sept. 17, 1968__

A total sum of $ __2,347,800__ has been approved for insurance hereunder by the Commissioner

FEDERAL HOUSING COMMISSIONER

By ____
(Authorized Agent)

Date __February 25, 1970__

Reference is made to the Act and to the Regulations thereunder covering assignments of the insurance protection on this note.

17645-P Rev. 4/66                FHA-Wash., D.C.

PAY TO THE ORDER OF
PITTSBURGH NATIONAL BANK
WITHOUT RECOURSE.

ASSOCIATED MORTGAGE COMPANIES, INC.

By: ____
George R. Simmons, Jr.
Asst. Vice President

PAY TO THE ORDER OF
GOVERNMENT NATIONAL MORTGAGE ASSOCIATION
WITHOUT RECOURSE.

PITTSBURGH NATIONAL BANK

By: ____
Tracy E. Greenholt
Assistant Vice President

IRH 0003851

ALLONGE

To be attached to and made a part of the Secured Note of F & S Corporation dated July 1, 1968, in the principal sum of $2,247,800.00 payable to Associated Mortgage Companies, Inc.

By Modification Agreement dated July 1, 1968, the aforesaid Note was modified as follows:

1. So that the maker thereof shall be the Venture, and not the F & S Corporation;

2. By inserting in the first paragraph thereof, after the words "with interest from the date hereof at the rate of six and three-quarters per centum (6 3/4%) per annum" the following: "(market rate) on the unpaid balance up to and including the date of final endorsement hereof by the Federal Housing Commissioner; thereafter interest shall be payable at the rate of three per (3%) per annum (below market rate) on the unpaid balance until paid.";

3. By striking out of the fourth sentence of the third paragraph thereof "six and three-quarters per centum (6 3/4%)" and inserting in lieu thereof "three per centum (3%)";

4. By inserting in the third paragraph thereof, starting in line 10 after the words "thereof shall be applied on account of principal.", the following: "In the event that final endorsement has not taken place at least one month prior to the aforesaid date for commencement of installments of interest and principal, then the undersigned shall be required to pay the aforesaid install- ments of principal and interest (calculated at the below market interest rate), plus an additional amount representing the difference between interest at the below market rate and interest at the market rate specified in the preceding paragraph for each month or part of a month that precedes final endorsement. Notwithstanding anything herein to the contrary, such payment shall be applied first to interest at the market rate and then to principal. After final endorse- ment the additional interest amount shall no longer be payable.";

5. By adding at the end of the third paragraph thereof, the following: "The maker of this note (i.e., Indian Head Manor Joint Venture) assumes no personal liability for the payment hereof except as set out in the Deed of Trust of even date herewith given to secure this indebtedness."; and

6. By inserting after the fifth paragraph thereof, the following new paragraph:

"The debt evidenced by this note may not be prepaid either in whole or in part prior to 20 years from the date of final endorsement of this note by the Federal Housing Commissioner without the prior written approval of the Commissioner; thereafter, the debt evidenced by this note may be prepaid either in whole or in part without the approval of the Commissioner. Prepayments may only be made in an amount equal to one or more monthly payments on principal next due on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder of the note."

IRH 0003852

INDIAN HEAD MANOR JOINT VENTURE, a Maryland General Partnership, in assuming a certain Note dated July 1, 1968, and executed by F & S CORPORATION, a Maryland Corporation, to ASSOCIATED MORTGAGE COMPANIES, INC., which Note is secured by a Deed of Trust dated July 1, 1968, and executed by F & S CORPORATION to Warren Browning and Albert Z. Hodge, Trustees, assumes no personal liability under said Note, which is attached hereto and incorporated herein by reference, except as set forth in said Deed of Trust as modified by a certain Modification Agreement dated July 1, 1968, which Deed of Trust as modified now secures said indebtedness.

INDIAN HEAD MANOR JOINT VENTURE

By _____
   Eugene F. Ford, General Partner

ASSOCIATED MORTGAGE COMPANIES, INC.

By _____
   Constantine Eugenides, Vice President

APPROVED:

FEDERAL HOUSING COMMISSIONER

By _____
   Authorized Agent

IRH 0003853

A138

3623  597

FHA FORM NO. 1730 Rev. 10/64
(Below Market Interest Rate)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

**REGULATORY AGREEMENT FOR LIMITED DISTRIBUTION MORTGAGOR PROJECTS
UNDER SECTION 221(d)(3) OF THE NATIONAL HOUSING ACT, AS AMENDED**

Project No.  000-55026-LDP

Mortgagee  Associated Mortgage Companies, Inc.

Amount of Mortgage Note  $2,247,800.00                    Date July 1, 1968

Mortgage : Recorded:        State        County        Date July 1, 1968

                            Book         Page

    This Agreement entered into this        first        day of        July        , 19 68 ,

between    INDIAN HEAD MANOR JOINT VENTURE, a general partnership organized and existing under the laws of the State of Maryland and having an office and place of business at ~~whose address is~~ 1832 M Street, N. W., Washington, D. C. (the partners of which are Eugene F. Ford and Bert L. Smokler & Company),

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Federal Housing Commissioner and his successors, (hereinafter called Commissioner).

