- 8 -

**3623  604**

DISTRICT OF COLUMBIA     ) SS.

I HEREBY CERTIFY That, on this 29 day of July , 1968, before me,
the subscriber, personally appeared Eugene F. Ford, a General Partner of Indian
Head Manor Joint Venture, a general partnership, and on behalf of said Indian Head
Manor Joint Venture did acknowledge the foregoing instrument to be his act and deed as
a General Partner of Indian Head Manor Joint Venture.

WITNESS my hand and notarial seal the date first above written.

_Lillian M. McGowan_
Notary Public, D. C.

My Commission expires _August 31, 1971_

STATE OF MICHIGAN       )
                        ) SS.
COUNTY OF OAKLAND       )

I HEREBY CERTIFY That, on this 23rd day of July , 1968, before me,
the subscriber, personally appeared Charles B. O'Neil, Senior Vice President of
the Bert L. Smokler & Company, and on behalf of said corporation did acknowledge
the foregoing instrument to be the act and deed of said corporation as a General
Partner of Indian Head Manor Joint Venture.

WITNESS my hand and notarial seal the date first above written.

_Mary M. Lemcke_
Notary Public

My Commission expires _July 16, 1971_.

DISTRICT OF COLUMBIA     ) SS.

I HEREBY CERTIFY That, on this 30th day of July , 1968, before me,
the subscriber, personally appeared Albert M. Willard , the duly appointed
Authorized Agent of the Federal Housing Commissioner and the person who executed
the foregoing Regulatory Agreement by virtue of the authority vested in him by
24 C.F.R. 200.96 and did acknowledge said Regulatory Agreement to be his act and
deed for and on behalf of said Federal Housing Commissioner.

WITNESS my hand and notarial seal the date first above written.

_Leland E. Lane_
Notary Public

My Commission expires ___My Commission Expires January 1, 1972___

GOV-WAS_08083

A147

GOV-WAS_08084

EXHIBIT

Parcel "A" Thorne Property, as per plat thereof recorded in plat book WWW 59

folio 34, one of the land records of Prince George's County, Maryland.

GOV-WAS_08085

3623 606

235

After recording, please
Return to:
Mr. Albert M. Miller, Acting Director
Federal Housing Administration
400 First Street, N. W.
Washington, D.C. 20412

Received for record on the 16
Day of Aug A. D. - 1968
and the same day recorded in Liber
No. 3623 at Folio 597 &c
one of the Land Records
of Prince George's County, Maryland
W. Waverly Webb
Clerk of the Circuit Court

FHA Project No. 000-55026 LDP
Indian Head Manor
Prince George's County, Maryland

ASSUMPTION AGREEMENT

THIS AGREEMENT, made, entered into and dated as of May 26, 1969, by and between INDIAN HEAD MANOR ASSOCIATES LIMITED PARTNERSHIP (hereinafter referred to as the "Mortgagor") and the PITTSBURGH NATIONAL BANK (hereinafter referred to as the "Mortgagee"), WITNESSETH THAT:

WHEREAS, the INDIAN HEAD MANOR JOINT VENTURE (hereinafter referred to as the "Venture") was the maker of a certain promissory note (hereinafter referred to as the "Note"), dated July 1, 1968, in the principal sum of $2,247,800.00; and

WHEREAS, the Note is secured by a deed of trust, dated July 1, 1968, and recorded among the land records of Prince George's County, Maryland, in Liber 3623, Folio 447; as modified and amended by Modification Agreement, dated July 1, 1968, and recorded among the land records of Prince George's County, Maryland, in Liber 3623, Folio 586; and as further modified and amended by Modification Agreement, dated August 23, 1968, and recorded among the land records of Prince George's County, Maryland, in Liber 3636, Folio 631; which deed of trust, as modified and amended as aforesaid, is hereinafter referred to as the "Deed"; and

WHEREAS, that certain Regulatory Agreement (hereinafter referred to as the "Regulatory Agreement"), dated July 1, 1968, and recorded among the land records of Prince George's County, Maryland, in Liber 3623, Folio 597, between the Venture and the Federal Housing Commissioner is incorporated in the Deed by reference; and

WHEREAS, the Venture was converted into the Mortgagor; and

WHEREAS, because title to the real property encumbered by the Deed was vested in Bert L. Smokler & Company and Eugene F. Ford, as Tenants in Partnership, trading as Indian Head Manor Joint Venture, a Maryland General Partnership, rather than in the Venture itself, by Deed, dated May 26, 1969, and recorded among the land records of Prince George's County, Maryland, in Liber 3722, Folio 635, Bert L. Smokler & Company and Eugene F. Ford, as Tenants in Partnership, trading and doing business as Indian Head Manor Joint Venture, a Maryland General Partnership, conveyed the said property encumbered by the Deed to the Mortgagor; and

WHEREAS, the Mortgagee is the owner and holder of record of the Note and is also the Beneficiary under the Deed:

NOW, THEREFORE, in consideration of the premises, and Ten Dollars ($10.00) by the parties hereto each to the other paid, receipt of which is hereby acknowledged by each of the parties hereto, and other good and valuable considerations, the parties hereto, for themselves and their respective heirs, executors, administrators, successors and assigns, hereby declare:

SEC. 1. The Mortgagor hereby acknowledges that title to the aforesaid property conveyed to it by the aforesaid Deed of May 26, 1969, was conveyed to it subject to the Note, the Deed and the Regulatory Agreement, and the Mortgagor hereby expressly assumes and agrees to be fully bound by the Note, the Deed and the Regulatory Agreement.

SEC. 2. The Venture is hereby released from any further liability or responsibility under the Note, the Deed and the Regulatory Agreement.

SEC. 3. The Mortgagor hereby assumes and agrees to be fully bound by that certain Superseding Building Loan Agreement, dated July 1, 1968, between the Venture and Associated Mortgage Companies, Inc. and assigned by the latter to the Mortgagee.

DOJ0820758

- 2 -

SEC. 4.  The Trustees have executed this Agreement to acknowledge their assent to this Agreement and agree to continue to act in such capacity under the terms of the aforesaid Deed, as heretofore modified and amended as aforesaid.

SEC. 5.  Except as heretofore modified and amended as aforesaid, all of the terms, covenants, conditions and provisions of the Note, the Deed, and the Regulatory Agreement shall remain in full force and effect.

IN TESTIMONY WHEREOF, the parties hereto have caused this Agreement to be executed in their respective names as of the date hereinabove first written.

INDIAN HEAD MANOR ASSOCIATES LIMITED PARTNERSHIP

By _____
Eugene F. Ford, General Partner

PITTSBURGH NATIONAL BANK

By _____
Attorney-in-Fact
ASST. VICE PRESIDENT

IN TESTIMONY WHEREOF, Warren Browning and Albert Z. Hodge have signed this Agreement as Trustees.

_____        _____
Warren Browning, Trustee                Albert Z. Hodge, Trustee

Approved:    FEDERAL HOUSING COMMISSIONER

By _____
Authorized Agent

DOJ0820759

A152

- 3 -

DISTRICT OF COLUMBIA    ) ss.

I HEREBY CERTIFY That, on this ___ day of _____, 1970, before me, the subscriber, personally appeared Eugene F. Ford, a General Partner of Indian Head Manor Associates Limited Partnership, and on behalf of said limited partnership did acknowledge the foregoing instrument to be the act and deed of said limited partnership.

WITNESS my hand and notarial seal the date first above written.

_____
Notary Public, D. C.

My commission expires _____ January 1, 1972

DISTRICT OF COLUMBIA    ) ss.

I HEREBY CERTIFY That on the ___ day of _____, 1970, before me, the subscriber, personally appeared _____, Attorney-in-Fact for the Pittsburgh National Bank, and on behalf of said Bank did acknowledge the foregoing instrument to be the free act and deed of said Bank.

WITNESS my hand and notarial seal as of the date hereinabove first written.

_____
Notary Public, D. C.

✗ Asst V P

My commission expires _____

DISTRICT OF COLUMBIA    ) ss.

I HEREBY CERTIFY That, on the ___ day of _____, 1970, before me, the subscriber, personally appeared Warren Browning and Albert Z. Hodge, Trustees under the Deed of Trust referred to in the annexed Assumption Agreement and who signed said Agreement as such Trustees and acknowledged said Agreement to be their act and deed as such Trustees.

WITNESS my hand and notarial seal the date first above written.

_____
Notary Public, D. C.

My commission expires _____

✗ by Albert Z. Hodge, attorney in fact

DOJ0820760

## INDIAN HEAD MANOR LIMITED PARTNERSHIP I

### LIMITED PARTNERSHIP AGREEMENT

THIS AGREEMENT is made as of October 17 , 1983 by and among the undersigned parties.

### WITNESSETH:

WHEREAS, a limited partnership, known as "Indian Head Manor Associates Limited Partnership," was formed as of January 1, 1969 pursuant to the laws of the state of Maryland;

WHEREAS, a certificate of Limited Partnership ("Certificate") dated as of January 1, 1969 was recorded by the Clerk of the Circuit Court of Prince George's County, Maryland, on May 26, 1969 in Liber 97, Page 20;

WHEREAS, the Certificate was amended by an Amended Certificate dated June 18, 1969 and recorded on July 18, 1969 in Liber 98, Page 208, an Amended Certificate dated August 1, 1969 and recorded on December 3, 1969 in Liber 100, Page 153 and an Amended Certificate dated May 10, 1982 and recorded on June 24, 1982 in Liber 217, Page 278;

WHEREAS, a Limited Partnership Agreement dated as of August 1, 1969 ("1969 Agreement") was previously entered; and

WHEREAS, the parties hereto desire to enter this Limited Partnership Agreement ("Agreement") in order to reflect the terms and conditions of their agreement and understandings and to supersede in their entireties the 1969 Agreement and Certificate as previously amended.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound hereby, agree as follows:

1.  <u>Name of Limited Partnership</u>.  The parties hereby continue that limited partnership known as Indian Head Manor Associates Limited Partnership under the name of "Indian Head Manor Limited Partnership I" (the "Partnership").

