PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0189, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024,

ISG/rlb (4-DEC-86   D10/11
MHF Multi-Family HELP                                    Page 4

6529   189

### 6.   Legal Action Upon Violation.

6.1  Violation of any of these Restrictive
Covenants may be enjoined, abated, restrained or otherwise
remedied by appropriate legal or equitable proceedings.
Proceedings to restrain violation of these Restrictive
Covenants may be brought at any time that such violation
appears reasonably likely to occur in the future. In the
event of proceedings brought by CDA or any person acting on
behalf of CDA to enforce or restrain violation of any of
these Restrictive Covenants, or to determine the rights or
duties of any person under this Declaration, CDA or any
person acting on behalf of CDA, ir it or they prevail in such
proceedings, may recover reasonable attorneys' fee to be
fixed by the court, in addition to court costs and any other
relief awarded by the court in such proceedings.

6.2  If HUD is the insurer of the loan secured
by the Superior Mortgage

(a)  failure to comply with any of the
Restrictive Covenants shall not be a default under the
Superior Mortgage; and

(b)  enforcement of these Restrictive
Covenants will not result in any claim against the Project,
the Superior Mortgage proceeds, any reserve or deposit
required by HUD in connection with the Superior Mortgage
transaction, or the rents or other income from the Property
other than (i) available surplus cash, if the Mortgagor is
profit-motivated, or (ii) available distributions and
residual receipts authorized for release by HUD, if the
Mortgagor is limited-distribution.

### 7.   Enforceability.

The Restrictive Covenants shall bind Declarant
and its heirs, successors and assigns, and shall inure to the
benefit of and be enforceable by CDA and its successors and
assigns.   The failure of CDA to enforce any of the
Restrictive Covenants shall not be deemed a waiver of the
right to enforce them thereafter.  There shall be no waiver
of any of the Restrictive Covenants except in accordance with
Paragraph 4.2 above.

### 8.   Grantee's Covenants.

Each grantee accepting a deed, lease or other
instrument conveying any interest in the Property, whether or



Case 1:93-cv-00655-DAT   Document 833-4   Filed 04/17/25   Page 2 of 79

6529   190

not it incorporates or refers to this Declaration, covenants
for itself, and its heirs, successors and assigns to observe,
perform and be bound by the Restrictive Covenants and, unless
otherwise specifically permitted by CDA, to incorporate them
by reference in any instrument of conveyance; however, this
covenant shall not bind a grantee (other than the Declarant
or a related person as defined in the Code) upon involuntary
conveyance of the Property (e.g., through foreclosure or deed
in lieu of foreclosure), as specifically permitted by the
Code.

### 9.   Definitions.

As used in this Declaration, the following
terms have the following respective meanings:

"Individuals of Low or Moderate Income means
"individuals of low or moderate income" as determined by the
Secretary of the United States Department of the Treasury in
a manner consistent with determinations of lower income
families under Section 8 of the United States Housing Act of
1937 ("Section 8") (or if such program is terminated, under
such program as in effect immediately before such
termination), except that the percentage of median gross
income which qualifies as low or moderate income shall be
80%.

"Qualified Number of Days" means 50% of the
number of days from the date of issuance of the           *
Bonds until the maturity date of the _____ Bonds with
the longest maturity, which is a period equal to ___4323___
days.

"Qualified Project Period" means a period
beginning on the first day on which 10% of the units in the
Project are occupied until the later of (1) the date which is
10 years after the date on which 50% of the units in the
Project are occupied, (2) the date which is a Qualified
Number of Days after the date of initial occupancy of the
Project, or (3) the date on which any assistance provided
with respect to the Project under Section 8 terminates.  For
purposes of this definition and Paragraph 3 above, "occupied"
or "occupancy" refer only to occupancy on or after the
initial closing of the Loan and do not include occupancy
before such initial closing.

### 10.   Terminology.

Terminology expressed in any gender and number
is employed for convenient expression and not for purposes of

*   1983-B HELP and 1985-A HELP

Case 1:93-cv-00655-DAT    Document 833-4    Filed 04/17/25    Page 3 of 79

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0191, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

```
ISG/rlb (8-DEC-86  D10/11
MHF Multi-Family HELP                              Page 6
```

## 6529    191

limiting the applicability of the provisions of this
Declaration. The use of the singular includes the plural and
the use of any gender includes all genders.

      11.  <u>Subordination.</u>

      This Declaration and the Restrictive Covenants
are subordinate to the deed of trust on the Property insured
by the Mortgage Insurer. In the event of foreclosure or
conveyance by deed in lieu of foreclosure, this Declaration
and the Restrictive Covenants shall automatically terminate;
however, the provisions of this Paragraph shall cease to
apply in the event of foreclosure or conveyance by deed in
lieu of foreclosure or similar event if, at any time
subsequent to such event and during the Qualified Project
Period, the obligor of the acquired purpose obligation (as
defined in Treas. Reg. §1.103-13(b)(4)(iv)(A)) or a related
person (as defined in Treas. Reg. §1.103-10(e)) obtains an
ownership interest in the Project for tax purposes.

      IN WITNESS WHEREOF, the parties have signed and
delivered this Agreement and Declaration of Covenants and
Restrictions as of the date first written above.

ATTEST/OR WITNESS:          COMMUNITY DEVELOPMENT
                         ADMINISTRATION

      E. Rouse           By: Nancy S. Kase
                        Name: Nancy S. Kase
                        Title: Authorized Officer

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0192, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

6529   192

**7**

**DECLARANT:**

INDIAN HEAD MANOR
LIMITED PARTNERSHIP I,
a Maryland limited partnership

By:   Indian Head Manor
Limited Partnership II,
a Maryland limited partnership
Managing General Partner

ATTEST:

By:   McShea & Company, Inc.,
a Maryland corporation,
General Partner

_John F. McShea_
JOHN F. McSHEA III
ASST. SECRETARY

By: _John F. McShea_
JOHN F. McSHEA
PRESIDENT

[CORPORATE SEAL]

WITNESS:

_Anne Wilburn_

_John G. Mergner_
John G. Mergner
General Partner

Case 1:93-cv-00655-DAT   Document 833-4   Filed 04/17/25   Page 5 of 79

6529   193

STATE OF MARYLAND:          COUNTY OF *Anne Arundel*, To Wit:

I HEREBY CERTIFY that on this _8th_ day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared *Nancy S. Kase*, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he or she is an Authorized Officer of the Community Development Administration, a division of the Department of Economic and Community Development, that he or she has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Notary Public

My Commission Expires: _7/1/1990_

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0193, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0194, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

6529    194

9

**STATE OF MARYLAND:**          **COUNTY OF** <u>MONTGOMERY</u>   : To Wit:

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared <u>JOHN F. McSHEA</u>, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is the <u>PRESIDENT</u> of McShea & Company, Inc., a Maryland corporation, a general partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Donna M. Dambrauskas<br>
Notary Public

My Commission Expires: <u>July 1, 1990</u>

DONNA M. DAMBRAUSKAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 1990

**STATE OF MARYLAND:**          **COUNTY OF** <u>MONTGOMERY</u>   : To Wit:

    I HEREBY CERTIFY that on this 8th day of January, 1987, before me, a Notary Public for the State and county described above, personally appeared John G. Mergner, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is a General Partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Donna M. Dambrauskas<br>
Notary Public

My Commission Expires: <u>July 1, 1990</u>

DONNA M. DAMBRAUSKAS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires July 1, 1990

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) NLP 6529, p. 0195, MSA_CE64_6610. Date available 10/09/2007. Printed 12/27/2024.

6529    195

*10*

## EXHIBIT A

### LEGAL DESCRIPTION OF

### INDIAN HEAD MANOR APARTMENTS

Parcel "A" in the subdivision known as "Thorne Property", as per plat thereof recorded in Plat Book W.W.W. 59 at Plat 34 among the Land Records of Prince George's County, Maryland and being in Oxon Hill (12th Election District).

PROJECT NAME:  INDIAN HEAD MANOR
CDA PROJECT NO.:  17.0003
MHF PROJECT NO.:  H-00008-001-17

## DEED OF TRUST NOTE

$93,817.00                          _Bethesda_ ,Maryland

                               _October 14_ , 1988

    FOR  VALUE RECEIVED, INDIAN HEAD MANOR LIMITED PARTNERSHIP I,
a limited partnership duly organized and validly existing under
the  laws  of  the  State of Maryland (the "Promisor"), promises to
pay to the Community Development Administration, an agency in  the
Division  of  Housing  Finance  of  the  Department of Housing and
Community Development of the State of Maryland ("CDA"), or  order,
the   principal   sum   of  Ninety-three  Thousand  Eight  Hundred
Seventeen Dollars ($93,817.00), or so much of that  sum  that  may
be  advanced  by CDA under the rehabilitation loan agreement dated
January 8, 1987 between Promisor  and  CDA  (the  "Rehabilitation
Loan  Agreement")  with  interest  payable as set forth below (the
"Loan").

    Promisor  promises  to  pay  to CDA the principal sum of this
Deed of Trust Note (the "Note"), together  with  interest  at  the
rate  of  8.75  percent  per annum (the "Interest Rate"), and all
assessments, taxes and premiums as follows:

    A.  Beginning  on  the  first day of each and every calendar
month after the date of this Note, Promisor shall pay to CDA
principal  and  interest  in  equal  monthly installments, each of
which installments shall be  in  an amount which,  when  applied
first  to  interest  and  then to the reduction of principal, shall
amortize the entire principal debt by --------------April 1 , 2007
(the "Maturity Date").

    B.  Beginning  with  the  first  payment  of  principal  and
interest under Paragraph A above, the Promisor shall make  monthly
payments  to  CDA  for  any  taxes, assessments, insurance premiums
for mortgage, property, hazard, and all other  policies  of
insurance,  and reserves at the times and in the manner prescribed
by CDA in accordance with the terms of the Deed of Trust  (defined
below).  (See Addendum I).

    C.  If  any  installment  of  interest  or  principal or any
other payment due under this Note is not paid within 10 days  from

IRH 0003804

A203

EMD/pld 101188 ~4/F55
HELP Deed of Tru_ Note, 19__ Series  FHA F__st/Conventional
First  HUD APPROVED FORM PKC:gfg (102484 - 75/127)
DO NOT MODIFY WITHOUT APPROVAL                    Page 2

the date that the installment or payment is due, Promisor promises to pay CDA a "late charge" equal to 5% of the aggregate monthly payment required by this Note.

D.  This Note is secured by a Deed of Trust, Security Agreement, and Assignment of Rents of even date herewith from Promisor to PAUL K. CASEY and ELIZABETH S. ROESE, trustees for the benefit of CDA (the "Deed of Trust"), covering real estate located in Prince George's County, Maryland, to which Deed of Trust reference is made for a description of the property, definition of terms, the nature and extent of the security, and the rights of CDA and its successors and assigns, in respect of such security.

E.  Upon the prior approval of CDA or subsequent holder, the Promisor may prepay the then outstanding amount of this Note, in whole or in part, if no default exists under this Note or the Deed of Trust, on the first day of any calendar month in multiples of (except in the case of the prepayment of the then total principal balance of the Note) not less than $10,000 upon not less than 30 days nor more than 90 days prior written notice to CDA or subsequent holder specifying the date on which prepayment is to be made and the amount which is to be prepaid. Any prepayment must include:

(i)  interest accrued and unpaid on the principal balance of this Note to and including the date of prepayment;

(ii)  all other sums due or owing under this Note or the Deed of Trust;

(iii)  the interest which shall accrue on the bonds to be redeemed in a principal amount equal to the amount of the prepayment to be applied to reduce the principal balance due under this Note, the proceeds of which bonds were used to fund the loan evidenced by this note (the "Bonds") from the date of prepayment until the next optional redemption date for the Bonds, as defined in CDA's applicable Trust Indenture, which period shall not exceed 6 months from the date of prepayment;

(iv)  an amount equal to the pro-rata share of the costs and expenses incurred in connection with the issuance of the Bonds; and

(v)  the costs and expenses of CDA in effecting the redemption.

Any partial prepayment of the principal balance of this Note shall be applied to the installments of principal and interest last due under this Note and shall not release the Promisor from the obligation to pay the installments of principal and interest next becoming due under this Note.

F.  Upon an Event of Default, as defined in the Deed of

IRH 0003805

EMD/pld  101188  ~D4/F55
HELP Deed of Tru  Note, 19_  Series    FHA 1 :st/
First  HUD APPROVED FORM PKC:gfg (102484 - 75/127
DO NOT MODIFY WITHOUT APPROVAL

Trust,  the  unpaid  principal  with  interest  a
secured by the Deed of Trust shall at the option
this  Note  become  immediately  due  and  payabl
exercise this option shall not constitute a waive
to exercise this option in the event of any subse

    G.   As  to  this  Note,  the  Deed  of  Trust, t
Loan  Agreement,  and any other documents or instru
or  securing  the  indebtedness  (the "Loan Document
all  guarantors,  if  any,  severally waive all  appl
rights,  whether  under  any state constitution  ʲ
otherwise,  and  also  severally  waive  valuation  ä
presentment,  protest  and  demand,  notice of p:
dishonor  and  nonpayment  of  this  Note,  and  expre
the  maturity of this Note, or any payment under
extended  from time  to  time  without  in  any  wä
liability of Promisor and all guarantors.

    H.   If  the  principal  amount  of  this  Notʲ
due  or  any  installment  of  interest,  pri.
administrative  fee,  or  any  other  payment due
not paid within 10 days of the date when due, wh
or  acceleration,  Promisor authorizes the clerk
any  court  of record  to  appear  for  it  and ʲ
confession  for  the  balance  then  due  on this
interest, court costs, and reasonable attorney's

    I.   All  payments  due  under this Note sh
regular  business  hours at the principal office o
7355  Wisconsin  Avenue,  Bethesda,  Maryland 2081
place  that CDA may designate in writing,  and ʂ
coin  or  currency  of  the  United  States of Am
time of payment is legal tender for the payme
private debts.

    J.   The  Promisor  represents  and warrants
(a)  a  natural  person  or (b) a business or commer
within  the  meaning  of  subtitle 1 of title 1:
Law Article of the Annotated Code of Maryland,
the  Promisor  further  represents  and  warrant
evidenced by this Note was made  and transacteʲ
purpose  of  carrying  on  or  acquiring  a bus
enterprise within the meaning of that subtitle.

