**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ANAHEIM GARDENS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 93-655 |
| | ) | (Judge David Tapp) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON THE CLAIMS OF SECOND-WAVE PLAINTIFFS
C-W ASSOCIATES, LP AND B-L ASSOCIATES, LP**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF THE ISSUES ..................................................................................... 2

RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED
MATERIAL FACT ........................................................................................................... 2

    I.    C-W Partnership and Development of 100 Centre Plaza ................................. 2

    II.    Variances and Special Permits Granted to the C-W Partnership ..................... 4

    III.    C-W Loan from MHFA and Related Mortgage .............................................. 5

    IV.    C-W'S Regulatory Agreement with the Massachusetts Department of Community
Affairs. ............................................................................................................................ 5

    V.    The Pledge Signed by C-W's General Partner in 1987 .................................... 6

    VI.    B-L. ................................................................................................................ 7

LEGAL STANDARDS ..................................................................................................... 7

    A.    Summary Judgment Standard of Review ......................................................... 7

    B.    Regulatory Takings Standard of Review ......................................................... 9

    C.    Reasonableness of the Partnerships' Prepayment Expectations ................... 10

ARGUMENT ................................................................................................................... 13

    I.    Plaintiffs Have Raised Genuine Issues of Material Fact With Respect To Their
Investment-Backed Expectations. ............................................................................... 13

    A.    The Plaintiffs had a reasonable expectation that they could prepay their MHFA
mortgages after twenty years ...................................................................................... 14

    B.    Subsequent agreements executed by the Plaintiffs did not compromise their
prepayment rights ........................................................................................................ 18

        1.    Chapter 121A Agreements ......................................................................... 18

        2.    Zoning variances from the Town of Brookline ......................................... 21

        3.    The So-Called "Pledge." ............................................................................ 23

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)......................................................................................8

*Alimanestianu v. United States*,
    888 F.3d 1374 (Fed. Cir. 2018).................................................................11, 13

*Anaheim Gardens, L.P. v. United States*,
    953 F.3d 1344 (Fed. Cir. 2020)..................................................................10

*Anaheim Gardens, L.P. v. United States*,
    Fed. Cir. No. 2026-1118.............................................................................19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................7, 8

*Anderson v. United States*,
    23 F.4th 1357 (Fed. Cir. 2022) ...................................................................8

*In re Back Bay Restorations, Inc.*,
    118 B.R. 166 (Bankr. D. Mass. 1990) .........................................................20

*Bass Enters. Prod. Co. v. United States*,
    381 F.3d 1360 (Fed. Cir. 2004)....................................................................9

*Brunswick Bank & Trust Co. v. United States*,
    707 F.2d 1355 (Fed. Cl. 1983).....................................................................19

*Casitas Mun. Water Dist. v. United States*,
    543 F.3d 1276 (Fed. Cir. 2008).....................................................................9

*CCA Assocs. v. United States*,
    667 F.3d 1239 (Fed. Cir. 2011).....................................................................19

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003).....................................................................10

*Ferring B.V. v. Barr Lab'ys, Inc.*,
    437 F.3d 1181 (Fed. Cir. 2006)......................................................................8

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999)...................................................................11, 12

*Ideal Innovations, Inc. v. United States,*
No. 2020-2065, 2021 WL 5754818 (Fed. Cir. Dec. 3, 2021) ...................................................8

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,*
285 F.3d 1353 (Fed. Cir. 2002) .................................................................................................8

*Love Terminal Partners, L.P. v. United States,*
889 F.3d 1331 (Fed. Cir. 2018) .................................................................................................9

*Loveladies Harbor v. United States,*
28 F.3d 1171 (Fed. Cir. 1994), *abrogated on other grounds by Bass*
*Enterprises Prod. Co.*, 381 F.3d 1360 (Fed. Cir. 2004) .........................................................10

*Murr v. Wisconsin,*
582 U.S. 383 (2017) ...................................................................................................................9

*Palazzolo v. Rhode Island,*
533 U.S. 606 (2001) .................................................................................................................19

*Palm Beach Isles Assocs. v. United States,*
208 F.3d 1374 (Fed. Cir.), *aff'd on reh'g,* 231 F.3d 1354 (Fed. Cir. 2000) ...........................19

*Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty., Md.,*
862 F.3d 433 (4th Cir. 2017) .............................................................................................11, 13

*Scope Enters., Ltd. v. United States,*
18 Cl. Ct. 875 (1989) .........................................................................................................11, 12

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
535 U.S. 302 (2002) ..............................................................................................................9, 19

*Tulio v. Lansdale Borough,*
660 F.Supp.3d 368 (E.D. Pa. 2023) ...................................................................................11, 12

*TypeRight Keyboard Corp. v. Microsoft Corp.,*
374 F.3d 1151 (Fed. Cir. 2004) .................................................................................................8

**State Statutes**

Mass. Gen. Laws Chapter 121A ......................................................................................... *passim*

**Rules**

RCFC 56(c) ..............................................................................................................................2, 7

## INTRODUCTION

Plaintiff's C-W Associates, LP  (the "C-W Partnership") and B-L Associates, LP  (the "B-L Partnership") (jointly, the C-W Partnership and the B-L Partnership are referred to herein as the "Plaintiffs" or the "Partnerships") hereby oppose the Defendant's Motion for Summary Judgment ("Motion") because, as demonstrated herein, there are genuine issues of material fact present which require the Court to deny the motion.

The factual issue at the heart of the Defendant's motion is the reasonableness of the Plaintiffs' investment backed expectations, in light of the terms in a set of documents that the Defendant cites. The Defendant's Motion is premised exclusively on language in those documents, which it argues, establishes, as a matter of fact, that the owners' investment backed expectations were not reasonable. Specifically, the Defendant points to a zoning variance issued in 1970 and so-called 121A Agreements the Partnerships entered into, apparently for the proposition, based primarily on the language of the documents, that they constrained the Partnerships for 40 years. The Defendant also argues that the Partnerships' respective mortgages with Massachusetts Housing Finance Authority ("MHFA") made their prepayment expectation unreasonable because of language in the mortgages about the ability of MHFA to redeem the associated bonds. Finally, as to C-W, the Defendant cites a "pledge" made by that partnership that, the Motion contends, prevented C-W from exercising its right to prepay its mortgage after 20 years.

