# In the United States Court of Federal Claims

No. 93-655C
Filed: July 13, 2026

---

**ANAHEIM GARDENS, et al.,**

*Plaintiffs*,

**v.**

**THE UNITED STATES,**

*Defendant*.

---

## MEMORANDUM ORDER AND OPINION

Trial in this matter begins on July 15, 2026. On June 23, 25, and 29, 2026, the Court heard the parties' pretrial motions. (*See generally* Hearing Transcript ("Hr'g Tr."), June 23, 2026, ECF No. 958; Hr'g Tr., June 25, 2026, ECF No. 960; *see also* Hr'g Tr. Excerpt (Preview of Judge's Ruling), June 29, 2026, ECF No. 967). One additional motion remains to be decided, SWPs' eleventh-hour motion seeking leave to retain a new expert. (ECF No. 978). Disposition of that issue awaits finalized briefing. This Order concerns four pending pretrial motions: (1) the United States' Motion *in Limine*, (Mot. *in Limine*, ECF No. 916); (2) the United States' Motion to Exclude the Expert Testimony of Dr. Stephen Roulac, (Def.'s Mot. to Exclude, ECF No. 918); (3) the Second-Wave Plaintiffs' ("SWP") Motion for Leave to File and Designate Deposition Transcripts for Trial, (SWPs' Mot. to Designate, ECF No. 929); and (4) the United States' Motion for Leave to File Deposition Transcripts and Designations, (Def.'s Mot. to Designate, ECF No. 930). The United States' Motion *in Limine* is **GRANTED-IN-PART** and **DENIED-IN-PART**. The United States' Motion to Designate is **GRANTED**. The SWPs' Motion to Designate is **GRANTED-IN-PART**, **DENIED-IN-PART**, and **DEFERRED-IN-PART**. The Court will address the United States' Motion *in Limine* and the parties' general objections to deposition designations herein. The Court will also address the parties' specific deposition designation objections pertaining to witnesses assigned to appear in the first trial group. (*See* SWPs' Proposed Order of Witnesses, ECF No. 970; Def.'s Order of Witnesses, ECF No. 971). The Court will address the remaining specific objections to deposition testimony on a rolling basis prior to the trial group to which that witness is assigned or based on contemporaneous objections at trial.

This Order also concerns SWPs' Motion for Clarification, which is **DENIED**. (Mot. for Clarification, ECF No. 975). On June 29, 2026, the Court indicated it intended to grant the United States' Motion to Exclude, but the final resolution of that issue awaited entry of a written Order. (*See* Hr'g Tr. Excerpt, Court, 11:14, June 29, 2026; Def.'s Mot. to Exclude). As explained below, that Motion is **GRANTED**.

## I.    Defendant's Motion *in Limine*

As a preliminary matter, the Court must address SWPs discounting two Orders requiring the presence of lay witnesses whose live testimony was necessary to resolve the United States' Motion *in Limine.* (May 28, 2026 Order, ECF No. 940; June 17, 2026 Order, ECF No. 954). In the Order filed May 28, 2026, the Court stated: "[S]hould either party believe that there are lay witnesses necessary for the Court to adequately address the United States' Motion *in Limine*, (ECF No. 916) . . . or any other forthcoming pretrial motions, the parties are likewise **ORDERED** to have those lay witnesses appear in person." (Order at 1). The parties then filed a Motion for Clarification, stating specifically that: "Plaintiffs' request is occasioned, in part, by the fact that in its Motion *in Limine*, the Government seeks to exclude the testimony of a large number of the Plaintiffs' lay witnesses. Plaintiffs do not believe it is the Court's intention for those witnesses to attend the hearing." (June 16, 2026 Mot. for Clarification, ECF No. 953). The notion that the Court would enter an Order providing for the attendance of witnesses, only for a party to decide that the Court did not mean what it said, is inexplicable. Nevertheless, the Court granted the Motion for Clarification, responding in the affirmative: it was indeed the Court's intention for SWP witnesses subject to the Motion *in Limine* to attend the hearing. (*See* June 17, 2026 Order). Specifically, the June 17, 2026 Order directed that:

> Further, the Court clarifies that witnesses who are merely the subject of general list objections and are not named in a pending motion *in limine* are not required to attend the pretrial proceedings. Conversely, if a witness is the subject of a pending motion *in limine*, and a party contends that live testimony is necessary for the adjudication of that motion, that party bears the burden of ensuring the witness is physically present. This requirement is intended to ensure a complete and sufficient record at the time of the hearing so that all pending motions may be decided expeditiously. Accordingly, if either party intends to rely on live witness testimony to support or oppose a pending motion, that party must make the necessary travel or subpoena arrangements to ensure the witness is available when the motion is called; otherwise, the Court will issue its ruling based solely on the filed briefs and the oral arguments of counsel.

(*Id.*). The Court found this language necessary due to SWPs' representations in their Response to the United States' Motion *in Limine*. (SWPs' Resp., ECF No. 927). For example, the third subheading in SWPs' Response reads: "The Court should not rule in advance of trial, without hearing from specific witnesses, that they may not testify." (*Id.* at 5). Under this subheading, SWPs situated their arguments on behalf of all nineteen individually-named lay witnesses subject to the United States' Motion. (*See id.* at 5–21). The phrase "without hearing from specific witnesses" is plain; SWPs urged the Court to hear live testimony to adjudicate the Motion *in Limine*. SWPs then repeated this language as it pertained to specific witnesses throughout their Response. (*See, e.g.*, SWPs' Resp. at 6 (Ms. Emge's testimony "cannot be excluded before trial and before the Court has the opportunity to hear Ms. Emge testify and evaluate any objections by the Defendant to specific questions."), 17 ("The Court certainly should avoid making any preemptive decision about the admissibility of Mr. Kaplan's testimony before it is offered at trial.")).

2

SWPs also argue that the United States "suggests that after waiting [thirty-five] years for their day at court, SWPs should be prevented from presenting their best evidence in this case based on limited testimony from these witnesses' depositions." (*Id.* at 5). And yet, on the day of the Motion *in Limine* Hearing, SWPs did not produce a single lay witness. Instead, characterizing the Court's Orders akin to suggestions, (Hr'g Tr.[1], 10:10–14, June 25, 2026), asserting that they "misunderstood[,]" (*id.*, 22:18), and contending that bringing their witnesses "would effectively lead to a mini trial[,]" (*id.*, 10:3–6). SWPs' ultimate position is that it was their "good faith belief that live testimony was not required to adjudicate the pending Motion *in Limine*" and "maintain in good faith, that the Motion *in Limine* can be decided on the briefing, including the appendices, and oral argument." (SWPs' Memorandum ("Memo") at 2, ECF No. 969). However, this directly contradicts their argument in their Response and throughout oral argument—that the Court must hear live testimony from their witnesses before potentially excluding them. (*See* SWPs' Resp. at 6, 17; *see e.g.*, Hr'g Tr., SWPs' Counsel, 9:2–5, ("[P]erhaps the factual record in the deposition of Ms. Emge is not complete . . . Ms. Emge could testify to that fact at trial. And . . . the Court should wait and defer this issue until . . . it has a full record on this issue."), 73:20–74:13 (SWPs unable to answer the Court's questions about Mr. Stern's proposed testimony based on the current record)).

Compounding the SWPs' obstinance, post-hearing they speciously claimed "SWPs *do not contend, and have never contended,* that live testimony is necessary for the adjudication of the Motion *in Limine*." (SWPs' Memo at 2) (emphasis added). Were the Court to abdicate its fact-finding role, the Court might postulate that SWPs inconsistent claims are reconcilable. Reason does not support such a conclusion. The Court cannot blindly allow every witness to testify at trial without bounds; this sort of nonfeasance would unjustly obviate the United States' entire motion.

SWPs wish to have their cake and eat it too. By simultaneously arguing that it is necessary for the Court to hear live testimony before making an admissibility determination, and then withholding that live testimony, SWPs have taken this opportunity to strain the Court's words past their plain meaning, in an attempt to justify some obscured litigation strategy. As a result, the Court makes what admissibility determinations it can on the limited record before it. That Court's intent is consistent with SWPs' preferences. (SWPs' Memo at 4 ("The Court's June 17, 2026 order says if there is no live testimony presented to the Court, it will 'issue its ruling based solely on the filed briefs and the oral arguments of counsel.' SWPs respectfully suggest that is the appropriate outcome here." (internal citation omitted)). SWPs' failure to produce its witnesses may exacerbate the already enormous monetary and temporal burdens of this trial, sometimes  necessitating additional admissibility hearings in the midst of trial. SWPs' decision to withhold live testimony is to the detriment of the parties and the Court alike. The Court expects—and will require—better.

In both briefing and at oral argument, the parties cite to a panoply of evidence rules in their attempts to admit or exclude testimony from SWPs' lay witnesses. The Court provides both

---

[1] Unless otherwise specified, the citations to "Hr'g Tr." in Section I refer to the June 25, 2026 Hearing, (ECF No. 960).

its general analysis of the more commonly cited rules, as well as a witness-by-witness breakdown. Lest this Order be misinterpreted, the Court clarifies that its general analyses of FRE 807, 803(3), and 701 are broadly applicable to all witnesses subject to the United States' Motion *in Limine*, even if not specifically referenced. This Order should be read as an integrated whole. The reasoning herein applies to every other section and subsection, whether or not expressly noted or cross-referenced.

SWPs rely heavily on Federal Rule of Evidence ("FRE") 807 as a defense to the United States' Motion *in Limine*. FRE 807 states:

> **(a) In General.** Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> > **(1)** the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
> >
> > **(2)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.
>
> **(b) Notice.** The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name— so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

SWPs invoke this rule not as a scalpel, but as a bludgeon. SWPs attempt to use this rule as grounds to admit the Declaration of Floyd Abramson, (SWPs' Resp. at 4), and the testimony of nine of the nineteen witnesses subject to the United States' Motion *in Limine*. (*Id.* at 6 (Suzanne Emge), 8 (Jeff Stern), 11 (Robert Ercolini), 15 (Peter Gray), 16 (Stephen Salup, James J. Reagan, Jr.), 17 (Marc Kaplan), 18 (Susan Doroh), 22 (Dean Donnelson)). The vast majority of SWPs' invocations of FRE 807 are overbroad—to the point that the residual exception entirely swallows the Rule itself. As the 2019 Advisory Committee Notes explain, "the focus for trustworthiness is on circumstantial guarantees surrounding the making of the statement itself, as well as independent evidence corroborating the statement." *See* Fed. R. Evid. 807. SWPs' FRE 807 arguments largely lack independent evidence for the Court to conduct any kind of trustworthiness analysis. Mere conclusory claims of a witness's proximity, relationship, or acquaintance to a partner during the investment decision, without more, is insufficient. Nor has FRE 807(2) been sufficiently satisfied for any witness.

SWPs also rely on FRE 803(3) to support their arguments against the exclusion of the testimony of Jeff Stern, (SWPs' Resp. at 7–8), Peter Gray, (*id.* at 15), Marc Kaplan, (*id.* at 17), and Dean Donnelson, (*id.* at 22).[2] FRE 803(3) excludes from hearsay:

> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Broadly, the United States rebukes SWPs' claim that FRE 803(3) permits witnesses to offer a range of testimony because intentions are at issue. (Def.'s Reply at 5). The United States argues that FRE 803(3) is meant to be construed more narrowly—only allowing the admission of a declarant's contemporaneously ("presently existing") expressed statement of intention and prohibiting the admission of "a statement of memory or belief to prove the fact should be remembered or believed." (*Id.* at 5–6). Therefore, the United States maintains that the witness must be able to prove they were physically present at the time the declaration contemporaneously expressed the alleged intention. (*Id.* at 6). The Court's and the United States' interpretations of FRE 803(3) are the same. (*See* Hr'g Tr., 103:17–104:13). The spirit of FRE 803(3) is that declarants do not usually lie about their own present feelings, and there is no time to fabricate. *See Shepard v. United States*, 290 U.S. 96, 105–106 (1933); *see also* Notes of Advisory Committee on Proposed Rules (citing 6 Wigmore § 1747 at 135 (discussing how spontaneity forecloses the capacity for conscious fabrication)). Therefore, the statement is inherently reliable. SWPs' application of FRE 803(3) usurps the fundamental safeguards of the rule.[3]

Finally, SWPs rely upon FRE 701 to support the admission of the testimony of Mr. Alpert, (*see* SWPs' Resp. at 10), Mr. Wall, (*see id.* at 13), and Mr. Preroff, (*id.* at 19). The rule states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or

---

[2] At the June 25 Hearing, SWPs also invoked FRE 803(3) to support the admission of the testimony of many other witnesses. (*See, e.g.*, Hr'g Tr., 141:16–23, 144:4–19, 145:1–4 (Reagan), 164:1–4 (Doroh), 169:1–3 (Preroff), June 25, 2026). Accordingly, to the extent SWPs seek to use FRE 803(3) to affirmatively argue the admissibility of witness testimony that was not included in their Response, those arguments have been waived.

[3] To be clear, statements of feelings, physical state, or emotions are allowable—but statements of memory or belief about the intentions and causes—the *why*—are not. *See* Fed. R. Evid. 803(3). It must also be a *statement. See id.* For example, statements such as "I am angry because I wanted to prepay" are not allowed under FRE 803(3). "I am angry" could be allowed, but the *why* is not. SWPs seem to try and circumvent this rule by splicing FRE 803(3) and FRE 701 together. (*See* Hr'g Tr., 169:1–170:6 (arguing that the *why* is admissible opinion testimony)).

5

> to determining a fact in issue; and (c) not based on scientific, technical, or
> other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. For these witnesses, the Court agrees with the United States that SWPs must demonstrate "first hand knowledge or observation" in order for their testimony to be allowable under FRE 701. (Def.'s Reply at 6 (citing the Advisory Committee Notes to the 1972 Rules)). To the extent that these witnesses can do so, their testimony may be admissible under FRE 701.