    In consideration of the endorsement for insurance by the Commissioner of the above described note or in consideration of the consent of the Commissioner to the transfer of the mortgaged property, and in order to comply with the requirements of Section 221(d)(3) of the National Housing Act, as amended, and the Regulations adopted by the Commissioner pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage, or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property :

1. Owners, except as limited by paragraph 17 hereof, shall promptly make all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $ 627.46         per month unless a different date or amount is approved in writing by the Commissioner. Such fund, whether in the form of a cash deposit or invested in obligations of or fully guaranteed as to principal by the United States of America, shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Commissioner.

    (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved or required in writing by the Commissioner.

    (c) Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts fund by depositing thereto, with the mortgagee, within sixty days after the close of any fiscal year, any residual receipts, as that item is defined herein. Such fund shall be under the control of the Commissioner, and shall be disbursed only on the direction of the Commissioner, who shall have the power and authority to direct that such fund, or any part thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in ~~Schedule~~ Exhibit A attached hereto.

GOV-WAS_08075

A139

3623   598
- 2 -

4. (a) The Owners covenant that occupancy shall be permitted only upon execution of a lease which must contain clauses, among others, wherein the Lessee:

(1) certifies the accuracy of the statements made in the application and income survey,

(2) agrees that the family income, family composition and other eligibility requirements, shall be deemed substantial and material obligations of his tenancy; that he will comply promptly with all requests for information with respect thereto from the Owners or the Commissioner, and that his failure or refusal to comply with a request for information with respect thereto shall be deemed a violation of a substantial obligation of his tenancy,

(3) agrees that, if family income limitations for continuing occupancy which may be established from time to time by the Commissioner are exceeded the lease may be terminated upon receiving a thirty day notice in writing from the Owners, which may be given at the discretion of the Owners or at the direction of the Commissioner, he will quit and deliver up possession of the premises,

(4) agrees that at such time as the Owners or Commissioner may direct he will furnish to the Owners certification of the then current family income.

(b) Owners shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a schedule approved in writing by the Commissioner. Such accommodations shall not be rented for a period of less than thirty days or for more than one year. Commercial facilities, if any, shall be rented at not less than the rate approved by the Commissioner. Subleasing of accommodations shall be prohibited without prior written approval of Owners and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Commissioner thereof.

(c) The Owner shall have the right to charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owner and approved in writing by the Commissioner for any facilities and/or services which may be furnished by the Owner or others to such tenant upon his request, in addition to the facilities and services included in the approved "Rental Schedule".

(d) The Commissioner will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which owners have no effective control, or

(2) Deny the increase stating the reasons therefor.

5. (a) Owners shall not execute or file for record any instrument which imposes a restriction upon the sale, leasing, or occupancy of the property subject to the insured mortgage on the basis of race, color, or creed.

(b) Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(c) Owners agree that admission to the project shall be limited solely to families of low or moderate income, as defined by the Commissioner, and any such family whose income exceeds the limits established from time to time by the Commissioner, shall not be eligible for admission to the project.

(d) Owners agree that, if during the term of any lease the family income exceeds the maximum for continuing occupancy which may from time to time be established by the Commissioner, Owners will at their discretion, or upon direction of the Commissioner shall, give the lessee notice that the lease will be terminated or not renewed.

(e) Owners agree that (1) each applicant for tenancy will be required to certify to Owners the total current income of the family which shall include the aggregate overall income earned by each member of the family except dependent children; and (2) at such time as the Commissioner may direct, the household head will be required to furnish to Owners certification of the then current family incomes.

GOV-WAS_08076

A140

3623    600

8. Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within forty-five days.

9. (a) Owners shall provide for the management of the project in a manner satisfactory to the Commissioner. Any management contract entered into by Owners, or any of them, involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Commissioner addressed to the Owners. Upon receipt of such request Owners shall immediately terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Commissioner.

(e) Within sixty days following the end of each fiscal year the Commissioner shall be furnished with a complete annual financial report based upon an examination of the books and records of the mortgagor prepared in accordance with the requirements of the Commissioner, certified to by an officer or responsible "Owner" and, when required by the Commissioner, prepared and certified by a Certified Public Accountant, or other person acceptable to the Commissioner.

(f) At the request of the Commissioner, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash. Any owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

10. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice, thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

(a) (1) If the Commissioner holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(2) If said note is not held by the Commissioner - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;

GOV-WAS_08077

3623    599

- 3 -

(f) Owners agree that they will extend a preference or priority of occupancy to those families of low and moderate incomes who shall have certificates of eligibility as displaced families, and such preferred applicants shall be given priority in original admission to the project and in their placement on a waiting list to be maintained by the Owners.