2.  <u>Principal Office and Registered Agent of Partnership</u>.  The principal office and place of business of the Partnership shall be located at 8520 Connecticut Avenue,

WSH0220355

Suite 103, Chevy Chase, Maryland 20815.  The Partnership may
have such other or additional offices as the Managing General
Partner (as hereinafter defined in Section 11), in its sole
discretion, shall deem advisable.  The Registered Agent of
the Partnership shall be Mr. Timothy McShea, located at 8520
Connecticut Avenue, Suite 103, Chevy Chase, Maryland 20815.

    3.   <u>Business of the Partnership</u>.  The business of
the Partnership shall consist of owning and operating Indian
Head Manor Apartments (the "Apartments"), situated at
Livingston Road and Indian Head Highway, Fort Washington,
Maryland, and carrying on any and all activities related
thereto.

    The Partnership is authorized to execute a note and
mortgage in order to secure a loan to be insured by the
Assistant Secretary for Mortgage Credit of the Department of
Housing and Urban Development (hereinafter referred to as the
"Commissioner") and to execute a Regulatory Agreement and
other documents required by the Commissioner in connection
with such loan.  So long as a mortgage is outstanding, unpaid
and insured or held by the Commissioner, any incoming Partner
shall, as a condition of receiving an interest in the Part-
nership property, agree to be bound by the note, mortgage and
Regulatory Agreement and other documents required in connec-
tion with the FHA-insured loan to the same extent and on the
same terms as the other Partners; and, upon any dissolution,
no title or right to possession and control of the project,
and no right to collect the rents therefrom, shall pass to
any person who is not bound by the Regulatory Agreement in a
manner satisfactory to the Commissioner.

    The Partnership is further authorized:

    (a)  To provide dwelling accommodations for
families displaced from urban renewal areas or as a result of
governmental action and to assist and further the provision
of housing for moderate and low income families.

    (b)  To construct, operate, maintain and
improve, and to buy, own, sell, convey, assign, mortgage or
lease, any real estate and any personal property necessary or
incident to the provision of such housing.

    (c)  To borrow money and issue evidences of
indebtedness in furtherance of any or all of the objects of
its business; to secure the same by mortgage, pledge or other
lien.

- 2 -

WSH0220356

(d)  To apply for and obtain or cause to be obtained from the Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of Section 221(d)(3) or any other section or sections of the National Housing Act, as amended.

(e)  To enter into any kind of activity, and to perform and carry out contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the purposes of the Partnership.

(f)  To enter into a Regulatory Agreement or Agreements with the Commissioner and to be bound by the terms thereof to enable the Commissioner to carry out the provisions of the National Housing Act, as amended, which Regulatory Agreement or Agreements, upon execution, shall be binding upon the Partnership, its successors and assigns, so long as a mortgage is outstanding, unpaid and insured or held by the Commissioner.

(g)  To do any and all things necessary and proper for the accomplishment of the objects herein enumerated or necessary or incident to the protection and benefit of the Partnership.

(h)  Any other provisions of this Agreement to the contrary notwithstanding, so long as any property of the Partnership is encumbered by a mortgage insured, owned or held by the Commissioner, the Partnership shall not be voluntarily dissolved without the prior written consent of the Commissioner.

4.  <u>Filing of Certificate</u>.  The General Partners shall promptly prepare (or cause to be prepared), for execution by all of the Partners, an Amended and Restated Certificate of Limited Partnership (the "Amended and Restated Certificate") to be recorded in the appropriate office(s) in Maryland, and shall do all and any other acts and things requisite for the perfection of the Partnership as a limited partnership pursuant to the Revised Uniform Limited Partnership Act of the State of Maryland and may file the Amended and Restated Certificate in any other jurisdiction.

5.  <u>Partners; Partnership Interests</u>.

The General Partners are Mr. Eugene Ford and Indian Head Manor Limited Partnership II, a Maryland limited partnership.  Indian Head Manor Limited Partnership II, as set forth on Exhibit A, is being admitted to the Partnership pursuant to this Agreement and the Partnership is redeeming

- 3 -

WSH0220357

the limited partnership interest of the Limited Partners
listed on Exhibit B.  Unless the context otherwise clearly
indicates, (i) the terms "Partner" and "Partners" shall
include both the General Partners and the new Limited Partner
of the Partnership, and (ii) the term "partnership interest"
and "partnership interests" shall include both the general
partnership and limited partnership interests in the Partner-
ship.  The addresses of the Partners are shown on Exhibit A.
All references to Exhibit A are references to Exhibit A as
amended and in effect from time to time.

     6.   <u>Capital Contributions; Capital Accounts.</u>

     (a)  Upon the execution of this Agreement, the
Limited Partner shall contribute to the capital of the Part-
nership the sum set forth after its name on Exhibit A.

     (b)  In the event that at any time (or from time
to time) additional funds (in excess of available loans and
the aforesaid capital contributions) are required by the
Partnership for or in respect of its business or any of its
obligations, expenses, costs, liabilities or expenditures
(including, without limitation of the generality of the fore-
going, operating deficits), the Managing General Partner
shall have the right (but not the obligation) either (i) for
and on behalf of the Partnership, to borrow such funds, with
interest payable at then-prevailing rates, from commercial
banks, savings and loan associations and/or other lending
institutions or persons (including Partners); or (ii) to lend
such additional funds to the Partnership, for such periods of
time and at then-prevailing rates of interest (but not less
than one percent (1%) above the then prime rate at Maryland
National Bank, as the Managing General Partner, in its sole
discretion, may determine.

     (c)  The foregoing provisions of this Section
are not intended to be for the benefit of any creditor or
other person (other than a Partner in his capacity as a Part-
ner) to whom any debts, liabilities or obligations are owed
by (or who otherwise has any claim against) the Partnership
or any of the Partners; and no such creditor or other person
shall obtain any right under any such foregoing provision or
shall by reason of any such foregoing provision make any
claim in respect of any debt, liability or obligation (or
otherwise) against the Partnership or any of the Partners.

     (d)  The "capital account" of a Partner as of
any date means the amount of cash or the tax basis (net of
liabilities assumed), to the Partnership, of other property

- 4 -

WSH0220358

contributed by such Partner to the capital of the
Partnership:

   (1) increased by his distributive share of
each year's (or part thereof) -

     (A) taxable income (or items thereof)
       of the Partnership and

     (B) income of the Partnership which
       is exempt from tax.

   (2) decreased by his distributive share of
each year's (or part thereof) -

     (A) losses (or items thereof) of the
       Partnership,

     (B) expenditures of the Partnership
       not deductible in computing its
       taxable income and not properly
       chargeable to a capital account,
       and

     (C) the amount of any cash
       distributed to him and the fair
       market value of any property
       distributed to him in kind.

   If property is distributed, in kind, to one or more
Partners, then, to the extent such distribution does not
result in the Partnership recognizing income or loss equal to
the difference, if any, between the fair market value and tax
basis of the distributed property, each Partner's capital
account shall be adjusted to reflect his proportionate share
of such difference, except that if property is distributed in
kind to one or more Partners in reduction or satisfaction of
their interests in the Partnership and the Partnership does
not recognize gain or loss upon such distribution, then the
capital accounts of the remaining Partners shall be adjusted
in proportion to their remaining percentage interests in the
Partnership to reflect the difference between the basis of
the property so distributed and the portion of the capital
accounts of the distributees eliminated by such distribu-
tion.

   The Limited Partner's capital account shall not be
credited with any amount represented by a promissory note to
the Partnership until such promissory note has been either
paid or the Partnership has sold such note without recourse.

<div align="center">- 5 -</div>

WSH0220359

Interest paid by the Limited Partner on any such promissory note shall be income to the Partnership and shall not be credited to the Limited Partner's capital account except as it may share in all items of Partnership income.

   (e) The Limited Partner, in its capacity as such, shall not be required or obligated to contribute to the capital of the Partnership any amount beyond that set forth after its name in Exhibit A.

   ·(f) Except as specifically provided in this Agreement, no interest or other compensation shall be paid by the Partnership to any Partner with respect to his capital contribution to the Partnership or his capital account in the Partnership.

   7.  Profits and Losses.

   (a) For bookkeeping purposes, the profits of the Partnership shall be shared, and the losses of the Partnership shall be borne, by the Partners each year in the same manner as set forth in Section 7(b). In no case, however, shall the Limited Partner (in its capacity as a Limited Partner) be personally liable for any losses, expenses, costs, obligations or liabilities in excess of the amount of its capital contribution set forth after its name in Exhibit A.

   (b) (1) Except as provided in sub-paragraphs (2), (3) and (4) of this Section 7(b), for the purposes of Sections 702 and 704 of the Internal Revenue Code of 1954 (the "Code"), or the corresponding provisions of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, the Partners' distributive share of all Partnership items of income, gain, loss, deduction, credit or allowance for any Partnership accounting year or other period shall be allocated 98% to the Limited Partner and 2% to the General Partners in proportion to their respective percentages of Partnership interest.

   (2) Subject to the provisions of subparagraphs (3) and (4) of this Section 7(b), the Partners' distributive share of all Partnership items of income, gain, loss, deduction or credit allocable to any property contributed to the Partnership by a Partner shall be allocated so as to take into account the variation between the basis of the property to the Partnership and its fair market value at the time of contribution.

- 6 -

WSH0220360

(3)   Gain or loss on the sale of all or a substantial portion of, or interest in, the property of the Partnership shall be allocated, to the extent possible, first to Eugene Ford so that the portion of his capital account allocable to the property or interest sold (when compared to the remaining property of the Partnership, if any) is equal to 6% of the proceeds from such sale after payment of all debts and other obligations or liabilities of the Partnership, and thereafter to the Partners other than Eugene Ford in proportion to their percentages of Partnership interest.

(4)   If it is determined by the Managing General Partner (either upon the advice of the Partnership's counsel or tax accountants or as a result of an audit by the Internal Revenue Service) that an allocation of an item of deduction or loss to the Limited Partner under subparagraph (1) of this Section 7(b) did not (or would not) have substantial economic effect within the meaning of Section 704(b) of the Code, such item of deduction or loss shall be reallocated in a manner which does have substantial economic effect.  In the event of such a reallocation the Managing General Partner shall, as soon as possible thereafter, make such compensating special allocations of taxable income or of items of deduction and loss (having substantial economic effect) as will restore the capital accounts of the Partners to the balance such capital accounts would have had if the allocations pursuant to subparagraph (1) had had substantial economic effect.  If it deems it in the overall interests of the Partnership and the Partners to do so, the Managing General Partner may accomplish all or a part of the restoration of the capital accounts (to the balances which would have existed had the allocation under subparagraph (1) had substantial economic effect) by making special allocations of gross income.