    K.   If  the  Promisor  is  a  limiteʲ
corporation,  neither the Promisor nor any part
the  Promisor  shall  have  any personal liabili
deposits due under this Note, except for:

        (i)  funds  or  property  of the Proj
Loan  coming  into  their  hands  which,  by  the
Note,  the  Deed  of  Trust,  the  Rehabilitation
Regulatory  Agreement  by  and  between  the  Promis
January  8,  1987  (the "Regulatory Agreement")

IRH 0003806

EMD/pld 101188  D4/F55
HELP Deed of Tru  Note, 19__ Series  FHA F__st/Conventional
First  HUD APPROVED FORM PKC:gfg (102484 – 75/127)
DO NOT MODIFY WITHOUT APPROVAL                    Page 4

Document, they are not entitled to retain; and

      (ii) their own acts, deeds, and omissions, or the acts,
deeds, and omissions of others which they authorized in violation
of the provisions of the Note, Deed of Trust, Rehabilitation Loan
Agreement, Regulatory Agreement, or any other Loan Document.

    L. If Promisor is not a limited partnership or
corporation, this Note shall be the joint and several obligation
of all promisors, sureties, guarantors and endorsers and shall be
binding upon them and their heirs, personal representatives,
successors and assigns.

    M. Addendum I attached hereto, is incorporated herein and
together herewith constitutes the entire Note.

    **IN WITNESS WHEREOF,** Promisor has caused this Note to be
executed and delivered on its behalf on the date first written
above.

                INDIAN HEAD MANOR LIMITED
                PARTNERSHIP I, a Maryland
                limited partnership

        By:  Indian Head Manor Limited
             Partnership II, a Maryland
             limited partnership,
             Managing General Partner

ATTEST:
                By:  McShea & Company, Inc.,
                  a Maryland corporation,
                  General Partner

*Beverly G. Hoover*

                By: *Timothy B. McShea*
                  Name:Timothy B. McShea
                  Title:Executive Vice President

[Corporate Seal]

WITNESS:

*Margaret A. Taylor*
                By: *John G. Mergner*
                  John G. Mergner,
                  / General Partner

IRH 0003807

EMD/pld  101188   04/F55
HELP Deed of Trust Note, 19__ Series   FHA First/Conventional
First  HUD APPROVED FORM PKC.gfg (102484 - 75/127)
DO NOT MODIFY WITHOUT APPROVAL                    Page 5

STATE OF MARYLAND:
COUNTY OF _Montgomery_     : To Wit:

    I HEREBY CERTIFY that on this ___ day of _____,
1988, before me, a Notary Public for the State and county
described above, personally appeared _____, known to
me or satisfactorily proven to be the person whose name is
subscribed to the foregoing instrument, who acknowledged that he
is the _____ of McShea & Company, Inc., a Maryland
corporation, a General Partner of Indian Head Manor Limited
Partnership II, a Maryland limited partnership, the Managing
General Partner of Indian Head Manor Limited Partnership I, a
Maryland limited partnership, that he has been duly authorized to
execute and has executed, such instrument on its behalf for the
purposes set forth in it, and that such execution is its act and
deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial
Seal, the day and year first above written.

                          Notary Public

My Commission Expires:
                    LINDA M. ASHER
              NOTARY PUBLIC STATE OF MARYLAND
              My Commission Expires July 1, 1990

STATE OF MARYLAND:
COUNTY OF _MONTGOMERY_     :To Wit:

    I HEREBY CERTIFY that on this _14th_ day of _OCTOBER_,
1988, before me, a Notary Public for the State and county
described above, personally appeared John G. Mergner, known to me
or satisfactorily proven to be the person whose name is
subscribed to the foregoing instrument, who acknowledged that he
is a General Partner of Indian Head Manor Limited Partnership II,
a Maryland limited partnership, the Managing General Partner of
Indian Head Manor Limited Partnership I, a Maryland limited
partnership, that he has been duly authorized to execute and has
executed, such instrument on its behalf for the purposes set
forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial
Seal, the day and year first above written.

            Donna M. Dambrauskas
            Notary Public

My Commission Expires: 7/1/90
              DONNA M. DAMBRAUSKAS
             NOTARY PUBLIC STATE OF MARYLAND
            My Commission Expires July 1, 1990

IRH 0003808

EMD/pld  101188   04/F55
HELP Deed of Trust Note, 19__ Series   FHA First/Conventional
First  HUD APPROVED FORM PKC:gfg (102484 − 75/127)
DO NOT MODIFY WITHOUT APPROVAL                    Page 6

This  Note  is  identified by  the signature of one of the Trustees
in the Deed of Trust securing it.

By: _____
    Elizabeth S. Roese, Trustee

        THIS  IS  TO CERTIFY that this is the Note described in,
and secured by, the Deed of Trust, as amended  by  that  certain
Modification  Agreement  dated  of  even  date  herewith,  in  the
principal amount of $93,817.00, covering  real  estate  in  Prince
George's County, State of Maryland.

        Dated this ____ day of _____, 1988.

                        _____
                              Notary Public

My Commission Expires:

IRH 0003809

EMD/pld 101188  ͻ4/F55
HELP Deed of Trust Note, 19__ Series   FHA First/Conventional
First  HUD APPROVED FORM PKC:gfg (102484 – 75/127)
DO NOT MODIFY WITHOUT APPROVAL                    Page 7

ADDENDUM I

      Except   for   the   payment   to   CDA   for   the   mortgage
insurance premium for the Maryland Housing  Fund,  the  provisions
of  Paragraph  B hereof shall not apply so long as the Borrower is
in compliance with the terms and  conditions  of  Paragraph  7  of
that   certain   Deed of Trust dated July 1, 1968 and recorded among
the Land Records of Prince George's County,  Maryland  in  Liber
3623,   folio   447,   as  modified  by  that  certain  Modification
Agreement dated July 1, 1968  and  recorded  among  the  aforesaid
Land  Records  in  Liber .3623,  folio 586, as further modified by
that certain Modification Agreement  dated  August  23,  1968  and
recorded   among   the  aforesaid  Land  Records  in Liber 3636, folio
631, as assumed pursuant  to  that  certain  Assumption  Agreement
dated  May  26, 1969 and recorded among the aforesaid Land Records
in Liber 3807, folio 820, and as further  modified  by  unrecorded
Modification  Agreements dated April 1, 1971 and December 1, 1973.
Beginning with the first payment of principal and  interest .under
Paragraph  A  hereof,  the  Promisor  shall make monthly payments to
CDA of the MHF insurance premium.

IRH 0003810

7123  519

When recorded return to:
Department of Housing and
  Community Development
Legal Office
45 Calvert Street
Annapolis, Maryland 21401
Attn:  Alice Pride
MHF Insured - Market

## MODIFICATION AGREEMENT

THIS **MODIFICATION AGREEMENT** (this "Agreement") is made this _14th_ day of _October_ , 1988, by and among INDIAN HEAD MANOR LIMITED PARTNERSHIP I, a Maryland limited partnership with its principal place of business at 4340 East-West Highway, Suite 900, Bethesda, Maryland 20814 (the "Borrower"), the COMMUNITY DEVELOPMENT ADMINISTRATION ("CDA"), an agency in the Division of Housing Finance of the Department of Housing and Community Development of the State of Maryland (the "Department"), located at 45 Calvert Street, Annapolis, Maryland 21401, and the MARYLAND HOUSING FUND ("MHF"), an agency in the Division of Housing Insurance of the Department.

### RECITALS

By Deed of Trust, Security Agreement and Assignment of Rents (the "Deed of Trust") dated January 8, 1987, and recorded among the Land Records of Prince George's County, Maryland in Liber 6529, folio 134, the Borrower granted and conveyed to CDA certain property located in Prince George's County, Maryland, more particularly described in said Deed of Trust and on Exhibit A attached hereto (the "Property"), for the purpose of securing payment of a loan from CDA to the Borrower (the "Loan") in the original principal sum of $385,000.00 (the "Original Loan Amount"), together with interest thereon, made pursuant to a Rehabilitation Loan Agreement dated January 8, 1987 (the "Loan Agreement") and evidenced by a Deed of Trust Note dated January 8, 1987 (the " Original Note").

In connection with the Loan, the Borrower and CDA entered into a Regulatory Agreement (the "Regulatory Agreement") dated January 8, 1987, and recorded among the Land Records of Prince George's County, Maryland in Liber 6529, folio 171, and an Agreement and Declaration of Covenants and Restrictions (the "Agreement of Covenants and Restrictions") dated January 8, 1987, and recorded among the Land Records of Prince George's County, Maryland in Liber 6529, folio 186.

IRH 0003811

EMD/pld 101188  HL  F49              7123  520
(053084 - 78)
MHF Indian Head Manor Modification Agreement          Page 2 of 6

Pursuant to the Agreement and Certification dated January 8, 1987, among Borrower, CDA and MHF, Borrower has submitted a Certificate of Actual Cost to MHF, and MHF has determined that the final approved mortgage amount shall be $478,817.00. Accordingly, CDA has agreed to lend an additional $93,817 to the Borrower, which loan will be insured by MHF, made pursuant to the Loan Agreement, evidenced by a Deed of Trust Note of even date herewith (the "Second Note"), and be secured by the Deed of Trust as an additional advance under Section 39 of the Deed of Trust.

CDA is the owner and holder of the Note and is the beneficiary of the Deed of Trust.

The parties hereto wish to modify the Deed of Trust and the Regulatory Agreement to reflect the Second Note and to increase the amount secured by the Deed of Trust.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. The Deed of Trust, the Loan Agreement, the Regulatory Agreement and the Agreement of Covenants and Restrictions are hereby modified by deleting all references to the Original Loan Amount and inserting in lieu thereof the amount of Four Hundred Seventy-Eight Thousand Eight Hundred Seventeen Dollars ($478,817.00).

2. All references to the "Bonds" set forth in the Agreement of Covenants and Restrictions shall be amended to include CDA's Home and Energy Loan Revenue Bonds, 1987 Series B.

3. The definition of "Qualified Number of Days" set forth in the Agreement of Covenants and Restrictions is deleted and the following definition substituted in its place:

"Qualified Number of Days' means 50% of the number of days from the date of issuance of the Bonds until the maturity date of the Bonds with the longest maturity, which is a period equal to 4679 days."

4. All of the terms, covenants and provisions of the Deed of Trust, Regulatory Agreement, Agreement of Covenants and Restrictions and all other documents relating to the Loan, as modified by this Agreement, shall remain in full force and effect.

5. This Agreement shall not constitute a novation of the obligation evidenced by the Original Note and the Borrower hereby ratifies its obligations under the Original Note.

6. All of the terms and conditions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IRH 0003812

EMD/pld 101188  H1  F49   7123  521
(053084 - 78)
MHF Indian Head Manor Modification Agreement                    Page 3 of 6

    **WITNESS** the hands and seals of the parties hereto the day and year first above written.

    **IN WITNESS WHEREOF,** Promisor has caused this Note, to be executed and delivered on its behalf on the date first written above.

                        INDIAN HEAD MANOR LIMITED
                        PARTNERSHIP I, a Maryland
                        limited partnership

                By:  Indian Head Manor Limited
                      Partnership II, a Maryland
                      limited partnership,
                      Managing General Partner

ATTEST:

                By:  McShea & Company, Inc.,
                      a Maryland corporation,
                      General Partner

*Beverly G. Hoover*

                By:  *Timothy B. McShea*
                    Name: Timothy B. McShea
                    Title: Executive Vice President
[Corporate Seal]

WITNESS:

*Margaret L. Gaylo*    By: *John G. Mergner*
                            John G. Mergner
                            General Partner

STATE OF MARYLAND:
COUNTY OF *Montgomery* : To Wit:

    I HEREBY CERTIFY that on this *14th* day of *October*, 1988, before me, a Notary Public for the State and county described above, personally appeared *Timothy B. McShea*, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument, who acknowledged that he is the *Exec V P* of McShea & Company, Inc., a Maryland corporation, a General Partner of Indian Head Manor Limited Partnership II, a Maryland limited partnership, the Managing General Partner of Indian Head Manor Limited Partnership I, a Maryland limited partnership, that he has been duly authorized to execute and has executed, such instrument on its behalf for the purposes set forth in it, and that such execution is its act and deed.

    IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

                         *Linda M. Asher*
                          Notary Public

My Commission Expires:

                  LINDA M. ASHER
          NOTARY PUBLIC STATE OF MARYLAND
          My Commission Expires July 1, 1990

IRH 0003813

EMD/pld  101188  ./F49         7123  5..
(053084 - 78)
MHF Indian Head Manor Modification Agreement        Page 3A of 5

    **IN WITNESS WHEREOF,** the Community Development Administration
and the Maryland Housing Fund have caused this  Note  Modification
Agreement  to  be executed and delivered on their behalf as of the
date first written above.

WITNESS:                        COMMUNITY DEVELOPMENT
                                ADMINISTRATION

_Jean D. Mahle_                 By: _Dennis Melton_
                                    Dennis Melton,
                                    Construction Loan Coordinator

                                MARYLAND HOUSING FUND

_Pat Sermon_                    By: _____

Approved as to form and
legal sufficiency

_Elizabeth M. Dunn_
Assistant Attorney General

IRH 0003814

EMD/pld 101188 H F49     **7123 523**
(053084 - 78)
MHF Indian Head Manor Modification Agreement     Page 4 of 6

STATE OF MARYLAND:
COUNTY OF MONTGOMERY : To Wit:


     I HEREBY CERTIFY that on this 14th day of OCTOBER ,
1988, before me, a Notary Public for the State and county
described above, personally appeared John G. Mergner, known to me
or satisfactorily proven to be the person whose name is
subscribed to the foregoing instrument, who acknowledged that he
is a General Partner of Indian Head Manor Limited Partnership II,
a Maryland limited partnership, the Managing General Partner of
Indian Head Manor Limited Partnership I, a Maryland limited
partnership, that he has been duly authorized to execute and has
executed, such instrument on its behalf for the purposes set
forth in it, and that such execution is its act and deed.

     IN WITNESS WHEREOF, I have set my hand and Notarial
Seal, the day and year first above written.

               _Donna M. Dambrauskas_
               Notary Public

My Commission Expires: 7/1/90

               DONNA M. DAMBRAUSKAS
               NOTARY PUBLIC STATE OF MARYLAND
               My Commission Expires July 1, 1990


STATE OF MARYLAND:
COUNTY OF Anne Arundel : To Wit:

     I HEREBY CERTIFY that on this ___ day of October ,
1988, before me, the subscriber, a Notary Public in, and for the
State of Maryland, personally appeared Dennis Melton
_____ of the Community Development
Administration; and he acknowledged to me that he executed the
foregoing Modification Agreement on behalf of the said Community
Development Administration for the purposes therein contained,
and further acknowledged the foregoing Modification Agreement to
be the act of the said Community Development Administration.