As the material cited herein by the Plaintiffs, such as the Declarations of Jeff Stern and Howard Cohen, Mr. Stern's testimony as the 30(b)(6) witness for both plaintiffs and the contemporaneous documents, including letters from Edward Pollack, the then General Counsel of MHFA, make abundantly clear, the documents do not tell either the whole story or even an

accurate story. The evidence relied upon by the Plaintiffs make it clear that genuine issues of material fact remain and, therefore, the Motion must be denied.

## STATEMENT OF THE ISSUES

1.      Whether there is a genuine issue of material fact that C-W Associates, LP and B-L Associates, LP, at the time of their investments, had a reasonable investment-backed expectation of prepaying their mortgages after 20 years.

2.      Whether there is a genuine issue of material fact that the enactment and implementation of the Preservation Statutes interfered with C-W Associates, LP's expectation of prepaying its mortgage and removing associated restrictions.

## RESPONSE TO DEFENDANT'S PROPOSED
## FINDINGS OF UNCONTROVERTED MATERIAL FACT

Pursuant to the provisions of Rule 56(c) of the RCFC, the Plaintiffs respond to the Defendant's Proposed Findings of Uncontroverted Material Fact. The paragraphs of this response are numbered to correspond to the numbered paragraphs of the Defendant's Proposed Findings where there is a genuine issue as to the specific fact.

### I.      C-W Partnership and Development of 100 Centre Plaza

3. The Defendant's quotation from part of the middle of one paragraph on page 6 of the C-W Limited Partnership Agreement ignores many other sections of that agreement and cannot, by itself, establish an uncontroverted fact. In pertinent part the C-W Partnership Agreement also says:

Article 1. Name and Purposes.

\*      \*      \*

1.3 Purpose. The purposes for which the Partnership is formed are to acquire the premises known as 88 Centre Street, Brookline, Massachusetts (the "premises") and   to develop the premises by construction thereon of a high-rise apartment

building consisting of approximately 113 dwelling units, together with appurtenances thereto, all as provided in this Agreement, and thereafter to own, lease, arrange for management of, finance, dispose of and otherwise deal with the premises and for no other purpose.

\*          \*          \*

Article 2. Capital and Financing.

2.1 General Partners. The General Partners hereby assign to the Partnership all of

their right, title and interest in and to the following:

\*          \*          \*

    (2) A commitment dated March 12, 1970 for interim and permanent financing of the development of the premises from the Massachusetts Housing Finance Agency ("MHFA").
    (3) An application in process with the Massachusetts Department of Community Affairs, Town of Brookline, and others for qualification of the proposed development of the premises as an Urban Redevelopment Project under Chapter 121A of the Massachusetts General Laws…

Def's Appx 1-2.[1]

\*          \*          \*

2.6 Initial Project Mortgage Financing. The General Partners shall finance the development of the premises and ownership thereof by using their best efforts to obtain the maximum amounts available from the MHFA pursuant to the MHFA commitments for interim and permanent mortgage financing of the project.

Def's Appx 4.

3.2. Duties of General Partners.[2]

… The General Partners shall use their best efforts to obtain construction and permanent first mortgage loans from MHFA pursuant to MHFA commitments therefor and to comply with such requirements as are imposed on the Partnership and the premises by the MHFA or in connection with MHFA borrowing. The General Partners shall further[3] use their best efforts to qualify the proposed

---

[1] "Def's Appx" is a reference to the Appendix filed with the Defendant's motion.
[2] Paragraph 3 of the Defendant's Proposed Findings of Uncontroverted Material Fact comes from the middle of this section and omits the word "further" from the material quoted.
[3] The Defendant omits this word when quoting this sentence.

development of the premises as an urban redevelopment project under Chapter 121A of the General Laws and to comply with such requirements as are imposed on the Partnership and the premises in connection with such qualification, whether imposed by law, regulation or agreement.

Def's Appx 6.

## II. Variances and Special Permits Granted to the C-W Partnership

8. The Defendant quotes from one sentence in the decision of the Town of Brookline Board of Appeals on C-W's request for zoning variances, apparently claiming that the clause "is exclusively for elderly persons" proves the Plaintiff's investment backed expectation to prepay was unreasonable. As the Declaration of Jeff Stern, filed herewith, establishes, however, the partners' investment backed expectation was to prepay. Pls' App'x ("PA") at PA002-PA003. Stern Declaration ("Stern Decl.") ¶ 5. At the time the variances were being considered, both the Partnership and the Town of Brookline understood that the use of the property could change over time. Stern Decl. ¶¶ 6, 7 (PA009). In short, the fact is that nothing in the zoning variance expressly impaired or affected the Partnership's right to prepay the MHFA mortgage. Stern Decl. ¶ 17 (PA013-PA014); Howard Cohen Declaration ("Cohen Decl.") ¶ 3 and 4 (PA004-PA005).[4] At the time it obtained the zoning variances, the Partnership's expectation was that, even after it prepaid its mortgage, it would provide housing to low-income households, although not for 100% of the units in the property. Stern Decl. ¶ 17 (PA013-PA014).

11. See response to paragraph 8 above.

12. See response to paragraph 8 above.

15. See response to paragraph 8 above. Nothing in the 1970 zoning variance impaired or affected in any way the Partnership's right to prepay its mortgage with MHFA. *Id.*

---

[4] Due to an apparent scanner malfunction, Mr. Cohen's signed declaration appears with blue vertical stripes on the document. For the convenience of the reader, a clean copy of his declaration follows the signed copy.

### III.    C-W Loan from MHFA and Related Mortgage

17 and 19. The language in the mortgage about the bonds being redeemable was not, at the time the mortgage was issued, understood by either party to be a limitation on the Partnership's right to prepay the mortgage after 20 years.  Stern Decl. ¶¶ 9-11 (PA009-PA011). Furthermore, the General Counsel of MHFA confirmed that MNFA was "compelled to redeem them (the bonds) if the borrower elects to prepay." Letter of Edward Pollack to HUD dated July 29, 1993 (PA075-PA076).