Interestingly, SWPs argued at the hearing that the testimonies of Ms. Emge, Mr. Gray, Mr. Reagan, Mr. Kaplan, and Ms. Doroh are admissible under FRE 701. (Hr'g Tr., SWPs' Counsel, 42:24–43:2 (arguing that "opinions . . . based on [Ms. Emge's] rational perception" are admissible under FRE 701), 127:22–23 (arguing that "lay opinion testimony . . . about the partnership's expectation based on [Mr. Gray's] direct experience and interactions" is admissible under FRE 701), 142:10–13 (arguing that Mr. Reagan's "personal knowledge is highly relevant based on his experience because of Rule 701."), 153:14–17 (Kaplan), 164:2–4 (Doroh))). None of these arguments were raised in SWPs' Response. To the extent SWPs seek to use FRE 701 to affirmatively argue the admissibility of these witness's testimonies, those arguments have been waived. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *Brooks Range Contract Servs., Inc. v. United States*, 101 Fed. Cl. 699, 702 (2011). SWPs are **ORDERED** to adhere to the Court's general instructions on the applicability of FRE 807, 803(3), and 701 at trial, and should assume that this preliminary guidance applies to all witnesses—not just those named herein. Specific analyses of certain witnesses' testimony is below.

### A. The Abramson Declaration

The United States moves for the exclusion of Mr. Floyd Abramson, who is deceased. (Mot. *in Limine* at 1–2). SWPs seek to present his declaration, dated more than a year prior to his passing, about The Palomar Apartments. (SWPs' Witness List at 1, ECF No. 892; *see* PX 1808 and PX 3766 of SWPs' Exhibit List at 51, ECF No. 893-1; *compare* Def.'s Reply App. at 21 (Obituary of Mr. Abramson stating his date of death was on March 19, 2025), ECF No. 935-1 *with* Def.'s App.[4] at 61–63 (Abramson Declaration showing execution date of January 30, 2024), ECF No 916-1). The United States argues that even though Mr. Abramson is unavailable, the declaration is not testimony that "was given as a witness at a trial, hearing or lawful deposition" in accordance with FRE 804 and is therefore inadmissible hearsay. (Mot. *in Limine* at 1). SWPs say that Mr. Abramson's declaration is sufficiently trustworthy "considering the totality of the circumstances." (SWPs' Resp. at 3, ECF No. 927 (citing FRE 804)). Specifically, Mr. Abramson "was terminally ill when he signed the declaration and there is no suggestion that he would benefit in any way from providing the declaration." (*Id.* at 3 (citing *Chavez v. Martinez*, 538 U.S. 760, 797 (2003) which discusses the imminent death exception to hearsay.")). SWPs also argue that Mr. Abramson's declaration should be admitted under FRE 807(b)(2) because it is "more probative on the point for which it is offered than any other evidence the proponent can obtain

---

[4] Unless otherwise specified, citations in Section I to "Def.'s App." refers exclusively to the Defendant's Appendix filed with its Response, (ECF No. 916-1), and "Def.'s Reply App." refers to the Defendant's Appendix filed with its Reply, (ECF No. 935-1).

through reasonable efforts" because he was the original limited partner in The Palomar Apartments. (*Id.* at 4 (citing the Residual Exception of Rule 807)).

The Court agrees with the United States. The residual hearsay exception under FRE 807[5] does not apply because Mr. Abramson's declaration does not satisfy the requirement that there are "equivalent circumstantial guarantees of trustworthiness" which are when:

> (A) the proponent offers the statement as evidence of a material fact, (B) the statement is more probative on the point for which the proponent offers it than any other evidence which the proponent can procure through reasonable efforts, and (C) admitting the evidence will serve the general purpose of the rules and the interests of justice.

*See Rd. & Highway Builders, LLC v. United States*, 102 Fed. Cl. 88, 91 (2011), *aff'd*, 702 F.3d 1365 (Fed. Cir. 2012). Even stretching the hearsay exception rules to their outer bounds does not allow Mr. Abramson's testimony to be admitted under FRE 807—there is nothing in Mr. Abramson's declaration to indicate that death was imminent, (*see* Hr'g Tr., 6:1–11), nor could counsel attest to how the declaration had come into existence, whether the process of obtaining it from Mr. Abramson had been recorded, who was present when it was obtained, who drafted the declaration, or even if it had been prepared contemporaneously with Mr. Abramson or in his absence and then presented for signature, (*id.*, 12:22–17:8). Ms. Emge is the only witness that may have been able to sufficiently guarantee the trustworthiness of this document, but SWPs inexplicably declined to call her. (*Id.*, 9:14–15). SWPs claim that the deposition testimony and "information in the record" in the United States' Appendix is "sufficient" for the Court to make its determination. (*Id.*, 11:5–21). The Court relies on Ms. Emge's deposition. Therein, Ms. Emge references the declaration, stating that Mr. Abramson expressed his willingness to be contacted by Nixon Peabody and to create a declaration. (Def.'s App. at 12 (Deposition of Suzanne Emge at 118:21–120:7)). This is insufficient to guarantee the trustworthiness of Mr. Abramson's declaration and does not provide the evidence necessary for FRE 807. Because Mr. Abramson's declaration does not fall into any hearsay exception, it is **EXCLUDED**.

### B. Exhibits Related to Dismissed Plaintiffs

SWPs designate a number of exhibits related to plaintiffs that have already been dismissed in this matter. (*See e.g.,* PX 790–PX 869 (5324 Foothill Apartments, G.P.) of SWPs' Second Revised Witness List, ECF No. 965). The United States objects under FRE 401 and 403. (Mot. *in Limine* at 2 (citing Summ. J. Op., ECF No. 868)). SWPs argue that these documents "shed light on Mr. Spieker's business practices and expectations and may be relevant to establish [distinct investment-backed expectations], regardless of whether those partnerships have been dismissed." (*Id.* at 4). SWPs ask the Court to rule on the relevance of Mr. Spieker's testimony as it relates to these exhibits when and if it comes up during trial. (*Id.* at 4–5). In response, SWPs stated that they "do not anticipate introducing all of those documents" and "no particular

---

[5] FRE 807 "accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial." *Idaho v. Wright*, 497 U.S. 805, 817 (1990).

decisions about particular documents have been made at this time." (Hr'g Tr., SWPs' Counsel, 28:5–15). As stated during the June 25 Hearing, the Court will not dedicate any significant time to hearing testimony or examining exhibits related to nonparties. (*Id.*, 31:3–12). However, the Court also recognizes that a "small percentage" of these exhibits may have some relevance to the "bigger picture" to SWPs' arguments. (*Id.*). Therefore, exhibits pertaining to plaintiffs no longer at issue in this matter will not be excluded at this point, but SWPs are cautioned against relitigating the claims of nonparties or spending an inordinate amount of the Court's time on these documents. SWPs are to notify the United States and the Court prior to presenting any witness with proposed exhibits, or other documents, relating to a nonparty, to enable a contemporaneous objection.

## C. Suzanne Emge

SWPs offer Ms. Emge as a witness as to "the history of The Palomar Apartments and partnership, all topics covered in her depositions related to the property, and facts regarding *Penn Central* factors, including investment-backed expectations and economic impact of ELIHPA and LIHPRHA." (SWPs' Witness List at 1). Ms. Emge's father, uncle, and grandfather built The Palomar Apartments before Ms. Emge was born. (Mot. *in Limine* at 2). Ms. Emge's understanding is based on "more than [forty] years discussing with [her] father and Limited Partner Floyd Abramson," and the fact that her father converted another property with a HUD-insured mortgage to a market-rate rental property. (*Id.* (citing App. at 6 (Emge Dep. Tr., 18:7–19, 20:1–5))). The company that managed The Palomar Apartments employed Ms. Emge for one year between 1993–1994; however, she was not employed in any capacity related to the sale of The Palomar Apartments on November 30, 1995. (Def.'s App. at 10 (Emge Dep. Tr. 102:6–103:21), 25).

SWPs argue that Ms. Emge has personal knowledge of the relevant events for the purposes of FRE 602 and to the extent she testifies to her father's expectations "or other topics" that testimony contains "sufficient guarantees of trustworthiness" "considering the totality of the circumstances to bring it within the ambit of Rule 807." (*Id.* at 6). SWPs also invoke FRE 807(a)(2) to argue that her testimony is "more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts." (*Id.*). SWPs expressly argue that Ms. Emge's testimony "cannot be excluded before trial and before the Court has the opportunity to hear Ms. Emge testify and evaluate any objections by the Defendant to specific questions." (SWPs' Resp. at 6). As discussed above, the Court ordered SWPs to have ready for the July 25 Hearing any witnesses whose live testimony they felt was necessary for the adjudication of the United States' Motion *in Limine*. (*See supra* at 1–3). SWPs chose to disregard the those Orders and requested a ruling based on the briefing and oral arguments alone. (*See* SWPs' Memo at 2 ("SWPs contended, and maintain in good faith, that the Motion *in Limine* can be decided on the briefing, including the appendices, and oral argument.")).

The Court has reviewed the evidence related to Ms. Emge and considered the arguments before it. Most of Ms. Emge's deposition is inadmissible hearsay. Ms. Emge's personal knowledge for the purposes of FRE 602 is limited to the year she was employed by The Palomar Apartment's parent company. The Court finds no evidence for admitting any other components of Ms. Emge's testimony and declines to extend "the ambit" of FRE 807 to include vague

8

references to personal knowledge gained through "discussions" or "play[ing] on the playground equipment" of The Palomar Apartments. (Hr'g Tr., 38:18–24 (citing Emge Dep. at 19:6)).

### D.  Lawrence ("Larry") Levy

The United States asks that all of Mr. Levy's testimony related to Metro West Apartments and Foothill Plaza Apartments be excluded because the partnerships that owned those properties were dismissed. (Def.'s Mot. at 4). SWPs do not raise any specific arguments concerning the relevance of Mr. Levy's testimony to these two dismissed properties in their Response. (*See* SWPs' Resp. at 6–7). Presumably, SWPs seek to assert the same relevance arguments here as the exhibits abovebut failed to do so. At the June 25 Hearing, SWPs stated only that "it's a little unclear whether the Government is still pressing the arguments about Metro West or San Tomas or the Palomar." (Hr'g Tr., SWPs' Counsel, 58:18–22). SWPs also referred to a "Levy Letter" that "is part of the Metro West summary judgment back-and-forth" but provide no argument specific to Mr. Levy's testimony. (*Id.*, 174:10–12). SWPs have left the Court with crumbs from which to piece together a defense to the United States' Motion *in Limine* on their behalf. This is not the role of the Court. SWPs' arguments are waived as they pertain to Mr. Levy's testimony about Foothill Plaza Apartments and that testimony is **EXCLUDED**. The Court will allow Mr. Levy to testify regarding Metro West, but only regarding the "Levy Letter" referenced in oral argument. All other arguments have been waived by SWPs. If the United States chooses to raise a contemporaneous objection, they may do so, and the Court will then determine the admissibility of testimony relating to the "Levy Letter."

The United States also asks the Court to preclude all of Mr. Levy's testimony related to investment backed expectations, because he lacks personal knowledge related to these issues and can only present hearsay from conversations with SWP partners. (*Id.* (citing SWPs' Witness List at 2; FRE 602, 701, 802)). SWPs assert that "[e]ntering some sort of blanket bar at this stage is inappropriate." (SWPs' Resp. at 6–7). SWPs also contend that because the Court found Mr. Levy's testimony credible and relevant to the investment-backed expectations of Mr. Spieker with regards to First Wave Plaintiffs ("FWPs") Silverlake and Cedar Gardens, (SWPs' Resp. at 6 (citing FWPs Post-Trial Op. at 33, ECF No. 858)), and his testimony regarding Palomar, Sierra Vista I, and 825 San Tomas should be found similarly relevant.[6] (*Id.* at 7). Mr. Levy represented Palomar and its general partner, Mr. Katleman, during the sale of the property under LIHPRHA, but Mr. Levy was not involved with Palomar in 1973 and did not meet Mr. Katleman until 1986 or 1987. (*Id.*). Mr. Levy also negotiated the purchase of Sierra Vista Apartments between Mr. and Mrs. Spieker and Sierra Vista I, LP. (*Id.* at 5). Sierra Vista I, LP was formed in 1972 and entered into a regulatory agreement with HUD in 1973. (*Id.*).

As discussed at the July 25 Hearing, Mr. Levy may testify within the bounds of his own personal knowledge. (Hr'g Tr., 60:17–61:11). In accordance with FRE 803(3), Mr. Levy may also testify to specific conversations and statements of investment-backed expectations of the

---

[6] The Court notes that the admissibility of Mr. Levy's testimony in the FWPs' trial was never an issue present to the undersigned. (*See* Evidentiary Rulings and Status Report Order, ECF No. 709 (Campbell-Smith, J.). This Court considers issues of admissibility anew as circumstances in different proceedings arise.

initial investors like Mr. Katleman. However, generally "fill[ing] in the gaps based upon his opinion[,]" (*see* Hr'g Tr., 62:18–19), of the investment-backed expectations of the initial investors without adequate contemporaneous support, falls well outside the "ambit" of any exception to the hearsay rules. The United States may provide a contemporaneous objection as the Court considers the actual testimony of the witness rather than SWPs' characterization of his anticipated testimony.

### E.  *Jeff Stern*[7]

SWPs seek to call Jeff Stern to testify about a broad range of factors, including "the history of 100 Centre Plaza and 1550 Beacon Street, the original general partners' investment-backed expectations" and "facts regarding *Penn Central* factors[.]" (SWPs' Witness List at 2–3). In response, the United States asks the Court to limit Mr. Stern's testimony to:

> (1) actual statements of intention or plan with respect to exercise of the prepayment rights by B-L Associates, LP (B-L) and C-W Associates, LP's (C-W) that he claims were made in his presence as a 15 year old or college student in the 1970s, provided that SWPs can demonstrate compliance with FRE 803(3), and (2) matters in which he was personally involved after 1981 (with respect to B-L) and 1983 (with respect to C-W[)].

(Mot. *in Limine* at 6–8). The Court agrees with the United States in full.

SWPs argue that Mr. Stern's testimony falls squarely within FRE 803(3) because the intent to prepay "is a distinct and material fact in a chain of circumstances" about which Mr. Stern can testify because he was present at many meetings and can therefore provide "contemporaneous oral . . . declarations of the party." (SWPs' Resp. at 8 (citing *Mutual Life Insurance Co. v. Hillmon*, 145 US 285 (1892)). SWPs also cite FRE 807. (*Id.*). As with Mr. Levy, Mr. Stern is welcome to testify to specific statements made in his presence, as well as matters in which he was personally involved. There is nothing in the record available to the Court that indicates Mr. Stern is able to recall any actual statements. Upon a contemporaneous objection from the United States, the Court will address the admissibility of Mr. Stern's testimony.