6. Owners shall not without the prior written approval of the Commissioner :

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from "surplus cash", except for reasonable operating expenses and necessary repairs ;

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or any right to manage or receive the rents and profits thereof, unless the transferees or assignees assume the obligations of this Agreement by an instrument in writing satisfactory to the Commissioner;

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except from "surplus cash" and except on the following conditions :

(1) All distributions shall be made only as of and after the end of an annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the equity investment, and the right to such distributions shall be cumulative;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds;

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project;

(g) Require, as a condition of the occupancy or leasing of any unit in the project any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease.  Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account;

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner;

(i) Incur any liability, direct or contingent, on behalf of the partnership, other than for current operating expenses, exclusive of the indebtedness secured by the mortgage and necessarily incident to the execution and delivery thereof;

(j) Pay any compensation or make any distribution of income or other assets to any of its officers, directors, or stockholders;

(k) Enter into any contract or contracts for supervisory or managerial services.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the building covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

GOV-WAS_08078

A142

3625 601

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Commissioner in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

11. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

12. Owners agree that there shall be full compliance with the provisions of (1) any state or local laws prohibiting discrimination in housing on the basis of race, color, creed, or national origin; and (2) with the Regulations of the Federal Housing Administration providing for nondiscrimination and equal opportunity in housing. It is understood and agreed that failure or refusal to comply with any such provisions shall be a proper basis for the Commissioner to take any corrective action he may deem necessary including, but not limited to, the rejection of future applications for FHA mortgage insurance and the refusal to enter into future contracts of any kind with which the Owners are identified; and further, if the Owners are a corporation or any other type of business association or organization which may fail or refuse to comply with the aforementioned provisions, the Commissioner shall have a similar right of corrective action (1) with respect to any individuals who are officers, directors, trustees, managers, partners, associates or principal stockholders of the Owners; and (2) with respect to any corporation or any other type of business association, or organization with which the officers, directors, trustees, managers, partners, associates or principal stockholders of the Owners may be identified.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any other security for the note identified herein, and endorsed for insurance or held by the Commissioner;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Mortgagor" means the original borrower under the mortgage and its successors and assigns;

(d) "Owners" refers to the persons named in the first paragraph hereof and designated as "Owners", their successors and assigns; *[handwritten: partnership / its]*

(e) "Mortgaged Property" includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, such business being the furnishing of housing and other such activities as are incidental thereto;

(g) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

GOV-WAS_08079

A143

3623₆ 602

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held;

(h) "Residual Receipts" means any cash remaining after payment from "surplus cash" of all dividends or distributions declared by the corporation as provided in paragraph 6 (e) (1) hereof.

(i) "Family" means (a) two or more persons related by blood, marriage, or operation of law, who occupy the same unit; (b) a handicapped person who has a physical impairment which is expected to be of long-continued and indefinite duration, substantially impedes his ability to live independently, and is of such a nature that his ability to live independently could be improved by more suitable housing conditions; or (c) a single person, 62 years of age or older, or single persons less than 62 years of age but not more than 10% of the dwellings in the project 1/
(j) "Distribution" means any withdrawal or taking of cash or other assets of the project other than payment for reasonable expenses incident to its operation and maintenance;

(k) "Income" means all gross income, before taxes and other deductions, received by all members of the family, except a dependent child or children, as the latter is defined by the Internal Revenue Service.

(l) "Rental" for the purpose of determining occupancy eligibility includes shelter and all utilities (except telephone), such as heat, water, electricity and cooking fuel which may be included in the approved "Rental Schedule".

(m) "Equity Investment" shall be considered the product of the amount of the final endorsement of the insured mortgage and 11.11 per centum.

(n) "Default" means a default declared by the Commissioner when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice;

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Commissioner and his successors so long as the contract of mortgage insurance continues in effect; and during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

17. The following Owners: Indian Head Manor Joint Venture, Eugene F. Ford, individually, Bert L. Smokler & Company and any other person who, after the date hereinabove 2/ do not assume personal liability for payments due under the note and mortgage, to the reserve for replacements, or for matters not under their control, except:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

1/ shall be occupied by such persons.
2/ first written, may become a partner in Indian Head Manor Joint Venture.

175303-P Rev. 10/64                    HUD-Wash., D. C.

GOV-WAS_08080

3623    603

18. This Agreement shall become effective the date the note hereinabove referred to is initially endorsed for insurance by the Federal Housing Commissioner.

IN TESTIMONY WHEREOF, the parties hereto have caused this Agreement to be executed in their respective names as of the date hereinabove first written.

INDIAN HEAD MANOR JOINT VENTURE

By _____
   Eugene F. Ford, General Partner

          and

By: Bert L. Smokler & Company, General Partner

By _____
   Charles B. O'Neil, Senior Vice President

(SEAL)

Attest:

By _____
                    Secretary

FEDERAL HOUSING COMMISSIONER

By _____
                 Authorized Agent

GOV-WAS_08081

GOV-WAS_08082