(c)   In the event of the transfer of all or any part of a partnership interest (in accordance with the provisions of this Agreement) at any time other than the end of a Partnership accounting year, the distributive share of the partnership items referred to in Section 7(b) above (in respect of the partnership interest so tranferred), as computed for income tax purposes, shall be allocated between the transferor and the transferee in such manner as they reasonably agree but not in contravention of Federal income tax regulations, and absent such agreement by April 1 following the year of the transfer, then in such equitable manner as the Managing General Partner shall determine.

- 7 -

WSH0220361

(d)   The Limited Partner acquired its interest in the Partnership by purchase from prior Partners.  Under the Code the Limited Partner is therefore deemed to have contributed its proportionate share of the assets of the Partnership as of the date of this Agreement (such proportionate share of assets being hereinafter referred to as the "Contributed Assets").  All items of Partnership income, gain, loss, deduction or credit shall therefore be adjusted consistently with Section 704(c)(3) of the Code so as to treat the Limited Partner (in both its capacity as a General Partner and its capacity as a Limited Partner) as if such Limited Partner owned directly its undivided interest in the Contributed Assets.  Without limiting the generality of the foregoing, the following adjustments shall be made:

(1)   depreciation and amortization with respect to any Contributed Asset shall be allocated among the Partners in proportion to their respective tax bases in such Contributed Asset as of the date of this Agreement; and

(2)   any ordinary income recapture realized by the Partnership which is attributable to the sale or other disposition of a Contributed Asset shall be allocated among the Partners in proportion to the amount of depreciation or amortization allocated to each Partner with respect to such Contributed Asset prior to such sale or other disposition (including depreciation or amortization allocated to each Partner prior to the date of this Agreement).

8.   <u>Distributions to Partners.</u>

(a)   For the purposes of this Agreement, subject to applicable FHA regulations, "Net Cash Flow" means:

(1)   The taxable income for Federal income tax purposes as shown on the books of the Partnership -- increased by (i) the amount of depreciation deductions or amortization or similar non-cash deductions in lieu of depreciation taken in computing such taxable income, (ii) other non-cash deduction items including, but not limited to, pre-paid interest and prepaid management fees, if any, and (iii) any non-taxable income or receipts of the Partnership (excluding capital contributions and the proceeds of any mortgages or of any other obligations or loans of the Partnership) -- and reduced by (i) payments upon the principal of any mortgages upon Partnership property or of any other Partnership obligations or loans (including loans from Partners), (ii) expenditures for the acquisition of Partnership property (excluding inventory items) and for capital improvements and/or replacements (except to the extent financed through

- 8 -

WSH0220362

capital contributions, mortgages on Partnership property or any other Partnership obligations or loans or reserves previously set aside by the Partnership for such purposes), and (iii) such reserves for capital improvements and/or replacements, for repairs, for escrows, security deposits or the like, for tax and insurance payments, and for meeting anticipated expenses or other contingencies, as the Managing General Partner, in its sole discretion, shall deem to be reasonably necessary in the efficient conduct of the Partnership business; plus

   (2) Any other funds (including amounts previously set aside as reserves by the Managing General Partner, where and to the extent no longer regarded as reasonably necessary in the efficient conduct of the Partnership business) deemed available for distribution and designated as Net Cash Flow by the Managing General Partner, in its sole discretion.

   (3) In computing Net Cash Flow, the gain or loss and proceeds from a sale of all or a substantial portion of, or interest in, the property of the Partnership and the proceeds of refinancing or financing the Apartments shall be disregarded.

   (b) The Net Cash Flow of the Partnership shall be distributed semi-annually (on a non-cumulative basis) for each calendar year or portion thereof 98% to the Limited Partner and 2% to the General Partners in proportion to their respective percentages of Partnership interest, but such distributions may be made more or less frequently if the Managing General Partner, in its sole discretion, shall deem it advisable to do so.

   (c) The Net Cash Flow distribution by the Partnership attributable to the Apartments is strictly limited by the FHA to an amount equal to six percent (6%) of eleven and eleven one-hundredths percent (11.11%) of the principal amount of the permanent first mortgage on the Apartments as finally endorsed. The foregoing Net Cash Flow shall be proportionately reduced in the event the permanent first mortgage is reduced as a result of FHA cost certification requirements. It is also understood that, under the FHA regulations, an excess Net Cash Flow distribution over the aforesaid amount may be allowed to the extent that the prior year's distributions were less than the allowable FHA Net Cash Flow distribution.

   (d) All distributions made to the Limited Partner shall be paid as set forth on Exhibit A, on the date of

- 9 -

WSH0220363

the distributions or on such record dates as the Managing
General Partner may designate for this purpose.
Distributions so made shall completely discharge and acquit
the Partnership and the General Partners from any liability
to any other person claiming a right to receive distributions
from the Partnership.

(e)  The proceeds from a sale of all or a sub-
stantial portion of, or interest in, the property of the
Partnership, and the proceeds of refinancing or financing
the property of the Partnership to the extent not necessary
for the conduct of Partnership's business or not used, or
committed for use, in the conduct of the Partnership's busi-
ness within twelve months after receipt, after payment of all
debts and other obligations or liabilities of the Partnership
(excluding a mortgage placed on the property of the Partner-
ship as a result of a financing or refinancing) shall be
distributed, in the case of sale proceeds, in accordance
with the Partners' capital accounts and, in the case of
refinancing or financing proceeds, 6% to Eugene Ford and
94% to the Partners other than Eugene Ford in proportion
to their respective percentages of Partnership interest.

(f)  All distributions made within the Partner-
ship accounting year are subject to adjustment by reference
to the financial statements for such Partnership accounting
year.  If any additional amount is to be distributed by
reason of such financial statements, such additional
amount shall be deemed a distribution for such Partnership
accounting year; and if any excess amount was distributed
during such Partnership accounting year, as reflected by such
financial statements, the excess amount shall be taken into
account in reducing subsequent  distributions.

9.  <u>Term of Partnership</u>.  The term of the Partner-
ship shall continue until December 31, 2020, and thereafter
from year to year, unless previously terminated in accordance
with provisions hereinafter stated.  On or after December 31,
2020, the Limited Partner, upon ninety (90) days' written
notice by such Limited Partner to all other Partners, shall
be entitled to the return of its capital account as of the
date of such notice, provided that the assets of the Partner-
ship are at such time sufficient to cover all of the Partner-
ship's liabilities, including liabilities to Partners in
respect of their capital accounts.

10.  <u>Legal Title to Partnership Property</u>.  Legal
title to the Partnership property shall be held in the name
of the Partnership, or in whatever other manner the Managing
General Partner, in its sole discretion, shall determine to

- 10 -

WSH0220364

be in the best interests of the Partnership.  Without limit-
ing the foregoing grant of authority, the Managing General
Partner may arrange to have title taken and held in the name
of trustees, nominees or straw parties for the Partnership.
Subject to the other provisions of this Agreement, the Manag-
ing General Partner shall have the right, power and authority
(without regard to the term of the Partnership), acting for
and on behalf of the Partnership, to lease, sell, mortgage,
convey, refinance, grant easements on or dedicate the prop-
erty (or any part thereof) of the Partnership, to borrow
money and execute promissory notes, to secure the same with
Partnership property, to convey Partnership property in fee
simple by deed, mortgage or otherwise, and to create straw
corporations to act as straw parties and nominees solely for
and on behalf of the Partnership.  In no event shall any
party dealing with the Managing General Partner with respect
to any property of the Partnership, or to whom any such prop-
erty shall be conveyed, contracted to be sold, leased, mort-
gaged or refinanced by the Managing General Partner for and
on behalf of the Partnership, be obligated to see that the
terms of this Agreement have been complied with, or be obli-
gated to inquire into the authority of any act or action of
the Managing General Partner.

11. <u>Management of Business</u>.

(a)  The Limited Partner (in its capacity as a
Limited Partner) shall not have nor exercise any rights in
connection with the management of the Partnership's business.
Subject to the provisions of this Agreement, such management
shall in every respect be the full and complete responsibil-
ity of Indian Head Manor Limited Partnership II, who shall be
the Managing General Partner ("Managing General Partner").
The Managing General Partner, as such, shall devote to the
management of the Partnership's business so much of its time
as it (in its sole discretion) deems reasonably necessary to
the efficient operation of the Partnership.  All decisions
made for and on behalf of the Partnership by the Managing
General Partner shall be binding upon the Partnership.
Except as expressly otherwise set forth elsewhere in this
Agreement, the Managing General Partner (acting for and on
behalf of the Partnership), in extension and not in limi-
tation of the rights and powers given it by law or by the
other provisions of this Agreement, shall, in its sole
discretion, have the full and entire right, power and author-
ity in the management of the Partnership business to do any
and all acts and things necessary, proper, convenient or
advisable to effectuate the purposes of the Partnership.
Notwithstanding the foregoing, the prior approval of the
Managing General Partner and Limited Partners owning at least

- 11 -

WSH0220365

a majority of the Units shall be required for the sale or other disposition of all or substantially all (which term does not include financing or refinancing by way of mortgage, deed of trust or other security agreement as defined in this Agreement) of the property of the Partnership.

(b)  The Managing General Partner may, in its sole discretion, contract, for and on behalf of the Partnership, with any person, firm or corporation, including itself, or any of the other Partners of the Partnership, or any firm, corporation or other entity in which a Partner may have an interest, at reasonable and competitive rates of compensation, commission or remuneration, for the performance of property management and any and all other services which may at any time be necessary, proper, convenient or advisable to carry on the business of the Partnership.  Pursuant to the provisions of this subsection, the Managing General Partner is authorized to cause the Partnership to, and it is the intention of the Partners that the Partnership shall, contract with Edgewood Management Corporation to manage the Apartments, pursuant to an FHA form management agreement, at the maximum rate approved by FHA and such management agreement shall be terminated only for cause.  The Managing General Partner is also authorized to execute a Regulatory Agreement or Agreements (FHA Form 2466) with the Secretary of Housing and Urban Development (and more particularly with his designee, the Commissioner), and to execute any and all other documents as shall be required by the FHA in connection with the FHA loan, including but not limited to executing any mortgage, note, contract, building loan agreement, Rent Supplement Contract (FHA Form 2503), bank resolution and signature card, release, discharge or any other instrument in any way pertaining thereto.