     AS WITNESS my hand and Notarial Seal.

               _Jean D. Mahle_
               Notary Public

My Commission Expires:
MY COMMISSION EXPIRES JULY 1, 1990

IRH 0003815

EMD/pld  101188  H   F49
(053084 – 78)
MHF Indian Head Manor Modification Agreement

**7123  524**

Page 5 of 6

STATE OF MARYLAND        )
                         )  SS.
COUNTY OF _Caroline_     )

    I HEREBY CERTIFY that on this 17th day of ___October___,
1988, before me, the subscriber, a Notary Public in and for the
State of Maryland, personally appeared ___Charles S. Colson___,
_____ of the Maryland Housing Fund who
acknowledged that he executed the foregoing Modification
Agreement on behalf of the said Maryland Housing Fund for the
purposes therein contained, and further acknowledged the
foregoing Modification Agreement to be the act of the said
Maryland Housing Fund.

    AS WITNESS my hand and Notarial Seal.

_____
Notary Public

My Commission Expires: 7/1/90

IRH 0003816

A215

EMD/pld  101188  H⌐ ⌐F49
:053084 - 78)
IHF Indian Head Manor Modification Agreement          Page 6 of 6

## 7123  525

EXHIBIT A

### Legal Description of the Property

Parcel "A" in the subdivision known as "Thorne Property", as per plat thereof
recorded in Plat Book W.W.W. 59 at Plat 34 among the Land Records of Prince
George's County, Maryland and being in Oxon Hill (12th Election District).

IRH 0003817

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ♦ Suite 300
Bethesda, Maryland 20814 ♦ 301/654-1420   Fax 301/654-6144



RECEIVED
DHUD

DEC 28 1990

LMB - MULTIFAMILY

December 21, 1990

Ms. Sylvia Hamilton
Dept. of Housing & Urban Development
Washington D. C. Area Office
451 - 7th St., SW
Washington, DC 20410-5500

Re:  Indian Head Manor Limited Partnership
     FHA Project No.:  000-55026-LDP

Dear Ms. Hamilton:

In accordance with HUD Notice (H90-88), Indian Head Manor Limited
Partnership I is submitting the enclosed Notice of Intent to
Prepay Mortgage under Section 222 of Title II of the Housing and
Community Development Act of 1987.

Very truly yours,

Dennis A. Koubek
Vice President of Finance

DK/lh
Enc

WSH0210559

Exhibit 1

OMB APPROVAL NO. 2502-0378

## INTENT TO PREPAY MORTGAGE

**IMPORTANT:** THIS FORM SHOULD BE COMPLETED IN TRIPLICATE AND SUBMITTED <u>SIMULTANEOUSLY</u> TO: 1) HUD FIELD OFFICE, 2) HUD HEADQUARTERS, AND 3) STATE AND/OR LOCAL AGENCY(IES).

PROJECT NAME:  INDIAN HEAD MANOR

PROJECT NUMBER:    FHA Project No.: 000-55026-LDP

PROJECT ADDRESS:   Indian Head Manor Apartments

8340 Indian Head Highway

Fort Washington,  MD 20744

PLANS FOR THE PROJECT:
(Pursuant to Sect. 248.211)   If prepayment not permitted by
Title II of the Emergency Low Income Housing Preservation
Act (ELIHPA), and assuming the Act is constitutional, then
operate as low and moderate income rental project provided
owner receives certain incentives permitted by ELIHPA.

TIMETABLES OR DEADLINES FOR PROPOSED ACTIONS:  As soon as possible
after the 20th anniversary of final endorsement.

7

WSH0210560

**REASON(S) FOR PREPAYMENT:** Assuming prepayment would be permitted, we would do so in order to operate the project at market rate without distribution restrictions.

**REASON(S) FOR CHANGING MORTGAGE TERMS/REGULATORY AGREEMENT:** Assuming no prepayment, we would desire change in regulatory agreement to end limitation on distributions and make other changes consistent with the incentives provision of ELIPHA. We are seeking no change in the mortgage.

**DESCRIPTIONS OF CONTACTS MADE OR DISCUSSIONS WHICH HAVE BEEN HELD WITH OTHER GOVERNMENT AGENCIES OR OTHER INTERESTED PARTIES IN CONNECTION WITH THIS NOTICE OF INTENT:** NONE

**ADDITIONAL COMMENTS:** By filing this Notice of Intent under Title II of ELIHPA, pursuant to Section 604(a) of the Cranston-Gonzalez National Affordable Housing Act of 1990, we do not waive our right to proceed under the provisions of the Title VI of the 1990 act at our option.

8

WSH0210561

FROM:

OWNER NAME:   INDIAN HEAD MANOR LIMITED PARTNERSHIP I
Eugene F. Ford, General Partner

OWNER ADDRESS:   4340 East-West Hwy., Suite 300

Bethesda, MD 20814

Attn.: Dennis A. Koubek

OWNER TELEPHONE: 301/961-1740

9

WSH0210562

A220

SH

INTENT TO PREPAY MORTGAGE

RECEIVED
DHUD
APR 11 1989

IMPORTANT: THIS FORM SHOULD BE COMPLETED IN TRIPLICATE AND SUBMITTED SIMULTANEOUSLY TO: 1) HUD FIELD OFFICE, 2) HUD HEADQUARTERS, AND 3) STATE AND/OR LOCAL AGENCY(S).

PROJECT NAME:        Indian Head Manor Apartments

PROJECT NUMBER:      000-55026

PROJECT ADDRESS:     8340 Indian Head Highway

                     Fort Washington, Maryland  20744

RECEIVED
DHUD
APR 1 2 1989
LOAN MANAGEMENT

PLANS FOR THE PROJECT:
(Pursuant to § 248.211)   The partnership intends to either prepay the

mortgage or seek modification of the Regulatory Agreement so that the

partnership would receive a level of compensation equivalent to an

unregulated project.

TIMETABLES OR DEADLINES FOR PROPOSED ACTIONS:   One year from the

date of this notice.

WSH0210563

REASON(S) FOR PREPAYMENT: _____ Contractual right. _____

_____

_____

_____

_____


REASON(S) FOR CHANGING MORTGAGE TERMS/REGULATORY AGREEMENT: _____

To increase level of compensation to the partnership. _____

_____

_____

_____

_____


DESCRIPTIONS OF CONTACTS MADE OR DISCUSSIONS WHICH HAVE BEEN HELD
WITH OTHER GOVERNMENT AGENCIES OR OTHER INTERESTED PARTIES IN
CONNECTION WITH THIS NOTICE OF INTENT? None. _____

_____

_____

_____

_____


ADDITIONAL COMMENTS? _____

_____

_____

_____

_____

WSH0210564

*Elliot Bernold*

FROM: Elliot Bernold, President, Edgewood
Management Corporation, Agent for

OWNER NAME: Indian Head Manor Limited
Partnership I

OWNER ADDRESS: c/o Edgewood Management Corp.

4340 East-West Highway, #900
Bethesda, Maryland  20814

OWNER TELEPHONE: (301) 654-9110

WSH0210565



# *Maryland*

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

Community Development Administration
Office of the Director

45 Calvert Street
Annapolis, Maryland 21401-1907
(301) 974-3161

William Donald Schaefer, Governor
Jacqueline H. Rogers, Secretary

*Copy — Koubek &
Bernold*
*4/2/91*

March 22, 1991

Mr. Eugene F. Ford
Indian Head Manor Limited Partnership I
4340 East-West Highway, Suite 300
Bethesda, Maryland  20814

Re:  INDIAN HEAD MANOR APTS.

Dear Mr. Ford:

We have been advised by the U.S. Department of Housing and Urban
Development that you have filed a Notice of Intent to Prepay
Mortgage under either Title II of the Emergency Low-Income Housing
Preservation Act (ELIHPA) of 1987, or Section 212 of the Low-Income
Housing Preservation and Resident Homeownership Act of 1990
(LIHPRHA), which is found at Sec. 601(a) of Title VI of the
Cranston-Gonzalez National Affordable Housing Act of 1990.

This letter is to inform you that if you pursue prepayment under
the 1987 ELIHPA, you will be subject to the provisions of the
Maryland Assisted Housing Preservation Act, which became effective
July 1, 1989.  The Maryland law is not preempted by the federal law
when owners file under the 1987 ELIHPA, but is preempted if they
elect to proceed under the 1990 LIHPRHA.  Owners that filed Plans
of Action under the ELIHPA prior to October 11, 1990 and, pursuant
to Section 604(b) of the Cranston-Gonzalez Act, elect to convert to
the incentives and restrictions of the 1990 LIHPRHA are also
covered by the Maryland law.

The Maryland Department of Housing and Community Development bears
the responsibility for enforcement of the Maryland Assisted Housing
Preservation Act, a copy of which is enclosed with this letter.
Regulations pertaining to the Act will be available in the near
future.

It is important that you be aware of this application of the State
law so that you can consider its ramifications when deciding under
which federal legislation to proceed.  You will want to review the
State law carefully if you elect to proceed under the 1987 ELIHPA,
because some of the State's requirements differ from the federal
law, including notification, timing of actions, and other
procedures.  The State law also requires owners to provide tenant

IRH 0045947



Mr. Eugene F. Ford
Page Two
March 22, 1991

protections which are similar to those contained in the Cranston-Gonzalez National Affordable Housing Act of 1990. Full compliance with all provisions of the State law would be required if you have filed or elect to file under the 1987 ELIHPA.

Please contact Mr. Patrick N. Sheridan, Director of Housing Management, if you require additional information. He may be reached at 301-974-2178.

Sincerely,

Trudy P. McFall
Director
Community   Development
Administration

Enclosure

IRH 0045948

*File*

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ◆ Suite 300
Bethesda, Maryland 20814 ◆ 301/654-1420  Fax 301/654-6144

September 13, 1991

M E M O R A N D U M

TO:     Leslie Steen
        John Wall

FROM:   Eugene Ford

RE:     CDA

CC:     Dennis A. Koubek

I talked with Nancy Rase concerning the position of CDA with respect
to approving transactions involving the sale to priority purchasers
or the recasting to continue ownership under ELIHPA.

Where they have loans to projects that require their consent for
payoff, they are willing to approve such prepayments in either case
subject to bond prepayment restrictions on the HELP loans which run
for ten (10) years from the time CDA sold the HELP bonds, which in
both cases that I am familiar with, Indian Head and Glenview
Gardens, Nancy said would be in 1993.  I think Millwood was funded
under another program with State money that would not require such
limitations.  I believe this is also the case with Rock Creek, but
this should be checked out as should the real date of issue of the
HELP bonds.

IRH 0095062

| Notice of Election to Proceed | U.S. Department of Housing and Urban Development Office of Housing Federal Housing Commissioner | |
|---|---|---|
| Title II or Title VI | | |

OMB Approval No. 2502-0459

Public reporting burden for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Office, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C., 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0459) Washington, D.C., 20503. Do not send this completed form to either of these addresses.

| 1. Project Name & Address: | 2. HUD Field Office Address: Charlene Fields, Acting Chief, Loan Management Branch |
|---|---|
| Indian Head Manor Apartments 8340 Indian Head Highway Ft. Washington, MD 20744 | Washington, D.C. Field Office Union Center Plaza, Suite 300 820 First Street, N.E. Washington, D.C. 20002-4205 |

| 2. Project Number: | 4. Date of Notice: |
|---|---|
| 000-55026-LDP | June 5, 1992 |

5. In order to maintain eligibility for incentives under Title II of the Housing and Community Development Act of 1987, an eligible owner who filed a Notice of Intent under NOTICE H 90 - 88 must submit this form to the local HUD Field Office within 30 days of the effective date of the regulations governing Title VI.

☐ a. I/We elect to proceed under the provisions of Title II.

☒ b. I/We elect to proceed with the appraisal process under the Title VI. I/We will choose Title II or Title VI incentives within 30 days of receipt of appraisal information from HUD. I/We agree to reimburse HUD for the cost(s) of HUD's appraisal(s) if Title II incentives are chosen.

☐ c. I/We certify that a Plan of Action has not been filed under Title II after October 11, 1990.

Under the penalties and provisions of Title II, United States Code, Section 1001, the statements contained in this request and its attachments have been examined by me and, to the best of my knowledge and belief, are true, correct, and complete.

| 6. Owner's Name & Address: Indian Head Manor Limited Partnership I c/o Eugene F. Ford, General Partner Mid-City Financial Corporation 4340 East-West Highway, Suite 300 Bethesda, Maryland 20814 | 7. Signature & Date: June 5, 1992 Eugene F. Ford, General Partner Indian Head Manor Limited Partnership I |
|---|---|

Form HUD-9610 (04/07/92)
ref Handbook 4350.6

IRH 0045079

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ◆ Suite 300
Bethesda, Maryland 20814 ◆ 301/654-1420   Fax 301/654-6144

**CERTIFIED MAIL**

December 8, 1994

Mr. David Faulk
Director
Community Development Administration
100 Community Place
Crownsville, Maryland 21032-2023

RE:   Initial Notice of Intent
      FHA Project #052-44007-LDP
      Glenview Garden Apartments
      Glen Burnie, Maryland

Dear Mr. Faulk:

        In accordance with the regulations governing Title VI of the
Low Income Housing Act of 1990 (LIHPRHA) which became effective May
8, 1992, and on behalf of Glenview Gardens Limited Partnership, I
herewith transmit HUD Form #9608, Initial Notice of Intent to
extend the low income affordability restrictions governing Glenview
Garden Apartments and to seek incentives authorized by law.

        Please  direct  all  future  correspondence  and  inquiries
regarding the enclosed to my attention at the address and phone
number provided above.

                              Very truly yours,

                              John L. Wall
                              Executive Vice President

JLW:lsd

Enclosure

IRH 0001925

A228

**Initial Notice of Intent**
To Terminate or Extend Low — Income
Affordability Restrictions

U.S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner

(Pursuant to Section 212 of the Low Income Housing Preservation and Resident Homeownership Act of 1990)    OMB Approval No. 2502—0459

Public reporting burden for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Office, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C., 20410—3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502—0459), Washington, D.C., 20503. Do not send this completed form to either of these addresses.

This Notice must be filed simultaneously with (1) the local HUD Field Office, (2) the chief executive officer of the appropriate State or local government, (3) the mortgagee, (4) tenants of the property, (5) all known representatives of the tenants.

1. Date of this Notice:    December 8, 1994

2. Purpose of this Notice (Check one)

   [X]  Extend the low income affordability restriction by requesting incentives or;

   [ ]  Offer to Sell the housing to a qualified purchaser.