20. The Partnership intended to prepay its mortgage after 20 years, a fact that was made known to MHFA at the time the Partnership was discussing financing with MHFA. Stern Decl. ¶ ¶ 9-11 (PA009-PA011). Cohen Decl. ¶ 5 (PA002-PA003).

### IV.    C-W'S Regulatory Agreement with the Massachusetts Department of Community Affairs

30-34.  The 121A statute says on its face that a property owner "may apply to the housing board for leave to change the type and character of the buildings on the property" and the application may be approved unless "the proposed change was a fundamental one," and even if the change was a "fundamental" one, that simply imposed additional approval processes. Addendum 8-9. The Partnership was always committed to providing housing for both low- and moderate-income residents, so it never contemplated a "fundamental change" in the use, such as not providing any low-income housing. Stern Decl. ¶ 18. The Partnerships did take steps to assure that some of their properties would be used as senior market rate housing. Stern Decl. ¶ 15 (PA012-PA013). The approach of the Partnerships was "a precursor to the concept known as assisted living." *Id.* The zoning variances that were obtained were intended to allow for future use by a mix of seniors, at market, moderate and low income levels. Stern Decl. ¶ 17 (PA013-PA014). The Partnerships reasonably understood that the 121A Agreement could be modified

because there was no fundamental change in the use. Stern Decl. ¶ 18 (PA014-PA015).

Consistent with the partnerships' expectation, the Town of Brookline did agree to terminate the

121A Agreement. *Id.* ¶ 19. The fact that the partnership did not "fundamentally" change the use

is evidenced by its work with the Town of Brookline to maintain 25% of the units to be rented to

low income seniors, while also have units to be rented to moderate income tenants and market

rate tenants. Stern Decl. ¶ 20 (PA015-PA016).[5]

### V.    The Pledge Signed by C-W's General Partner in 1987

45-48, 50. The "pledge" signed by C-W's general partner was something the administration of

Michael Dukakis, then the governor of the Commonwealth of Massachusetts, developed to

support his campaign to become the nominee of the Democratic Party for President in 1988.

Cohen Decl. ¶ 6 (PA003). Contrary to what the Defendant suggests the language of the pledge

means, in fact it was a strictly voluntary and aspirational document about cooperating on

preservation matters. *Id.* It was not supported by any consideration. *Id.* The language of the

"pledge" itself confirms its vague and aspirational nature.  For example, the partnership "agrees

to work with "state agencies and would "aim to achieve (certain) goals… for as long a period as

feasible." Stern Decl. ¶ 22 (PA016-PA017). The fact of the matter is that the "pledge" did not

impose any restrictions on the C-W Partnership's ability to prepay its mortgage. Stern Decl. ¶ 23

(PA017).

---

[5] The Motion briefly discusses an interest reduction contract ("IRC") under the Section 236
program entered into by HUD and the C-W Partnership (Mot. at 37-43) but does not appear to
argue that contract affected that partnership's ability to prepay.  Regardless, in 1990, Edward
Pollack, then MHFA's counsel, confirmed to HUD that pending mortgage modifications "have
been satisfied so that the Section 236 portion of the Mortgage is eligible to be prepaid."  PA067.
The IRC provides no grounds for summary judgment but if it does, Mr. Pollack's letter is
sufficient to raise a genuine issue of material fact.

## VI.    B-L.

### The Development of B-L

51, 53, 55, 59, 60-67. The language of the B-L Limited Partnership Agreement is virtually identical to the language of the C-W Partnership Agreement. Just as it did with the C-W Partnership Agreement, the Defendant quotes part of one sentence from the middle of page 6 of the agreement apparently to support its argument that the partnership could not have had a reasonable investment backed expectation to prepay in light of those words in the document. ¶ 63, Def's Prop. Statement of Uncontroverted Facts. *See* pages 3-4 infra. At all times the partners of the B-L Partnership intended to prepay the mortgages after 20 years, just as they did for C-W. Stern Decl. ¶¶ 5, 9-11, 16-19, and 20 (PA007-PA008, PA009-PA011, PA013-PA016); Cohen Decl. ¶¶ 4 and 5 (PA002-PA003).

Paragraphs 85 through 94 are statements about ELIHPA and LIHPRHA about which there is no factual dispute.

## LEGAL STANDARDS

### A.    Summary Judgment Standard of Review

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a).  A dispute of material fact is genuine if the evidence could cause a reasonable trier of fact to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The parties must support their assertions of whether there is a genuine dispute by either "citing to particular parts of materials in the record, […] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c).

A "non-moving party can defeat summary judgment by identifying an 'evidentiary conflict created on the record' as to any material issue of fact." *Ideal Innovations, Inc. v. United States*, No. 2020-2065, 2021 WL 5754818, at *4 (Fed. Cir. Dec. 3, 2021) (quoting *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984)). Further, the evidence, and inferences drawn therefrom, are viewed in the light most favorable to the non-moving party. *See Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)) ("all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party"); *Anderson v. Liberty*, 477 U.S. at 255 (citing *Adickes*, 398 U.S. at 158–59) ("[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

 Summary judgment is inappropriate where "a case may ultimately turn on the credibility of witnesses." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1361–62 (Fed. Cir. 2002) (citing *Anderson v. Liberty*, 477 U.S. at 255). Credibility "become[s] an issue once a party offers a declarant's testimony in support or in opposition to summary judgment." *Ferring B.V. v. Barr Lab'ys, Inc.*, 437 F.3d 1181, 1192 n.13 (Fed. Cir. 2006); *see TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158–59 (Fed. Cir. 2004).

As explained in more detail below, the government's arguments rely heavily on dry words in documents that lack the real-life experience of persons who were actually involved in the events relevant to the Motion. The testimony of those persons reveals genuine issues of material facts that the documents themselves do not disclose and that preclude summary judgment here.