### F.  *Howard Cohen*

According to SWPs, Mr. Cohen may be called to testify to the B-W Associates L.P. and C-W Associates L.P. properties, "ELIHPA and LIHPRHA application processing, correspondence with HUD, facts regarding *Penn Central* factors including investment-backed expectations and issues related to Ch. 121A (as needed) . . . ." (SWPs' Witness List at 3). The United States takes issue with SWPs' phrasing that Mr. Cohen "will testify as to 'facts regarding

---

[7] The United States' Motion to Strike Inadmissible Evidence, (ECF No. 889), will be addressed in a separate order as it pertains to both Jeffrey Stern and Howard Cohen in the context of the United States' Motion for Summary Judgment on the Claims of C-W Associates, L.P. and B-L Associates, L.P., (ECF No. 871).

*Penn Central* factors including investment-backed expectations and other issues'" because it is overbroad. (Mot. *in Limine* at 8 (citing SWPs' Witness List at 2)).[8] Specifically, the United States contends that Mr. Cohen lacks personal knowledge—he is an attorney who represented B-L and C-W in connection with their applications to HUD but was not involved during the time of the initial investment so anything he has to say is based on hearsay and/or speculation. (*Id.* (citing FRE 401, 403, 802)). SWPs direct the Court to their response to the United States' Motion to Strike and make no additional arguments here. (*See* SWPs' Resp. at 8)

The Court has examined the limited evidence available to it—a three-page declaration of Howard Cohen attached to SWPs' Response to the United States' Motion for Summary Judgment and the argument of counsel. (*See* ECF No. 883-1 at 4–6). Mr. Cohen's declaration states that he represented C-W and B-L "in connection with their applications to HUD" and "understood that from the time they organized the Partnerships, the general partners intended to prepay their MHFA mortgages and anticipated no obstacles to doing so." (*Id.* (Cohen Decl. at ¶ 4)). He gleaned this knowledge from speaking "frequently" with the general partners and others, and familiarity "with the Partnerships' individual partners and investment goals and expectations." (*Id.*). All of this is hearsay, none of which is admissible. Mr. Cohen may testify to *only* his direct, personal experience with the properties during the ELIHPA and LIHPRHA application processing period. Without the benefit of hearing from Mr. Cohen as requested at the Motion *in Limine* Hearing, the Court has no choice but to exclude the other aspects of Mr. Cohen's purported testimony as inadmissible hearsay.

### G. *Seymour Alpert*

SWPs seek to elicit testimony from Mr. Seymour Alpert on "the development of Jodani Apartments and Suehar Apartments, the history of the partnerships, investment in the properties, his involvement as general partner, facts regarding *Penn Central* factors including investment-backed expectations and economic impact of ELIHPA and LIHPRHA, correspondence with HUD, and other topics[.]" (SWPs' Witness List at 4). SWPs seek to designate portions of Mr. Alpert's deposition testimony. (*See* SWPs' Mot. to Designate at 7). The United States argues that Mr. Alpert has no personal knowledge of investment-backed expectations of Jodani Associates, L.P. ("Jodani") or Suehar Associates, LP ("Suehar") because Jodani formed as a partnership and entered into a mortgage note with HUD in 1973, but Mr. Alpert's "role" with Jodani did not begin until 1974. (Def.'s Mot. *in Limine* at 9 (citing App. at 374; FRE 602, 802, 401, 403)). Significantly, Mr. Seymour Alpert also testified that he did not know why the partners in either Jodani or Suehar thought those respective properties were a good investment. (*Id.* at 9–10 (citing App. 432–33)).

---

[8] The United States also takes issue with Mr. Cohen because he was not disclosed as a witness in SWPs' initial disclosures in violation of RCFC 37(c)(1). (Mot. *in Limine* at 8). In the Court's hearing on the United States' pending Motion for Summary Judgment, it specifically alleged that the "first indication that [SWPs] might call Mr. Cohen as a witness" was on March 10, 2026, when SWPs filed his declaration with their Response. (Hr'g Tr., 60:8–61:15, June 22, 2026). The Court agrees that this is a significant discovery violation. However, this argument is now moot.

In response, SWPs ask the Court to resolve the admissibility of Mr. Seymour Alpert's testimony based on the deposition designations (and objections thereto). (Hr'g Tr., 81:3–15 (The Court: "So what do you intend to get from [Mr. Alpert]?" SWPs Counsel: "[W]e've made designations with respect to Mr. Alpert's deposition testimony . . . the Government should have objected to particular passages of that deposition testimony if it believes that some of those are not supported by admissibility. And that would be the way to handle this.")). The Court has reviewed Mr. Alpert's deposition testimony, as well as the designations and counter-designations submitted by SWPs and the United States. (*See* Def.'s App. 783–803). At no point in his depositions does Mr. Seymour Alpert establish a foundation for his knowledge of investment-backed expectations. In fact, much of his testimony points in the opposite direction. For example, when asked if he was involved in the development of the Jodani property, he responded "[o]n the construction end only." (SWPs' Mot. Designate App. at 785 (S. Alpert Dep. (Jodani), 11:14–17), ECF No. 929-5). He also testified that he did not have a role in the formation of the partnership until his father passed away, (*Id.* at 786 (S. Alpert Dep. (Jodani), 13:6–11)), and that there was "no plan" to ultimately prepay the Jodani mortgage, (*Id.* at 789 (S. Alpert Dep. (Jodani), 26:10–20)). Mr. Seymour Alpert made similar representations regarding the Suehar property. (*Id.* at 798 (S. Alpert Dep. (Suehar), 9:21–10:16, 19:10–19)). To the extent that SWPs intend to offer Mr. Seymour Alpert's testimony on the subject of investment-backed expectations of the original investors in Suehar and Jodani, it is **EXCLUDED** as inadmissible hearsay. Mr. Seymour Alpert had no personal knowledge of the original investment-backed expectations of the investors. SWPs may offer Mr. Seymour Alpert's testimony *only* as to the topics within his direct, personal knowledge. The Court will defer ruling upon the United States' specific objections to Mr. Alpert's testimony.

### H. Joseph Alpert

Mr. Joseph Alpert, the son of Mr. Seymour Alpert, "was Vice President of the management company for Jodani Apartments and Suehar Apartments." (SWPs' Witness List at 4). SWPs offer his testimony on substantively similar topics as his father, including "the development of the [Jodani and Suehar] properties, the partnerships, his involvement as a property manager, facts regarding *Penn Central* factors including investment-backed expectations, and economic impact of ELIHPA and LIHPRHA and other topics[.]" (*Id.*). The United States argues that Mr. Alpert has no personal knowledge of Jodani and Suehar's investment-backed expectations because his role as vice-president for the management company for both properties was from 1990 until 2000. (Mot. *in Limine* at 10 (citing App. at 438–39)). In turn, SWPs allege that his role as vice president of Bronx Park Management which managed the Suehar and Jodani properties, he has sufficient personal knowledge to testify to the investment backed expectations of the investors. (*Id.*).

The Court agrees with SWPs that Mr. Joseph Alpert may testify to topics he gained personal knowledge of when he was involved with the properties from 1990–2000. (Hr'g Tr., 85:15–24). The issue at hand is whether Mr. Joseph Alpert is able to testify to the investment-backed expectations of his father and grandfather. SWPs argue that Mr. Joseph Alpert's "personal knowledge" of his father and grandfather allows him to testify to "inferences and . . . opinions" of their investment-backed expectations. (*Id.*, 86:10–87:6). Nothing in the evidence available to the Court suggests that Mr. Joseph Alpert will offer anything *other* than inadmissible

12

hearsay regarding the investment-backed expectations of his father and grandfather. Vague opinions of Mr. Joseph Alpert based upon his understanding of the unspoken feelings of his father and grandfather are not allowable under even the most generous interpretation of the relevant FRE. However, to the extent that Mr. Joseph Alpert can offer *specific statements* that comply with the Court's above analysis of FRE 803(3) and 702, those will be allowed. Again, upon contemporaneous objection, the Court may reconsider this issue with the benefit of live testimony.

### I.   Robert Ercolini

Mr. Ercolini a general partner of Algonquin Heights Associates, LP. ("Algonquin Heights"), and SWPs purport that he "may testify about the history and development of [Algonquin Heights], the history of the partnership, his involvement as general partner in the partnership . . . facts regarding *Penn Central* factors including investment-backed expectations and economic impact of ELIHPA and LIHPRHA[.]" (SWPs' Witness List at 5). However, as with Mr. Joseph Alpert above, the United States specifically argues that Mr. Ercolini had no personal knowledge regarding the investment-backed expectations of the investors because he only became involved in Algonquin Heights in the late 1970s. (Mot. *in Limine* at 10 (citing Def.'s App. 481, 485, 490)).

In turn, SWPs argue that the United States has cherry-picked six lines of his 2007 deposition, and four lines from his 2025 deposition to vaguely assert that Mr. Ercolini has no personal knowledge. (SWPs' Resp. at 10–11). Specifically, SWPs state "that it would be error to bar Mr. Ercolini's testimony in whole or in part based upon such a scant record." (*Id.* at 11). However, wholly due to SWPs' complete disregard for two of this Court's orders, this "scant record" is all the Court has to base its opinion of Mr. Ercolini. At the Hearing, SWPs were unable to direct the Court to corroborating documents that would lend themselves to sufficient guarantees of trustworthiness of Mr. Ercolini's opinions other than "some of the partnership agreements and the mortgage note themselves that contain the prepayment language . . . ." (Hr'g Tr., 93:1–6). When asked if the referenced mortgage notes were available to the Court or pointed out in the briefing, SWPs' counsel responded "I don't think so." (*Id.*, 94:1).

In the words of the Seventh Circuit, "[j]udges are not like pigs, hunting for truffles[.]" *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Mr. Ercolini's name and signature appear on page 456 of the United States' Appendix, which is an un-notarized mortgage note executed by Algonquin Heights with the Massachusetts Housing Finance Agency on February 23, 1972. (Def.'s App. at 451–56). Even with the benefit of this document, the totality of the evidence before the Court does not support SWPs' arguments that Mr. Ercolini is able to testify to the investment-backed expectations of the original investors. (*See e.g.,* Def.'s App. at 481 (Ercolini July 17, 2007 Dep. at 11:19–12:1 (Q: "What were the circumstances under which you became involved with Algonquin Heights?" A: "In the late '70s as an accountant[.]"), 485 (Ercolini Jan 13, 2025 Dep. at 24:18–21 (Q: "So you were not familiar with the Algonquin Heights Associates partnership in 1972 when the property was initially being developed, right?" A: "Right, yes."")).

13

SWPs argue that "it is simply balderdash to contend that [Mr. Ercolini] cannot testify about his own expectations concerning the property." (SWPs' Resp. at 11). The Court is not interested in barring Mr. Ercolini from testifying as to his *own expectations* after he became a general partner, but to the extent that SWPs are offering Mr. Ercolini to testify as to his opinions on the expectations of the *original* investors, that testimony is **EXCLUDED**.[9] Should Mr. Ercolini be able to proffer specific statements made by the original investors in his presence (per the Court's analysis above), the Court will evaluate each of those instances at trial. SWPs have offered nothing to rectify their own "scant" record, which demonstrates only that Mr. Ercolini plans to offer inadmissible hearsay at trial.

### J.  John Wall

Mr. Wall works for Mid-City Financial Corporation (formerly known as Mid-City Developers, Inc.). (SWPs' Witness List at 5). According to SWPs, Mr. Wall may testify to a variety of topics, including the investment-backed expectations of Indian Head Manor Apartments ("Indian Head"), Millwood Townhouses ("Millwood"), Napa Park Apartments ("Napa Park"), Glenview Gardens Apartments ("Glenview"), Ontario Townhouses ("Ontario"), Brookside Manor Apartments ("Brookside"), Landmark Apartments ("Landmark"), Forest Glen Townhouses Phases I and II/III ("Forest Glen"), Cherry Branch Townhouses (f/k/a) Kimberly Gardens Apartments ("Kimberly"), and Suburbia Fairfax Apartments ("Suburbia Fairfax"). (*Id.* at 5–6). Mr. Wall worked for Mid-City Developers starting in August 1971 until 1976, and then again starting in 1994. (Mot. *in Limine* at 11 (citing Def.'s App. 752)). Mid-City was involved in developing some (but not all) of the properties about which SWPs intend Mr. Wall to testify. (*Id.*). Mr. Wall had no personal involvement in the original investment decisions of nine out of the ten properties. (*Id.* citing Def.'s App. at 743–44 (Jan. 9, 2025 Deposition Transcript ("Dep. Tr."), 41:22–42:3) (Indian Head), 745 (Dep. Tr., 56:9–12) (Napa Park), 742 (Dep. Tr., 32:16–33:3) (Glenview Gardens), 754 (Dep. Tr., 14:11–21) (Glenview Gardens), 746 (Dep. Tr., 61:5–10) (Ontario), 747 (Dep. Tr., 62:6–9) (Brookside), 750 (Dep. Tr., 78:1–4) (Landmark), 747–48 (Dep. Tr., 64:8–12, 65:15–66:9) (Forest Glen), 748 (Dep. Tr., 68:22–69:5) (Kimberly), 749 (Dep. Tr., 73:2–5) (Suburbia))). For the remaining property, Millwood, Mr. Wall could not have been involved in the decision to develop it as low-income housing with a HUD loan because that decision was made in 1970, before Mr. Wall began working at Mid-City. (Mot. *in Limine* at 12 (citing Def's App. at 757, 758)).