(c)  The Partnership to the extent of its assets, and then the Managing General Partner to the extent any amount due remains unpaid, agree to indemnify and hold harmless Eugene F. Ford ("Ford") against any and all losses, claims, damages, liabilities, judgments and actions resulting from or relating to Ford's general partnership interest in the Partnership, other than any loss, claim, damage, liability, judgment or action (i) attributable in part or in whole to action taken by Ford at any time in violation of this Agreement or (ii) arising before the date of this Agreement. The Partnership agrees to reimburse Ford for any legal or other expenses reasonably incurred by him in connection with the investigation of any loss, claim, damage, liability, judgment or action for which he is indemnified pursuant to this subparagraph.

- 12 -

WSH0220366

12.  <u>Fees for Management Services</u>.  Indian Head Manor
Limited Partnership II shall be paid no fees under this
subsection for serving as a General Partner or managing the
business of the Partnership  but shall be fully and entirely
reimbursed by the Partnership for any out-of-pocket costs or
expenses incurred in connection with the Partnership's busi-
ness, provided that it shall present the Partnership with
such documentation as the Partnership's accountants shall
deem necessary.  Mr. Ford shall be paid an annual fee of
$10,000 for 1983 through 1987 and one half of one percent of
the Apartments' gross monthly rental collection thereafter,
for continuing to serve as a General Partner.  Such fee to
Ford, to the extent not paid on a current basis, shall accrue
interest at a rate of 15 percent per annum.

13.  <u>Bank Accounts</u>.  The funds of the Partnership
shall be deposited in such bank account or accounts as may be
required, and the Managing General Partner shall arrange for
the appropriate conduct of all such accounts.

14.  <u>Books of Account</u>.

(a)  There shall be kept at the principal office
of the Partnership (or at such other office as the Managing
General Partner may designate) accurate books of account, in
which shall be entered fully and accurately each and every
transaction of the Partnership.  Each Partner shall have
access thereto at all reasonable times.  Such books, which
shall be maintained in accordance with the FHA regulations,
shall be kept on the cash receipts and disbursements method
or on an accrual method, and for such accounting year (calen-
dar or fiscal) as the Managing General Partner, in its sole
discretion, may determine.  A certified audit shall be pre-
pared as of the end of each accounting year (and/or at such
other intervals as may be required by FHA or any mortgage
lender) by such certified public accountants or certified
public accountants as the Managing General Partner, in its
sole discretion, may designate, and each Partner shall be
entitled to a copy of the audit report, as well as a summary
of such other information as is relevant to such Partner for
Federal income tax purposes.  Any Partner shall further have
the right to a private audit of the books and records of the
Partnership, provided such audit is made at the expense of
the Partner desiring it and is made at a reasonable time
after due notice.

(b)  Within the earlier of six months of the
commencement of sale of the Units or upon completion of such
offering, each Partner shall be provided with a detailed

- 13 -

WSH0220367

written statement of the application of the proceeds of such offering.

15.  <u>Assignability of Partnership Interest</u>.

(a)  The General Partners shall have no right to assign their general partnership interests, or any part thereof, without the unanimous consent of the Partners. The preceding sentence shall not limit the right of a Limited Partner in Indian Head Limited Partnership II to assign his interest in such partnership.

(b)  The partnership interest of each Limited Partner (including such partner's right to receive a share of the profits and a return of his capital account) shall not be assignable without the consent in writing of the General Partners.  Even if the General Partners consent in writing to any such assignment, the assignee shall not become a substituted Limited Partner of the Partnership unless (i) the assigning Limited Partner so provides in the instrument of assignment; (ii) the assignee agrees in writing to be bound by the provisions of this Agreement, the Amended and Restated Certificate and the other documents described herein in Section 3; (iii) the assignment complies in all respects with applicable Federal and state securities laws; (iv) the assignee pays to the Partnership a fee of Five Hundred Dollars ($500) to cover the costs and expenses of preparation, execution and recordation of an amendment to the Amended and Restated Certificate; and (v) the assignment would not cause the Partnership to terminate for Federal income tax purposes.  If all of such conditions are satisfied, the General Partners shall prepare (or cause to be prepared) for recordation an appropriate amendment to the Amended and Restated Certificate to be signed and sworn to by them, by each of the Limited Partners, by the assigning Limited Partner, and by the assignee.  Unless named in this Agreement, admitted to the Partnership as above provided in this Section or unless admitted to the Partnership by unanimous consent of all Partners, no person shall be considered a Partner.  The Partnership, each Partner and any other person having business with the Partnership need deal only with Partners so named or so admitted; they shall not be required to deal with any other person by reason of an assignment by a Partner or by reason of the death of a Partner, except as otherwise provided in this Agreement.  In the absence of the substitution (as provided herein) of a Limited Partner for an assigning or deceased Limited Partner, any payment to a Partner or to his executors or administrators shall acquit the Partnership of all liability to any

- 14 -

WSH0220368

other persons who may be interested in such payment by reason
of an assignment by, or the death of, such Partner.

(c)  Notwithstanding any other provision of this
Section, the Limited Partner shall not dispose of any part or
all of its limited partnership interest without first giving
to the General Partners, at least thirty (30) days in advance
of such proposed disposition, written notice of its intention
to make such disposition.  No such notice shall be considered
effective under this Section unless (i) the Limited Partner
desiring to make such disposition (hereinafter in this
Section 15(c) referred to as the "offering Partner") shall
have first obtained a <u>bona fide</u> offer in writing to purchase
such partnership interest and (ii) a true copy of such offer,
setting forth all of the terms and conditions of the proposed
purchase, with the names and addresses of the proposed pur-
chaser or purchasers, shall have been attached to such writ-
ten notice.  For a period of thirty (30) days from the
receipt of such written notice, the General Partners shall
have the option to make (or cause to be made by another
party) the purchase from the offering Partner under the same
terms and conditions as set forth in the written offer.  Such
option shall be exercised by giving written notice to the
offering Partner.  If notice has not been given by the expi-
ration of the aforesaid thirty (30) day period, the offering
Partner shall be free to make the disposition if the General
Partners so consent in writing; provided, however, that the
disposition shall be made within ninety (90) days after such
expiration and in accordance with the terms and conditions of
the <u>bona fide</u> offer, and shall be subject to the provisions
of Section 15(b).

16.  <u>Bankruptcy or Dissolution of the Limited
Partner</u>.  The bankruptcy or dissolution of the Limited
Partner shall not dissolve the Partnership.  In such event,
the legal representative of such Limited Partner, shall, for
the purposes of settling the estate, have all the rights of a
Limited Partner, including the same right (subject to the
same limitations) as such Limited Partner would have had
under the provisions of Section 15 hereof to assign the
limited partnership interest (including the right to receive
a share of the Partnership profits and a return of the
capital account) of such Limited Partner and to provide in
the instrument of assignment that the assignee may become a
substituted Limited Partner in accordance with the procedure
specified in Section 15.

WSH0220369

17.  <u>Dissolution of Partnership</u>.

    (a)  The Partnership shall be dissolved upon the occurrence of any of the following events:

        (1)  The decision of all Partners.

        (2)  The retirement, death, bankruptcy or incompetency of a General Partner, unless the Partnership is continued under Section 17(e).

    (b)  Any General Partner may resign effective at the end of a Partnership accounting year by giving not less than 90 days's advance written notice to all other Partners.

    (c)  Upon the retirement, death, bankruptcy or incompetency of a General Partner, the General Partner's partnership interest shall be converted automatically to a limited partnership interest, and the provisions of Section 17(e) shall apply to determine whether the Partnership shall be continued.

    (d)  The death, bankruptcy or incompetency of a Limited Partner shall not dissolve the Partnership. In such event, the successor or legal representative of the dead, bankrupt or incompetent Limited Partner shall have all the rights of the Limited Partner.

    (e)  Upon the occurrence of retirement, death, bankruptcy or incompetency of a General Partner, the Partnership shall not dissolve but shall continue, if the remaining General Partner agrees to continue the business of the Partnership or, if there is no remaining General Partner, if within 90 days after such event, all remaining Limited Partners agree in writing to continue the business of the Partnership and appoint, as of the date of such event, one or more additional General Partners.

    (f)  If the Partnership is dissolved and not continued, the net proceeds from the sale or other disposition of the Partnership property, and any other liquid assets of the Partnership, after payment of or due provisions for all liabilities of the Partnership to creditors, shall be distributed in accordance with the Partners' capital accounts.

    (g)  In the event any property of the Partnership is to be distributed in kind, such property shall, for the purpose of such distribution, be valued at its fair

- 16 -

WSH0220370

market value and the capital accounts of the Partners shall be adjusted as though such property had been sold for its fair market value.

(h)  The Partnership shall terminate when all property and assets owned by the Partnership shall have been disposed of, and the net proceeds therefrom and any other liquid assets of the Partnership, after payment of or due provision for all liabilities to creditors of the Partnership, shall have been distributed in accordance with the provisions of this Agreement.

18.  <u>Meetings</u>.

(a)  Special Meetings of the Partners may be called by the Managing General Partner, in its discretion.

(b)  The Partnership will maintain at its offices a list of the names and addresses of the Partners which will be available for inspection by any Partner or his authorized representative.

19.  <u>References to FHA</u>.  The provisions in this Agreement concerning the FHA, the FHA Regulatory Agreement and the Commissioner shall remain in effect so long as the Apartments referred to in this Agreement are encumbered by a mortgage insured by the FHA and during such further time, if any, as the Commissioner shall be the owner, holder or reinsurer of any such mortgage or obligated to reinsure any such mortgage.

20.  <u>Liability and Indemnity of the General Partners</u>.