   [ ]  Terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance.

3. Borrower and Project Information:

   a.  Borrower Entity    Glenview Gardens Limited Partnership

   b.  FHA Project Number:  #052—44007—LDP

   c.  State Agency Project Number (if project is Section 236 non—insured):    N/A

   d.  Project Name:    Glenview Gardens Apartments

   f.  Project Address (include City, State, and Zip Code):   7987 Nolpark Court

   Glen Burnie, Maryland 21061

   e.  Date of Final Endorsement:   September 21, 1972

4. Name of Mortgagee:  First: FNMA;   Second: Bogman, Inc.

5. Name of State or Local Agency Receiving this Notice of Intent:   Governor and Community Development Administration (State)
   County Executive, County Council, ACDA (County)

6. Owner's Certification

   I, the undersigned, certify that this Notice of Intent has been submitted and distributed in accordance with the requirements of the statute as specified above.

   [X]  I certify that I know of no tenant representative.

Under the penalties and provision of Title 18, United States Code, Section 1001, the statements contained in the request and its attachments have been examined by me, and to the best of my knowledge are true, correct, and complete.

Signature (Owner):                               Date: December 8, 1994

Name (Owner):  BY: Dennis A. Koubek, General Partner
               Glenview Gardens Limited Partnership
Address (Include City, State, Zip Code):  c/o Mid—City Financial Corporation

               4340 East—West Highway, S. 300

               Bethesda, Maryland 20814

# Residents

## Important Information about this Notice of Intent is on the back of this form

ref Handbook 4350.6                Form HUD—9608 (04/03/92)

IRH 0001926

**Notice of the Availibility
of Translations of
Forms HUD-9608 and 9609**

U. S. Department of Housing
and Urban Development
Office of Housing
Federal Housing Commissioner



OMB Approval No. 2502-0458

If you need a translation of this Notice of Intent, please contact the owner of the project:

Si necesita una traducción de este Aviso, sirvase solicitarla
al propietario del edificio.

Если Вам нужен перевод текста данного Уведомления, пожалуйста,
обратитесь к владельцу Вашего здания.

このお知らせの日本語版をご希望の方は、当ビルの所有者にお問い合わせください。

如果你需要本通告的译文，請與你所在的公寓楼之業主聯絡。

Si vous avez besoin de la traduction de cette annonce, veuilles vous
mettre en rapport avec le propriétaire de cet immeuble.

ถ้าท่านต้องการคำแปลของเอกสารนี้ กรุณาติดต่อเจ้าของอาคาร

اگر به ترجمه این آگهی احتیاج دارید خواهشمند است
با مالک ساختمان خودتان تماس بگیرید ٠

اذا انت بحاجة لترجمة هذا الاعلان، الرجاء الاتصال بمالك عمارتكم٠

이 공고문의 한국어 번역본이 필요하신분은
본건물의 소유주에게 연락하시면 구할수 있습니다.

Nếu quí vị cần bản dịch thông cáo này ra tiếng của mình, xin
liên lạc với chủ nhân chung cư nói mình cư ngụ.

ref. Handbook 4350.5          form HUD-9608-A (01/01/92)

IRH 0001927

A230

<u>**MEMORANDUM TO RESIDENTS**</u>
<u>**DECEMBER 1994**</u>

As a resident of Glenview Garden Apartments you have benefitted from an affordable rent structure resulting from agreements entered into between the owners of the property and the U. S. Department of Housing and Urban Development (HUD). Recent Federal law changes containing incentives have made it possible for the property to continue as HUD-assisted affordable low and moderate income housing.

In order to begin this process, the owners have filed the attached Initial Notice of Intent. As a result of the recent Federal law changes, we expect that at some time in the next two to three years, either the owners will accept HUD incentives, or the property will be sold. In either case, the property is expected to continue as HUD-assisted affordable low and moderate income housing.

As we understand the new Federal laws, this process will not cause any residents to have to move. We anticipate that HUD Section 8 rental assistance will be awarded, so that qualified residents will have the benefits thereof after the process is complete, and qualified residents will pay no more than 30% of income for rent and utilities.

Congress, HUD, resident groups and property owners all worked on the recent Federal law changes, and it is clear that the intent of the law changes is that this property, and others like it, will continue to be available as affordable, low and moderate income housing for years to come.

If you have any questions about this process, please put them in writing and send them to The Department of Housing and Urban Development at the following address:

   Robert Iber, Chief
   Loan Management Branch
   U. S. Department of Housing & Urban Development
   Baltimore, Maryland Field Office
   10 South Harwich Street, 5th Floor
   Baltimore, Maryland 21201

Again, we are pleased that Congress found a way for property owners to realize fair market value for their properties, while preserving and repairing much-needed affordable housing.

GLENVIEW GARDENS LIMITED PARTNERSHIP

IRH 0001928

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ♦ Suite 300
Bethesda, Maryland 20814 ♦ 301/654-1420   Fax 301/654-6144

**VIA FAX:   (410) 987-4097**

June 26, 1996

Mr. Russ Baxter
Maryland Housing Fund
Maryland Department of Housing and
    Community Development
100 Community Place
Crownsville, Maryland 21032-2023

RE:  Glenview Garden Apartments
     FHA Project #052-44077-LDP
     CDA Project #02.0002

     Indian Head Manor Apartments
     FHA Project #000-55026-LDP
     CDA Project #17.0003

Dear Russ:

       Pursuant to our recent phone conversation I wish to respond to
the matters discussed as follows:

**Repayment of the CDA Second Mortgage**

       During the months of April, May and June 1992 several
conversations and meetings took place between Nancy Rase,
Stephanie White, my council Scott Sterling and myself wherein
CDA was asked to consent to the prepayment of the Glenview and
Indian Head Second Mortgages pursuant to HUD's preservation
program known as LIHPRHA.   The request was denied on the
grounds that the second mortgages were financed as part of a
larger tax exempt bond funding that could not be prepaid.   I
challenged the response but was emphatically told that the
mortgages could not be prepaid.   Consequently, my LIHPRHA
Plans of Action and the project value determinations
(Preservation Values) were predicated upon the mortgages
staying in place.

       To change CDA's earlier decision at this stage in the LIHPRHA
process will have the effect of disqualifying both Glenview
and Indian Head from the preservation program which is
scheduled to sunset in the near future.

IRH 0254969

Mr. Russ Baxter
June 26, 1996
Page 2

**<u>Annual Oversight Costs</u>**

   With regard to the annual oversight fee, the National Foundation for Affordable Housing Solutions, Inc. has stipulated that any such fee paid shall be subordinate to the debt service requirements of the First and Second Mortgages of both projects as well as their operating expenses.

   Should you or Vickie require additional information please give me a call.

   Also, your timely approval of the requested transfer is critical to our ability to fund and preserve both Glenview Garden and Indian Head Manor Apartments.

                    Sincerely,

                    John L. Wall
                    Executive Vice President

JLW:lsd

A233

IRH 0254970

**MEMORANDUM**

**DRAFT**

TO:        Appraiser(s)

FROM:    Scott A. Sterling, Esq.
             Dunnells, Duvall & Porter

DATE:     May 16, 1992

RE:        <u>Appraisal of Preservation Values</u>
             Glenview Garden Apartments
             7987 Nolpark Court, Glen Burnie, Anne Arundel County, Maryland
             FHA Project No.: 052-44007

---

Glen Burnie Associates Limited Partnership, a Maryland limited partnership ("Owner") is the owner of the above-referenced low-income housing project ("Project"). The Project was constructed using the proceeds of a Section 236 HUD-insured deed of trust loan evidenced by a Deed of Trust Note dated August 27, 1970 in the original principal amount of $2,834,000 (the "HUD Note"). The HUD Note was "finally endorsed" for full insurance by HUD on _____, 197__. The HUD Note is secured by a Deed of Trust dated August 27, 1970 and which was recorded on August 27, 1970 in the Land Records of Anne Arundel County, Maryland (the "Land Records") in Liber 2360, Folio 321, which was modified by Modification Agreement dated January 1, 1972 which was recorded on September 21, 1972 in the Land Records in Liber 2523, folio 833 ("HUD Deed of Trust"). The Project is further encumbered by that certain Regulatory Agreement for Limited Distribution Mortgagors Insured Under Section 236 entered into by and between the Owner and HUD, which is also dated August 27, 1970 and which was recorded on August 27, 1970 in the Land Records in Liber 2360, Folio 329, and which was amended by Amendment to Regulatory Agreement dated November 8, 1971 and which was recorded in the Land Records on December 8, 1971 in Liber 2545, Folio 386 ("HUD Regulatory Agreement").

It is my understanding that the Owner desires to extend the low-income affordability restrictions and receive incentives from HUD pursuant to the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA").

As you know, the interim rule implementing LIHPRHA was published on April 8, 1992 (57 FR 11992), and the final Appraisal Guidelines were published on May 8, 1992 (57 FR 19970). The preamble to the interim rule suggests that the appraiser should obtain an analysis, performed by competent professionals (such as owner's legal counsel), of those non-HUD use restrictions, covenants and/or ordinances that currently encumber or may effect the Project, in order to assist the appraiser in making his/her determination of the effect these regulations, covenants or ordinances would have on the Project's Preservation Values if the Owner were to prepay the HUD Deed of Trust and convert the Project to conventional use. The Appraisal Guidelines state that it is the appraiser's responsibility to explore whether the Project has any such agreements.[1]

---

[1]    Please note that the Appraisal Guidelines state that the appraiser is supposed to seek legal advice from HUD Field Office Counsel on such restrictions and their impact on the appraisal. It is
(continued...)



EXHIBIT

A234

IRH 0044881

May 16, 1992
Page 2

As special counsel to the Owner, we have been asked to set forth our summary of those non-HUD use restrictions that currently affect this Project, specifically, those that arose out of a certain $447,285 Second Deed of Trust Rehabilitation Loan ("CDA Loan") made to the Owner pursuant to the Community Development Administration Home and Energy Loan Program, which CDA Loan is insured by the Maryland Housing Finance Agency.[2/] CDA issued its 1983 Series B and 1985 Series A tax-exempt revenue bonds (collectively, the "CDA Bonds") to provide the funds necessary to make this CDA Loan.

The CDA Loan is evidenced by a $447,285 (Second) Deed of Trust Note dated September 22, 1986 ("CDA Note"), and is secured by a (Second) Deed of Trust, Security Agreement and Assignment of Rents dated September 22, 1986 and which was recorded on September 22, 1986 in the Land Records in Liber 4154, Folio 206 ("CDA Deed of Trust"). The Project is further encumbered by a Regulatory Agreement dated September 22, 1986 and which was recorded on September 22, 1986 in the Land Records in Liber 4154, Folio 265 ("CDA Regulatory Agreement"). In connection with this CDA Loan, the Owner also entered into an Agreement and Declaration of Covenants and Restrictions dated September 22, 1986 and which was recorded on September 22, 1986 in the Land Records in Liber 4154, Folio 254 ("CDA Agreement and Declaration of Covenants and Restrictions"), and an unrecorded Occupancy Agreement dated September 22, 1986 ("CDA Occupancy Agreement").

A summary of the operative use restrictions contained in these CDA Loan documents and their duration is set forth below:

I.     CDA Regulatory Agreement

A.     Operative Use Restrictions

1.     "CDA Approval of Rent Increases" -- Owner must supply CDA with written notice of any rent increases, and CDA may require Owner to reduce rents and to establish rents only after approval by CDA (Section 7)

2.     "Rental Rates" -- the rental rates for initial occupancy of the Project shall be set by CDA (Section 9)

3.     "51% Occupancy Covenant" -- at least 51% of the units in the development will be rented to "families of limited incomes" under the limits established by the Secretary

---

[1/] (...continued)
our view that this does not preclude an appraiser from obtaining a memorandum from owner's counsel setting forth whether such non-HUD use restrictions exist and analyzing their impact on the Project.

[2/]     We have not been asked to determine whether the Project is, indeed, "eligible low-income housing" for purposes of LIHPRHA. In addition, this memorandum does not address the existence or impact of any Section 8 Housing Assistance Payment Contracts on this Project.

IRH 0044882

May 16, 1992
Page 3

of Economic and Community Development's Determination as to Upper Income Limits for Community Development Administration, i.e., annual incomes not exceeding $28,000 for one person and $33,000 for two or more persons (Section 10)
(see also CDA Occupancy Agreement described below)

B.    Duration of CDA Regulatory Agreement

The CDA Regulatory Agreement remains in effect "so long as the CDA Deed of Trust continues in effect. Upon payment in full of the indebtedness evidenced by the CDA Note and Deed of Trust, ... the CDA Regulatory Agreement shall terminate and be released of record" (Section 26)

II.    <u>CDA Agreement and Declaration of Covenants and Restrictions</u>

A.    Operative Use Restrictions

1.    "Rental Requirement" -- all dwelling units in the Project must be maintained for residential rental use (Section 2)

2.    "Low- and Moderate-Income Occupancy Requirement" -- at least 20% of the units in the development will be occupied by "individuals of low or moderate income," i.e., families with incomes less than 80% of the adjusted median area income for a family of four (Section 3)

B.    Duration of Restrictive Covenants

1.    The "Rental Requirement" is a covenant which runs with the land (Section 1) and remains in effect for the longer of (a) the "Qualified Project Period," or (b) the remainder of the term during which the portion of the CDA Bonds allocable to the CDA Loan are outstanding (Section 4.1.1.). "Qualified Project Period" is defined as the period beginning on the first day on which 10% of the units in the Project are "occupied" until the later of (i) the date which is ten (10) years after the date on which 50% of the units in the Project were "occupied," (ii) the date which is the "Qualified Number of Days" after the date of initial "occupancy" of the Project, or (iii) the date on which any Section 8 assistance provided to the Project terminates. For purposes of this definition, "occupied" and "occupancy" refer only to occupancy on or after the date of the initial closing of the CDA Loan and do not include occupancy before such initial closing. "Qualified Number of Days" is defined as 50% of the number of days from the date of issuance of the CDA Bonds until the maturity date of the CDA Bonds with the longest maturity, which is a period equal to 4,133 days (Section 9).