### B.    Regulatory Takings Standard of Review

"Regulatory takings jurisprudence ... is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1289 (Fed. Cir. 2008) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321 (2002)).  Courts must "resist[] the temptation to adopt what amount to *per se* rules" in regulatory takings cases. *Tahoe-Sierra*, 535 U.S. at 321 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017) (internal citation omitted).  Regulatory takings are evaluated under the multi-factor balancing test articulated in *Penn Cent. Transp. Co. v. City of New York*, "including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr*, 582 U.S. 383 at 393 (citing *Palazzolo,* 533 U.S. at 617).

"The reasonable, investment-backed expectation analysis is designed to account for property owners' expectation that the regulatory regime in existence at the time of their acquisition will remain in place, and that new, more restrictive legislation or regulations will not be adopted."  *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018).  A "gestalt approach should be used when evaluating all of the *Penn Central* factors."  *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1370 (Fed. Cir. 2004).  Thus, summary judgment is inappropriate prior to a "full examination of the relevant circumstances" in a regulatory takings case. *Id.*

C.    **Reasonableness of the Partnerships' Prepayment Expectations**

While the Partnerships must demonstrate that they had an investment-backed expectation to prepay their mortgages, the governing law does not require them to be clairvoyant. Nevertheless, relying on a variety of cases, the government claims it was speculative rather than reasonable for the Partnerships to assume that they could prepay their mortgages or that other agreements with state and local agencies were incompatible with prepayment, or would not be modified to permit prepayment. However, these cases articulate a standard that is inapplicable to the Partnerships whose investment-backed expectations in their ability to prepay and either terminate or revise the agreements were reasonable.

In determining whether investment-backed expectations are reasonable, courts consider "the timing of the purchase and knowledge of the purchaser" as "relevant considerations in determining whether a purchaser had reasonable expectations "with which the government's regulatory action interfered." *See Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1350 (Fed. Cir. 2020) (citing *Norman v. United States*, 429 F.3d 1081, 1092–93 (Fed. Cir. 2005)). Among the knowledge courts consider is the context of the investment within the regulatory regime into which the party is investing. Where a party invests in reliance on the then-existing regulatory landscape to recover, courts find investment-backed expectations reasonable. *See, e.g.*, *Loveladies Harbor v. United States*, 28 F.3d 1171, 1177–84 (Fed. Cir. 1994) (holding that plaintiffs had reasonable investment-backed expectations when they purchased the land in question before enactment of environmental regulations found to be a regulatory taking), *abrogated on other grounds by Bass Enterprises Prod. Co.*, 381 F.3d at 1369–70; *Cienega Gardens v. United States*, 331 F.3d 1319, 1346–48 (Fed. Cir. 2003) (holding that plaintiffs had reasonable investment-backed expectations when they bought property and entered into contracts with ability to prepay mortgages in reliance on a prior regulatory regime).

On the other hand, where a party invests into a regulatory landscape that would necessitate clear defiance of the pre-existing legal or regulatory regime to recover, courts find investment-backed expectations "speculative" and unreasonable. *See, e.g., Scope Enters., Ltd. v. United States*, 18 Cl. Ct. 875, 883 (1989) (holding plaintiffs' investment-backed expectations in purchasing of classified military parts was unreasonable because the State Department would have needed to approve the exporting of the parts, and plaintiffs "bought the parts knowing that they must be exported illegally in order to realize a profit on the transaction"); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1362–64 (Fed. Cir. 1999) (holding that plaintiff did not have reasonable investment-backed expectations where plaintiff invested with knowledge that issuance of a required permit to develop property would have been contrary to clearly established permitting regulations under the Clean Water Act); *Tulio v. Lansdale Borough*, 660 F.Supp.3d 368, 380–81 (E.D. Pa. 2023) (denying plaintiff's regulatory taking claim because "[a] reasonable investor would expect that utility services would be terminated for nonpayment" and would be contrary to clearly established Pennsylvania law). Furthermore, courts find investment backed expectations "speculative" where a party acts with pre-investment knowledge that recovery would be highly unlikely due to structural factors beyond the parties' control. *See, e.g.*, *Alimanestianu v. United States*, 888 F.3d 1374, 1384 (Fed. Cir. 2018) (finding that no regulatory taking occurred, in part, because plaintiff's prospect of recovering for injuries from foreign terrorist actors was highly unlikely because it would have depended on enforcing judgments on foreign actors in foreign courts); *Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty., Md.*, 862 F.3d 433, 442–43 (4th Cir. 2017) (holding that no reasonable investment-backed expectations existed for plaintiff who made risky real estate investments in underdeveloped properties whose

success depended upon the receipt of a government service, implementation of sewage systems, to which the plaintiff was not entitled).

As explained in more detail below, the Partnerships' initial investment in their Properties was made within the context of the Massachusetts regulatory and legal framework, and prepayment of their mortgages? manifestly would not have required clear defiance of that regime. That legal framework included mortgage financing agreements with the MHFA, Chapter 121A of the MASS. GEN. LAWS, local regulations from the Town of Brookline, and any federal regulations in existence when the agreements were entered into. Importantly, it is within this regulatory and legal framework that the contractual right to prepay the mortgage was made, a fact that, as discussed below, the MFHA confirmed when they asserted that owners would be able to prepay their mortgages because the bonds that financed them were redeemable. *See* PA075.

The expectation of prepayment does not present any of the circumstances the government cited in the Motion as "speculative" rather than reasonable. It would not have involved the defiance of a long-standing regulatory regimes like export-control laws in *Scope Enters.*, 18 Cl. Ct. at 883, and Clean Water Act regulations in *Forest Props., Inc.*, 177 F.3d at 1362–64, or widely understood utilities rules in *Tulio*, 660 F.Supp.3d at 380–81. If anything, the contractual right to prepay was directly bargained for at the time of investment in accordance with rather than contrary to an existing legal or regulatory scheme.