The justification of SWPs argument as to why Mr. Wall's testimony of investment-backed expectations should be allowed is that "at least eight of these properties that are at issue for the Second-Wave Plaintiffs that [Mr. Wall] would testify about were developed by Mid-City and/or Eugene Ford, Mr. Wall's mentor, who he testified about extensively and knew for decades, was a partner in those partnerships." (Hr'g Tr., 108:7–13). For the remaining two properties, Mid-City and Eugene Ford were not involved "in the inception of those properties, but Mid-City was directly involved and Mr. Wall was directly involved through all the LIHPRHA processing . . . ." (*Id.*, 108:14–19). When the Court asked if there were any kind of

---

[9] The Court is doubtful that Mr. Ercolini's own investment-backed expectations are relevant—because he was not an original investor and only became a general partner in 1977. (*See* Def.'s App. at 481, 490). However, the Court is willing to resolve the inevitable objections at trial.

contemporaneous records to support Mr. Wall's testimony of Mid-City and Eugene Ford's investment-backed expectations, SWPs' counsel responded in the negative. (*Id.*, 108:20–109:14). Instead, SWPs argue that Mr. Wall can extrapolate Mid-City's business and investment strategy (pertaining to properties not at issue in this litigation) backwards in time to the expectations of the original investors in the properties at issue *in this matter*. (*Id.*, 110:6–25). This assertion is unsupported by Mr. Wall's testimony, corroborating evidence, or any guarantees of trustworthiness other than counsel's characterizations. None of the litany of evidence rules cited by SWPs justify Mr. Wall testifying to his opinions of the investment-backed expectations of SWPs at issue in this case, without offering *specific statements* backed by contemporaneous evidence and sufficient guarantees of trustworthiness. As far as Mr. Wall's testimony on other topics is concerned, he may testify to those properties of which he has *direct, personal experience* while working at Mid-City. Mr. Wall is also welcome to testify under FRE 406 to the "general, routine business model and investment" strategies of Mid-City in the 1970s.

### K.  Murray Haber

Mr. Haber is slated to testify via deposition "about his involvement in the affordable housing industry, investments related to affordable housing projects, his involvement with some plaintiffs' properties, facts regarding *Penn Central* factors including investment-backed expectations . . . and other topics covered in his deposition related to the affordable housing industry." (SWPs' Witness List at 4; *see* SWPs' Mot. to Designate at 3–4). The United States argues that Mr. Haber's testimony is specific to First Wave Plaintiff Buckman Gardens and that his deposition is irrelevant, inadmissible hearsay. (Mot. *in Limine* at 12 (citing Def.'s App. at 536; FRE 401, 403, 802)). SWPs argue that Mr. Haber "can offer lay opinion testimony about expectations of the industry because he worked in the industry attracting investors." (Hr'g Tr., 120:12–15). SWPs also confirm that they are "not trying to offer his testimony to show the subjective expectations of the partnerships." (*Id.*, 122:17–21). The Court is amenable to hearing Mr. Haber's testimony on objective investment-backed expectations and other topics in his deposition provided that it complies with the hearsay rules and is relevant.

### L.  Peter Gray

SWPs indicate that Mr. Gray will testify as to his personal knowledge regarding "investment backed expectations" for Leader House Associates, LP ("Leader House"), New Amsterdam Associates, LP ("New Amsterdam"), and Tower West Associates, LP ("Tower West") among other topics. (SWPs' Witness List at 4). In 1996, Mr. Gray began his role as vice president at Pembroke Properties, which is a member of BRE Metro Residential Holdings ("BRE") which controlled the single asset entities that were the general partners of Leader House, New Amsterdam, and Tower West. (Mot. *in Limine* at 13 (citing Def.'s App. at 554–56, 559)). However, Mr. Gray had no involvement with the properties before 1999. (*Id.* at 13–14).

SWPs argue that the information Mr. Gray provided in his deposition is sufficient to establish personal knowledge for the purposes for FRE 602 and satisfies the requirements of FRE 803(3) and 807 for admissibility. (SWPs' Resp. at 14–15). SWPs specifically state that: "[c]ertainly, the Court should wait to hear from Mr. Gray before making any decision about the admissibility of his testimony and avoid and preemptive action to preclude Mr. Gray from

offering testimony at trial." (*Id.* at 15). The Court took this statement to mean that SWPs found it necessary for the Court to hear from Mr. Gray in order to resolve the United States' Motion *in Limine*. Instead, once again, SWPs disregarded two Orders relating to the attendance of witnesses in favor of the Court ruling upon the briefing (including appendices) and oral argument.

As the record stands, there are no sufficient guarantees of trustworthiness for the Court to admit Mr. Gray's testimony under FRE 807. Mr. Gray's vague testimony about what the original investors or Mr. Stephen Salup may or may not have felt at the time of the initial investment is inadmissible hearsay. For example, when asked if the initial investors in Leader House intended to convert the property to market rate, Mr. Gray responded: "Um, over time, that was definitely part of the business plan." (Def.'s App. at 558 (Gray Dep. Tr., 24:3–8)). When asked about the basis of his knowledge, Mr. Gray referenced "legacy employees" like Mr. Stephen Salup. (*Id.*). When asked if the initial investors in Leader House would have invested had they not been able to convert and prepay, Mr. Gray responded: "I can only speculate that the answer would be no." (*Id.* (Gray Dep. Tr., 25:11–16)). Mr. Gray provided similarly vague answers in response to questions about the investment-backed expectations of Tower West and New Amsterdam. (*Id.* (Gray Dep. Tr., 29:24–30:10) (Q: "[W]hat's the basis of your knowledge that they intended to convert the apartments to market rate apartments?" A: "Um, both anecdotal and the agreements that were signed at the time.")).

The sum of the evidence is insufficient for the Court to draw any other conclusion; Mr. Gray intends to offer testimony on investment-backed expectations with no personal knowledge in violation of FRE 602, 803(3), and 807. (*See also* Hr'g Tr., SWPs' Counsel, 129:18–21 ("I just read you several portions of the testimony that is in the record. And I think that is a fair example of what he would say at trial, and I think that's admissible.")). Because the Court is not required to wait until trial to rule on the United States' Motion *in Limine*, Mr. Gray's testimony as to investment-backed expectations is **EXCLUDED**. He may be allowed to testify to other topics in his *direct, personal knowledge* beginning in 1999.

### M.  Stephen Salup

As with Mr. Gray above, Mr. Salup is also slated to testify as to the "investment-backed expectations" of the partners of Leader House, New Amsterdam, and Tower West, among other topics, via deposition. (SWPs Witness List at 4; *see* SWPs' Mot. to Designate at 7 n.3). However, the United States argues that Mr. Salup did not become involved with these properties until "roughly 1984, 1985[.]" and therefore has no personal knowledge of the relevant events. (Mot. *in Limine* at 14; Def.'s Resp. to SWPs' Mot. to Designate App. at 447 (Salup Dep. Tr., 19:20–21) (Leader House & New Amsterdam), ECF No. 930-3).

SWPs argue that Mr. Salup's testimony demonstrates that he has deep personal knowledge "of matters relevant to the partnerships' claims in this litigation" sufficient to satisfy FRE 602 and 807. (SWPs' Resp. at 15–16). This is not evident from the record. When asked for contemporaneous evidence of Mr. Salup's statements, SWPs responded: "Mr. Salup's testimony is not based solely on a review of documents and it's not based solely on people that he spoke to." (Hr'g Tr., 137:20–25). SWPs were unable to direct the Court to any specific evidence

16

corroborating Mr. Salup's hearsay statements about the investment-backed expectations of the partners of Leader House, New Amsterdam, and Tower West. (*See id.*, 137:11–25). SWPs also failed to bear their burden to show personal knowledge in accordance with FRE 602. The Court finds that Mr. Salup's testimony about the initial investment-backed expectations of the partners of Leader House, New Amsterdam, and Tower West inadmissible under FRE 807 and 602. The Court will resolve the objections to the other topics in Mr. Salup's proposed testimony in its forthcoming order on deposition designations or in-person at trial.

*N.  James ("Jay") Reagan, Jr.*

Mr. Reagan is slated to testify to the investment-backed expectations of Brandy Hill Company ("Brandy Hill"), Cromwell Court Company ("Cromwell"), King's Grant Company ("King's Grant"), Pine Crest Company ("Pine Crest"), and Riverside Village Company ("Riverside"), among other topics, via deposition. (SWPs' Witness List at 7). However, as with the majority of SWPs' lay witnesses, the United States' exclusion argument is limited to Mr. Reagan's lack of personal knowledge of the investors' expectations. (Mot. *in Limine* at 14–15). Mr. Reagan began working at State Street Development Company ("State Street") in November 1971. (*Id.* (citing Def.'s App. at 557)). State Street and Brandy Hill, Cromwell, King's Grant, Pine Crest, and Riverside share common partners—Walter Winchester, John Gallagher, John O'Donnell, and Steven Casey. (Def.'s App. at 575). Mr. Reagan's understanding of the investment-backed expectations of the State Street partners stemmed largely from talking to them, (*id.* at 578 (Regan Dep. Tr., 226:19–23), from his "assumption that they wanted to make money," (*id.* (Reagan Dep. Tr., 227:3–5)), and from "financial documents[,]" including the private placement memorandum, mortgage, and mortgage note, (*id.* (Reagan Dep. Tr., 227:6–228:13)). Mr. Reagan specifically stated that he was not employed at State Street when the decision was made to invest in the King's Grant property and does not have personal knowledge of the partners' investment-backed expectations. (*Id.* at 577 (Reagan Dep. Tr., 224:11–18) (Q: "So you don't have personal knowledge of the expectations of the King's Grant partnership at the time that King's Grant was developed?" A: "That would be correct.")).

SWPs argue that "his testimony is supported by sufficient guarantees of trustworthiness, considering the totality of the circumstances and his testimony is more probative on the points for which it will be offered other than any other evidence the proponent can obtain through reasonable efforts." (SWPs' Resp. at 16 (also citing "the ambit of [FRE] 807")). SWPs also argue that Mr. Reagan can provide testimony on an investor's then-present intention of the partnership to prepay in twenty years under FRE 803(3). (Hr'g Tr., 141:16–23). SWPs go on to call Mr. Reagan's testimony "sort of a combination of 803(3) with 701." (*Id.*, 145:3). However, SWPs did not raise FRE 803(3) or FRE 701 as arguments for the admissibility of Mr. Reagan's testimony in their Response. (*See* SWPs' Resp. at 16). These are therefore waived.

SWPs have also not met their burden under FRE 807. Nowhere in their argument do they cite or produce the evidence that would qualify as "sufficient guarantees of trustworthiness" under the rule. (*See e.g.,* SWPs' Resp. at 16 (lacking citations in the two paragraphs dedicated to Mr. Reagan)). The Court has considered the totality of the circumstances and finds that SWPs have failed to show that Mr. Reagan's personal knowledge of the investment-backed expectations of the initial investors is admissible. *See* FRE 807. SWPs are welcome to proffer

17

Mr. Reagan's testimony on other topics in accordance with this Court's forthcoming opinion on the parties' deposition designations.

### O. Marc Kaplan

Mr. Kaplan is offered to testify to the investment-backed expectations of Fort Health Associates, LP ("Fort Health"), among other topics. (SWPs' Witness List at 8). Mr. Kaplan's mother and father were the partners in Fort Health when it entered into its mortgage note with HUD in 1971. (Mot. *in Limine* at 15 (citing Def.'s App. at 639, 642, 665, 678)). Mr. Kaplan testified that his personal knowledge of the investment-backed expectations of the initial investors is based on "conversations with [his] father and [his] mother[.]" (*Id.* at 15–16 (citing Def.'s App. 679–80)). SWPs argue that Mr. Kaplan was involved in the Fort Health property "from an early age, cleaning the model apartment in his youth, and, after graduating from college, working for his father in the management of the Fort Health property and other tasks." (SWPs' Resp. at 16). SWPs also argue that Mr. Kaplan came from "a real estate family" and real estate was "in the blood" and from conversations with his father, Mr. Kaplan knew what the investment-backed expectations were. (*Id.*). Based on this, SWPs maintain that this establishes personal knowledge sufficient under FRE 602 and 702. (*Id.*). Furthermore, SWPs maintain that Mr. Kaplan's specific statements concerning his father's intent are admissible under FRE 803(3) and 807. (*Id.* at 17).

There is nothing in the record to support SWPs' assertion that Mr. Kaplan's opinions about his parents' investment-backed expectations are admissible under FRE 803(3). That Mr. Kaplan had conversations around the dinner table with his parents about real estate does not allow him to testify to his father's then existing state of mind. (*See* Def.'s App. at 679 (Kaplan Dep. Tr., 13:18–22)). However, it may be the case that Mr. Kaplan is able to recount specific statements made in his presence at trial that *do* fall within FRE 803(3). The Court will leave that window open for SWPs. Mr. Kaplan's testimony as to the investment-backed expectations of his parents is *not* admissible under FRE 807.

### P. Jeff Gardner

Mr. Gardner's testimony is offered on "the history of Briar Crest I, LP, Briar Crest II, LP, and Briar Hills, LP, . . . his involvement in the partnerships and with the properties, correspondence with HUD, facts regarding *Penn Central* factors including investment-backed expectations, and the economic impact of ELIHPA and LIHPRHA on these properties, and other topics . . . ." (SWPs' Witness List at 13). The United States argues that he has no personal knowledge of the investment backed expectations of partnerships because he became a limited partner in these properties in 2004, and a general partner in 2019. (Mot. *in Limine* at 16 (citing Def.'s App. at 933, 936)). Prior to 2019, Mr. Gardner worked "on behalf of the original partners" in a property management capacity for the three properties—he would conduct "normal drive-through inspections and meet with management" and would assist with any "management issue" or "construction related issue[.]" (*Id.* at 16–17 (citing Def.'s App. at 939, 941, 936, 942)). He testified that "[he] was not there . . . in the early 70s so I cannot tell you exactly what their intentions were." (*Id.* at 16 (citing Def.'s App. at 937)). The United States also alleges that Mr. Gardner was also not aware of the decision-making process of the partnerships when seeking in

18

incentives from HUD through LIHPRHA, because the partnerships' notices of intent were dated from 1992, 1994, and 1996. (*Id.* (citing Def.'s App. at 934–35, 943–52)).

In response, SWPs make only a procedural objection—that it would be "more straightforward and efficient" to wait until trial to rule on whether Mr. Gardner's testimony is admissible because his "deposition testimony may or may not reflect questions he will be asked at trial or objectionable answers he might give." (SWPs' Resp. at 17–18). That the Court should "wait and see" is not a valid reason to defer ruling. SWPs do not cite a single rule of evidence or substantive reason that the Court should not grant the United States' Motion *in Limine* with respect to Mr. Gardner. (*See id.*). At oral argument, SWPs simply read an excerpt from Mr. Gardner's deposition containing his general feelings about prepayment that SWPs claim is admissible "based on his longstanding history." (Hr'g Tr., 157:10–158:1). SWPs offer little more than *ipse dixit* and expect the Court to accept it. The Court notes, with some concern, the thinness of the argument presented and the burden that places on SWPs. . The United States' Motion *in Limine* is granted in its entirety as it pertains to Mr. Gardner and as a result his testimony is **EXCLUDED** in full.