(a)  A General Partner shall not be liable, responsible or accountable in damages or otherwise to any of the Partners, as follows:

(1)  for any act or omission performed or omitted by him in good faith on behalf of the Partnership and in a manner reasonably believed by him to be within the scope of the authority granted to him by this Agreement and in the best interests of the Partnership; provided that such conduct does not constitute gross negligence or willful and wanton misconduct and provided that any action taken on advice of counsel for the Partnership·or the certified public accountants for the Partnersip shall be deemed as having been taken in good faith;

- 17 -

WSH0220371

(2) for any failure of any third parties to comply with their obligations under any agreements; however, the foregoing shall not apply if such General Partner was grossly negligent and failed to act in good faith in contracting with any such third party; and

(3) for any unbudgeted or unforeseen catastrophes or for any loss or damage to Partnership property caused by strikes, labor troubles, riots, fires, tornadoes, floods, acts of a public enemy, insurrections, acts of God, breakdowns or failure of plant or machinery, failure to carry out the provisions hereof due to provisions of law, rules and regulations promulgated by any governmental agency, any demand or requisition by any government, or from any other cause beyond the control of the General Partner.

(b) The Partnership shall indemnify and hold harmless each General Partner (including former General Partners who have not ceased to be liable as General Partners), as follows:

(1) In any threatened, pending, or completed action, suit, or proceeding by or in the right of the Partnership, to which a General Partner was or is a party or is threatened to be a party, involving an alleged cause of action by one or more limited partners for damages arising from the activities of the General Partner in performance of the management of the internal affairs of the Partnership as prescribed by this Agreement and/or the law of Maryland, the Partnership shall indemnify the General Partner against expenses, including, but not limited to, attorneys' fees, actually and reasonably incurred by the General Partner in connection with the defense and/or settlement of such action, suit, or proceeding if the General Partner acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Partnership other than acts or omissions involving gross negligence or willful and wanton misconduct. Any action taken on advice of counsel for the Partnership or the certified public accountants for the Partnership shall be deemed as having been taken in good faith.

(2) In any threatened, pending or completed action, suit, or proceeding, except for those described in §20b(1) above, brought by any person or entity, to which a General Partner was or is a party or is threatened to be a party, involving any claim or liability incurred by him to any person or entity by reason of any act or failure to act performed or made by him in good faith and in a manner reasonably believed by im to be in or not opposed to the

— 18 —

WSH0220372

interests of the Partnership, other than acts or omissions
involving gross negligence or willful and wanton misconduct,
the Partnership shall indemnify the General Partner against
any claim, judgment, loss or expense, including, but not
limited to, attorney's fees actually and reasonably incurred
by the General Partner in connection with the defense and/or
settlement of such action, suit or proceeding.  Any action
taken on advice of counsel for the Partnership or the
certified public accountant for the Partnership shall be
deemed as having been taken in good faith.

21.  Miscellaneous Provisions.

(a)  Unless otherwise so provided in this Agree-
ment, no Partner shall be liable to any other Partner or to
the Partnership by reason of his actions in connection with
the Partnership, except in the case of actual fraud, gross
negligence or dishonest conduct.

(b)  Except as provided herein, nothing herein
contained shall be construed to constitute any Partner the
agent of any other Partner or to limit in any manner the
Partners in the carrying on of their own respective busi-
nesses or activities.

(c)  Any Partner may engage in and/or possess
any interest in other business and real estate ventures of
every nature and description, independently or with others,
including, but not limited to, the ownership, financing,
leasing, operation, management, syndication, brokerage and
development of real property; and neither the Partnership
nor any Partner shall have any rights in or to any such
independent venture or the income or profits derived there-
from.

(d)  Any claim or controversy arising out of or
relating to this Agreement or a breach hereof shall, upon the
request of any party involved, be submitted to and settled by
arbitration in accordance with the rules then obtaining in
the State of Maryland of the American Arbitration Association
(or any other form of arbitration mutually acceptable to the
parties so involved).  The decision made pursuant to such
arbitration shall be binding and conclusive on all parties
involved; and judgment upon such decision may be entered in
the highest court of any forum, state or Federal, having
jurisdiction.

(e)  All notices provided for herein shall be
sent by certified or registered mail, return receipt
requested, and first-class postage prepaid, to the address of

- 19 -

WSH0220373

the Partner to whom such notice is addressed, as shown on Exhibit A, unless notice of a change of address is given to the Partnership pursuant to the provisions of this Section. Unless otherwise provided herein, time periods shall commence on the date of mailing of a notice. Any notice which is required to be given within a stated period of time shall be considered timely if postmarked before midnight of the last day of such period.

(f)   The Limited Partner does hereby appoint the Managing General Partner, and the general partners of the Managing Partner, or any one of them, as its true and lawful attorney-in-fact, in such Limited Partner's name and behalf, to prepare any amendment to the Amended and Restated Certificate and to sign, certify under oath and acknowledge any and every such amendment to the Amended and Restated Certificate (such power of attorney being irrevocable so long as the Managing General Partner herein named remains a General Partner of the Partnership) where such an amendment is necessary to reflect:

(1)   a change in the name of the Partnership or in the amount or character of the contribution of any limited partner (including a change by reason of the return to any Limited Partner of all or any part of his capital account);

(2)   the admission of an additional or substituted Limited Partner in accordance with the provisions of Section 15(b) or as otherwise provided in this Agreement or by unanimous agreement of all Partners;

(3)   the admission of an additional or substituted General Partner by unanimous agreement of all Partners;

(4)   the change of the Managing General Partner by unanimous agreement of all Partners;

(5)   a change in the character of the business of the Partnership;

(6)   the correction or clarification of any incorrect statement in the Amended and Restated Certificate (or any amendment thereof);

(7)   a change in the time stated in the Amended and Restated Certificate (or any amendment thereof) for the end of the term of the Partnership or for the return of the capital account of any Partner; or

- 20 -

WSH0220374

(8)  any other change or modification of
the Amended and Restated Certificate (or any amendment there-
of) made in order to represent accurately the agreement among
the Partners.  The Limited Partner does further agree, when-
ever requested to do so, personally to sign, certify under
oath and acknowledge any such amendment (made pursuant to
this Section, or pursuant to Section 15) to the Amended and
Restated Certificate and to execute whatever further instru-
ments may be requisite.  The General Partners shall attend to
the due execution and recordation of each and any such amend-
ment to the Amended and Restated Certificate.

(g)  The terms "bankruptcy" and "bankrupt," and
derivations thereof, shall be deemed to refer to (i) the
commencement of a voluntary case under the United States
Bankruptcy Code or any other applicable federal or state
bankruptcy, insolvency or other similar law, or (ii) the
issuance of an "order for relief" in an involuntary case
under the United States Bankruptcy Code, or (iii) the
commencement before a court having jurisdiction in the
premises of an involuntary case under any other applicable
federal or state bankruptcy, insolvency or other similar law,
and the continuance of any such proceeding unstayed and in
effect for a period of ninety (90) consecutive days.

(h)  The use of any gender herein shall be
deemed to be or include the other genders and the use of the
singular herein shall be deemed to be or include the plural
(and vice versa), wherever appropriate.

(i)  Any other provision of this Agreement
notwithstanding, (1) to the extent that there is any conflict
between this Agreement and the Regulatory Agreement entered
into between the Partnership and the Commissioner, the
Regulatory Agreement shall prevail; and (2) so long as the
Commissioner or his successors or assigns, is the insurer or
holder of the mortgage on the Apartments, no amendment to
this Agreement which results in any of the following shall be
of no force or effect without the prior written consent of
HUD: (A) any amendment which modifies the duration of the
Partnership, (B) any amendment which results in the
requirement that a HUD prior participation certification be
obtained for any additional party and (C) any amendment which
in any way impacts on or affects the HUD mortgage or
Regulatory Agreement.

(j)  This Agreement sets forth all (and is intended
by all parties hereto to be an integration of all) of the
promises, agreements, conditions, understandings, warranties
and representations among the parties hereto with respect to

- 21 -

WSH0220375

the Partnership, the Partnership business and the property of the Partnership, and there are no such promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, among them other than as set forth herein.

22. <u>Governing Law</u>. It is the intention of the parties hereto that all questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Maryland.

23. <u>Burden and Benefit</u>. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective spouses, heirs, executors or administrators, personal and legal representatives, beneficiaries, distributees, successors and assigns.

IN WITNESS WHEREOF, the undersigned partners have hereunto affixed their signatures and seals as of the day and year first above written.

GENERAL PARTNERS:

[Corporate Seal]

INDIAN HEAD MANOR LIMITED
PARTNERSHIP II

ATTEST:

By McShea & Company, Inc., a
general partner

By _____

By _____
John McShea, President

_____
Eugene Ford, for himself, and
on behalf of the assigning
Limite Partners

- 22 -

WSH0220376

A175

LIMITED PARTNER:

[Corporate Seal]                    INDIAN HEAD MANOR LIMITED
                                    PARTNERSHIP II

ATTEST:                             By McShea & Company, Inc.,
                                       a general partner

By _____              By _____
                                       John McShea, President

– 23 –

WSH0220377

## EXHIBIT A

## INDIAN HEAD MANOR LIMITED PARTNERSHIP I

GENERAL PARTNERS:

| Name and Address | Contribution | Percentage of Partnership Interest |
|---|---|---|
| Indian Head Manor Limited Partnership II<br>8520 Connecticut Avenue<br>Suite 103<br>Chevy Chase, Maryland  20815 | $  12,300 | 1% |
| Eugene Ford<br>4340 East-West Highway<br>Suite 900 - South Tower<br>Bethesda, Maryland  20814 | $  100.00 | 1% |

LIMITED PARTNER:

| | | |
|---|---|---|
| Indian Head Manor Limited Partnership II<br>8520 Connecticut Avenue<br>Suite 103<br>Chevy Chase, Maryland  20815 | $ 1,217,700 | 98% |

WSH0220378

HUD APPROVED FORM MMcF:dal (070885 - 127)
DO NOT MODIFY WITHOUT APPROVAL

When recorded return to:
Department of Economic and
 Community Development
Office of the Assistant Attorneys General
45 Calvert Street
Annapolis, MD  21401
Attn:  Counsel - DECD
MHF Insured - Market

Project Name: <u>INDIAN HEAD MANOR</u>     CDA Project No.: <u>17.0003</u>

## REGULATORY AGREEMENT

THIS REGULATORY AGREEMENT (the "Agreement") is made this 8th day of <u>January</u> , 19<u>87</u>, by and between <u>INDIAN HEAD MANOR LIMITED PARTNERSHIP I</u>  ("Borrower"), whose address is <u>4733 Bethesda Avenue, Suite 560, Bethesda, Maryland 20814</u>  and the Community Development Administration ("CDA"), a division of the Department of Economic and Community Development of the State of Maryland, whose address is 45 Calvert Street, Annapolis, MD  21401.