2.    The "Low- and Moderate-Income Occupancy Requirement" remains in effect for the "Qualified Project Period" (Sections 4.1.2. and 9)

IRH 0044883

May 16, 1992
Page 4

III.    CDA Occupancy Agreement

    A.    Operative Use Restrictions

       "51% Occupancy Covenant" -- at least 51% of the units in the development (104 units) will be rented to "families of limited incomes" under the limits established by the Secretary of Economic and Community Development's Determination as to Upper Income Limits for Community Development Administration (Section II.A.), i.e., annual incomes not exceeding $28,000 for one person and $33,000 for two or more persons (Section I.B.) (see also CDA Regulatory Agreement described above)

    B.    Duration of Restrictive Covenants

       The "51% Occupancy Covenant" remains in effect until the repayment in full of that portion of the CDA Bonds allocable to the CDA Loan (Section II.A.)

## Prepayment of CDA Note

    Paragraph F. of the CDA Note provides that upon the prior written approval of CDA, the Owner may prepay the then outstanding amount of the CDA Note, in whole or in part, if no default exists under the CDA Note or Deed of Trust, on the first day of any calendar month, upon not less that 30 nor more than 90 days prior written notice to the CDA. Such prepayment must include:

(i)    interest accrued and unpaid on the principal balance of the CDA Note to and including the date of prepayment;

(ii)   all other sums due and owing under the CDA Note or Deed of Trust;

(iii)  the interest which accrues on the CDA Bonds to be redeemed in a principal amount equal to the amount of the prepayment from the date of prepayment until the next optional redemption date for the CDA Bonds, which period shall not exceed 6 months from the date of prepayment;

(iv)  an amount equal to the pro-rata share of the costs and expenses incurred in connection with the issuance of the CDA Bonds; and

(v)   the costs and expenses of CDA in effecting the redemption.

## Effect of Prepayment of CDA Note

    The Owner intends to request CDA's prior written approval to prepay the CDA Loan in full. CDA has indicated that in order to grant its consent to such request, the Owner must agree to the following conditions:

IRH 0044884

May 16, 1992
Page 5

Assuming the Owner satisfies each of these conditions, the effect of such prepayment on the CDA Loan documents described above will be as follows:

● As to the CDA Deed of Trust, upon repayment in full of the indebtedness evidenced by the CDA Note, the CDA Deed of Trust is released of record.

● As to the CDA Regulatory Agreement, upon repayment in full of the indebtedness evidenced by the CDA Note and Deed of Trust, the CDA Regulatory Agreement terminates and is released of record (Section 26).

● As to the CDA Agreement and Declaration of Covenants and Restrictions, the "Rental Requirement" would last until the later of January 15, 1998 (September 22, 1986 plus 4,133 days) or the expiration of any Section 8 HAP Contract executed in connection with the LIHPRHA process, notwithstanding the prepayment of the CDA Note and the redemption of that portion of the CDA Bonds allocable to the CDA Loan (Section 4.1.1.). The "Low- and Moderate-Income Occupancy Requirement" also remains in effect, notwithstanding the prepayment of the CDA Note and the redemption of that portion of the CDA Bonds allocable to the CDA Loan, for the "Qualified Project Period" (Section 4.1.2.). Again, this would mean that this use restriction would last until the later of January 15, 1998 or the expiration of any Section 8 HAP Contract executed in connection with the LIHPRHA process.

Commentary -- The "Rental Requirement" should not affect the value of the Project inasmuch as the Owner's Plan of Action will provide for the Project to be maintained as low-income rental housing for the "Remaining Useful Life" of the Project, i.e. at least another 50 years. As such, there should be no impact on value with respect to the "Rental Requirement." The "Low- and Moderate-Income Occupancy Requirement" also should not present any problem from a valuation standpoint inasmuch as the Owner's Plan of Action will provide for the Project to be maintained as low-income rental housing for substantially more than 20% of the units in the Project for the "Remaining Useful Life" of the Project.

● As to the CDA Occupancy Agreement, both the "51% Occupancy Covenant" and the "Economic Displacement Prohibition" terminate upon repayment in full of the indebtedness evidenced by the CDA Note and consequent repayment in full of that portion of the CDA Bonds allocable to the CDA Loan (Section II).

The Maryland Assisted Housing Preservation Act of 1989

The Appraisal Guidelines also require the appraiser to evaluate other state and local requirements that may effect value. As you may know, the State of Maryland adopted a low-income housing preservation act of its own effective July 1, 1989 called the Assisted Housing Preservation Act. (See Title 9 of Article 83B of the Annotated Code of Maryland.) While the State of Maryland's preservation scheme is similar in many ways to the LIHPRHA legislation, it also imposes requirements that are, on their face, more burdensome than the federal statute.

However, you should note that the CDA has correctly interpreted the federal preemption provisions of LIHPRHA (Section 232(a)) so as to provide that those owners who file Notices of Intent under LIHPRHA will not be subject to the provisions of the Maryland Assisted Housing Preservation

IRH 0044885

May 16, 1992
Page 6

Act. (For your information, an owner who elects to pursue prepayment under ELIHPA will be subject to the Maryland Assisted Housing Preservation Act.)  A copy of a letter from the Director of the CDA dated March 22, 1991 is attached for your reference in support of this proposition.

　　Should you need any additional information, or should you desire copies of any of these documents, please do not hesitate to contact Scott Sterling at 202/861-1014.

cc:　　Glen Burnie Associates Limited Partnership
　　　c/o Mid-City Financial Corporation
　　　Attn:　Mr. John Wall

z:\wp\5045-041\m-apprai.plg

IRH 0044886

```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     - - - - - - - - - - - - - - -  X

 3     ANAHEIM GARDENS, et al.,          :

 4          Plaintiffs,                  :

 5               v.                      :  No. 93-655

 6     THE UNITED STATES,                :

 7          Defendant.                   :

 8     - - - - - - - - - - - - - - -  X

 9                         Washington, D.C.

10                         Thursday, January 9, 2025

11          Deposition of Glenview Gardens Limited

12     Partnership by JOHN LAWRENCE WALL, a 30(b)(6) witness

13     herein, called for examination by counsel for

14     Defendant in the above-entitled matter, pursuant to

15     notice, the witness being duly sworn by MARY GRACE

16     CASTLEBERRY, a Notary Public in and for the District

17     of Columbia, taken at the offices of Nixon Peabody,

18     799 9th Street, N.W., Washington, D.C., at 1:05 p.m.,

19     Thursday, January 9, 2025, and the proceedings being

20     taken down by Stenotype by MARY GRACE CASTLEBERRY,

21     RPR, and transcribed under her direction.

22
```

1    cetera."

2        Q.    Does Glenview Gardens have any information

3    to contradict or qualify the information communicated

4    in the paragraph that you just read regarding the

5    conversation with Nancy Rase recounted in the

6    memorandum?

7        A.    Not to my knowledge.

8            MS. ELEY:  I'll mark Glenview 12.

9            (Glenview Exhibit No. 12 was marked

10           for identification.)

11   BY MS. ELEY:

12       Q.    Mr. Wall, do you recognize Glenview

13   Exhibit 12?

14       A.    Yes.

15       Q.    What is Glenview Exhibit 12?

16       A.    It is a memorandum initiated by Scott

17   Sterling, Esquire with regard to Glenview Gardens and

18   in conjunction with paying off the CDA second

19   mortgage and also related to elements of the LIHPRHA

20   process including the potential sale of Glenview

21   Gardens.

22       Q.    And does Glenview Exhibit 12 reflect


Scheduling@TP.One        800.FOR.DEPO
www.TP.One               (800.367.3376)

1    Glenview Gardens' understanding of the restrictions

2    in the Maryland CDA regulatory agreement as of May

3    16th, 1992?

4              MR. WHITTAKER:  Objection to form.

5    BY MS. ELEY:

6        Q.    You may answer.

7        A.    It appears to reflect that understanding.

8              MS. ELEY:  I'd like to mark Glenview

9    Exhibit 13.

10               (Glenview Exhibit No. 13 was marked

11               for identification.)

12    BY MS. ELEY:

13        Q.    Mr. Wall, do you recognize Glenview

14    Exhibit 13?

15        A.    Yes.

16        Q.    What is Glenview Exhibit 13?

17        A.    It is a letter sent to Russ Baxter who was

18    the attorney for the Maryland Housing Fund of CDA

19    with regard to Glenview Gardens and it addresses the

20    elements related to the payoff of the second -- CDA

21    second mortgage.

22        Q.    And is Glenview Exhibit 13 a letter that

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1          A.     Yes.

2          Q.     Do you have any information regarding the

3   term of the bonds in connection with the Maryland CDA

4   loan on Glenview Gardens Apartments?

5          A.     No, I don't recall the terms of the bonds

6   themselves.

7          Q.     Mr. Porter goes on to write, "The income

8   limitation continues for the qualified project

9   period."  And then he goes on to write, "In each

10  case, the qualified project period will continue as

11  long as HUD Section 8 assistance is provided to the

12  project."

13              Do you see that?

14         A.     Yes.

15         Q.     He goes on to write, "The period is

16  further extended if the original bonds have been

17  refunded by a later series of bonds."

18              Do you see that?

19         A.     Right.  And that was not disconcerting at

20  all because whether the bonds were sold, whether the

21  property were converted to market use, whatever, the

22  residents were a protected class and would all


Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1    receive vouchers and they would be -- and those

2    vouchers -- enhanced vouchers would pay full market

3    rent on behalf of the residents.

4        Q.    Did Glenview Gardens end up prepaying its

5    Maryland CDA loan?

6        A.    No.

7        Q.    Okay.

8        A.    Yes and no.

9        Q.    Okay.

10        A.    The partnership did not.  At the closing

11    of Glenview Gardens, in the closing sale to the

12    nonprofit, Marble Mortgage purchased the loans from

13    CDA and they eventually prepaid them.  But to

14    facilitate the closing of Marble Mortgage, a related

15    party to Mid-City bought the mortgages.

16            MS. ELEY:  I'm going to ask the court

17    reporter to mark Exhibits 16 through 21.

18                (Glenview Exhibit Nos. 16-21 were

19                    marked for identification.)

20    BY MS. ELEY:

21        Q.    Let's just walk through these really

22    quickly.  Mr. Wall, do you recognize what the court

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

# *Maryland*

## DEPARTMENT OF HOUSING / AND COMMUNITY DEVELOPMENT

Community Development Administration
Maryland Housing Fund

100 Community Place
Crownsville, Maryland 21032-2023
(410) 514-____

Parris N. Glendening, Governor
Patricia J. Payne, Secretary

### *TELECOPY COVER SHEET*

**PLEASE DELIVER PROMPTLY**

TO: JOHN WALL

FROM: *Maryland Housing Fund/* RUSS BAXTER

TOTAL NUMBER OF PAGES INCLUDING THIS PAGE: 3

DATE: 10/25/96

FAX: (301) 654-6144

RE: GLENVIEW MANOR

*Our Fax number is: (410) 987-4185*

Please call (410) 514-7300 or (410) 514-7350 if you have any problems receiving this fax.

**MESSAGE**

John, Attached hereto is a memo from our Assistant Attorney General, Mr. David Porter, outlining the restrictions on the use of the property. Mr. Porter is receptive to your telephone call (if needed) to discuss his memo in further detail. Mr. Porter's # is (410) 517-7800. I hope to have payoff numbers to you by Monday or Tuesday of next week.

Russ



TTY for the Deaf: (410) 514-7531
"IN PARTNERSHIP, BUILDING STRONGER COMMUNITIES"
The Maryland Department of Housing and Community Development (DHCD) pledges to foster the letter and spirit of the law for achieving equal housing opportunity in Maryland.

IRH 0091984

J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL

WILLIAM N. FITZPATRICK, JR.
ASSISTANT ATTORNEY GENERAL
COUNSEL TO THE DEPARTMENT

PHILIP J. DETERS
ASSISTANT ATTORNEY GENERAL
DEPUTY COUNSEL TO THE DEPARTMENT

OFFICE OF
THE ATTORNEY GENERAL
STATE OF MARYLAND



JUDY K. MAISTRELLIS
TERESA E. DRAKOPULOS
ARNOLD A. SHEETZ
HANS FROELICHER, IV
ANTHONY J. MOHAN
DAVID M. PORTER

ASSISTANT ATTORNEYS GENERAL

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

100 Community Place, Suite 2.300, Crownsville, Maryland 21032-2023
Telephone: (410) 514-7800        Facsimile: (410) 514-7099; (410) 987-4096

## MEMORANDUM

**To:**      Russell L. Baxter

**From:**    David M. Porter

**Date:**    October 24, 1996

**Subject:** Glenview Garden Apartments -- loan payoff
             CDA No. 02.0002
             MHF No. H-0007-001-02

The borrower on this CDA/MHF loan has notified MHF that the loan is to be paid off some time around the end of 1996. You asked me to review the loan documents to determine whether all restrictions on the use of the property terminate when the loan is paid off. Restrictions on the use of this property are imposed under both the Regulatory Agreement and the Agreement and Declaration of Covenants and Restrictions.

The Regulatory Agreement requires the borrower to establish certain funds and accounts and generally governs rents, rent increases, tenant income level, tenant preferences, and lease forms. Section 26 of the Regulatory Agreement provides that the agreement is binding "so long as the Mortgage continues in effect" and that it will "terminate and be released of record" when the Note is paid in full. CDA is required to execute any documents necessary to effect this release.

The Agreement and Declaration of Covenants and Restrictions requires that the units in the project be continuously rented or available to the general public and that at least 20% of the units be occupied by "Individuals of Low or Moderate Income". These restrictions are tied not to the term of the mortgage but to the term of the bonds that provided funds for the loan. The "available for rent" requirement continues for the longer of the "Qualified Project Period" (which is approximately 11 years after the units were occupied) or the remainder of the term of the related bonds. The income limitation continues for the Qualified Project Period. In each case, the Qualified Project Period will continue as long as

Telephone Number for Hearing Impaired: *514-7631* Annapolis Area, 565-0450 Toll-free Washington Area
*AN EQUAL OPPORTUNITY EMPLOYER*

IRH 0091985

**Glenview Garden Apts**                                                        **Page 2**
**DMP/0089(102496)**

HUD Section 8 assistance is provided to the project.  The period is
further extended if the original bonds have been refunded by a
later series of bonds.

    This is a complex area of tax and bond law, and for purposes
of this memo I have not tried to be mathematically precise.  An
exact answer would require more research.  Please let me know
whether this is sufficient for your purposes.


cc:  William N. Fitzpatrick, Jr.

IRH 0091986

# HESSEL AND ALUISE, P.C.

ATTORNEYS AT LAW

SUITE 900
1050 17TH STREET, N.W.
WASHINGTON, D.C. 20036

November 4, 1996

Ms. Vicky Davis,
Deputy Director and
Mr. Russ Baxter
Maryland Housing Fund
Maryland Department of Housing
 and Community Development
100 Community Place
Crownsville, MD 21032-2023

RE:  Glenview Garden Apartments
     FHA Project No. 052-44007
     CDA Project No. 02.0002

Dear Ms. Davis and Mr. Baxter:

This letter follows up on the recent telephone conversations
between you, John Wall, David Porter, Esq. and myself concerning
the referenced property.