Moreover, it was entirely reasonable for the Partnerships to believe that these parallel agreements either (i) did not present an obstacle to prepayment of their HUD mortgages or (ii) could have been terminated or revised in such a manner, such that they wouldn't have been an obstacle. As discussed below, the power to terminate or revise the agreements was wholly within

the power of the agencies involved and would not have relied upon highly speculative or structural forces outside of parties' control. *See Alimanestianu*, 888 F.3d at 1384; *Quinn*, 862 F.3d at 442–43. Indeed, one of the statutes that supposedly made prepayment speculative specifically included provisions that allowed agreements to be modified. *See* Mass. Gen. Laws ch. 121A, § 13 (1969) (amended 1975). Consideration of these factors is inherently reasonable, and the reasonability of this expectation is confirmed by the fact that, as explained in more detail below, MHFA subsequently confirmed that the Partnerships could prepay their mortgage and that the Chapter 121A Agreement was terminated at the owners' request later on. Accordingly, as the evidence offered in connection with this brief shows, the Partnerships' expectation that they could prepay their mortgages, and that agreements made with other agencies could, if necessary, be terminated or revised was reasonable, not speculative.

## ARGUMENT

### I. Plaintiffs Have Raised Genuine Issues of Material Fact With Respect To Their Investment-Backed Expectations.

The government is in the tenuous position of arguing for something that on its face is intuitively unlikely: that owners of affordable housing properties that had an express right to prepay their mortgages after 20 years would somehow dilute or surrender that right voluntarily. The facts show the opposite. Testimony from witnesses—including someone who was a day-to-day participant in the Plaintiffs' activities, dating back to the early days of the partnership—is far more informative than the dry words on paper that the government offers. The testimony and declarations offered by the Plaintiffs provide a more compelling narrative and demonstrate that there are genuine issues of material facts that preclude summary judgment here.

**A.    The Plaintiffs had a reasonable expectation that they could prepay their MHFA mortgages after twenty years.**

Because financing was provided through MHFA, the prepayment provisions for the Plaintiffs' mortgages vary from the typical language found in mortgage notes used for HUD-insured mortgages. Nevertheless, the MHFA mortgages both expressly provided for prepayment of the mortgage loans. Thus, the mortgage for C-W Partnership provided that:

> Mortgagor [C-W] will not make any advance principal payment prior to twenty years from the date of the permanent loan, and thereafter only in the event that at the time of such payment, all of the bonds issued by Mortgagee for the purpose of obtaining funds with which to make this mortgage loan are redeemable[.]

Def's Appx 74. The B-L Partnership's mortgage also expressly authorized prepayment:

> Subsequent to twenty (20) years from the date hereof, prepayment shall be permitted[.] . . . In no event, however, shall Mortgagor at any time prepay the principal in advance of such schedule unless at the time of such payment, all of the bonds issued by Mortgagee for the purpose of obtaining funds with which to make this mortgage loan are redeemable[.]

Def's Appx 228. True, both mortgages contained additional language that referred to MHFA's ability to redeem the bonds issued to finance the mortgage loans, but that language should not be read as a condition to or limitation on the right to prepay. As Jeffrey Stern, a former general partner of both Partnerships explained, the general partners of the Partnerships and representatives of MHFA had discussed the right to prepay at length, and neither the MHFA nor the Partnership understood that MHFA's ability to redeem the bonds was a limitation or condition to the Partnership's prepayment right. Stern Decl. ¶¶ 9-11 (PA009-PA011). As he explained in his deposition, there was no misunderstanding between the Partnerships and MHFA with respect to their right to prepay:

> The commitment and agreements that MHFA made with the partnership contained a critical element, which was the ability to prepay the mortgage at the 20-year mark. What you are alluding to is perhaps a question of whether or not the bonds were redeemable prior to their term or their term ending, I guess. ***And my response to that is, as I said earlier, we were promised certain critical elements that induced us to finance with [MHFA].*** One was a reduced interest rate, ***the***

14

> ***other was the ability to prepay that mortgage at the 20-year mark.*** If MHFA did
> not include that in its bond issue, that's not the partnership's problem.

Deposition of Jeffrey Stern (Dec. 13, 2024) (emphases added) (PA080).

Likewise, Howard Cohen, who worked for decades as an affordable housing lawyer in Boston and served as counsel to the Partnerships in connection with their applications under LIHRPHA, was familiar with MHFA financing and similarly confirmed that the redeemability language did not condition or limit the Plaintiffs ability to prepay. Cohen Decl. ¶ 5 (PA007-PA008). Certainly, it was not unreasonable for the Plaintiffs to assume that they could rely on the terms of the mortgage notes to prepay after 20 years and that the prepayment promise was not illusory.

Evidence that the mortgage notes conveyed a right to prepay is evidenced by the fact that in subsequent years, MHFA attempted to restrict that right. Mr. Stern explained that, after the permanent loan was put in place, the Partnerships returned to MHFA for subsequent rounds of financing. This included financing for fire suppression sprinklers and electrical upgrades to permit individual unit metering. Stern Decl. ¶¶ 14, 16 (PA012, PA013). MHFA allowed the additional financing for 100 Centre Plaza without making demands for additional prepayment restrictions. *Id.* ¶ 16 (PA013). But when the B-L Partnership sought similar financing, MHFA insisted that the Partnership accept additional restrictions on their right to prepay. Anticipating these hardball techniques, Mr. Stern had obtained a commitment letter from Brookline Capital Corp. for the cost of the proposed renovations. *Id.* Realizing that it had overplayed its hand, MHFA ultimately placed the permanent financing for the renovations without the prepayment language. But the incident shows that MHFA itself understood that the language in the mortgage note allowed the Partnerships to prepay their mortgages after 20 years.

And indeed, MHFA itself ultimately confirmed that the Plaintiffs could prepay their mortgages and provided a key explanation for the mortgages' redeemability language. In a letter to HUD dated July 29, 1993, Edward Pollack, then-MHFA's general counsel, explained that redeemability was no bar to the Plaintiffs' ability to prepay:

> This letter is in response to your request *for a clarification of the relationship between the prepayment rights of mortgagors and MHFA's "option" to call the bonds issued to finance these mortgages*. In a letter I sent to Kevin East [who oversaw the LIHPHRA program at HUD headquarters] on February 11, 1993, I explained that *"prepayment is at the discretion of the Mortgagor once the twenty year lock in period has expired and the bonds have become redeemable. The MHFA cannot prevent this prepayment by simply refusing to redeem the bonds...we are compelled to redeem them if the borrower elects to prepay."*
>
> Attached is a list of MHFA financed developments with prepayment options in their 20th year which are eligible to apply for incentives under either Title II or Title VI. *There are no cases where the Agency can prevent prepayment of the mortgage by withholding consent to redeem the underlying bonds*.