### Q. Susan Doroh

Ms. Doroh was a management agent on behalf of Briar Crest I, L.P., Briar Crest II, L.P., and Briar Hills, L.P. beginning in December of 1971 (Mot. *in Limine* at 17 (citing Def.'s App. at 957); Hr'g Tr., Def.'s Counsel, 160:7–9). She is slated to testify via deposition to "facts regarding *Penn Central* factors including investment-backed expectations, and the economic impact of ELIHPA and LIHPRHA on the properties . . . the history of the partnerships, her involvement with the partnerships and properties, ELIHPA and LIHPRHA application processing, correspondence with HUD, and other topics . . . ." (SWPs' Witness List at 14–15). The United States argues that she has no personal knowledge of the investment-backed expectations or the economic effects of the Preservation Statutes on the properties because she was not involved in the development of the properties and was therefore "out of the loop on those investment decisions." (Mot. *in Limine* at 17; Hr'g Tr., Def.'s Counsel, 161:15–16).

In their Response, SWPs cite exclusively to FRE 807 for the admissibility of Ms. Doroh's testimony, hinging their argument on her "extensive and very lengthy involvement with the properties." (SWPs' Resp. at 18 (citing Doroh Dep. Tr., 15:11–22, 16:1–5)). Counsel for SWPs "believe[s]" that Ms. Doroh "had conversations with the investors at the time she was a management agent" about their investment decisions. (Hr'g Tr., 163:3–9).[10] Without the benefit of her presence or testimony at the hearing, the Court has very little evidence for which to make its determination on the admissibility of Ms. Doroh's testimony. In her deposition, Ms. Doroh does not directly testify to any specific statements made regarding the initial investors' intent to prepay their mortgages. (*See* Def.'s App. at 953–65 (excerpts); Def.'s Resp. to SWPs' Dep. Designations App. at 488–512, ECF No. 929-5)). Without any additional evidence or guarantees of trustworthiness outside the word of counsel, the Court has little choice other than to

---

[10] At oral argument, SWPs also cited FRE 803(3) and FRE 701 to support the admissibility of Ms. Doroh's testimony. (Hr'g Tr., 164:2–4). As discussed above, those arguments are waived. (*See supra* at 4–6).

**EXCLUDE** Ms. Doroh's testimony on SWPs' investment-backed expectations under FRE 807. Ms. Doroh's testimony may be offered on other topics in accordance with the FRE.

### R.  Francis ("Moe") Preroff

Mr. Preroff is slated to testify to the investment backed expectations of SWPs Garrison Forest Associates I and II ("Garrison Forest"), and Town and Country Apartments and Townhouses, Sections I and II ("Town and Country"). (SWPs' Witness List at 15). Mr. Preroff was the company director of Mount Royal Management Company, the managing agent for these partnerships. (Mot. *in Limine* at 18 (citing Def.'s App. at 724–25, 733)). SWPs plan to have him testify to: "the history of the partnerships and properties, his involvement as management agent . . . facts regarding *Penn Central* factors including investment-backed expectations, and the economic impact of ELIHPA and LIHPRHA on these properties, correspondence with HUD, and other topics . . . ." (SWPs Witness List at 15). The United States argues that Mr. Preroff's involvement with these properties was from 1991–2024, and the decision to invest, as Mr. Preroff testified, "predates [his] association by 20 years or so[.]" (Mot. *in Limine* at 18 (citing Def.'s App. at 728)). Accordingly, the United States argues that Mr. Preroff has no personal knowledge related to the investors' expectations. (*Id.* at 18–19).

SWPs argue that regardless of whether Mr. Preroff knows why the partners invested in the properties, this does not preclude him from having knowledge related to investment expectations. (*See* SWPs' Resp. at 19). SWPs' cite to FRE 701 to support their assertions but seem to primarily make a case for admission under FRE 803(3). (*Id.* ("For example, he could testify about his knowledge regarding *frustration* of SWPs' expectations by the Preservation Statutes . . . .")). From his deposition, and SWPs argument, the Court has no confidence that Mr. Preroff plans to testify regarding specific statements that are admissible under FRE 803(3). SWPs' counsel specified that Mr. Preroff "would offer an opinion and he would also talk about frustration, the present sentiment—or state of mind when [the investors] couldn't prepay." (Hr'g Tr., 167:20–168:1). However, as with Mr. Kaplan, the Court will not close the window and fully exclude Mr. Preroff. On the off chance he is able to recount specific statements made in his presence that *do* fall within FRE 803(3), his testimony on the investment-backed expectations of the initial investors is admissible.

### S.  Richard ("Tod") Spieker and Catherine Reilly Spieker

Mr. Spieker "will testify about Metro West Apartments, Sierra Vista One, Foothill Plaza Apartments, San Tomas Garden Apartments . . . involvement in the partnerships, processing of ELIHPA and LIHPRHA applications, correspondence with HUD, facts regarding *Penn Central* factors including investment-backed expectations, and economic impact of ELIHPA and LIHPRHA, and other topics . . . ." (SWPs' Witness List at 16). As a preliminary matter, the United States asks the Court to preclude Mr. Spieker's testimony regarding Metro West and Foothill Plaza because those partnerships have been dismissed. (Mot. *in Limine* at 19; *see* Op. Dismissing, ECF No. 869). The Court's ruling is the same as above: the Court will not dedicate any significant portion of time to hearing testimony or examining exhibits for nonparties but

recognizes there may be some relevance to the "bigger picture." (Hr'g Tr., 31:3–12; *see supra* Section C).[11]

The United States also argues that Mr. Spieker has no personal knowledge regarding the investment-backed expectations of Sierra Vista I, LP as required by FRE 602. (*Id.*). Sierra Vista entered the HUD program in 1974, but Mr. Spieker did not become a partner in Sierra Vista until 1989. (Def.'s Reply at 19 (citing Def.'s App. at 111–127)). The United States draws a parallel between the Spiekers' investment in Sierra Vista I, LP to Rock Creek Terrace, LP, where this Court found that the expectations of a partner that entered into the partnership "more than a decade after the initial investment in the property" were irrelevant. (*Id.* (citing Order Den. FWPs' Mot. for Recon. at 8, ECF No. 857)). In response, SWPs argue that Mr. Spieker's testimony about Sierra Vista will be "equally compelling" to his testimony during the FWPs' trial about Silverlake. (SWPs' Resp. at 20–21). SWPs also argue that "[i]t is painfully obvious that the Rock Creek Terrace facts are dramatically different than the Sierra Vista facts. It is undisputed that Mr. Spieker acquired the property and became the general partner of the partnership that owned the property." (*Id.* at 21). To this point, the Court finds that it cannot determine the relevance of Mr. Spieker's testimony about the investment-backed expectations of the original investors in Sierra Vista and will resolve objections to his testimony live at trial.

## T. *Dean Donnelson*

Mr. Donnelson is expected to testify about the investment-backed expectations of Cambridge Square North I Apartments, Cambridge Square of Fort Wayne I Apartments, Cambridge Square of Grand Rapids I Apartments, Cambridge Square of Grand Rapids II Apartments, Carriage House North Apartments, Carriage House of Mishawaka II Apartments, and Carriage House West IV Apartments, among other topics. (SWPs' Witness List at 17). In 1992, Mr. Donnelson started working for Eugene Glick, a developer who participated in the initial development of these properties as low-income housing. (Def.'s App. at 825). Mr. Donnelson testified that he had "no personal knowledge" as to the intentions of the early investors. (*Id.* at 837–49 (Donnelson Dep.)). Specifically, when asked "do you have any firsthand personal knowledge of the reasons that any of the six properties that we've been discussing today were developed as affordable housing?" Mr. Donnelson responded: "I have no firsthand experience. I wasn't there at the time." (*Id.* at 848–49). The United States argues that Mr. Donnelson has no personal knowledge of the investors' initial investment-backed expectations and therefore any testimony he offers would be inadmissible hearsay under FRE 602, 701, and 802. (Mot. *in Limine* at 21).

SWPs argue that while Mr. Donnelson had no personal knowledge about prepayment expectations when the properties were developed, "he learned about the Glick Partnership's prepayment expectations in the course of his extensive work on the applications under the Preservation Statutes and understood that those statutes frustrated the Glick Partnership's prepayment expectations." (SWPs' Resp. at 22 (citing Def.'s App. 53–67)). SWPs contend that

---

[11] This ruling also applies to Mrs. Catherine Reilly Spieker, whose testimony is being offered on Metro West Apartments and Foothill Plaza Apartments only. (*See* SWPs' Witness List at 16–17; SWPs' Resp. at 21).

his personal knowledge is also "based on refinancings" that resulted in purchase money notes that could not be prepaid while the original HUD insured mortgage was outstanding, which SWPs call "financial circumstances that 'absolutely' demonstrated a mutual desire between the general and limited partners to prepay." (*Id.*). As with Mr. Kaplan and Mr. Preroff, it is possible that Mr. Donnelson is able to recount specific statements about the investors' expectations made in his presence that *do* fall within FRE 803(3) or FRE 701. The Court will therefore resolve the United States' objections to his testimony at trial.

## II.    Defendant's Motion to Exclude the Expert Testimony of Dr. Stephen Roulac

Redactions are useful things. They permit courts to balance privacy interests of parties with the presumptive openness of court proceedings and First Amendment access. *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) ("Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access."). Given the benefits of limited redactions in appropriate circumstances, judges and lawyers are familiar with navigating circumstances involving concealed facts and analysis and the resulting documents with lines, paragraphs, and sometimes entire pages obscured beyond readability. While shrouded facts and analyses may in circumscribed situations be appropriate, rarely can it be said that similar obfuscation is appropriate when parties seek admission of expert testimony. Reliance on hidden data and the methodology by which such data is used is antithetical to the truth finding function of the courts. *See* FRE 102 ("These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, *to the end of ascertaining the truth and securing a just determination*.") (emphasis added). Just as redactions preclude observation and analysis of the words underneath, undisclosed data or the application of that data impairs the purposes underlying evidentiary rules.

The United States seeks to exclude the expert testimony of Dr. Stephen Roulac under FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Def.'s Mot. to Exclude at 1, ECF No. 918). The United States argues that Dr. Roulac's opinions are *ipse dixit*, unsupported and unreliable and separately, that they reflect disregard of his affirmative disclosure obligations under RCFC 26(a)(2). (*Id.* at 2). SWPs argue that Dr. Roulac's methodologies are "fully disclosed" in his report and "he was interrogated about them at length during his deposition." (SWP's Resp. at 2, ECF No. 936). Furthermore, SWPs argue that Dr. Roulac did comply with his obligations "albeit belatedly," and none of the factors set forth in *Banks v. United States*, 75 Fed. Cl. 294 (2007), are present. (*Id.* (referring to prejudice, surprise, disruption of trial, and bad faith)). SWPs also allege that Dr. Roulac's methodology for calculating economic losses is "a standard discounted cash flow ("DCF") analysis" comparing "the discounted value that SWPs would have earned if they had been allowed to prepay their mortgages and operate as market rate rental properties (the "unrestricted scenario") to the discounted value of what they did earn subject to the restrictions imposed by the Preservation Statutes (the "restricted scenario")." (*Id.* at 3).[12]

---

[12] SWPs also note in a footnote that Dr. Roulac also produced an estimate of economic loss using an "option analysis," in which he "attempted" to value the option to prepay itself, measured as the net increase in the value of the owners' equity from the time of project origination to the date

The United States notes that while it is prepared to prove that Dr. Roulac's methodology does not measure economic impact or just compensation, its grounds to exclude are focused on a narrower issue—the "threshold inadmissibility of Dr. Roulac's opinions regarding the "Unrestricted Rents" on which his "severity" and just compensation equation are premised. (Def.'s Mot. to Exclude at 3). During the resulting hearing, SWPs elected not to present testimony from Dr. Roulac to clarify the origins of data that he relied upon, opting instead to rely largely on counsel's argument and selected portions of the United States' appendices to its Motion to Exclude. (*See generally*, Hr'g Tr.,[13] June 23, 2026).[14] Based on the record before it, the Court concludes that SWPs have failed to establish the requisites of both FRE 702 and Daubert.[15]

The language of FRE 702 is plain: the burden of establishing admissibility is on the *proponent* of the expert testimony.[16] The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

---

when the owners could exercise their option to prepay. (SWPs' Resp. at 3 n.8).

[13] Unless otherwise specified, the citations to "Hr'g Tr." in Section II refer to the June 23, 2026 Hearing, (ECF No. 958).

[14] On July 8, 2026, SWPs filed a Motion for Leave to Engage a New Economic Expert. (SWPs' Mot. for Leave, ECF No. 978). SWPs state:

> SWPs have worked diligently to get their economic expert, Dr. Stephen Roulac, to meet his obligations and comply with the rules of this Court. Despite their efforts, SWPs have encountered significant issues with Dr. Roulac, many of which have been addressed in motions papers and the recent hearing on the United States' motion to disqualify Dr. Roulac. SWPs have become increasingly concerned about the performance of Dr. Roulac. Specifically, in spite of the fact that SWPs repeatedly explained to Dr. Roulac, in writing and orally, what his obligations are under Rules 26 and 37, Dr. Roulac has repeatedly fallen short of what those rules require.

(*Id.* at 1). The United States' Response to the Motion is due by July 22, 2026.

[15] At the outset of the hearing, SWPs indicated they sought to argue the FRE 702 and *Daubert* issues, hear from the United States, and then potentially call Dr. Roulac. (Hr'g Tr., 3:10–7:5). The Court directed that given that the proponent of evidence offered under FRE 702 bears the burden, the Court would hear from any SWPs' witnesses and their argument, rather than bifurcating argument, and only then hearing testimony. (*Id.*).

[16] SWPs incorrectly claim the burden rests upon the United States, rather than themselves as proponents of the challenged scientific or specialized knowledge evidence. (Hr'g. Tr., 7:6–8:12).

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Accordingly, to admit expert testimony, the proponent must establish the four elements by a preponderance of the evidence. FRE 702 (imposing "more likely than not" standard); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration."); *Huddleston v. United States*, 485 U.S. 681, 687 n.5 (1988) ("preliminary factual findings under Rule 104(a) are subject to the preponderance-of-the evidence standard")).