### RECITALS

The Borrower, as the owner of the Mortgaged Premises (as defined in the Deed of Trust), has applied to CDA for a loan in the principal amount of $ <u>385,000.00</u>  ( the "Loan") evidenced by a Note of even date (the "Note") to aid Borrower in the rehabilitation and operation of a "community development project", known as <u>Indian Head Manor</u> (the "Project"), in accordance with the drawings and specifications forming a part of the rehabilitation documents executed in respect to the Loan.

The Loan will make possible the rehabilitation and operation of safe, sanitary, and adequate housing, which could otherwise not be provided, for "families of limited incomes" within the meaning of Sections 11-301 through 11-308 of Article 41 of the Annotated Code of Maryland, as amended (formerly Sections 266DD-1 through 266DD-8 of Article 41) (the "Act"), and the regulations promulgated under the Act.

The Maryland Housing Fund ("MHF") will insure the Deed of Trust, Security Agreement and Assignment of Rents of even date from Borrower to certain trustees for the benefit of CDA (the "Deed of Trust") encumbering the Project and the Mortgaged Premises.

IRH 0046212

Because of its obligation to accomplish the public purposes set forth in the Act, CDA is unwilling to make the Loan unless Borrower agrees to be regulated in the manner set forth below.    Borrower is willing to execute and abide by this Agreement as a condition of obtaining financing.

NOW THEREFORE, in consideration of the making of the Loan by CDA and Borrower's agreement to be regulated and restricted by CDA so as to assure the public purpose of the Project, CDA agrees, and Borrower agrees for itself, and its successors, and assigns, to abide by the following terms and provisions so long as the Loan remains outstanding:

1.    As used in this Agreement the term:

(a) "Borrower" means the original borrower under the Deed of Trust and its successors and assigns.

(b) "CDA" includes persons to whom the Deed of Trust is assigned.

(c) "Deed of Trust" means the Deed of Trust, Security Agreement and Assignment of Rents and any other document evidencing or securing the Loan.

(d) "Default" means a default declared by CDA when it determines that there has been a violation of this Agreement.

(e) "Distribution" means any withdrawal or taking of cash or any assets of the Project within the limitations of paragraph 6 below.

(f) "Family" means (1) two or more persons who occupy the same unit; or (2) a single person.

(g) "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions and considerations determined by the Secretary pursuant to the Act.

(h) "Final Closing" is the date on which the final principal amount of the Deed of Trust is accepted and approved by both MHF and CDA.

(i) "Mortgaged Premises" is defined in the Deed of Trust.

(j) "Surplus Cash" means any cash remaining after:

(1) the payment of:

(i) all sums due or currently required

IRH 0046213

ISG:rlb (17-Dec-86 D10/12)
Multi-Family Hi   Reg.Agmt. (FHA First)
(Conventional First)                                    Page 3

to be paid under the terms of any Deed of Trust or Note held
by CDA; and

           (ii) all amounts required, if any, to be
deposited in the Reserve Fund for Replacements as set forth
in paragraph 4 below; and

           (iii) all obligations of the Project other
than the Deed of Trust held by CDA, unless funds for payment
have been set aside or deferment of payment has been approved
by CDA; and

      (2) the segregation of:

           (i) an amount equal to the aggregate of
all special funds required to be maintained by the Project;
and

           (ii) all tenant security deposits held.

    (k) Capitalized terms not specifically defined
have the meanings given them in the Deed of Trust.

    2.   This Agreement shall be recorded with the Deed of
Trust and any default under the terms of the Deed of Trust
shall constitute a default under this Agreement; any default
under the terms of this Agreement shall be a default under
the Deed of Trust.

    3.   Borrower shall promptly make all payments due under
the Note and Deed of Trust.

    4.   Concurrently with the beginning of amortization of
the principal amount of the Loan as provided in the Note,
Borrower may be required by CDA to establish and thereafter
maintain a Reserve Fund for Replacements by depositing to
such reserve fund with CDA or in a depository designated by
CDA, the amount of $ 3,470 * _____ payable monthly without
demand, unless a different date or amount is approved by CDA.
The monthly payment into the Reserve Fund for Replacements
shall continue until the Loan is paid in full. Disbursements
from such fund, whether for the purpose of effecting
replacement of structural elements and mechanical equipment
of the Project or for any other purpose, may be made only
after receiving the written consent of CDA and MHF. In the event of
a default in the terms of the Deed of Trust, pursuant to
which the Loan has been accelerated, CDA may apply or
authorize the application of the balance of the Reserve Fund
for Replacements to the amount due on the Loan as
accelerated.

    5.   CDA may in its sole discretion deposit the moneys
paid to it pursuant to paragraph 4 into a non-interest

*    The Borrower shall be required to maintain a Reserve Fund for Replacements
in accordance with the loan documents executed by the Borrower for the benefit
of Government National Mortgage Association, which loan is insured by the
Federal Housing Administration.

IRH 0046214

ISG:rlb (17-Dec-86 D10/12)
Multi-Family HI  Reg.Agmt. (FHA First)
(Conventional First)                                    Page 4

bearing account or an interest bearing account, to be
invested or reinvested at the discretion of CDA; however, CDA
shall hold any interest accruing on these moneys for the
benefit of the Project.  Within 6 months after the payment in
full of the Loan and of any other sums due to CDA, CDA shall
pay all moneys remaining in the Reserve Fund for Replacements
to Borrower.

   6.  Borrower shall not, without the prior written
approval of CDA make, or receive and retain, any distribution
of assets or any income of any kind of the Project except
from Surplus Cash and on the following conditions:

      (a)  All distributions shall be made only as of or
after the end of a fiscal year and only as permitted by the
law of the jurisdiction.

      (b)  No distribution may be made from borrowed
moneys, and no distribution may be made when there is any
default under this Agreement or under the Note or Deed of
Trust.

      (c)  Any distribution of any moneys of the Project,
which the Borrower or any other holder is not entitled to
retain, shall be held in trust separate and apart from any
other moneys for the benefit of CDA and the Project.
Borrower shall restore any such improper distributions
immediately upon request by CDA.

      (d)  Before any distribution, Borrower shall have
complied with all outstanding notices or requirements for
proper maintenance of the Project.

   7.  Borrower shall provide CDA with written notice of
any rent increases for units in the Project within 30 days of
any such increases.  If CDA determines, in its sole
discretion, that rent increases are excessive and contrary to
the public interest, then CDA may require the Borrower to
reduce or otherwise adjust rents and to establish any
subsequent rents only after approval by CDA.

   8.  Borrower assures that it shall pay all expenses of
the Project, including debt service payments and reserve
deposits, if any.

   9.  Unless otherwise directed or approved by CDA, the
rental rates for initial occupancy of the Project shall be
those set forth in the Commitment for the Loan or in CDA's
Financial Analysis Form.

   10.  (a)  Except as otherwise provided in the Occupancy
Agreement of even date between Borrower and CDA, Borrower may
not approve any person or family for occupancy unless, at the
time of such approval, the following conditions have been met

IRH 0046215

ISG:rlb (17-Dec-?6 D10/12)
Multi-Family HE. Reg.Agmt. (FHA First)
(Conventional First)                                    Page 5

with respect to at least 51% of the units in the Project:

(1) The person or family is a "family of limited income" as defined by the Act and the person or family certifies that the application for occupancy is for the purpose of providing housing in the Project for the person or family.

(2) The total current income of the person or family shall not exceed the limits established by CDA then in effect, and the person or family has certified to the Borrower, on forms prescribed or approved by CDA, the total current income of such person or family.

(3) In a manner prescribed or approved by CDA, the Borrower shall obtain written evidence substantiating the information given on the certification of income and shall retain this evidence in its files for a period of 3 years from the date of initial occupancy by such person or family.

(b) If the Borrower fails to comply with the marketing plan for the Project, as approved by CDA, CDA may require that no further applications be accepted or acted upon by or on behalf of Borrower until and unless strict compliance with the marketing plan shall have been instituted.

(c) Among eligible applications, preference shall be given to the elderly, those displaced by urban renewal, slum clearance, and other governmental actions, and those currently living in substandard housing.

(d) In selecting tenants, Borrower shall not discriminate against any person or persons because there are children in the family.

11. (a) Borrower shall require all residents to execute a lease in a form approved by CDA, which lease shall comply with applicable State and local laws, and which may not be modified in any manner without CDA's approval. Borrower may not rent any unit in the Project for a term of less than 30 days nor more than one year.

(b) Borrower may not require as a condition of the occupancy or leasing of any dwelling unit in the Project, and may neither accept nor allow any employee or agent to accept, any consideration other than the prepayment of the first month's rent plus a security deposit not in excess of one month's rent to guarantee the performance of the covenants of the lease or occupancy agreement.

(c) Moneys paid to Borrower by a residential tenant as a security deposit for the payment of rent shall be

IRH 0046216

ISG:rlb (17-Dec-86 D10/12)
Multi-Family HE   Reg.Agmt. (FHA First)
(Conventional First)                                    Page 6

deposited in an interest bearing bank account, separate from all other accounts and funds, with a financial institution whose deposits are insured by an agency of the United States or Maryland government, and interest earned on such account shall be credited to each resident in accordance with Maryland law. The amount in such account shall at all times equal or exceed the aggregate of all outstanding obligations with respect to security deposits.

12. When requested by CDA at any time, Borrower shall obtain and verify recertifications of income and other criteria of eligibility from residents of the Project.

13. Borrower shall maintain the Mortgaged Premises in good repair and condition. If all or any portion of the Project is destroyed or damaged by fire or other casualty, the money derived from any insurance on the project shall be applied in accordance with the terms of the Deed of Trust.

14. Upon prior written approval of CDA, Borrower may charge to and receive from any tenant any amounts that from time to time Borrower and the tenant may mutually agree upon for any facilities or services which Borrower or other persons may furnish to the tenant upon his or her request in addition to the facilities and services included in the approved rental schedule.

15. At the request of CDA, Borrower shall furnish occupancy reports and shall give specific answers to any questions or requests for information that CDA puts to Borrower.

16. Borrower shall comply with the provisions of all federal, State and local law prohibiting discrimination in housing on the grounds of race, color, creed, national origin, sex, marital status, or physical or mental handicap.