As you know, we represent Glenview Housing, Inc., a nonprofit
corporation (the "Purchaser"). The Purchaser is under contract
with the current owner, Glen Burnie Associates Limited
Partnership (the "Seller") to purchase Glenview Garden Apartments
(the "Property") under HUD's housing preservation program,
authorized by the Low Income Housing Preservation and Resident
Homeownership Act of 1990 ("LIHPRHA").

The Property is encumbered by an FHA-insured first mortgage and a
second mortgage in the original principal balance of $447,285,
held by the Maryland Community Development Administration ("CDA")
and insured by the Maryland Housing Fund ("MHF") (the "CDA
Loan").

At the time of the transfer, the Purchaser will receive a LIHPRHA
grant from HUD of approximately $4,000,000 to cover the purchase
price, over $100,000 in rehabilitation and more than $1,000,000
to be deposited in the Property's reserve for replacement
account. In exchange for these incentives, the Purchaser will
agree to maintain the existing low income use restrictions on the
Property for at least 50 more years.

We are now first in the HUD funding queue to receive fiscal year
1997 appropriations to close this deal. We understand, from
conversations with HUD officials, that the funding will become
available very shortly. We anticipate closing this transaction
during the month of November.

The one remaining issue that affects the transfer of the Property
concerns what will happen to the CDA Loan upon transferring the

TELEPHONE (202) 466-5300    TELECOPIER (202) 466-5508

IRH 0044804

Property. We would like to meet with you and your staff as soon
as possible to discuss this issue.

LIHPRHA Processing and CDA/MHF Involvement

On March 5, 1996, prior to execution of an agreement of sale,
John Wall, as consultant for the Seller, sent a letter to Vicky
Davis indicating the Seller's intention to sell the Property to
the Purchaser under LIHPRHA. At Ms. Davis' request, on March 21,
1996, Mr. Wall sent to Russ Baxter a copy of the draft agreement
of sale, HUD Form 9607 and a copy of the LIHPRHA appraisal.

The parties acknowledge that any transfer of the Property during
the period of time that the CDA Loan is in place requires CDA's
consent. Please note that the agreement of sale specifically
conditions the transfer of the Property on CDA's approval to the
assumption of the CDA Loan by the Purchaser.

At the beginning of the LIHPRHA process, Mr. Wall and his
counsel, Scott Sterling, Esq., apparently had telephone
conversations and met with Nancy Rase and Stephanie White
concerning the assumption of the CDA Loan by the Purchaser.
Apparently these discussions included not only the issue of CDA's
consent to the assumption but also, the possibility of prepaying
the CDA Loan. My understanding is that MHF was concerned that
this mortgage was having a negative effect on its bond rating and
preferred liquidating the mortgage over having it assumed by the
Purchaser.

After further analysis, however, CDA apparently determined that
the mortgage could not be prepaid. The June 26, 1996
correspondence from Mr. Wall to Mr. Baxter indicates that MHF
concluded that the CDA Loan could not be prepaid because of the
bond financing.

Because of the CDA Loan could not be prepaid, the Purchaser and
the Seller assumed that CDA would consent to the mortgage
assumption and submitted a LIHPRHA plan of action to HUD which
provided for this assumption. Pursuant to the plan of action,
the first, FHA-insured mortgage would remain in place, as would
the CDA Loan. Rent levels would be established taking into
consideration the debt service payments of these two mortgages.
HUD would fund current rehabilitation and an initial deposit to
the reserve for replacement account for future physical needs of
the Property. The Purchaser would execute a use agreement to
continue the existing rental restrictions for the Property's
remaining useful life. HUD approved the LIHPRHA plan of action
and we are now awaiting release of the funding that would permit
us to consummate the transaction.

2

IRH 0044805

In recent weeks, I contacted Mr. Baxter to discuss the
documentation that would be necessary to complete the CDA Loan
assumption at closing.  During our telephone conversations, as
well as in telephone conversations with Mr. Wall, Mr. Baxter
indicated that MHF was still reluctant to have the CDA Loan
assumed by the Purchaser and preferred that the loan be prepaid.
We explained that the Purchaser, being a nonprofit, does not have
sufficient funds to prepay the CDA Loan, nor is the LIHPRHA
program designed to provide funds for this purpose.

We then discussed with Mr. Baxter the possibility of CDA selling
the loan.  This option had originally been suggested by Ms.
Davis.  In order to accommodate MHF's concerns and to ensure that
the transaction would be consummated, Marble Mortgage Corporation
offered to purchase the CDA Loan without MHF insurance.  Before
we can determine whether the sale of the CDA Loan to Marble, or
any other lender, is feasible, certain issues need to be
resolved.


**Issues Concerning the CDA Loan**

MHF initially determined that the CDA Loan cannot be prepaid at
this time.  Even if this determination is incorrect, the
Purchaser does not have funding to prepay the CDA Loan.
Therefore, we appear to have the following options:

   1.  The Property is transferred to the Purchaser and the
   Purchaser assumes all obligations of the CDA Loan in its
   current form and the CDA Loan continues to be held by CDA.
   The Property will receive rehabilitation and reserve for
   replacement funding in excess of $1,100,000 from the federal
   government.  This, of course requires CDA's approval.

   2.  The Property is transferred to the Purchaser, the CDA
   Loan is transferred to another lender and the Purchaser
   assumes all obligations of the CDA Loan.  The Property will
   receive rehabilitation and reserve for replacement funding
   in excess of $1,100,000 from the federal government.  This
   option raises a number of complicated issues which are
   discussed in more detail below.

   3.  The Property is retained by the Seller and the CDA Loan
   continues to be held by CDA and insured by MHF under its
   current terms.  The Property will not be preserved for low
   income use and will not receive federal rehabilitation or
   reserve for replacement funding.  The Seller would retain
   the right to prepay the FHA-insured mortgage and terminate
   the low income use restrictions at any time.  No one favors
   this option.  It is the result that will occur if we cannot
   reach agreement on option 1 or 2.

3

IRH 0044806

From the Purchaser's and Seller's viewpoints, the simplest option is number 1. This would also be the least time-consuming option, which is important given that there is limited LIHPRHA funding and we must be able to close the transaction relatively quickly. We would require MHF's written consent to the assumption and would draft the necessary assumption and assignment agreement. Under this option, the CDA Loan, Regulatory Agreement and the Agreement and Declaration of Covenants and Restrictions would remain in place under their current terms; as would the FHA-insured mortgage. A new HUD regulatory agreement and use agreement would be executed by the Purchaser and HUD. The financial structure of the Property, including the rents would continue unchanged, ensuring that debt service payments on the CDA Loan would continue uninterrupted. The security for the CDA Loan would be improved with the rehabilitation and reserve for replacement funds provided by HUD.

Option 2 would permit CDA to sell the loan and may absolve MHF of its mortgage insurance obligation. In order to determine whether this option is feasible, however, we ask that MHF answer the following preliminary questions:

   1. Can CDA sell the loan? If so, can it sell the loan to Marble Mortgage Corporation? We do not have copies of the bond documents, but we assume that since the CDA Loan is financed with tax exempt bonds which are part of a larger pool, there may be some restrictions on selling the mortgage.

   2. If the CDA Loan cannot be sold at the time that the Property is transferred, would CDA consider an agreement to sell the Loan when a transfer becomes possible? What would be the terms of such an agreement?

   3. Can CDA defease the tax exempt bonds at the time of the sale? If not, is a sale possible with the tax exempt bond remaining in place?

   4. Will the MHF insurance be terminated at the time of the sale? If not, can CDA sell the loan with the insurance in place?

   5. How quickly can the sale of the CDA Loan be consummated? If it cannot be consummated before the Property is transferred, is this acceptable?

If option 2 is the result that you prefer, these are the initial issues we would like to discuss with you. As you can see, there are some very complicated bond and tax issues that would need to be resolved. Because of the complexity of these issues and the time constraints involved, the Purchaser and, I believe, the Seller, would prefer the first option. Our efforts to work out a

4

IRH 0044807

strategy under option 2 are purely for purposes of accommodating MHF's concerns.

We are concerned that if we cannot resolve this matter, option 3 will be the result; and both the Seller and Purchaser would all like to avoid this.  We assume that CDA and MHF would like to avoid this also.  Under option 3, no rehabilitation or reserve for replacement funding would be available to the Property and the property would not be preserved for low income use.  This would adversely impact the residents, as well as the security for the CDA Loan.  You should also note that under this option, the Seller would retain the right to prepay the FHA-insured mortgage at any time, which could affect the security of the CDA Loan.

As you probably know, LIHPRHA funding is very limited.  Only about 15% of the properties that have been approved for funding will actually receive it.  As noted previously, Glenview Gardens is the first in line on the funding queue.  If we cannot resolve these issues and move towards closing, we fear that the funding may be passed down to other properties that are lower on the queue.

The Seller and Purchaser have expended much time and money on this transaction over the last year.  The transfer of the Property to the Purchaser would ensure the preservation of the Property for low and moderate income use for at least the next 50 years.  It would be to everyone's benefit to have this transaction succeed.

Because of the complexity of these issues, we feel that the best way to reach resolution is to have a meeting with all of the concerned parties.  Once you have had the chance to review this letter, please contact me.  We would like to arrange a meeting for sometime this week or next week.

Thank you for your assistance in this matter.

Sincerely,

Susan M. Sturman

cc:  David Porter, Esq.
     Nancy Trick
     John Wall
     Holly Bastian, Esq.

5

IRH 0044808

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ♦ Suite 300
Bethesda, Maryland 20814 ♦ 301/654-1420  Fax 301/654-6144

**VIA FEDERAL EXPRESS**

November 19, 1997

Ms. Nancy Trick
Glenview Housing, Inc.
c/o National Foundation for Affordable
    Housing Solutions, Inc.
11200 Rockville Pike, Suite 220
Rockville, MD 20852

RE:  Glenview Garden Apartments

Dear Nancy:

In the next seven days, Marble Mortgage Corporation will be purchasing the CDA Second Mortgage on Glenview Apartments.  As you will recall, Marble agreed to do so in response to a condition set by CDA in order to obtain the agency's approval of the LIHPRHA transfer.

In regard to the mortgage acquisition by Marble, please have an officer of Glenview Housing, Inc. sign and return to my attention the following enclosed documents:

1.  UCC-1 Financing Statement (County)
2.  UCC-1 Financing Statement (Secretary of State)
3.  Owner Certification re:  Lost Note

Thank you for your assistance in this matter.

Sincerely,

John L. Wall
Executive Vice President

JLW:lsd

Enclosures

A253

IRH 0271676

# MARYLAND FINANCING STATEMENT

__ Not subject to Recordation Tax    __ Subject to Recordation Tax: Principal Amount is: $_____

_x_ To be recorded in the State Department of Assessments and Taxation

__ To be recorded in Land Records (for fixtures, crops, timber, or minerals only)

_x_ I.    The Maryland county in which the Debtor has a principal place of busine

__ II.    The Maryland county in which the Debtor has a residence is: _____

__ III.    Neither I nor II or apply.

*Please make copies for me send originals to Nancy*

| DEBTOR | SECURED PARTY |
|---|---|
| Glenview Housing, Inc. | Marble Mortgage Corporation |
| (Name) | (Name) |
| c/o National Foundation for Affordable Housing Solutions | 4340 East-West Highway, Suite 300 |
| (Address) | (Address) |
| 11200 Rockville Pike | Bethesda, Maryland 20814 |
| Rockville, Maryland 20852 | |

This Financing Statement covers and the Debtor grants to the Secured Party a security interest in: (i) if one or more boxes below is marked, the types of property so marked; or (ii) if none of the boxes below is marked, all of the following property:

_x_    All equipment.  All of the now owned and hereafter acquired machinery, equipment, furniture, fixtures (whether or not attached to real property), vehicles, supplies and other tangible personal property of the debtor other than inventory, including any leasehold interests therein and all substitutions, replacement parts an annexations thereto, and including all improvements and accessories thereto and all spare parts, tools, accessories, and attachments now owned or hereafter acquired in connection therewith, and any maintenance agreements applicable thereto, and all proceeds and products thereof, including sales proceeds, and all rights thereto.

_x_    Specified Equipment.  All of the now owned and hereafter acquired machinery, equipment, furniture, fixtures (whether or not attached to real property), vehicles, supplies and other personal property of the Debtor described on the attached Exhibit and in any separate schedule at any time delivered by the Debtor to the Secured Party and attached to this Financing Statement , including any leasehold interests therein and all substitutions, replacement parts and annexations thereto, and including all improvements and accessions thereto and all spare parts, tools, accessories and attachments now owned or hereafter acquired in connection therewith, and any maintenance agreements applicable thereto, and all proceeds and products thereof, including sale proceeds, and all rights thereto.

_x_    Receivables.  All of the Debtor's now owned and hereafter acquired and/or created accounts, accounts receivable, contracts, contract rights, instruments, documents, chattel paper, notes, notes receivable, drafts, acceptances, general intangibles (including, but not limited to, trademarks, tradenames, licenses and patents), and other choses in action (not including salary or wages), and all proceeds and products thereof, and all rights thereto, including, but not limited to, proceeds of inventory and returned goods and proceeds arising from the sale or lease of or the providing of inventory, goods, or services by the Debtor, as well as all other rights of any kind, contingent or non-contingent, of the Debtor to receive payment, benefit, or credit from any person or entity, including, but not limited to, the right to receive tax refunds or tax rebates.