PA075 (the "Pollack Letter") (emphases added). The second page of the Pollack Letter is a list of properties eligible to prepay. At the top of the list are 100 Centre Plaza and 1500 Beacon Plaza. PA076.

The Pollack Letter is important for many reasons. First, it explains that the language in the mortgages about MHFA's ability to redeem the bonds was not a condition or limitation on the Partnerships' ability to prepay but simply addressed the trigger for "MHFA's 'option' to call the bonds issued to finance these mortgages." PA075. Pollack further explained that "prepayment is at the discretion of the Mortgagor once the twenty year lock in period has expired *and the bonds have become redeemable."* PA075 (emphasis added). In other words, redemption of the bonds was not a condition to the Partnership's ability to prepay; it simply reflected that after 20 years, the Partnerships could exercise *their* option to prepay and MHFA was then authorized to redeem the bonds. But there was nothing MHFA could do to stop the Partnerships from prepaying their

mortgages: "The MHFA cannot prevent this prepayment by simply refusing to redeem the bonds...we are compelled to redeem them if the borrower elects to prepay." PA075.  Further, Pollack concluded, "There are no cases where the Agency can prevent prepayment of the mortgage by withholding consent to redeem the underlying bonds."[6] PA075.

The Pollack Letter demolishes the government's contention that, at the time they signed the mortgages, the Partnerships did not have a reasonable expectation that they could prepay those mortgages after 20 years.  To the contrary, the Pollack Letter confirms the reasonableness of their original expectations.

Finally, as discussed below, the so-called "pledge" that the C-W Partnership executed with an agency of the Commonwealth of Massachusetts expressly states that "the OWNER may prepay the PROJECT mortgage on July 16, 1990."  Def's Appx 115.  Clearly, the Commonwealth itself understood the C-W Partnership could prepay its mortgage; indeed, there would have been no purpose for the pledge if the Partnership could not prepay.  And finally, HUD processed the Partnerships' LIPHRHA application without ever challenging to Plaintiffs to prepay their mortgages.  Stern Decl. ¶ 25 (PA017).

To the extent that the government contends (Mot. at 32-33) that the mortgages did not convey a clear right to prepay the mortgages after 20 years is a red herring, concocted by snipping excerpts from dry documents.  Testimony from live witnesses who were active in these transactions and familiar with the actual negotiations, and documents ignored by the government's Motion, tell a different story.  Plaintiffs believe the evidence is dispositive that

---

[6]    Significantly, the first page of the Pollack Letter was used as an exhibit at the deposition of Jay Reagan, a witness for another Second Wave Plaintiff, on November 22, 2024.  The government was clearly aware of the Pollack Letter and its significance, but did not attach it to the pending Motion.

they reasonably expected to prepay their mortgages at the time they executed them, but at a minimum, they have raised a genuine issue of material fact that precludes summary judgment.

### B.    Subsequent agreements executed by the Plaintiffs did not compromise their prepayment rights.

To defeat the express right to prepay enjoyed by the Plaintiffs, the government offers a myriad of subsequent agreements with state and local agencies that, it claims, compromised that right. As explained below, nothing is further from the truth.

### 1.    Chapter 121A Agreements.

The focus of the Motion's argument is that having obtained an express promise from MHFA to allow them to prepay their mortgages, the Partnerships would have abandoned that hard-won right in exchange for some tax advantages. That argument misreads the history and language of the Partnerships' involvement with Chapter 121A and the testimony of one of its general partners, Jeff Stern. The Court should not accept the lifeless words of a document over the testimony of a witness who was familiar with the Partnerships' involvement in the Chapter 121A process and their understanding about the obligations imposed by their Chapter 121A Agreements.

By way of background, Chapter 121A is a provision of Massachusetts law that allows developers of residential and commercial properties to enter into agreements with local governments to assure long-term stable real estate taxes. Essentially, developers who entered into Chapter 121A agreements paid excise taxes in lieu of real estate property taxes.

In this case, the Partnerships entered into Chapter 121A Agreements with the Town of Brookline, where the Properties were located. To be clear, these agreements on their face did not contain any express provision limiting the Partnerships' ability to prepay their mortgages. Rather, according to the Motion, the sole obstacle presented by the 121A Agreements was that

they included dividend limitations that would have restricted the Partnerships income after prepayment in such a way as to make prepayment infeasible. *See, e.g.*, Mot. at 29.[7]

 As an opening matter, the impact of the Chapter 121A Agreements is in the nature of an affirmative defense asserted by the government, and the government has the burden of proof to show those agreements prevented prepayment. *See CF Brunswick Bank & Trust Co. v. United States*, 707 F.2d 1355, 1360 (Fed. Cl. 1983) (where plaintiff has demonstrated existence of parties' contract, defense as to why it was unenforceable was government's burden of proof). As the Federal Circuit has explained, "[a]lthough the plaintiff has the burden to prove a taking occurred, this ultimate burden does not require the plaintiff to identify and come forward with evidence rebutting economic harm." *CCA Assocs. v. United States*, 667 F.3d 1239, 1245 (Fed. Cir. 2011). It is not the Partnerships' duty to rebut inferences. The burden is on the government to prove that the Chapter 121A Agreements would have prevented the Partnerships from prepaying, and it has failed to meet that burden.