A "black box," sanitizing data or methodology, functions like a redaction by obscuring insight into an expert's analysis. When applied to an expert's chosen methodology or data, the term is a descriptor used when an expert presents an opinion to the court based in whole or in part on undisclosed processes or underlying data. *See* Ran Xi*, A Systems Approach to Shedding Sunlight on A.I. Black Boxes*, 53 HOFSTRA L. REV. 441, 444 (2025); *see also Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, No. 2022-1861, 2024 WL 89642, at *5 (Fed. Cir. Jan. 9, 2024) (explaining within the patent context that a black box involves "specifying what data enters and leaves the proverbial 'black box,' but revealing nothing about the inner workings of the box itself."). Ultimately, the resulting mystery negates the intent behind FRE 702, as the court cannot determine the sufficiency of the data or the reliability of the hidden data or methodology.

Alongside FRE 702, trial courts serve as "gatekeep[ers]" for the admission of expert witness testimony. *Daubert*, 509 U.S. at 597. To accomplish this task, judges must evaluate a non-exhaustive list of factors to determine admissibility. These include whether: the offered opinion can be tested or replicated; the methodology has been peer-reviewed; a known error rate exists; and the underlying technique is generally accepted within the relevant scientific community. *Id.* at 593–94. Because the bounds of this inquiry naturally vary from case-to-case and expert-to-expert, courts cannot fulfill this essential gatekeeping role when the data underlying an expert's opinion is obscured. *See id.* at 591–92.

Importantly, as the commentary to FRE 702 reflects, perfection is not required.[17] *See*

---

[17] (*See also* Def.'s Mot. to Exclude App. at 401–02, ECF No. 918-2) (describing series of inadvertent errors involving attachment and inclusion errors in connection with production of Dr. Roulac's report.)).

Fed. R. Evid. 702 Advisory Committee Notes on 2000 Amendment ("[N]othing in the amendment requires the court to nitpick . . . ."). There is some acceptable degree of discretion afforded to qualified experts based upon education and experience. However, if the proponent fails to demonstrate that a proposed expert's opinion meets the reliability standards of FRE 702 and *Daubert*, the court is usually left with only one solution: exclusion. Courts may no longer, as has been sometimes done in the past, abdicate their threshold obligation and leave it to a jury to sort. That responsibility is no different when the Court serves as factfinder. *See Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1381 (Fed. Cir. 2018) ("[T]here is nothing in the text of Rule 702 that indicates that the standard may be applied differently in bench trials than it is in jury trials.").

SWPs' difficulties in compliance with their obligations under RCFC 26(a)(2) are well documented. (*See* Def.'s Unopposed Mot. to Stay Deadlines, at 1 (calling SWPs' expert report "significantly incomplete; lacking in supporting materials and workpapers consistent with the opinions stated in key areas[.]") ECF No. 874; Status Conf. Tr., ECF No. 880; Order, ECF No. 877 (requiring Dr. Roulac to produce missing information from his report by March 2, 2026); JSR at 4 (SWPs unable to confirm Dr. Roulac's compliance with RCFC 26), ECF No. 855; Hr'g Tr., April 1, 2026, 4:12 –7:9, ECF No. 900; Hr'g Tr., 67:6–7, SWPs' Counsel, June 23, 2026 ("It wasn't produced timely. There's no question about that.")). Though expert reports were originally due in December 2025, (*see* Sched. Order, ECF No. 866), SWPs acknowledge that their discovery obligations remained outstanding in  Spring 2026—only months prior to trial. (Hr'g Tr., April 1, 2026, 6:1–4 (The Court: "Have you fully complied as of this moment with your Rule 26 obligations?" SWPs' Counsel: "No, Your Honor[.]"), 7:23–8:10 (SWPs' Counsel acknowledging that Dr. Roulac's white papers "should have been produced, but they weren't.")). SWPs' failure to disclose critical information underlying Dr. Roulac's just compensation quantum involves data and its treatment fundamental to the opinions expected at trial—increasing the value of SWPs' properties in the expected condition had they been able to prepay their mortgages and convert from restricted rents to market rate rents.

First, the United States argues that Dr. Roulac's opinions regarding the "Unrestricted Rents" on which his "severity" and just compensation equation are premised are inadmissible. (Def.'s Mot. to Exclude at 3). Unrestricted rents are integral as parts of both the numerator and denominator of Dr. Roulac's economic impact calculation:



(Def.'s App.[18] at 130 (Roulac Report at 125)). In Dr. Roulac's estimation, the "[o]ption to convert their projects['] status from restricted to unrestricted was a primary motivation essential to the [SWPs'] expectation for participating in the HUD affordable housing programs." (*Id.* at 99 (Roulac Report at 94)).

The United States argues that Dr. Roulac's "Unrestricted Rents" calculations are based on a faulty assumption that SWPs properties would have significantly outperformed comparable market-rate properties. (Def.'s Mot. to Exclude at 3). Dr. Roulac did this by applying what he calls an "Enhancement Factor" comprised of "12 elements and three categories: rent, occupancy, and operating expense." (*Id.* (citing Def.'s App. at 415 (Roulac Deposition), ECF No. 918-2)). According to Dr. Roulac, the rent factor includes: "property attributes," a "walk-bike-transit score," "property features," "size of apartment units," "management," and "balance/imbalance in terms of demand for units." (Def.'s App. at 415–16 (Roulac Dep.)). The occupancy factors included "the features of the property, which are also affecting rents; the balance/imbalance . . . [and] also management. So factors that would influence rent also influence occupancy." (*Id.* at 416). The operating expense category factors included "property features, management, [and] rent factors[,]" so "[t]hose three factors influencing operating expenses also influence rents." (*Id.*). The adjustments Dr. Roulac made to the unrestricted rents are encapsulated in the table below:

---

[18] Unless otherwise specified, the citations to "Def.'s App." in Section II refer to the Appendix filed with the United States' Motion to Exclude, (ECF Nos. 918-1, 918-2).



**EXHIBIT 8**

**GROUP DEPICTION OF PROPERTY PROCESS ADJUSTMENT MODEL**

82

App87

(*Id.* at 87 (Roulac Report at 82)).

In response, SWPs claim that Dr. Roulac's calculations were "a laborious undertaking" and that he did "independent research to determine how a change in [a] factor would increase or decrease rent, or expenses, or occupancy (Would a swimming pool increase rent? Would a nearby dog park increase rent? And if so, by how much?)" (SWPs' Resp. at 5). To that end, SWPs include a chart that is "a summary of the calculation method and data inputs" used for the twelve performance enhancement factors that SWPs claim shows Dr. Roulac did not use regression models, but *did* use "various Excel formulas, calculated ratios, linear interpolation,

business judgment, and event-based analysis, all of which fall under the broad umbrella of regression analysis because they compare the relationship of multiple variables[:]"

| Perform Factor Rent | Calculation Method | Third-Party Data Inputs |
|---|---|---|
| Apartment Size | Excel formulas and calculated ratios, business judgement | Costar |
| Attributes | Excel formulas for 2025, event-based regression for 37 years | Database USA, ESRI |
| Walk Bike Transit | Excel formulas for 2025, event-based regression for 37 years. | Walkscore.com, Rent Impacting Coefficients were based on hedonic pricing models |
| Balance/Imbalance | Excel formulas | Costar, ESRI, Apportionment factor |
| Property Features | Excel formulas, quantitative and qualitive Scoring | Costar, Google Maps |
| Management | Published Factors, 37 years was linear interpolation and business judgement | Harvard Joint Center for Housing Studies, National Multifamily Housing Council |
| **Perform Factor Expense** | | |
| Property Features | Static over 37 years | Costar, Google Maps |
| Management | Linear interpolation with event-based adjustments | Harvard Joint Center for Housing Studies, National Multifamily Housing Council |
| Factor Impact for SF, WBT, PF | Excel formulas | |
| **Perform Factor Occupancy** | | |
| Balance/Imbalance | Linear interpolation with event-based adjustments | Costar, ESRI |
| Property Features | Static over 37 years | Costar, Google Maps |
| Management | Linear interpolation with event-based adjustments | Harvard Joint Center for Housing Studies, National Multifamily Housing Council |

(SWPs' Resp. at 10–11). However, in its Reply, the United States reports that "[t]here are no native arithmetic models in SWPs' supporting materials for their opposition." (Def.'s Reply at 8, ECF No. 937). In developing his opinions, Dr. Roulac utilized many databases and outside sources.[19] The United States focuses its concern on Dr. Roulac's undisclosed data from four of the many sources he utilized: CoStar, DataBase.com, ESRI, and Walkscore.com. (*See* Def.'s Mot. to Exclude at 5, 16, 21–22, 26). The United States does not contest reliance on such sources. (Hr'g Tr., Def.'s Counsel, 78:18–21 ("CoStar data is recognized as a legitimate source for rents, and our expert uses it. CoStar is fine. Database USA is fine. ESRI is fine.")). Rather, it is the lack of their data and methodology that is the issue.

Courts accept expert testimonies built upon otherwise inadmissible data. Per FRE 703:

---

[19] (Def.'s App. at 345–391 (Roulac Report at 340–86) (List of Materials Considered)).

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

However, that reliance must be reasonable and replicable. "Experience alone cannot substitute for reliable principles" because there must be a "basis upon which to verify or evaluate the accuracy or legitimacy of [an expert's] conclusion." *Bedwell v. United States*, 181 Fed. Cl. 30, 50 (2026) (citing *Boston Edison Co. v. United States*, 80 Fed. Cl. 468, 495 (2008); FRE 703. Nowhere have SWPs presented any actual methodology though which to test Dr. Roulac's conclusions that does not rely on blind acceptance of his "professional judgment" or unavailable data. (*See* Def.'s App. at 412–13 (Roulac Dep. Tr., 366:12–370:16)).[20]

The Court does not know whether: (1) Dr. Roulac's proposed just compensation amounts can be replicated; (2) the values attributed to his online sources can be reproduced; or (3) his analytical methodologies and those of CoStar, Database.com, ESRI, and Walkscore.com are generally accepted within the relevant scientific community. SWPs' overwhelming response to the Court's technical questions was "I don't know." (Hr'g Tr., SWPs' Counsel, 31:11–12, 35:21–22, 37:17–19, 38:12–13, 39:18–20, 55:14–15, 55:17, 57:4–8, 58:14–17, 59:6–7, 59:10–11, 59:13, 59:16–17, 60:1–3, 60:17, 75:20). This response is inadequate, particularly because SWPs could not direct the Court to anywhere in the record to locate the missing data and methodology. The Court concludes that the information does not exist.

First, Dr. Roulac applies information derived from CoStar's website, and even appends a report published by CoStar entitled "CoStar Data and Forecasting Methods" to his own report.[21] (Def.'s App. at 254–324 (Roulac Report at 249–319); *See* SWPs' Resp. at 15 n.16 (citing CoStar product information page)).[22] An overview from the CoStar report appended to Dr. Roulac's

---

[20] By choosing not to present Dr. Roulac, SWPs completely stripped the Court of its ability to test his expert opinions. The Court was left with no way to determine whether the datasets from ESRI, CoStar, and Walk Score were sufficient or legally reliable. This omission ultimately barred the Court from evaluating the data sources under standard *Daubert* factors or confirming that forensic economists would reasonably rely on them.

[21] SWPs were unsure if the slides used during its argument were from CoStar's website. (Hr'g Tr., SWPs' Counsel, 21:11–17 (information is "probably" from the website, but "I don't know."), June 23, 2026). While SWPs are unaware of the provenance of the slides used during oral argument, the Court considers them, for purposes of this Motion, as derived from CoStar's website.

[22] The Court notes that CoStar collects "asking" rent data, rather than "actual" rents. CoStar acknowledges that "asking" prices "do not necessarily reflect the actual rent." (Def.'s App. at 288). While relevant at trial, this is the type of factor which goes to the weight afforded to an expert's opinion when presented at trial rather than admissibility. FRE 703. It is referenced herein only because it assists in understanding an overview of the CoStar database. CoStar data

report provides little helpful information. (Def.'s App. at 254–324 (Roulac Report at 249–319)).

CoStar data relating to housing in the United States is broad. Its report states that:

> CoStar's collection of multifamily data began in 2012. In addition to filling in missing data, the vacancy series for multifamily properties are extended using trends based on data from the United States Census Bureau . . . metro level-apartment rent trends reported by brokerage firms since the early 1990s are applied to each individual property to extend all multifamily series back to 2000.

(*Id.* at 273 (Roulac Report at 268)). The "vast majority of CoStar's rent data comes via Apartments.com and the CoStar Group's other marketplaces." (*Id.* at 263 (Roulac Report at 258)). Costar's other marketplaces involve "user entered data" from sources like Apartments.com and ForRent.com. (*Id.* at 283 (Roulac Report at 278)). SWPs provide no reference from which the Court can assess any actual data from these sources, nor can the Court determine if that data is of the type normally relied upon. In fact, CoStar applies analytics to its proprietary data, though exactly what those analytics involve is unknown.[23] The Court concludes that Dr. Roulac did not disclose the CoStar data used for his calculations within his report.

SWPs' argument at the hearing was largely nonresponsive. SWPs demonstrated a series of tabs available on the CoStar website as slides. (Hr'g Tr., 14:11–40:11; *See* SWPs' Notice of Filing Demonstratives, ECF No. 972-1). SWPs' Counsel represented that Dr. Roulac used these specific CoStar functions yet could not explain how CoStar manipulates its massive database to generate the values embedded in Dr. Roulac's analysis. (*See* Hr'g Tr., 14:11–40:11). Moreover, Dr. Roulac's use of those tabs is not reflected in his report, and not confirmed by declaration, or testimony. SWPs' bare contention that Dr. Roulac "sourced" data from CoStar and that the slideshow elements were "in CoStar," does nothing to cure this fatal analytical gap. (*See id.*, 16:21–22, 17:22–23; 36:7–9). Even now, SWPs have not attempted to produce the specific CoStar data and CoStar analytics used by Dr. Roulac.

---

was also unavailable for several of SWPs' properties. (*See* SWPs' Notice of Filing Demonstratives, Ex. A at Slide 5, ECF No. 972-1). The Court does not consider pages from CoStar's website relating to student housing or hotels in determining *whether* Dr. Roulac's testimony is admissible under FRE 702 or *Daubert*, nor does the Court construe gaps in CoStar data for some properties owned by SWPs as matters important to admissibility. Instead, these gaps relate to the weight afforded to the expert testimony at trial, though SWPs have not identified for the Court which properties lack CoStar data.