17. (a) At Initial Closing of the Loan, Borrower shall deliver to CDA as an Operating Expense Deficit Deposit the amount of $ 0            in cash or an unconditional irrevocable letter of credit acceptable in all respects to CDA and MHF, to be held by CDA in the Operating Expense Deficit fund to cover the Project's Cumulative Operating Deficit (as defined in the CDA Commitment Letter, dated December 17        , 1985), as amended.

(b) The amount of the Operating Expense Deficit Fund may be reviewed from time to time at the discretion of CDA and MHF and may be adjusted as determined by CDA and MHF. Borrower shall maintain the Operating Expense Deficit Fund in the amount required by CDA and MHF until CDA and MHF determine that for each of   0  consecutive months (the "Sustaining Occupancy Period") the Project's effective gross income (gross income adjusted for vacancies and collections)

IRH 0046217

ISG:rlb (17-Dec-86 D10/12)
Multi-Family Hl · Reg.Agmt. (FHA First)
(Conventional First)                              Page 7

equals all Project costs and expenses, including any required
reserves, plus 110% of debt service (principal and interest,
plus CDA override and the MHF premium) ("Sustaining
Occupancy"). The Sustaining Occupancy period may be modified
by CDA and MHF acting jointly, as a result of any
circumstances affecting the Project of a unique or unusual
nature which, in the joint determination of CDA and MHF,
support such a modification.

          (c) the moneys in the Operating Expense Deficit
Fund may be disbursed upon the joint direction or joint
approval of CDA and MHF to pay operating expenses of the
Project, to pay principal and interest installments or any
other payment due under the Note and to pay any other costs,
expenses or payments related to the Project and required by
the Loan Documents. After any disbursement, Borrower, upon
10 days written notice from CDA or MHF, shall reimburse the
Operating Expense Deficit Fund so that such fund is
maintained at the amount required by CDA and MHF. CDA may in
its sole discretion deposit the moneys in the Operating
Expense Deficit Fund into a non-interest bearing account or
an interest bearing account, to be invested or reinvested at
the discretion of CDA. Within six months after Sustaining
Occupancy is achieved the Operating Expense Deficit Fund
shall terminate and all moneys therein shall be paid to
Borrower.

     18. (a) In the event that any Rehabilitation Cost
Savings, as defined herein, are realized in rehabilitating
the Project such Rehabilitation Cost Savings will be used to reduce the
Loan at Final Closing.



          (b) Rehabilitation Cost Savings shall be
calculated at the time of final cost certification of the
rehabilitation of the Project ("Final Cost Certification") as
the sum of (1) and (2) as follows:

          (1) The difference between the actual
rehabilitation costs which are approved at final cost
certification and the rehabilitation cost amount as listed on
CDA's Financial Analysis at Initial Closing of the Loan; and

          (2) The difference between the actual total
of fees, financing and carrying charges, as described in
CDA's Financial Analysis which are approved at Final Cost
Certification, and the amount of fees, financing and carrying
charges as listed on CDA's Financial Analysis at Initial
Closing of the Loan.

          ~~(c) Any moneys in the Rehabilitation Surplus Fund~~
shall be disbursed ~~at the sole discretion~~ of CDA for Project
~~related improvements~~.

IRH 0046218

(d) CDA may in its sole discretion deposit the moneys in the Rehabilitation Surplus Fund into a non-interest bearing account or an interest bearing account, to be invested or reinvested at the discretion of CDA; however, CDA shall hold any interest accruing on these moneys for the benefit of the Project. Within six months after the payment in full of the Loan and of any other sums due to CDA, all moneys remaining in the Rehabilitation Surplus Fund, including any investment income or gain, shall be paid to the Borrower.

19. (a) Upon a violation of any of the provisions of this Agreement by Borrower, CDA may give written notice to Borrower by first class mail, postage prepaid, at the address stated in this Agreement, or such other address that Borrower subsequently designates in writing to CDA as Borrower's legal business address. If the violation is not rectified to CDA's satisfaction within 10 days after the date the notice is mailed or within such further time that CDA reasonably determines is necessary to correct the violation, CDA may without further notice declare a default under this Agreement effective on the date of such declaration. Upon such declaration CDA may, in addition to those actions permitted under the Note or Deed of Trust or under Maryland or federal law:

(1) declare the whole of the indebtedness under the Note immediately due and payable and then proceed with foreclosure of the Deed of Trust;

(2) collect all rents and charges in connection with the operation of the Project and use such collections to pay Borrower's obligations under this Agreement and under the Note and Deed of Trust and the necessary expenses of preserving the Mortgaged Premises and operating the Project;

(3) take possession of the Project, bring any action necessary to enforce any rights of Borrower growing out of the Project's operation, and operate the Project in accordance with the terms of this Agreement until such time that CDA in its discretion determines that Borrower is again in a position to operate the Project in accordance with the terms of this Agreement and in compliance with the requirements of the Note and Deed of Trust;

(4) apply to any court, State or federal, for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Project in accordance with the terms of this Agreement, or for such other relief that may be appropriate; in this regard, Borrower acknowledges that any injury to CDA arising from a

IRH 0046219

ISG:rlb (17-Dec-96 D10/12)
Multi-Family HE   Reg.Agmt. (FHA First)
(Conventional First)                              Page 9

default under any of the terms of this Agreement would be
irreparable and the amount of damage would be difficult to
ascertain.

(b)  No failure by CDA to exercise and no delay in
exercising any right, power, or privilege under this
Agreement shall operate as a waiver thereof; nor shall any
single or partial exercise of any right, power or privilege
preclude any other exercise thereof or the exercise of any
other right, power, or privilege.

20.  Borrower shall not transfer, assign or pledge any
right or interest in or title to any funds, including without
limitation letters of credit and other assets, deposited by
the Borrower with CDA or reserved by CDA for Borrower,
without the prior written approval of CDA.

21.  Nothing contained in the Deed of Trust shall be
deemed to be a release or impairment of any obligation of the
Borrower contained in this Regulatory Agreement; however,
neither Borrower nor any partner or member assumes personal
liability for payments and deposits due under the Note and
Deed of Trust, for deposits to the Reserve Fund for
Replacements and other deposits required by this Agreement,
for matters not under their control or for any obligation
under this Agreement, except for:

(a)  funds or property of the Project coming into
their hands which, by the provisions of this Agreement, the
Note, the Deed of Trust or any other Loan document they are
not entitled to retain; and

(b)  their own acts, deeds, and omissions, or the
acts, deeds and omissions of others which they have
authorized in violation of the provisions of this Agreement,
the Deed of Trust, the Note or any other Loan document.

22.  Except as otherwise provided in this Agreement,
whenever any approval or notice by CDA is required under this
Agreement, or whenever any action by CDA is required or
permitted, the Secretary of Economic and Community
Development, Director of CDA, or any authorized officer of
CDA may approve, give notice, or act on behalf of CDA.

23.  The invalidity of any clause, part or provision of
this Agreement shall not affect the validity of the remaining
portions.

24.  This Agreement may not be altered, modified or
amended except in writing signed on behalf of the Borrower
and CDA.

25.  (a) No member, officer, or employee of CDA, no
member of the governing body of the State or locality in

IRH 0046220

which the Project is situated, and no other public official of the State or such locality who exercises any functions or responsibilities with respect to the Project, during his tenure or for one year after the end of such tenure may have any interest, direct or indirect, in this Agreement or in any proceeds or benefits arising from it.  If the Project is owned by a public housing agency, this prohibition shall also apply to members of the governing body of the locality in which the public housing agency operates.

(b)  The Borrower shall insert the provisions of paragraph (a) above in each of its contracts entered into in connection with the Project.

26.  This Agreement shall bind and the benefits shall inure to Borrower, its legal representatives, successors in office or interest, and assigns, and to CDA so long as the Deed of Trust continues in effect.  Upon payment in full of the indebtedness evidenced by the Note and Deed of Trust, or foreclosure of the Deed of Trust or deed in lieu of foreclosure, or assignment to the Maryland Housing Fund (except when resulting in a conveyance to the Borrower or any related person), this Agreement shall terminate and be released of record.  CDA shall execute any documents necessary to effect the release.

27.  Borrower warrants that it will not execute any agreement with provisions contradictory to, or in opposition to, the provisions of this Agreement, and that in any event the requirements of the Agreement are paramount and controlling and they supersede any other requirements in conflict with this Agreement, <u>except as set forth in paragraph 28 hereof</u>.

28.  Notwithstanding anything contained herein to the contrary, if the Mortgaged Premises are subject to a superior lien securing a loan (the "Superior Mortgage") which loan is insured by the United States Department of Housing and Urban Development ("HUD"), then CDA, for itself and its successors and assigns acknowledges and agrees that all of its rights and powers under this Regulatory Agreement are subordinate and subject to the rights of the Secretary of HUD under the HUD Regulatory Agreement recorded in connection with the Superior Mortgage, and further acknowledges and agrees that CDA will not attempt to enforce any of the covenants of Borrower contained herein, until such time as the Superior Mortgage is paid in full or the HUD Regulatory Agreement is released of record.

IRH 0046221

II

IN WITNESS WHEREOF, the parties by their duly authorized representatives have signed and delivered this Regulatory Agreeement as of the date first written above.