_x_    Inventory.  All of the Debtor's now owned and hereafter acquired inventory, wherever located, including, but not limited to, goods, wares, merchandise, raw materials, parts, containers, goods in process, finished goods, work in progress, bindings or component materials, packaging and shipping materials and other

IRH 0271677

## MARYLAND FINANCING STATEMENT

__ Not subject to Recordation Tax     __ Subject to Recordation Tax: Principal Amount is: $_____

_x_ To be recorded in the State Department of Assessments and Taxation

__ To be recorded in Land Records (for fixtures, crops, timber, or minerals only).

_x_ I.   The Maryland county in which the Debtor has a principal place of business is: <u>Montgomery</u>

__ II.   The Maryland county in which the Debtor has a residence is: _____

__ III.   Neither I nor II or apply.

|  |  |
|---|---|
| <u>DEBTOR</u> | <u>SECURED PARTY</u> |

<u>Glenview Housing, Inc.</u>                            <u>Marble Mortgage Corporation</u>
      (Name)                                     (Name)
<u>c/o National Foundation for Affordable Housing Solutions</u>  <u>4340 East-West Highway, Suite 300</u>
      (Address)                                     (Address)
<u>11200 Rockville Pike</u>                                  <u>Bethesda, Maryland 20814</u>

<u>Rockville, Maryland 20852</u>

This Financing Statement covers and the Debtor grants to the Secured Party a security interest in: (i) if one or more boxes below is marked, the types of property so marked; or (ii) if none of the boxes below is marked, all of the following property:

_x_   All equipment.  All of the now owned and hereafter acquired machinery, equipment, furniture, fixtures (whether or not attached to real property), vehicles, supplies and other tangible personal property of the debtor other than inventory, including any leasehold interests therein and all substitutions, replacement parts an annexations thereto, and including all improvements and accessories thereto and all spare parts, tools, accessories, and attachments now owned or hereafter acquired in connection therewith, and any maintenance agreements applicable thereto, and all proceeds and products thereof, including sales proceeds, and all rights thereto.

_x_   Specified Equipment.  All of the now owned and hereafter acquired machinery, equipment, furniture, fixtures (whether or not attached to real property), vehicles, supplies and other personal property of the Debtor described on the attached Exhibit and in any separate schedule at any time delivered by the Debtor to the Secured Party and attached to this Financing Statement , including any leasehold interests therein and all substitutions, replacement parts and annexations thereto, and including all improvements and accessions thereto and all spare parts, tools, accessories and attachments now owned or hereafter acquired in connection therewith, and any maintenance agreements applicable thereto, and all proceeds and products thereof, including sale proceeds, and all rights thereto.

_x_   Receivables.  All of the Debtor's now owned and hereafter acquired and/or created accounts, accounts receivable, contracts, contract rights, instruments, documents, chattel paper, notes, notes receivable, drafts, acceptances, general intangibles (including, but not limited to, trademarks, tradenames, licenses and patents), and other choses in action (not including salary or wages), and all proceeds and products thereof, and all rights thereto, including, but not limited to, proceeds of inventory and returned goods and proceeds arising from the sale or lease of or the providing of inventory, goods, or services by the Debtor, as well as all other rights of any kind, contingent or non-contingent, of the Debtor to receive payment, benefit, or credit from any person or entity, including, but not limited to, the right to receive tax refunds or tax rebates.

_x_   Inventory.  All of the Debtor's now owned and hereafter acquired inventory, wherever located, including, but not limited to, goods, wares, merchandise, raw materials, parts, containers, goods in process, finished goods, work in progress, bindings or component materials, packaging and shipping materials and other

A255

tangible or intangible personal property held for sale or lease or furnished or to be furnished under contracts of service or which contribute to the finished products or the sale, promotion, storage and shipment thereof, all goods returned for credit, repossessed, reclaimed or otherwise reacquired by the Debtor, whether located at facilities owned or leased by the Debtor, in the course of transport to or from account debtors, placed on consignment, or held at storage locations, and all proceeds and products thereof and all rights thereof and rights thereto, including, but not limited to, all sales proceeds, all chattel paper related to any of the foregoing and all documents, including, but not limited to, documents of title, bills of lading and warehouse receipts related to any of the foregoing.

_x_     Other Property.  All now owned or hereafter acquired assets of the Debtor, other than receivables equipment and inventory, including, but not limited to all leases and rents, chattels, leasehold improvements, installment purchase and/or sales contracts, bonds, stocks, certificates, advances, deposits, trademarks, tradenames, licenses, patents and insurance policies, including cash values.

_x_     Other.  All of the property described on the attached Exhibit.

This Financing Statement also covers and the Debtor grants to the Secured Party a security interest in: (a) all proceeds (including insurance proceeds) and products of the above-described collateral; (b) any accounts, property, securities, or monies of the Debtor which may at any time be maintained at, assigned to, delivered to, or come into possession of, the Secured Party, as well as all proceeds and produce thereof; and (c) all of the books and records pertaining to any of the above described items of collateral.

___     Some of the above-described items of collateral are affixed or are to be affixed to, or are crops grown on, or are lumber to be cut from, or minerals or the like (and accounts resulting from the sale thereof) to be extracted from the real estate described on the attached Exhibit.  Record Owner, if different from Debtor:
_____

Filing Officer: Mail Instrument to:     Susan M. Sturman
                                        Hessel and Aluise, PC
                                        1050 17th Street, NW, Ste. 900
                                        Washington, DC 20036

| **DEBTOR** | **SECURED PARTY** |
|---|---|
| Glenview Housing, Inc., a Maryland non-profit corporation | Marble Mortgage Corporation, a Maryland corporation |
| _____ (Seal) | _____ (Seal) |
| (Signature) | (Signature) |
| Name: Frank L. Mooney, Vice President | Name: John Wall, Executive Vice President |

IRH 0271679

EXHIBIT "A"

COLLATERAL

All of the following, which may be located on certain land located in Glen Burnie, Maryland, as legally described in Exhibit "B", attached hereto and made a part hereof (the "Premises"), or which may otherwise relate to, or be used or usable in connection with, the acquisition, construction, equipping, repair, ownership or operation of a certain (multifamily apartment complex known as Glenview Garden Apartments (such project being referred to herein as the "Project"), in which Debtor has an interest now or hereafter existing or acquired (all of the following is herein referred to collectively as the "Property"):

1.  All materials now owned or hereafter acquired by Debtor and intended for construction, reconstruction, alteration and repair of any building, structure or improvement now or hereafter erected or placed on the Premises, all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Premises.

2.  All the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by Debtors and attached to or contained in and used or usable in connection with any present or future operations of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment, all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment, all lift, elevator and blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposal, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Premises; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the Premises in any manner; all except for any right, title or interest therein owned by any tenant of any apartment unit in the Project.

3.  All of Debtors's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds,

IRH 0271680

settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Premises, the Project or any of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give Property receipts and acquittance therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection as a credit upon any portion, as selected by Secured Party, of the Obligation.

4. All of Debtor's right, title, interest in any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same form any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

5. The interest of Debtor in all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising form the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of Debtor in and to, and remedies under, all contract rights, accounts receivable and general tangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other Property described herein or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof' and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

6. All of Debtor's rights, options, power and privileges in and to (but not Debtor's obligations and burdens under) any construction contract, architectural and engineering agreements and management contract pertaining to construction and management of the Premises or the Project and all of Debtor's right, title and interest in and to (but not Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, operations and maintenance of, or provision of services to, the Premises, the Project or any of the other property described herein, and all sewer taps and allocations agreements for utilities, bonds and the like all relating to the Property.

7. All intangible personal property, accounts, licenses, permits, instruments, contact rights, and chattel paper of

IRH 0271681

Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes; rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnations rights; deposits; judgment, liens and causes of action; warranties and guarantees.

8.  All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

9.  All income, rents, profits, receipts, and charges derived from the Premises described in Exhibit "B".

10. All accounts including but not limited to the following accounts:  Reserve for Replacement; Surplus Cash for Residual Receipts; Mortgage Insurance Premiums, Special Funds; ground rents, taxes, water rents, assessments, fire and other hazard insurance premiums; accounts receivable; operating revenue; initial operating escrow; construction fund; escrow for delayed completion; escrow for latent defects; depreciation reserve; sinking fund.

11. Proceeds, products, returns, additions, accessions and substitutions of any to any or all of the above.

12. Any of the above arising or acquired by Debtor or to which Debtor may have a legal or beneficial interest on the date hereof and at any time in the future.

13. Any of the above which may become fixtures by virtue of attachment to the Premises.

IRH 0271682

<u>EXHIBIT B</u>

All that land situated in Anne Arundel County, State of Maryland, described as follows:

**Section One (1)**, in a subdivision known as "ADMINISTRATIVE PLAT OF GLEN VIEW GARDENS" as per plat thereof recorded in Plat Book 180 at plat 50 and in Plat Book 181 at plat 1 among the Land Records of Anne Arundel County, Maryland.

Said land being also described as follows:

**(A)** **Beginning for the same** at a point at the end of the third or South 20 ½ degrees East, 117.7 perch line as described in the aforesaid deed and running thence reversely with a part of said third deed line:

1. North 26 degrees 15 minutes 31 seconds West 877.29 feet to a point, thence across the lands of the grantor the following forty-six courses and distances:
2. North 63 degrees 44 minutes 29 seconds East 121.18 feet to a point;
3. North 18 degrees 44 minutes 29 seconds East 10.00 feet to a point;
4. North 26 degrees 15 minutes 31 seconds West 127.24 feet to a point;
5. North 63 degrees 44 minutes 29 seconds East 147.00 feet to a point;
6. South 26 degrees 15 minutes 31 seconds East 120.00 feet to a point;
7. South 63 degrees 44 minutes 29 seconds West 5.00 feet to a point;
8. South 26 degrees 15 minutes 31 seconds East 112.00 feet to a point;
9. South 63 degrees 44 minutes 29 seconds West 28.00 feet to a point;
10. South 26 degrees 15 minutes 31 seconds East 50.00 feet to a point;
11. North 63 degrees 44 minutes 29 seconds East 5.00 feet to a point;
12. South 26 degrees 15 minutes 31 seconds East 108.00 feet to a point;
13. South 63 degrees 44 minutes 29 seconds West 60.00 feet to a point;
14. South 26 degrees 15 minutes 31 seconds East 106.00 feet to a point;
15. North 63 degrees 44 minutes 29 seconds East 100.95 feet to a point;
16. North 26 degrees 15 minutes 31 seconds West 136.39 feet to a point;
17. North 63 degrees 44 minutes 29 seconds East 52.00 feet to a point;
18. North 26 degrees 15 minutes 31 seconds West 71.60 feet to a point;
19. South 63 degrees 44 minutes 29 seconds West 15.00 feet to a point;
20. North 26 degrees 15 minutes 31 seconds West 95.00 feet to a point;
21. North 63 degrees 44 minutes 29 seconds East 92.00 feet to a point;
22. North 26 degrees 15 minutes 31 seconds West 50.00 feet to a point;
23. South 63 degrees 44 minutes 29 seconds West 90.00 feet to a point;
24. North 26 degrees 15 minutes 31 seconds West 95.00 feet to a point;
25. North 63 degrees 44 minutes 29 seconds East 65.00 feet to a point;
26. North 26 degrees 15 minutes 31 seconds West 50.00 feet to a point;
27. North 63 degrees 44 minutes 29 seconds East 118.00 feet to a point;
28. South 26 degrees 15 minutes 31 seconds East 9.00 feet to a point;

IRH 0271683

29. North 63 degrees 44 minutes 29 seconds East 100.00 feet to a point;
30. North 26 degrees 15 minutes 31 seconds West 29.00 feet to a point;
31. North 63 degrees 44 minutes 29 seconds East 28.00 feet to a point;
32. North 26 degrees 16 minutes 16 seconds West 98.11 feet to a point;
33. North 54 degrees 10 minutes 43 seconds West 10.00 feet to a point;
34. 154.98 feet along the arc of a curve deflecting the right, said curve having a radius of 50.00 feet and a chord bearing North 55 degrees 22 minutes 25 seconds West 99.98 feet to a point;
35. North 33 degrees 24 minutes 56 seconds East 23.44 feet to a point;
36. North 26 degrees 16 minutes 16 seconds West 625.59 feet to a point;
37. 271.60 feet along the arc of a curve deflecting to the left, having a radius of 135.00 feet and a chord bearing North 83 degrees 54 minutes 23 seconds West 228.06 feet to a point of tangency;
38. South 38 degrees 27 minutes 30 seconds West 70.34 feet to a point of curvature;
39. 31.04 feet along the arc of a curve deflecting to the left, said curve having a radius of 75.00 feet and a chord bearing, South 26 degrees 36 minutes 12 seconds West 30.81 feet too point of tangency;
40. South 14 degrees 44 minutes 55 seconds West 25.00 feet to a point of curvature.
41. 54.92 feet along the arc of a curve deflecting to the right; said curve having a radius of 125.00 feet and a chord bearing South 27 degrees 20 minutes 08 seconds West 54.48 feet to a point of tangency;
42. South 39 degrees 55 minutes 20 seconds West 116.50 to a point of curvature;
43. 5.95 feet along the arc of a curve deflecting to the right, said curve having a radius of 175.00 feet and a chord bearing South 38 degrees 56 minutes 52 seconds West 5.95 feet to a point;
44. North 52 degrees 01 minutes 36 seconds West 50.00 feet to a point;
45. North 06 degrees 03 minutes 08 seconds West 34.75 feet to a point;
46. North 50 degrees 04 minutes 40 seconds West 85.45 feet to a point;
47. South 85 degrees 16 minutes 08 seconds West 35.14 feet to a point in Crain Highway (U.S. Route No. 3); thence with said Highway and reversely with the second or South 47 degrees 15 minutes West 25 perch line of the aforesaid deed;
48. North 40 degrees 36 minutes 56 seconds East 355.61 feet to a point; thence leaving said southeasterly line and reversely with the outline of the aforesaid deed the three following courses and distances;
49. North 76 degrees 00 minutes 34 seconds East 271.08 feet to a point marking the point of beginning of the aforesaid deed;
50. South 26 degrees 16 minutes 16 seconds East 1761.27 feet to an iron pipe (found);
51. South 37 degrees 36 minutes 09 seconds West 743.32 feet to a place of beginning, containing 15,000 acres of land, more or less, being the same land described in the Deed to Glen Burnie Associates, a Maryland Limited Partnership, recorded in Liber 2360 at Page 316;

IRH 0271684

**Less and Except** all those strips or parcels of land located in the Third Assessment District of Anne Arundel County, Maryland, and being more particularly described as follows:

### NOLPARK ROAD (60 FEET WIDE)

All of said portion of Nolpark Road, 60 feet wide, running from Crain Highway southeasterly for a distance of 170± feet to the common origin of Nolpark Road and Nolpark Court; thence running from this point southwesterly for a distance of 60 feet ± to the limit of Section One, Glen View Gardens.

### NOLPARK COURT (50 FEET WIDE)

All of said portion of Nolpark Court, 50 feet wide, running from the common origin of Nolpark Road and Nolpark Court northeasterly and thence southwesterly for a distance of 1305 feet + to the limit of Nolpark Court Cul-de-Sac.