---

[7] The Court should be aware that the Plaintiffs filed an appeal with the Federal Circuit challenging, among other things, the outcome of the Court's decision about the impact of a Chapter 121A Agreement on the prepayment expectations of First Wave Plaintiff Chauncy House Company. *See Anaheim Gardens, L.P. v. United States*, Fed. Cir. No. 2026-1118. In their brief, Appellants specifically addressed the Court's conclusions concerning Chauncy House and pointed out that approval by the Boston Redevelopment Authority of termination of the Chapter 121A Agreement for that property was likely. *See* Brief for Plaintiff-Appellants (ECF No. 19) at 39-42. At a minimum, as courts interpreting the *Penn Central* decision repeatedly confirm, the Court should avoid adopting a *per se* rule that the mere existence of a Chapter 121A Agreement automatically defeats a plaintiff's claim of that it had a reasonable expectation it could prepay its mortgage. *See Tahoe-Sierra*, 535 U.S. at 326; *see also Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1381 (Fed. Cir.), *aff'd on reh'g*, 231 F.3d 1354 (Fed. Cir. 2000) (In the context of evaluating a regulatory taking, precedent in this jurisdiction "displays a flexible approach, designed to account for factual nuances"); *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring). Preferably, the Court should stay consideration of the Motion until the Federal Circuit rules on the appeal of Chauncy House Company.

Moreover, the government's argument hinges on a further supposition—that the Town of Brookline would not have approved an attempt to modify or terminate the Chapter 121A Agreements—and the assumption that it was "speculative" to assume that they would modify or terminate the agreement. (Mot. at 31). Certainly, the opportunity to seek approval for change or modification of the 121A Agreement was itself not speculative. Section 13 to Chapter 121A itself authorized modification of agreements and only imposed additional procedural rules if the proposed change was a "fundamental" one. MASS. GEN. LAW ch. 121A sec. 13 (1969) (Addendum at 8-9). As noted above, the Partnership was always committed to providing housing for both low and moderate income residents, so it never contemplated a "fundamental change" in the use, such as not providing any low income housing. Stern Decl. ¶ 18 (PA014-PA015). Massachusetts courts agree that the Town retained authority to modify the Chapter 121A Agreements if it chose to do so. *In re Back Bay Restorations, Inc.*, 118 B.R. 166, 168 (Bankr. D. Mass. 1990) (local housing authority is "vested with the responsibility of . . . deciding when to allow modifications . . . .").

Approval was likely here for multiple reasons. First, the purpose of Chapter 121A was to accelerate urban redevelopment—to eliminate "blight," as the Motion points out (Mot. at 27)—and the Partnerships certainly met that goal by developing two new senior multifamily housing. Prepayment also would itself have been consistent with Chapter 121A's goal of encouraging the investment of private capital into these such areas. Second, prepayment would have preserved the use of the Properties for residential purposes, consistent with the 121A Agreements. Third, it was reasonable to assume that the Town would be eager to modify or terminate the 121A Agreements, which set limits to the Properties' taxes. Fourth, as explained elsewhere, the Partnerships had long-standing plans to continue to provide low- and moderate-income housing

even after prepayment; prepayment would not have prevented them from continuing to provide

that housing opportunity.  Stern Decl. ¶ 18 (PA014-PA015).  Finally, Chapter 121A was modified

in 1975, reducing the term of the benefits and obligations from 40 years to 15 years.  *See* MASS.

GEN. LAWS ch. 121A, § 18C (amended 1975) (if parties to 121A agreements carried out their

duties for 15 years, they are no longer subject to Chapter 121A).

History cannot be ignored here.  Ultimately, the Partnerships and the Town agreed to

terminate the Chapter 121A Agreements.  Stern Decl. ¶ 19 (PA015).  Termination of the 121A

Agreements proved to be anything but speculative, because the Town had authority to terminate

those agreements and the Partnerships and the Town found it mutually beneficial to do so.  Stern

Decl. ¶¶ 19-20 (PA015-PA016).  The government has failed to meet its burden here, and the

Partnerships have presented more than sufficient evidence to show that there is a genuine issue of

material fact with respect to the Chapter 121A Agreements precluding summary judgment.

### 2.  Zoning variances from the Town of Brookline.

When 100 Centre Plaza was developed, the C-W Partnership requested and received

zoning variances from the Town of Brookline.  Typically, the Town sets requirements for the

number of parking spaces at multifamily properties but, because it was being developed as senior

housing, the Town reduced the number of required parking spaces.  Stern Decl. ¶ 17 (PA013-

PA014).   The variances contained restrictions on the Properties' operations, such as requiring the

Plaintiffs to provide housing to low and moderate income residents and said that they would

remain in place for forty years, unless found to conflict with MHFA regulations.  *Id.*

The government contends that these restrictions effectively precluded the Partnerships

from prepaying their mortgages, (Mot. at 24–26), but the arguments asserted by the government

are unpersuasive.  While Mr. Stern correctly affirmed that the 100 Centre Plaza was subject to

those zoning requirements, the government offers no evidence that the C-W Partnerships could

21

not operate its property in compliance with those requirements after prepayment.  The variance only set general obligations to operate the property for "low and moderate income" residents but did not define those terms and did not state a specific number of units that were required to be low or moderate income.  Mr. Stern has repeatedly testified that the C-W Partnership always expected to provide housing to low-income residents after prepayment. Stern Dep. at 125:20–126:2 (PA084-PA085); Stern Decl. ¶¶ 17, 20 (PA013, PA015-PA016).  And indeed, as they approached the prepayment deadline, the Partnership took steps to obtain rental assistance that assured low- and moderate-income residents could remain at 100 Centre Plaza and never displaced a single resident on the basis of their ability to pay their rent.  *Id.*  There is not a scintilla of evidence presented in the Motion to suggest what rents would be after prepayment and why the C-W Partnership could not successfully operate 100 Centre Plaza in compliance with the zoning variance.