[23] (*See* Def.'s App. at 263 ("data enables the creation of accurate, high-frequency analytic series"), 271 (gaps in multifamily dwellings caused by missing data points are filled by "linear interpolation" and "estimating the vacancy rate at each point in time for properties for which CoStar has never collected a vacancy observation"), 272 ("an algorithm is deployed to estimate lease-up trends"), 273 ("algorithms is also applied to properties in lease-up that have some actual data points"), 275 (describing rents as an "analytic challenge")).

SWPs' slides from the June 23 Hearing clarified nothing. For example, CoStar dictated both the submarkets and the corresponding submarket rents utilized by Dr. Roulac:



(SWPs' Notice of Filing Demonstratives, Ex. A at Slide 6; *see* Hr'g Tr., 16:18–22; 23:5–7, 14–24; 24:11–12).        SWPs were unaware whether any of the CoStar data or analytics relied on by Dr. Roulac was generated by artificial intelligence.[24] (Hr'g Tr., 20:5–17). When asked to explain how CoStar determined submarket rents, SWPs responded:

> The only answer I can give you is a general one. It's their business. What they do is survey in various markets throughout the United States to gather rent data. And people subscribe because they want to know the rent data, and CoStar is a source where one can go and gather that.

(*Id.*, SWPs' Counsel, 24:14–19). Though CoStar uses the term "multi-family" dwellings in its apartment database, SWPs did not know whether the generic term "apartments" included

---

[24] For reference, Slide 15 indicates that the Intellisite database uses artificial intelligence. (SWPs' Notice of Filing Demonstratives, Ex. A at Slide 15 (referring to an "AI research assistant[.]")).

31

condominiums. (*Id.*, 30:10–31:12). Counsel was unable to explain gaps within CoStar's data presented at the hearing. (*Id.*, 36:7–22 (referring to the number of buildings referenced by CoStar inexplicably declining in 2022 from 489 to 186)). Despite Dr. Roulac collecting CoStar data on enhancements like balconies and pools, SWPs' Counsel could not tell the Court whether one example property had a balcony, let alone how many SWP properties featured them. (*Id.*, 37:5–40:12). The data underlying other factors, like business experience, competence, and continuity, was also unknown to SWPs. (*Id.*, SWPs' Counsel, 58:14–17 ("I don't know the specifics of how they sourced the data referenced in this slide from the one, two, three, four, five, six sources. I don't know the answer to that[.]"); *but see id.*, SWPs' Counsel, 53:10–13 (Explaining that the vacancy rate "[c]omes from CoStar, because CoStar is an extremely comprehensive dataset."). Rather than providing clarity, the hearing raised more questions than answers. The Court concludes that SWPs' expert valuation of unrestricted rents and just compensation is fundamentally flawed, as it is premised in part on undisclosed data and analysis gathered and conducted entirely by CoStar.

Second, SWPs turned to slides regarding Database USA and ESRI to support the replicability of Dr. Roulac's methodology. (*See* Hr'g Tr., 40:13–15). According to SWPs, Dr. Roulac selected various "property attributes" that "he, in his opinion, thought were relevant to his analysis" including proximity to full-service restaurants, coffee shops, farmers markets, and various pet amenities. (SWPs' Notice of Filing Demonstratives, Ex. A at Slide 15, 17). The United States contends that there is no way to "figure out how to access this data and therefore [Dr. Roulac] ought to be disqualified." (Hr'g Tr., 44:3–5). The Court agrees. The United States might access *some* data from the website, but there is no way to determine whether it is the *same* data viewed and used by Dr. Roulac. A review of the ESRI website, conducted at SWPs' invitation, (*see* SWPs' Resp. at 14 n.15), provides no clarity. Overview, ESRI, https://www.esri.com/en-us/about/about-esri/overview [https://perma.cc/CER2-PZLU] (last visited July 10, 2026).[25] According to SWPs, Dr. Roulac used both Database USA and ESRI as "a data-gathering exercise." (Hr'g Tr. at 44:1–2; 46:12–15). What data was gathered, and how it was utilized, remains a mystery.

SWPs still misapprehend the Court's reliability concerns. They argue that FRE 702 and *Daubert* are satisfied because Dr. Roulac personally analyzed the data rather than relying on automated website conclusions. Yet, this argument ignores the unverified nature of the source data itself, which SWPs conceded they could not fully explain: "Dr. Roulac is doing all the anlaysis. The analysis is not being done—the three websites gather data. And I can't explain to you why they picked the titles they picked for various boxes. Dr. Roulac did the analysis." (*Id.*, 47:21–25). This characterization is overbroad. Dr. Roulac began his analysis after he collected

---

[25] ESRI markets itself as using AI geospatial mapping technology. ESRI, https://www.esri.com/en-us/home [https://perma.cc/3T32-KD58] (last visited July 12, 2026). Like CoStar, ESRI appears to provide expansive services: "ArcGIS [an ESRI product] is powerful geographic information system (GIS) technology that provides tools to capture, view, edit, manage, analyze, and share data in the context of location, It includes access to thousands of curated datasets and maps that can be explored and leveraged for analysis and insight." *Technology*, ESRI, https://www.esri.com/en-us/about/about-esri/technology [(last visited July 12, 2026).

datasets from third-party sources. There is nothing in the record that allows the Court to verify his data collection process or examine the underlying data and analytics that formed the basis for Dr. Roulac's *entire* economic impact analysis. Despite ample opportunity to do so, SWPs have failed to clarify this analysis at every turn.

From the record, the Court cannot discern what data or analyses from DatabaseUSA or ESRI exist in Dr. Roulac's report. "DatabaseUSA" and "ESRI" appear only as brief source citations, neither produced nor explained. (*See* Def.'s App. at 21, 35, 59, 62, 63, 353). SWPs' reliance on Slides 42–43 is particularly illustrative. (*See* SWPs' Notice of Filing Demonstratives, Ex. A at Slides 42–43). SWPs have provided the Court with no explanation for how the submarket comparables were derived by Dr. Roulac. Presumably, the submarket data was sources from the online databases. However, without the benefit of Dr. Roulac's live testimony, the Court must necessarily draw its own inferences. Logically, a submarket of multi-family dwellings smaller than SWPs' properties would yield a radically different data set than one consisting of dwellings predominantly larger. Therefore, the composition of each comparative submarket is critical to Dr. Roulac's analysis. However, SWPs provide no insight into precise methodology for delineating submarkets—or whether the submarket composition was determined by the databases or Dr. Roulac himself. The Court is left with no assurance of consistency or reproducibility; it remains unknown whether an identical inquiry by another user would produce the same defined submarket on the same day, a week later, or a month later.

Third, the United States argues that the "Walk Bike Transit (WBT)" factor is not Dr. Roulac's opinion. (Def.'s Mot. to Exclude at 15). Dr. Roulac indicated that "rent factors were calculated from multiple sources including Hedonic pricing models based on property proximity to walk, bike, and transit" to come up with the WBT score for each property. (Def.'s App. at 57 (Roulac Report at 52)). Dr. Roulac utilizes the following graphic in his report:



*(Id.)*. Dr. Roulac used the website "[W]alkscore.com" which generates a "dynamic" score that depends on the date the inquiry was being made, among other factors. (*See* Def.'s App. at 459 (Roulac Dep.)). The United States argues that Dr. Roulac's "blind acceptance" of Walkscore.com, without any independent investigation to validate, verify or confirm the accuracy or completeness of the underlying information, is also grounds for exclusion under *Daubert*. (Def.'s Mot. to Exclude at 26–27 (citing *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137–138 (M.D. Pa. 2015)). The Court agrees.

SWPs' argument and corresponding presentation regarding Dr. Roulac's use of Walkscore.com was the most cursory of the three data sources. Despite its brevity, this section clearly illustrates the necessity of exclusion. According to SWPs, Dr. Roulac obtained a "score" for each subject property from the website, then deconstructed that number. (Hr'g Tr., 72:19–73:24). However, the Walkscore.com "score" is unavailable to the both United States and the Court.

The Court: The scoring algorithm. Whose scoring algorithm?

SWPs' Counsel: It is their scoring algorithm.

The Court: Walkscore's algorithm?

SWPs' Counsel: Right. And he takes the data, but he then deconstructs it, to

use a word in here, to –

The Court: Where in the report is Walkscore's scoring algorithm?

SWPs' Counsel: I don't think it's in there.

(*Id.*, 73:16–24). Once again, the issue is not what Dr. Roulac did with data obtained from an online source—the concern relates entirely to the Court's inability to verify the dataset and methodology underlying the creation of the "score." As SWPs concede:

The Court: That makes sense to me. The second sentence also says, Because these scoring systems are proprietary and were not publicly produced for most of the 1988 through 2025 period, that's the part of that sentence I'm asking. Proprietary. So Dr. Roulac didn't have it. The United States doesn't have it. The algorithms that Walkscore used to derive these numbers is, for lack of a better term, it is opaque. We, none of us, get to see it, right?

SWPs' Counsel: That's correct, Your Honor. But as Exhibit 52 and the deposition testimony explained, Dr. Roulac's opinion is not based on blindly accepting those numbers. That's the point, Your Honor.

(*Id.*, 74:10–22; *see also id.*, SWPs' Counsel, 75:7 ("I doubt [the United States] ha[s] ever seen [the Walkscore.com algorithm].")). Despite SWPs' assertions, there is no evidence to the contrary. It is clear to the Court that Dr. Roulac obtained an initial score from Walkscore.com, then retroactively applied that score to SWPs' properties, thereby increasing or decreasing their property values. However, the data and calculations used by Walkscore.com to arrive at the initial score—and the starting place for Dr. Roulac's computations—are unknown. Neither the United States, nor the Court can access Walkscore.com's methodology.[26]

SWPs' decision to withhold Dr. Roulac's live testimony from Court was impactful—it precludes the Court from what is normally a straightforward evaluation of the plain standards set forth in FRE 702 and the requirements of *Daubert*. The limitations of gleaning information from SWPs' counsel, rather than the expert, about the technical components of the just compensation analysis were evident throughout the June 23 Hearing. For example:

The Court: What is labor efficiency?

SWPs' Counsel: It's -- I don't know specifically what they looked at, Your Honor, but it's part of the opinion, and it's -- that's as far as I can go.

The Court: And it says, Modeled from industry research, and then it's got those same, I think it's six -- same sources listed, National Apartment

---

[26] Dr. Roulac's report also lacks *any* data or explanation of Walkscore.com's methodology. Like Database USA and ESRI, the report only briefly mentions Walkscore.com a handful of times and provides no useful information. (*See* Def.'s App. at 33, 34, 57, 58, 388).

Association, HUD, NMHC, RAND Corp, Harvard and IREM. Okay.

SWPs' Counsel: Then reference 1.3, again, pictorially depicts how the analysis was done for occupancy, how does that impact rent, and references a number of steps that were taken, if you will, to try to come to an opinion with regard to that, all of which is discussed.

The Court: What is the market equilibrium assessment?

SWPs' Counsel: I don't know, Your Honor.

The Court: And the sources here are a little bit different. They are CoStar, the Census, ACS, HUD, NMHC and the RAND Corp. Okay. And the reason I'm asking you these questions is I don't have Dr. Roulac. And if we had a witness, you would have presented him, they would have gotten to cross him, and then perhaps I would have some of this information. But we are having to -- we'll need to depend, it sounds like, on this presentation.

(Hr'g Tr., SWPs' Counsel, 59:25–60:25). The Court emphasizes again—there is nothing precluding an expert from relying on databases such as those used here. The problem, which SWPs do not acknowledge, is that the data produced by CoStar, Database, ESRI, and Walkscore.com must be available for inspection. The Court agrees with the United States; the data generated by these sources are not included in Dr. Roulac's report, nor have they been produced elsewhere. (*See id.*, 79:4–16; 79: 80:7; *see also id.*, 80:8–15 (citing Def.'s App. at 449 (Roulac Dep.)) (Dr. Roulac acknowledging that none of the many inquiries made to online sources are included within his report or workpapers)).

Given the opacity of significant segments of the process from which SWPs' expert derived their just compensation quantum, the United States' motion seeking to exclude Dr. Roulac from testifying at trial must be granted. "If . . . black boxes are being used to make a high-stakes decision in lending, insurance, healthcare, or the judicial system, we have to decide whether we feel comfortable not knowing exactly why the decision was being made." Dave Gilson, *Trust but Verify: Peeking Inside the "Black Boxes of Machine Learning*, INSIGHTS BY STANFORD BUSINESS (Oct. 6, 2022), https://www.gsb.stanford.edu/insights/trust-verify-peeking-inside-black-box-machine-learning [https://perma.cc/FN6B-8W3W] (discussing black boxes in AI). The stakes here are high, both for SWPs and American taxpayers. A modicum of clarity in the process used by SWPs to arrive at a damage amount is required.

### III.    Motions to Designate Deposition Testimony

Both parties filed Motions to File Deposition Transcripts and Designations. (SWPs' Mot. to Designate, ECF No. 929; Def.'s Mot. to Designate, ECF No. 930).[27] The Court first turns to the deposition of Richard Urban, whose testimony is subject to both Motions. (*See* Def.'s Mot. to

---

[27] As stated above, the Court will address the parties' specific deposition designations as it is able—either on a rolling basis or through objections at trial.

Designate at 1–2; SWPs' Mot. to Designate at 5–7). The United States has both general and specific objections to SWPs' designations of Mr. Urban's deposition testimony, and specific objections to SWPs' counter-designations. (*See* Def.'s Resp. Ex. 1 at 19–30, ECF No. 939-1; Def.'s Reply Ex. 1 at 7–20, ECF No. 948-1). [28] SWPs do not object to the United States' Motion or to the United States' deposition designations. (SWPs' Resp., ECF No. 938). Nor do SWPs oppose the United States' counter-designations. (SWPs' Reply at 4, ECF No. 947).