**BORROWER:**

INDIAN HEAD MANOR
LIMITED PARTNERSHIP I,
a Maryland limited partnership

By:   Indian Head Manor
      Limited Partnership II,
      a Maryland limited partnership
      Managing General Partner

ATTEST:

                               By:   McShea & Company, Inc.,
                                      a Maryland corporation,
                                      General Partner

JOHN F. MCSHEA III
ASST. SECRETARY

                               By:
                                  JOHN F. MCSHEA
                                  PRESIDENT

**[CORPORATE SEAL]**

WITNESS:

                               John G. Mergner
Anne Wilbur                              General Partner

WITNESS:

                            COMMUNITY DEVELOPMENT ADMINISTRATION

                            By:   Nancy S. Kase (SEAL)
E Roese                             Name:   Nancy S Kase
                              Title:   Authorized Officer

APPROVED by the Maryland Housing Fund:

By:
Name:   CHARLES S. COLSON
Title:   Director
        DEPUTY

IRH 0046222

*12*

STATE OF MARYLAND:              COUNTY OF  MONTGOMERY    : To Wit:

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared  JOHN F. McSHEA , known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is the  PRESIDENT  of McShea & Company, Inc., a Maryland corporation, a general partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_Donna M. Dambrauskas_
Notary Public

My Commission Expires: _July 1, 1990_

DONNA M. DAMBRAUSKAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 1990

STATE OF MARYLAND:              COUNTY OF  MONTGOMERY    : To Wit:

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared John G. Mergner, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is a General Partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_Donna M. Dambrauskas_
Notary Public

My Commission Expires: _July 1, 1990_

DONNA M. DAMBRAUSKAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 1990

IRH 0046223

13

STATE OF MARYLAND:          COUNTY OF *Anne Arundel* : To Wit:

I HEREBY CERTIFY that on this _8th_ day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared _Nancy S Rase_ , known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he or she is an Authorized Officer of the Community Development Administration, a division of the Department of Economic and Community Development, that he or she has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_Melanie S. Wot..._
Notary Public

My Commission Expires: _7/1/1990_

IRH 0046224

*14*

STATE OF MARYLAND:          COUNTY OF *Anne Arundel*: To Wit:

  I HEREBY CERTIFY that on this ___8th___ day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared *Charles S. Colson*_____, Maryland Housing Fund, and who acknowledged to me that he or she approved the foregoing Regulatory Agreement on behalf of the Maryland Fund.

  IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

            _Melanie S. Wa..._
            Notary Public

My Commission Expires: ___7/1/1990___

A191

IRH 0046225

*15*

## EXHIBIT A

### LEGAL DESCRIPTION OF

### INDIAN HEAD MANOR APARTMENTS

Parcel "A" in the subdivision known as "Thorne Property", as per plat thereof recorded in Plat Book W.W.W. 59 at Plat 34 among the Land Records of Prince George's County, Maryland and being in Oxon Hill (12th Election District).

IRH 0046226

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0186, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

HUD APPROVED 607/0885 - 96/125
DO NOT MODIFY WITHOUT APPROVAL

6529    186

## AGREEMENT AND DECLARATION
## OF COVENANTS AND RESTRICTIONS

THIS AGREEMENT AND DECLARATION OF COVENANTS AND
RESTRICTIONS (the "Declaration") is made on January 5,
19 87, by and between INDIAN HEAD MANOR LIMITED PARTNERSHIP *,
a limited partnership organized and existing under the laws
of the State of Maryland ("Declarant") and the COMMUNITY
DEVELOPMENT ADMINISTRATION ("CDA"), a division of the
DEPARTMENT OF ECONOMIC AND COMMUNITY DEVELOPMENT ("DECD"), a
principal department of the State of Maryland.

### EXPLANATORY STATEMENT

Declarant has requested CDA, and CDA has agreed, to
provide construction and permanent financing in the amount of
$ 385,000.00    (the "Loan") to rehabilitate a "community
development project "within the meaning of Sections 11-301
through 11-308 of Article 41 of the Annotated Code of
Maryland, as amended (formerly 266DD-1 through 266DD-8 of
Article 41), known as " Indian Head Manor          " (the
"Project") which Project will be located on a certain parcel
of real property owned in fee simple by the Declarant,
described in Exhibit A, composed of 8.9444          acres,
more or less, and located in Prince George's County Maryland
(the "Property"). The Loan is secured by a deed of trust of
even date herewith by and between Declarant and certain
trustees for the benefit of CDA (the "CDA Mortgage").    In
order to induce CDA to make the Loan for the Project, and to
satisfy certain conditions existing under Section 103 of the
Internal Revenue Code of 1954, as amended, and the
regulations promulgated thereunder (collectively, the "Code")
applicable to CDA's tax-exempt revenue obligations, the
proceeds of which are to be used to fund the Loan (the
" *          Bonds" or the "Bonds"), the Declarant is
willing to subject the Property to certain covenants and
restrictions which are contained in this Declaration. The
Property is subject to the lien of a mortgage or deed of
trust (the "Superior Mortgage") which is superior to the CDA
Mortgage and this Declaration.

*    1983-B HELP and 1985-A HELP

Case 1:93-cv-00655-DAT    Document 833-3    Filed 04/17/25    Page 48 of 53

6529    187

NOW, THEREFORE, in consideration of the premises set forth in the Explanatory Statement and for other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

### 1.    Covenants Running with the Land

Declarant declares that the Property and every part of it is and shall be owned (legally and beneficially), leased, or otherwise conveyed, transferred, developed, rehabilitated, improved, built upon, occupied, or otherwise used, subject to the covenants and restrictions set forth in paragraphs 2-4 below (collectively, the "Restrictive Covenants"). The Restrictive Covenants shall run with the Property and every part of it for all purposes and shall be binding upon Declarant and all property owners, tenants, licensees, occupants, and their successors in interest with respect to the Property and shall inure to the benefit of Declarant and CDA and their respective successors and assigns.

### 2.    Rental Requirement.

All of the dwelling units in the Project shall be rented or available for rental on a continuous basis to the general public.

### 3.    Low or Moderate Income Occupancy Requirement.

At least 20% of the dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently becomes, a "targeted area project") shall be occupied by "Individuals of Low or Moderate Income" as defined below.

### 4.    Duration and Modification.

4.1 Duration. Unless terminated sooner in accordance with the provisions of Paragraph 4.2, the Restrictive Covenants shall continue and remain in full force and effect at all times with respect to the Property and each part of it, now or hereafter made subject to the Restrictive Covenants for the following periods:

4.1.1 With respect to the Rental Requirement set forth in Paragraph 2 above, for the longer of (a) the Qualified Project Period or (b) the remainder of the term during which the portion of __the__ Bonds allocable to the Loan are outstanding;

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0187, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024,



Case 1:93-cv-00655-DAT    Document 833-3    Filed 04/17/25    Page 49 of 53

6529    188

4.1.2    With respect to the Low or Moderate Income Occupancy Requirement set forth in paragraph 3 above, for the Qualified Project Period.

### 4.2    Termination and Modification.

4.2.1    This Declaration, or any provisions of it, or any of the Restrictive Covenants, may be terminated, extended, modified, or amended upon an amendment to or modification of Section 103(b)(4)(A) of the Code, and, in each case, only upon approval by the Maryland Housing Fund ("MHF"), which is the entity insuring the Loan (the "Mortgage Insurer"), and receipt by CDA of an opinion of bond counsel of nationally recognized standing in the field of law applicable to municipal finance acceptable to CDA and the trustee under the indenture authorizing the issuance of the Bonds, to the effect that upon such termination, extension, modification or amendment interest on the Bonds shall remain exempt from federal income taxation.    Such termination , extension, modification, or amendment shall be in writing and shall be effective only after approval by the Mortgage Insurer, execution by CDA and Declarant,and recordation among the land records of Prince George's County, Maryland.    For purposes of execution of  the instrument evidencing such termination, extension, modification or amendment, Declarant irrevocably appoints CDA its attorney-in-fact, with full power and authority to execute all documents and do all acts necessary or desirable to give effect to such termination, extension, modification, or amendment.

4.2.2    Notwithstanding any provisions of Paragraph 4.1 or 4.2.1 to the contrary, this Declaration and the Restrictive Covenants shall automatically terminate in the event of foreclosure or conveyance by deed in lieu of foreclosure; however, the provisions of this Paragraph 4.2.2 shall cease to aply  in the event of foreclosure or conveyance by deed in lieu of foreclosure or similar event if, at any time subsequent to such event and during the Qualified Project Period, the obligor of the acquired purpose obligation (as defined in Treas. Reg. §1.103-13(b)(4)(iv)(A)) or a related person (as defined in Treas. Reg. §1.103-10(e)) obtains an ownership interest in the Project for tax purposes.

### 5.    Effect of Headings.

The headings of the paragraphs in this Declaration are for convenience only and do not affect the meanings or interpretation of the contents.



PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0192, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

**7**

6529   192

**DECLARANT:**

**INDIAN HEAD MANOR**
**LIMITED PARTNERSHIP I,**
a Maryland limited partnership

By:   Indian Head Manor
      Limited Partnership II,
      a Maryland limited partnership
      Managing General Partner

**ATTEST:**

By:   McShea & Company, Inc.,
      a Maryland corporation,
      General Partner

By: _John F. McShea_
    JOHN F. McSHEA III
    ASST. SECRETARY

By: _John F. McShea_
    JOHN F. McSHEA
    PRESIDENT

[CORPORATE SEAL]

**WITNESS:**

_Anne Wilburn_

_John G. Mergner_
John G. Mergner
General Partner

6529   193

STATE OF MARYLAND:          COUNTY OF *Anne Arundel* To Wit:

I HEREBY CERTIFY that on this _8th_ day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared _Nancy S Kase_ , known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he or she is an Authorized Officer of the Community Development Administration, a division of the Department of Economic and Community Development, that he or she has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

My Commission Expires: _7/1/1990_

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0193, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

6529  194

9

**STATE OF MARYLAND:**          **COUNTY OF** <u>MONTGOMERY</u>   **: To Wit:**

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared <u>JOHN F. McSHEA</u>, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is the PRESIDENT of McShea & Company, Inc., a Maryland corporation, a general partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

                        Donna M. Dambrauskas
                        Notary Public

My Commission Expires: <u>July 1, 1990</u>

                                  DONNA M. DAMBRAUSKAS
                                NOTARY PUBLIC STATE OF MARYLAND
                                My Commission Expires July 1, 1990

**STATE OF MARYLAND:**          **COUNTY OF** <u>MONTGOMERY</u>   **: To Wit:**

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared John G. Mergner, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is a General Partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

                        Donna M. Dambrauskas
                        Notary Public

My Commission Expires: <u>July 1, 1990</u>

                                    DONNA M. DAMBRAUSKAS
                                NOTARY PUBLIC STATE OF MARYLAND
                                My Commission Expires July 1, 1990

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0194, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0195, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

6529    195

10

**EXHIBIT A**

**LEGAL DESCRIPTION OF**

**INDIAN HEAD MANOR APARTMENTS**

Parcel "A" in the subdivision known as "Thorne Property", as per plat thereof recorded in Plat Book W.W.W. 59 at Plat 34 among the Land Records of Prince George's County, Maryland and being in Oxon Hill (12th Election District).