All as shown on the plat of Glen View Gardens, Section One and recorded among the Land Records of Anne Arundel County, Maryland in Plat Book 41 at plat 5, being the same land conveyed by Glen Burnie Associates, a Maryland Limited Partnership to Anne Arundel County, Maryland by Deed recorded in Liber 2926 at Folio 737;

## And Together With

0.2315 acres of land, more or less, described as follows: BEGINNING FOR THE SAME at a point designated as control point number 45 as shown on the plat "PLAT ONE AND TWO, GLEN VIEW GARDENS," recorded among the Land Records of Anne Arundel County, Maryland in Plat Book 41, Page 5; thence leaving said point of beginning so fixed and running with and binding along the boundary of Section Two as shown on the aforementioned plat,

1) South 26 degrees 15 minutes 31 seconds East 127.24 feet,
2) South 18 degrees 44 minutes 29 seconds West 10.00 feet,
3) South 63 degrees 44 minutes 29 seconds West 68.20 feet, and
4) North 26 degrees 15 minutes 31 seconds West 134.31 feet; thence running across part of said Section Two shown on the aforementioned plat,
5) North 63 degrees 44 minutes 29 seconds East 75.27 feet to the point of beginning, Containing in all 0.2315 acres of land, more or less; and

0.9983 acres of land, more or less, described as follows: BEGINNING FOR THE SAME at a point designated as control point number 67 as shown on the plat "PLAT ONE AND TWO, GLEN VIEW GARDENS," recorded among the Land Records of Anne Arundel County, Maryland in Plat Book 41, Page 5; thence leaving said point of beginning so fixed and running with and binding along the boundary of the 2.9082 Recreation Area shown on the aforementioned plat,

IRH 0271685

1)     South 26 degrees 15 minutes 31 seconds East 50.00 feet,
2)     South 63 degrees 44 minutes 29 seconds West 65.00 feet,
3)     South 26 degrees 15 minutes 31 seconds East 95.00 feet,
4)     North 63 degrees 44 minutes 29 seconds East 90.00 feet,
5)     South 26 degrees 15 minutes 31 seconds East 50.00 feet,
6)     South 63 degrees 44 minutes 29 seconds West 92.00 feet,
7)     South 26 degrees 15 minutes 31 seconds East 95.00 feet,
8)     North 63 degrees 44 minutes 29 seconds East 15.00 feet,
9)     South 26 degrees 15 minutes 31 seconds East 71.60 feet,
10)     South 63 degrees 44 minutes 29 seconds West 52.00 feet,
11)     South 26 degrees 15 minutes 31 seconds East 136.39 feet,
12)     South 63 degrees 44 minutes 29 seconds West 100.95 feet,
13)     North 26 degrees 15 minutes 31 seconds West 106.00 feet,
14)     North 63 degrees 44 minutes 29 seconds East 60.00 feet,
15)     North 26 degrees 15 minutes 31 seconds West 108.00 feet,
16)     South 63 degrees 44 minutes 29 seconds West 5.00 feet,
17)     North 26 degrees 15 minutes 31 seconds West 50.00 feet,
18)     North 63 degrees 44 minutes 29 seconds East 28.00 feet,
19)     North 26 degrees 15 minutes 31 seconds West 112.00 feet,
20)     North 63 degrees 44 minutes 29 seconds East 5.00 feet,
21)     North 26 degrees 15 minutes 31 seconds West 120.00 feet; thence running across part of the said 2.9082 acre Recreation Area,
22)     North 62 degrees 46 minutes 00 seconds East 116.97 feet to the point of beginning.

Containing in all 0.9983 acres of land, more or less, and being the same land as was conveyed to Glen Burnie Associates, a Maryland Limited Partnership by Deed recorded in Liber 7143 at Folio 560.

A263

IRH 0271686

## OWNER CERTIFICATION

I, _____ as _____ of Glenview Housing, Inc., a
Maryland nonprofit corporation (the "Owner"), understand that Maryland Community
Development Administration ("CDA") holds that certain Deed of Trust Note from Glen
Burnie Associates Limited Partnership to CDA, dated September 22, 1986, in the original
principal amount of $447,285.00 ("Note").  The Note is secured by that certain Deed of
Trust of even date recorded in the public records against Glenview Garden Apartments,
located in Glen Burnie, Maryland (the "Deed of Trust").  By execution of a Release,
Assumption and Modification Agreement dated as of February 13, 1997, the Owner has
assumed all obligations under the Note and Deed of Trust.

The Owner understands that the original Note cannot be located by CDA.  CDA desires
to transfer its interest in the Note and the Deed of Trust to Marble Mortgage
Corporation, a Maryland corporation ("Marble").  In order to facilitate this transfer, the
Owner hereby certifies that the attached photocopy of a deed of trust note is a true and
correct copy of the Note and that said Note and Deed of Trust are an obligation of the
Owner.

DATED:        _____

GLENVIEW HOUSING, INC.

BY:        _____
             _____
             _____

IRH 0271687

# MID-CITY FINANCIAL CORPORATION

4340 East-West Highway ◆ Suite 300
Bethesda, Maryland 20814 ◆ 301/654-1420   Fax 301/654-6144

## MEMORANDUM

**TO:**    Eugene F. Ford

**FROM:**  John L. Wall

**DATE:**  March 2, 1994

**RE:**    Indian Head and
           Rock Creek Terrace
           Millwood Townhouses
------------------------------------------------------------------

With the issuance of HUD Form #9607 on February 11, 1994 for Indian Head, Millwood Townhouses and Rock Creek Terrace a decision to sell (if applicable) must be posted within 30 days of February 11, 1994. We know that Millwood is a definite keeper and that the Rock Creek controlling partners have strongly indicated their desire to retain ownership of the property. However, Indian Head is another matter. Since there appears to be adequate equity to pay off the "Note", cover transaction costs and to pay the limited partners tax liability, a sale may be in the interest of all parties concerned even McShea & Company who gets a disposition fee equal to the Mid-City 1 1/2% fee. The issue remains over our inability to prepay the CDA Second Mortgage ($428,000) which could potentially (if applicable) preclude a sale. However, we have discussed the possibility of defeasing the CDA loan with cash or a cash equivalent should the partnership elect to sell the project. Since time is of the essence and inasmuchas no decision has been made as to keeping or selling the project, I recommend that we go ahead and file a "Second Notice of Intent to Sell" prior to March 11, 1994. In so doing we will retain the option to sell while exploring ways to accomplish same. We also need to work with McShea & Company as to the partnerships' election to sell or retain ownership while meeting its' obligation under the Note. Even though we file the Second Notice, the partnership _always_ has the right to keep the project if it files a POA within 6 months after registering the Second Notice of Intent to Sell. Let's discuss.

JLW:lsd

IRH 0045831

1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2     - - - - - - - - - - - - - - - X

3     ANAHEIM GARDENS, et al.,            :

4         Plaintiffs,                     :

5             v.                          :   No. 93-655

6     THE UNITED STATES,                  :

7         Defendant.                      :

8     - - - - - - - - - - - - - - - X

9                           Washington, D.C.

10                          Thursday, January 9, 2025

11            Deposition of JOHN LAWRENCE WALL, a

12    witness herein, called for examination by counsel for

13    Defendant in the above-entitled matter, pursuant to

14    notice, the witness being duly sworn by MARY GRACE

15    CASTLEBERRY, a Notary Public in and for the District

16    of Columbia, taken at the offices of Nixon Peabody,

17    799 9th Street, N.W., Washington, D.C., at 9:02 a.m.,

18    Thursday, January 9, 2025, and the proceedings being

19    taken down by Stenotype by MARY GRACE CASTLEBERRY,

20    RPR, and transcribed under her direction.

21

22

A266
Scheduling@TP.One
www.TP.One

TP One

800.FOR.DEPO
(800.367.3376)

1    A.    That is correct.  You have notes, the

2  benefit thereof, I don't, so some of my memories are

3  not as accessible as yours there.  So --

4    Q.    Well, I'll represent to you that -- I was

5  discussing with your counsel yesterday -- there are

6  some instances where, you know, we're largely going

7  off of documents and in some cases there have been

8  instances where the documents suggest there was at

9  least progress towards a use agreement, but then

10  ultimately it wasn't funded --

11    A.    Correct.

12    Q.    -- so those didn't come into place.  So I

13  do have to rely to some extent on your memory and I

14  do think that maybe Indian Head was one of those.

15         So Indian Head, to your recollection, did

16  not get incentives under the preservation statutes?

17    A.    That's correct.

18    Q.    And you're familiar, Mr. Wall, are you

19  not, with what we in this litigation call the HOPE

20  Act?

21    A.    Yes.

22    Q.    And the HOPE Act was enacted in March

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1    1996, correct?

2         A.    Yes.

3         Q.    So not having received incentives under

4    the preservation statutes, did Indian Head -- well,

5    generally speaking, do you have any understanding

6    that the HOPE Act restored the right to prepay

7    uninsured mortgages that had been entered into in the

8    '70s?

9         A.    Yes.

10        Q.    And with the enactment of the HOPE Act,

11   did Indian Head prepay?

12        A.    No.

13        Q.    Did Indian Head -- do you know whether --

14   well, maybe you can tell me this.

15             So Mid-City Financial Corporation, it

16   looks like based on this interrogatory response, was

17   a general partner with a 1 percent share in Indian

18   Head in 1998, correct?

19        A.    Yes.

20        Q.    And in 1998, was Indian Head Manor

21   Apartments being operated as low-income housing?

22        A.    Yes.


Scheduling@TP.One                    800.FOR.DEPO
www.TP.One                           (800.367.3376)

1      Q.    Do you know the reasons why Indian Head

2  Manor Apartments' mortgage was not prepaid after the

3  enactment of the HOPE Act?

4      A.    Well, we have to go back a few years.  In

5  1983, similar to Glenview, there was a

6  recapitalization of the partnership.  New limited

7  partners came along and there was a purchase money

8  note involved in that -- reforming the partnership.

9  And that note expectation was, I believe, a

10  prepayment option in 1994, maybe '95, was the

11  expectation for that.  And that note accrued interest

12  and grew over the years.

13          The McSheas, similarly to Glenview,

14  re-syndicated that and brought the limited partners

15  in.  And the notes -- that purchase money note,

16  because there was not a LIHPRHA execution or funding

17  in LIHPRHA, did not have the resources to pay the

18  note.  And the note was ultimately extended and I

19  think it extended maybe through 1999, that time

20  frame.

21          And ultimately the holders of the note,

22  saying what was occurring, sold the note to one


TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)

1    Richard Corey, a former associate of the National

2    Housing Partnership who had a full understanding of

3    these notes.  And he purchased the note from the note

4    holders at that time, which principally were the

5    members of the Ford family at that time because of

6    some of those limited partners exited or sold their

7    interest in the note.

8            And ultimately Dick Corey foreclosed upon

9    the note and refinanced Indian Head with, I believe,

10   bond proceeds issued by CDA of Maryland, Community

11   Development Association of the State of Maryland.  So

12   that is the history as I recall.

13       Q.    Okay.  I'm going to ask an ignorant

14   question that is going to -- I recognize this is an

15   ignorant question.  I really don't know.

16            What do you mean when you say that

17   Mr. Corey -- what did it mean to foreclose on a note?

18   What does it mean to foreclose on a note?

19       A.    The purchase money notes were secured by

20   the limited and general partnership interests of the

21   makers of the note, which were the limited partners

22   in place.  So the note holders, upon a default of


Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

1    prepayment or whatever, they could negotiate other

2    terms, if they desired to do, related to the note.

3    In some cases, they were -- the notes that were

4    coming due could be foreclosed upon.  And so

5    generally, a negotiation would occur between note

6    holders and the note makers and, in some cases,

7    they're friendly parties and each would work out an

8    arrangement on them.

9              In the case of Dick Corey, who came in,

10   he -- and I'm not clear whether he actually

11   foreclosed or had a payout arrangement with the note

12   holders related to their taxes and, you know, a value

13   payment.  And I think that that was -- anyway,

14   ultimately the partnership was reconstituted because

15   the makers -- the limited partners that were makers

16   of the note exited and Dick Corey had full ownership

17   and control over Indian Head Manor and then, in due

18   time, refinanced the property paying off the mortgage

19   and refinancing with CDA.

20       Q.    I think you mentioned that Mr. Corey was a

21   National Housing Partnership associate?

22       A.    He was a former.



```
 1            IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2       - - - - - - - - - - - - - - - X

 3       ANAHEIM GARDENS, et al.,          :

 4            Plaintiffs,                   :

 5                 v.                       :  No. 93-655

 6       THE UNITED STATES,                 :

 7            Defendant.                    :

 8       - - - - - - - - - - - - - - - X

 9                               Washington, D.C.

10                               Thursday, January 9, 2025

11            Deposition of Indian Head Manor Limited

12       Partnership I by JOHN LAWRENCE WALL, a 30(b)(6)

13       witness herein, called for examination by counsel for

14       Defendant in the above-entitled matter, pursuant to

15       notice, the witness being duly sworn by MARY GRACE

16       CASTLEBERRY, a Notary Public in and for the District

17       of Columbia, taken at the offices of Nixon Peabody,

18       799 9th Street, N.W., Washington, D.C., at 2:42 p.m.,

19       Thursday, January 9, 2025, and the proceedings being

20       taken down by Stenotype by MARY GRACE CASTLEBERRY,

21       RPR, and transcribed under her direction.

22
```

1    witness and you are now Indian Head Manor Apartments,

2    let me just review that and get an answer on behalf

3    of the partnership, okay?

4         A.    Uh-huh.

5         Q.    So Indian Head -- my understanding is that

6    Indian Head Manor Apartments did not sell, as you've

7    just expressed.  Indian Head Manor also did not

8    prepay its mortgage after the HOPE Act, is that

9    correct?

10        A.    That is correct.

11        Q.    I believe you previously indicated that

12   Indian Head note holders sold the note for the

13   property to Richard Corey, a former NHP associate, is

14   that correct?

15        A.    Yes.

16        Q.    And then my understanding -- is it correct

17   that Mr. Corey subsequently foreclosed on that note

18   and refinanced the property with bond proceeds from

19   the Maryland CDA?

20        A.    Yes, taking the -- yes.

21        Q.    And what was the reason that Indian Head

22   Manor -- what is the reason that Indian Head Manor



1    Apartments did not have its HUD-insured mortgage

2    prepaid after the enactment of the HOPE Act?

3        A.    A matter of not having the funds to pay

4    the mortgage off.

5            MS. ELEY:  Those are all my questions on

6    Indian Head.  Do you want to take a break while I get

7    set up for Millwood?

8            THE WITNESS:  Sure.

9            (Whereupon, at 3:11 p.m., the taking of

10   the instant deposition ceased.)

11

12

13

14

15

16

17

18

19

20

21

22

TP One
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800.367.3376)