Moreover, Mr. Stern testified that the zoning restrictions remained in place only so long as the mortgage and the Chapter 121A Agreement remained in place.  Stern Dep. at 180:19–181:2 (PA088).  As noted above, the C-W Partnership had well-founded expectations that it could prepay its mortgage and that the Chapter 121A Agreement could be terminated.  In the unlikely event that the restrictions contained in the zoning variances might have interfered with the C-W Partnership's ability to operate 100 Centre Plaza as low- and moderate-income housing, the C-W Partnership had a reasonable expectation that those restrictions would not be an obstacle to its plan to prepay its mortgage.  Stern Decl. ¶ 17 (PA013-PA014).  The fact that the C-W Partnership undertook elaborate steps to protect low- and moderate-income tenants as the prepayment trigger date approached is further evidence of the C-W Partnership's plan to continue

to provide housing to low and moderate income households, notwithstanding their plans to prepay their mortgages.

### 3.    The So-Called "Pledge."

The Motion also contends that it was a so-called "pledge" executed by one of the general partners of the C-W Partnership in September 1987, and not the Preservation Statutes, that presented an obstacle to prepayment to that partnership. (Mot. at 33-34). To be clear, the government does not contend that the so-called "pledge" reflected the C-W Partnership's investment-backed expectations. Rather, it contends that the "pledge" would have prevented the C-W Partnership from exercising its right to prepay. In this instance, the dry words of the "pledge" themselves do not support the government's claims, and the testimony of others demonstrates that the truth is far different from what the government alleges.

First, on its face, the "pledge" does not restrict the C-W Partnership's prepayment rights. Even the language the government quoted undermines its position. To begin, as the Motion points out, the "pledge" contains language stating that:

> the terms of agreement with respect to the PROJECT, by and between the OWNER and [MHFA], provide that ***the OWNER may prepay the PROJECT mortgage on July 16, 1990 and thereby be released from certain continuing obligations which restrict the use of the project to housing for low and moderate income families;*** . . . ***[that] the OWNER has made investments in the PROJECT in reliance upon the terms of the agreement and with an expectation of return on those investments***; . . .

Def's Appx 115 (emphasis added). Thus, the Commonwealth, through its Executive Office of Communities and Development ("EOCD"), acknowledged that the C-W Partnership had a right to prepay its mortgage, that prepayment would release the partnership from "certain continuing obligations which restrict the use of the project to housing for low and moderate income families," and the C-W Partnership had made numerous investments in the property with the

prospect of prepaying its mortgage, "with an expectation of return on those investments." Def's Appx 115. That language itself should quell any doubts about the reasonableness of the C-W Partnership's prepayment expectations.

The language of the pledge—including vague, ill-defined undertakings by both the C-W Partnership and EOCD—is even less convincing. As the Motion itself explains, the "pledge" says no more than that "[t]he OWNER [C-W Partnership] *agrees to work with EOCD* to develop a PLAN for the Protection and Preservation of the PROJECT as affordable housing . . ." but that the undertaking will persist only "*for so long a period as is feasible*," without determining what "feasible" means or who decided when something becomes unfeasible. (Def's Appx 116) (emphases added). As Mr. Stern and Mr. Cohen explain, the so-called pledge contained no firm commitment from the Commonwealth to provide additional assistance to the C-W Partnership, and it did not impose a firm commitment on the partnership to any specific restrictions for any defined period of time. Stern Decl. ¶¶ 21-22 (PA016-PA017); Cohen Decl. ¶ 6 (PA003). Because it lacked consideration from the Commonwealth, it was unenforceable and was ultimately superseded by ELIPHA and LIHPRHA. Stern Decl. ¶ 22 (PA016-PA017). As both Stern and Cohen explained, the "pledge" was essentially a political document, intended to boost the campaign of then-Governor of Massachusetts, Michael Dukakis. Stern Decl. ¶¶ 21-22 (PA016-PA017); Cohen Decl. ¶ 6 (PA003). Mr. Stern referred to it as "window-dressing." Stern Decl. ¶ 22 (PA016-PA017). As Mr. Cohen, who had worked for decades as an affordable housing attorney in Massachusetts, summed it up:

> The pledge was a completely voluntary and aspirational document to cooperate on preservation matters, but it contained no firm obligations by the owners to waive or renounce their prepayment rights and was not supported by any consideration in the form of additional subsidy payments from the Commonwealth. *Nothing in the so-called pledge would have prevented an owner from exercising its right to prepay its mortgage.*

Cohen Decl. ¶ 6 (PA003).  The so-called "pledge" did not impose a restriction on the C-W Partnership's prepayment plans and was never cited by HUD as a reason to reject the Partnership's LIHPHRA application.  Stern Decl. ¶ 22 (PA016-PA017.  Indeed, HUD never raised a question about either Partnership's ability to prepay its mortgages in the course of processing their LIHPHRA applications.  Stern Decl. ¶ 25 (PA017).  The testimony of Messrs. Stern and Cohen, who were intimately involved with the C-W Partnership's prepayment plans, undercut any argument that the so-called "pledge" restricted these plans.

## CONCLUSION

The government has assembled a carefully edited set of documents to argue that the Plaintiffs did not have a reasonable expectation that they could prepay their MHFA mortgages at the time their investment was made, or that they willingly renounced that right as a result of subsequent agreements with various state and local agencies.  The factual details, eschewed by the government, tell a far different and much richer story.  Testimony and declarations from persons who participated in the Partnerships' financial transactions and other documents discussed in this brief, demonstrate that the Partnerships had a well-founded and reasonable expectation that they could prepay their mortgages, and that none of the subsequent agreements changed that expectation.  At a minimum, the Partnerships have presented evidence that creates a genuine issue of material facts that prevents summary judgment here.  The Motion should be denied.

Dated: March 10, 2026                     Respectfully submitted,


                                          */s/ Harry J. Kelly*
                                          Harry J. Kelly
                                          NIXON PEABODY LLP
                                          799 9th Street N.W., Suite 500
                                          Washington, D.C. 20001
                                          (202) 585-8000
                                          hkelly@nixonpeabody.com

                                          Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of the foregoing Response to be filed electronically on this 10th day of March, 2026, which will then send a notification of such filing (NEF) to the following recipients:

> AMANDA L. TANTUM
> Senior Trial Counsel
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> Ben Franklin Station
> P.O. Box 480
> Washington, D.C. 20044
> amanda.tantum@usdoj.gov

*/s/ Harry J. Kelly*
Harry J. Kelly