The United States frequently cites FRE 602, 1002, 401, 403, 801, and 802 in its extensive objections to SWPs' designations and counter-designations. (*See* Def.'s Resp. Ex. 1 at 19–30). The Court will broadly examine the application of each rule, and rule on the United States' specific objections to SWPs' deposition designations in accordance the chart appended to this Order.[29]

The United States largely bases its FRE 602 objections on Mr. Urban's lack of personal knowledge necessary to testify regarding Title II, Title VI, and LIHPRHA programs, HUD's internal processing timelines, and the reasons underlying other decisions and communications that reflect the partners' investment-backed expectations.[30] In response to the United States' objections to SWPs' designations, SWPs argue that each subject falls within Mr. Urban's own perception and experience as the general partner responsible for management and personally

---

[28] The United States' objections to SWPs' counter-designations were filed as an attachment to its Reply, (*see* Def.'s Reply Ex. 1 at 7–20, ECF No. 948-1), and SWPs have not had an opportunity to respond. Rather than resolve those objections without the benefit of SWPs' position, the Court defers ruling. Defendant may renew its objections at trial, where the Court can consider them in context and SWPs will have an opportunity to respond. The Court notes that its analysis of FRE 602, 1002, 401, 403, 801, and 802 and the United States' objections to SWPs' designations will in many instances bear directly on the same evidentiary questions posed by the United States' objections to SWPs' counter-designations. The United States should take that analysis into account before renewing its objections at trial, in lieu of relitigating issues the Court has already substantively resolved.

[29] The chart has been reproduced from SWPs' Reply App. at 41–58. The "Deposition" column has been removed, and the "Court's Ruling" column have been added, but the text submitted by the parties is the same.

[30] *See* Def.'s Resp. Ex. 1 at 19–30 (Objections to SWPs' Designations) (July 25, 2007 Tr., 47:3–48:11; 49:17–50:3; 56:11–13; 58:22–60:12; 66:6–12; 73:9–11, 73:17–74:5; 79:20–80:3; 80:3–82:3; 89:16–90:4; July 27, 2007 Tr., 102:13–14, 17–22; 121:15–19; Nov. 28, 2007 Tr., 166:7–8); *see also* Def.'s Reply Ex. 1 at 7–20 (Objections to SWPs' Counter-Designations) (July 27, 2007 Tr., 26:5–18, 28:10–11, 43:10–13, 46:6–10, 47:9–12, 48:13–18, 48:21–22, 49:4, 49:18–50:2, 50:9–16, 51:7–10, 51:20–52:4, 63:20–64:2, 74:11–14, 74:20–75:4, 75:5–16, 76:5–17, Tr. 76:20–77, 80:4–5, 9–16, 91:4–5, 92:9–16, 94:17–18, 95:7–19, 103:10–12, 15–16, 17–19, 117:6–10, 21–22, 118:1–5, 133:13, 113:17–134:21; Nov. 28, 2007 Tr., 34:5–9, 92:5–9, 95:12–14, 16–20, 96:4–10; July 25, 2007 Tr., 47:3–4, 47:7–9, 49:17–18, 49:22–50:3, 56:11–13, 79:14–80:12, 94:12–16, 95:2–5, 95:14–16, 95:20–22, 107:8–13, 158:2–4, 158:7–9, 159:14–160:2, 162:2–7, 79:20–80:3, 80:3–12).

engaging with relevant advisors and agencies, and that any imprecision in his recollection goes to weight rather than admissibility. (*See* SWPs' Reply App. at 41–58, ECF No. 947-1).

FRE 602 requires that all admitted testimony derive from "personal knowledge of the matter." Fed. R. Evid. 602. Such personal knowledge can be demonstrated by the witness's own testimony, and facts that can be perceived by the senses. Fed. R. Evid. 602 Advisory Committee Notes to 1972 Proposed Rules. The party offering the witness must demonstrate that the witness had adequate opportunity to observe the event and presently recalls that observation rather than merely hearing descriptions from a third party. *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 492 (2022) (quoting *BPLW Architects & Eng'rs, Inc. v. United States*, 106 Fed. Cl. 521, 545 (2012)) (cleaned up). However, this threshold is low and not difficult to meet. *Definitive Holdings v. Powerteq*, 171 F.4th 1373, 1379 (Fed. Cir. 2026). "Courts have admitted opinion testimony from lay witnesses even when based on the witnesses' experience or knowledge obtained in their profession, rather than on their own 'observations and personal perceptions respecting the incident in question . . . .'" *Authentic Apparel Grp., LLC v. United States*, 134 Fed. Cl. 78, 83 (2017). For example, a witness may "express opinions about a business when the opinions were 'based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of [the] business.'" *Authentic Apparel Grp.*, 134 Fed. Cl. at 83 (2017) (quoting *United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007)).

Here, Mr. Urban has demonstrated sufficient personal knowledge regarding the application processes for Title II, Title IV, and LIHPRHA incentives as they pertain to *his* properties. However, Mr. Urban has no experience working for HUD, and therefore his testimony as to the inner workings or reasoning of the Agency must be excluded. (July 25, 2007 Dep. Tr., 56:11–13). Because he has experience working in housing management throughout North Carolina from the early 1990s to 1996 and handled housing investments, the Court admits his testimony about the then-conditions of the profession based on his day-to-day perceptions at that time and those of close business associates. (*See id.*, 49:17–50:3, 58:22–60:12). However, objections on Mr. Urban's testimony regarding an out-of-court conversation in order to prove the truth of the conversation or information derived entirely from another party are deferred. (*See id.*, 102:13–14, 102:17–22).

FRE 1002—the best evidence rule—states that "an original writing, recording, or photograph is required in order to prove its contents unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. The United States generally argues that any time Mr. Urban testifies to the contents of a document, that testimony violates the best evidence rule when the underlying document does not appear on either party's proposed exhibit list.[31] In response,

---

[31] *See* Def.'s Resp. Ex. 1 at 19–30 (Objections to SWP Designations) (July 25, 2007 Dep. Tr., 70:25–71:2, 73:9–11, 73:17–74:5; July 27, 2027 Dep. Tr., 34:1–2, 34:4–35:12, 36:16–17; 36:20–37:9, 56:5–6, 56:9–57:4, 57:21–22, 67:8–9, 67:12–68:1, 68:8–18, 82:18–19, 99:14–15, 99:17–100:5, 109:3–7, 109:10, 109:15–22, 110:5–6, 110:21, 111:7–8, 111:11–112:21, 113:4–9, 116:18–19, 116:21–117:5, 118:8–9, 118:11–19, 119:17–18, 119:21–120:17, 156:7–22, 125:16–20, 129:22–130:20, 135:3–15, 137:18–19, 140:22–145:7, 145:19–20, 145:22–146:7, 146:11–12, 46:16–17, 146:22–147:5, 147:11–14, 137:22–138:8, 147:18–19, 147:22–148:12, 152:9–10, 152:21–153:7, 153:8–9, 153:11–154:4, 140:1–2, 140:5–16, 149:11–15, 142:5–21; 143:3–8,

SWPs argue that where a document has been marked, produced, and questioned by the United States' own counsel at the deposition, the United States cannot claim surprise or prejudice. (*See* SWPs' Reply App. at 45, 47–52, 56–57). While some objections are sustained, the Court defers ruling on objections that concern documents appearing on a proposed exhibit list. Specifically, the Court will defer as to those objections that concern documents appearing on a proposed exhibit list. Where the document does not appear in on an exhibit list, and where neither party moves to amend their proposed exhibits lists, the Court will sustain the United States' objections. The Court allows the parties to amend their exhibit lists where reserved.

As to relevancy, the United States primarily argues that parts of Mr. Urban's testimony and accompanying documents are irrelevant because they concern a property that is not one of SWPs at issue in this litigation, or because they concern incentives unrelated to the HUD prepayment process at issue. (*See* Def.'s Resp. Ex. 1 at 20, 23, 27–29 (citing FRE 401, 403)). In response, SWPs argue that this testimony is relevant either directly, because it concerns a property actually at issue, or indirectly, because it lays the foundation for testimony concerning a property that is at issue. (*See* SWPs' Reply App. at 43, 48, 54, 55, 57). Evidence is relevant if it tends to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence may nonetheless be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or wasting time. Fed. R. Evid. 403. The Federal Rules favor admission; exclusion under Rule 403 is an extraordinary remedy to be used sparingly. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Here, the challenged testimony either discusses a property directly at issue, such as prepayment dates for Icemorelee Street Apartments, (*see* Nov. 28, 2007 Dep. Tr., 30:3–5, 30:7–32:1), or discusses a property not itself at issue but offered as foundation for later testimony concerning a property that is at issue, (*see* July 25, 2007 Dep. Tr., 75:2–13; Nov. 27, 2007 Dep. Tr., 118:4–6, 12–17; Nov. 28, 2008 Dep. Tr., 79:21–80:5, 80:22–81:12, 84:2–10, 88:13–89:3). To the extent that SWPs intend to offer this testimony only for this stated purpose, it is admitted or deferred until trial. It bears on a fact of consequence in this litigation under FRE 401, and its probative value is not substantially outweighed by any prejudice, waste of time, or confusion of the issues per FRE 403. Therefore, the United States' objections to the designation of the deposition transcripts cited in this paragraph are overruled.

Relying on the rules related to hearsay, the United States argues that Mr. Urban's testimony recounting statements made by unidentified or identified out-of-court declarants, including other property owners, employees of Recapitalization Advisors, and unnamed attorneys or advisors, constitutes inadmissible hearsay. (*See* Def.'s Resp. Ex. 1 at 20–22, 24, 26–27 (citing FRE 801, 802)). In response, SWPs argue that this testimony not offered for the truth

---

143:13–144:8, 179:5–7, 12–21, 196:16–18, 196:20–197:4, 198:11–13, 15–21, 199:4–6; Nov. 28, 2007 Dep. Tr., 10:14–11:5, 30:3–5, Tr. 30:7–32:1, 43:14–16, 43:19–44:3, 79:21–80:5, 80:22–81:12, 84:2–10, 88:13–89:3, 123:8–10, 123:12–124:1; *see also* Def.'s Reply Ex. 1 at 7–20 (Objections to SWP Counter-Designations) (July 27, 2007 Dep. Tr., 82:18–19, 82:22–9, 111:7–8, 111:11–112:21, 113:4–10, 119:21–120:17, 129:22–130:20, 133:13, 133:17–134:21, 134:22–135:1, 135:3–22, 140:18–19, 140:22–141:9, 141:18–142:2; Nov. 28, 2007 Dep. Tr., 30:3–5, 30:7–14, 19–31:12).

of the matter asserted, and is therefore not hearsay, or falls within the state-of-mind exception under FRE 803(3). (*See* Def.'s Resp. Ex. 1 at 44–47, 49, 53).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and inadmissible unless it falls within an exception. Fed. R. Evid. 801, 802. A statement offered to show the declarant's then-existing state of mind, including motive, intent, or plan, is not excluded by the hearsay rule, even if the declarant is unavailable. Fed. R. Evid. 803(3); *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295–96 (1892). Much of the challenged testimony here depends entirely on the purposes for which it is offered. The Court's ruling is therefore deferred until trial. However, some of Mr. Urban's testimony is blatantly inadmissible hearsay, and the United States' objections to those portions are sustained.

### IV.      SWPs' Motion for Clarification

Eight days before the start of trial, SWPs seek what they style as "clarification" of the Court's April 21, 2026 trial management order, (Trial Mgmt. Order, ECF No. 912), and seemingly their own July 25, 2025 Joint Status Report, (JSR, ECF No. 852). (SWPs' Mot. for Clarification at 1, ECF No. 975). SWPs state that trial is "imminent" and therefore "request expedited consideration of this motion[,]" (*id.* at 3), but do not acknowledge their belated request, nor explain why SWPs failed to raise this seemingly critical misunderstanding at the Court's Final Pretrial Conference on June 22, 2026. (*See* Hr'g Tr., June 22, 2026, ECF No. 963). It remains unclear to the Court how its instructions can be comprehensible to one party, here the United States, and so vexing to the other that an essentially emergency motion for clarification is necessary. It is also plain to the Court that SWPs' Motion does not seek clarification—it is nothing more than yet another attempt to change the Court's mind. Therefore, SWPs' Motion is **DENIED**.

Motions to "clarify" are not intended to allow parties to relitigate issues already decided. *United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 315 F. Supp. 3d 90, 99 (D.D.C. 2018) (citing *United States v. Philip Morris USA, Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011) ("The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend."); *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1359–62 (Fed. Cir. 2004) (district court abused its discretion by not granting "motion to clarify, vacate, or modify [its] injunction" where the court had "impermissibly expand[ed] the scope of the . . . [i]njunction."). The issue SWPs now express confusion about is one the Court has addressed on multiple prior occasions. The "clarification" SWPs seeks is a pretense relating to an issue already resolved.

The Court has been consistent in expressing its expectations—the trial of SWPs' claims is intended to fully maximize the time available to the parties and the Court in order to ensure the speedy and just determination of the actions now pending for over three decades. At the suggestion of the parties, the Court adopted the parties' grouping of claims. (July 25, 2026 JSR; Trial Mgmt. Order). Having set aside multiple two-week periods for trial, the Court has stressed that those periods will be fully utilized and that the parties should be prepared accordingly. (Trial Mgmt. Order). Setting aside two weeks for each trial period, only using three days of that period (as an example) and then recessing until the next two week period is not only wasteful, it

precludes the Court from trials in other matters. The Court has allowed the parties to select the order of the claims presented—on the condition that "each entire two-week period is utilized to the fullest extent and trial is proceeding efficiently." (*See* Trial Mgmt. Order at 2; *see also* July 25, 2026 JSR). Even if genuine confusion exists regarding the Court's April 21, 2026 Order, the time to address that issue was then, not nearly three months later and only days before trial.

### V.    Conclusion

In accordance with the Court's foregoing analysis:

1) The United States' Motion *in Limine*, (ECF No. 916), is **GRANTED-IN-PART** and **DENIED-IN PART**;

2) The United States' Motion to Exclude the Expert Testimony of Dr. Stephen Roulac, (ECF No. 918), is **GRANTED**;

3) SWPs' Motion for Leave to File and Designate Deposition Transcripts for Trial, (ECF No. 929), is **GRANTED-IN-PART**, **DENIED-IN-PART**, and **DEFERRED-IN-PART**;

4) The United States' Motion for Leave to File Deposition Transcripts and Designations, (ECF No. 930) is **GRANTED**; and

5) SWPs' Motion for Clarification, (ECF No. 975), is **DENIED**.

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge

41